# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., TempsNow Employment and Placement Services LLC, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No.: 1:23-cv-16208 ) ) |
| Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiffs Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., and TempsNow Employment and Placement Services LLC, by their attorneys at Locke Lord LLP, complain of Defendant Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, as follows:

## NATURE OF PLAINTIFFS' CLAIMS

1.      Plaintiffs Staffing Services Association of Illinois and American Staffing Association (collectively the "Trade Association Plaintiffs"), along with Plaintiffs ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc. and TempsNow Employment and Placement Services LLC (collectively the "Staffing Agency Plaintiffs"), bring this case to secure necessary preliminary and permanent injunctive relief addressing multiple violations of the Illinois and United States Constitutions. Recently enacted amendments to the Illinois Day and Temporary Labor Services Act (820 ILCS 175 *et seq.*), as well as accompanying emergency and proposed regulations (Ill. Admin. Code tit. 56, §§ 260.100 *et seq.*), violate the Supremacy Clause of the United States

Constitution and are therefore preempted by the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001 *et seq.*), the Patient Protection and Affordable Care Act (42 U.S.C. §§ 18001 *et seq.*), and the National Labor Relations Act (29 U.S.C. §§ 151 *et seq.*).

2.      In addition, certain provisions in the recent amendments to the Illinois Day and Temporary Labor Services Act, alongside their related regulations, which are administered and enforced by Defendant Jane R. Flanagan in her capacity as Director of the Illinois Department of Labor, also violate the Illinois and United States Constitutions' due process clauses. U.S. Const. amend. XIV, § 1; Ill. Const. art. I, § 2.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 because the claims arise under federal statutes and the U.S. Constitution. This Court has supplemental jurisdiction of Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

4.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

## PARTIES

5.      Plaintiff Staffing Services Association of Illinois (individually "SSAI") is an Illinois not-for-profit corporation with its principal place of business in Springfield, Illinois. SSAI conducts operations throughout the State of Illinois, including within the Northern District of Illinois. SSAI is a trade association that promotes the interests of its thirty members that are temporary staffing agencies operating throughout the State of Illinois.

6.      Plaintiff American Staffing Association (individually "ASA") is a Virginia non-stock corporation with its principal place of business in Alexandria, Virginia. ASA promotes the

interests of temporary staffing agencies operating in the State of Illinois, including within the Northern District of Illinois and throughout the United States.

7.     Plaintiff ClearStaff Inc. (individually "ClearStaff") is an Illinois corporation with its principal place of business in this District. ClearStaff is a staffing agency that specializes in meeting the needs of corporations in Illinois, including in this District, which need temporary labor services. ClearStaff typically employs over 2,000 individuals in the State of Illinois in a given week and sends them out to work at over 300 third-party clients, some of whom have multiple worksites. ClearStaff is an SSAI member.

8.     Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc. (individually "AllStaff") is an Illinois corporation that is principally located within this District. AllStaff is an employment agency that specializes in meeting the needs of corporations in manufacturing and industrial environments. AllStaff operates in multiple states, including serving the needs of clients located in this District. AllStaff typically employs over 3,000 field employees in the State of Illinois in a given week and sends them out to work at over 100 third-party clients, many of whom have multiple worksites. AllStaff is an SSAI member.

9.     Plaintiff TempsNow Employment and Placement Services LLC (individually "TempsNow") is a Delaware corporation with its principal place of business in the Northern District of Illinois. TempsNow is a staffing agency that specializes in meeting the needs of Illinois corporations, including those in this District, which need temporary labor services. TempsNow typically employs approximately 400 temporary individuals in the State of Illinois in a given week and sends them out to work at approximately thirty third-party clients. TempsNow is an SSAI member.

10.     The Staffing Agency Plaintiffs are registered day and temporary labor service agencies under the Day and Temporary Labor Services Act. A "Day and Temporary Labor Service Agency" is "any person or entity engaged in the business of employing day and temporary laborers to provide services, for a fee, to or for any third party client pursuant to a contract with the day and temporary labor service agency and the third party client, and which is located, operates, or transacts business within the State of Illinois." 820 ILCS 175/5; *see also* Ill. Admin. Code tit. 56, § 260.100.

11.     Defendant Jane R. Flanagan is the Director of the Illinois Department of Labor ("IDOL"). As the leader of the IDOL, Ms. Flanagan is the official responsible for the administration and enforcement of the Illinois Day and Temporary Labor Services Act, including the amendments and rules associated with those amendments.

## BACKGROUND FACTS

**I.      The Temporary Staffing Industry Is an Integral Part of the Illinois Economy.**

12.     According to the findings of the Illinois General Assembly, more than 650,000 people work as day or temporary laborers in the State of Illinois. 820 ILCS 175/2. Day and temporary laborers are those who contract "for employment with a day and temporary labor agency." 820 ILCS 175/5.

13.     Illinois law defines "day or temporary labor" as "work performed by a day or temporary laborer at a third party client, the duration of which may be specific or undefined, pursuant to a contract or understanding between the day and temporary labor service agency and the third party client" and does not include "labor or employment of a professional or clerical nature." 820 ILCS 175/5.

14. For workers, employment as a "temp" meets a need for short-term, flexible employment. Because temporary workers can refuse assignments and take extended—and even unplanned—breaks from working, "temping" can provide the flexibility needed to balance work with other commitments, such as family responsibilities, school, and other employment. Temporary work is also useful for people looking to enter or re-enter the workforce. Temping is attractive to stay-at-home parents, workers with seasonal jobs, students, immigrants, and retired workers.

15. Employment with a temporary staffing agency also gives workers opportunities to obtain experience and training, explore the local labor market, and test a variety of job settings before making a permanent commitment, that is, being directly hired by the company at which the temporary employee has been placed. Some workers simply prefer the variety of temporary assignments to the routine of a regular job.

16. Temporary staffing agencies hire individuals as employees and then offer agency clients flexible staffing, candidate screening, and the opportunity to try out potential hires before committing to a direct-hire employment arrangement. Temporary staffing agencies also allow employers to ramp up quickly and scale down rapidly depending on the ebb and flow of demand. Companies may turn to staffing agencies for temporary workers until permanent staff are hired. Companies may also source potential direct hires.

17. Ultimately, reliance on staffing agencies allows light industrial companies, such as manufacturing and distribution companies, the chance to compete more effectively by focusing on growing their businesses, while outsourcing the task of sourcing qualified individuals to perform the work that is needed. Temporary staffing agencies promote the growth of commerce and

industry throughout the State of Illinois by helping their clients meet their staffing needs more efficiently.

## II.     Illinois Amends the Day and Temporary Labor Services Act.

18.      The Illinois Day and Temporary Labor Services Act ("DTLSA") has regulated Illinois' temporary staffing industry since its enactment in 2006.

19.      For example, since passage of the DTLSA in 2006, temporary staffing agencies have been required to register to do business in the State of Illinois. The DTLSA has also always provided that staffing agencies must provide their employees with a detailed itemized statement providing information such as the number of hours worked at each third-party client and the rate of payment for each hour worked. The DTLSA has also always provided a minimum four-hours of pay, at the agreed rate of pay, whenever a temporary laborer is assigned to work at a third-party client's worksite but is not utilized by the third party client.

20.      The Illinois General Assembly passed amendments to the DTLSA in the Spring of 2023. In its findings, the General Assembly noted that the number of individuals working as temporary employees in Illinois has risen from 300,000 in 2006 to more than 650,000 in 2023. 820 ILCS 175/2.

21.      One of the amended provisions provides that a temporary employee is to be provided equal pay and equivalent benefits after working at a particular client site for ninety days in a twelve-month period.

22.      No guidance was provided as to how, for example, "equivalent benefits" were to be determined, the effect of existing laws, or the negative financial impact that such a vague requirement imposed upon the temporary staffing industry.

23.      The amendments were immediately effective upon being signed into law on August 4, 2023. The IDOL enacted emergency rules on August 7, 2023, based on a purported emergency.

The IDOL published proposed permanent rules on August 18, 2023 that were substantially identical to the emergency rules.

24.     The Joint Committee on Administrative Rules ("JCAR") objected to the IDOL's emergency rules and stated on September 13, 2023:

> JCAR objects to the Department of Labor's emergency rule titled Day and Temporary Labor Services Act (56 IAC 260; 47 Ill Reg 12457) because the rulemaking is too vague to provide meaningful guidance to employers looking to comply with its requirements, especially small businesses. 1 Ill. Adm. Code 230.400(a)(3)(E) requires agencies to use simple and clear language that can be understood by the persons and groups the rulemaking will affect and 1 Ill. Adm. Code 230.400(a)(3)(B) requires agencies to consider the economic effect of the rules upon those regulated, including small businesses. By not using clear standards that are applicable to all sizes of employers for purposes of determining comparators and calculations for hourly cash equivalents of benefits, the Department has created immediate confusion, rather than workable standards regulated entities can use to demonstrate compliance with PA 103-437. Additionally, the Committee wishes to remind the agency that an immediate effective date of a Public Act is not necessarily grounds for an emergency rulemaking.

Jt. Comm. on Admin. Rules, The Flinn Report, 47 ILL. REG. 37, 5 (2023).

25.     The IDOL heard public comments on the proposed rules on September 28, 2023. The IDOL has not yet finalized the proposed permanent rules.

26.     On November 9, 2023, the Illinois General Assembly enacted an amendment to delay the effective date of the "equivalent pay and equivalent benefits" provision of the DTLSA (820 ILCS 175/42) until April 1, 2024. The Governor signed this amendment into law on November 17, 2023.

## III.    The DTLSA Amendments and Related Regulations Impose Burdensome and Impermissible Restrictions on Staffing Agencies and Their Clients.

27.     The amendments to the DTLSA and related regulations include several unworkable provisions that have caused—and will continue to cause—harm to the Staffing Agency Plaintiffs,

the Trade Association Plaintiffs and their members, the Staffing Agency Plaintiffs' business partners, and Illinois companies that use temporary staffing agencies.

28.     All Plaintiffs are amenable to reasonable regulation of the temporary staffing industry. Reasonable minds can differ as to the parameters for reasonable regulations, but no reasonable debate can be had about the crippling impact of the amendments to the DTLSA and related regulations. They impose extraordinary burden, cost, and compliance risk in violation of federal law. The amendments and related regulations essentially guarantee non-compliance because compliance is literally impossible.

29.     This challenge is exacerbated by the fact that non-compliance risks loss of licensure, exposure to statutory penalties, and endless lawsuits from uninjured, "interested" third parties that claim to monitor compliance with statutory requirements.

## A. The Equivalent Benefits Provision Imposes Substantial and Impermissible Burdens.

30.     Under the newly adopted Section 42 of the DTLSA, temporary staffing agencies operating in Illinois must ensure their employees are paid the same or better wages, and receive equivalent benefits, as those received by the lowest paid, comparable, directly-hired employee employed by the temporary staffing agency's third-party client whenever a temporary employee works at a particular worksite for more than ninety days within a twelve-month period. 820 ILCS 175/42. Alternatively, an agency "may pay the hourly cash equivalent of the actual cost benefits [sic] in lieu of benefits required under this Section." *Id.* Section 42 thus provides two options, neither of which are viable.

31.     Section 42's requirement that agencies "pay" equivalent benefits may seem like a reasonable rule to those that do not operate staffing agencies or light industrial companies with the

need for temporary labor. But it is shockingly far from workable in practice, extraordinarily costly and burdensome, and is inconsistent with federal regulation.

32.     Section 42 and its related regulations purport to require a never-ending, multistep process that first requires identification of the direct-hired employee that is most comparable to the temporary employee. *See id.* This task is burdensome given that third-party clients may have a vast pool of potential candidates for this comparable employee, and their actual cost of benefits varies from candidate to candidate and depends on individual employee decisions because individual employees (1) can accept or reject benefits, (2) have individual circumstances that affect their benefits, such as having a spouse and/or child(ren), and (3) have preferences for more coverage or less coverage.

33.     Thus, for example, group life insurance is often offered as a benefit to directly-hired employees of the Plaintiff temporary staffing agencies' third-party clients. But the participation in life insurance as a benefit differs from employee to employee. Some employees reject the benefit because it comes with an employee contribution that reduces the employee's pay-day compensation. Other employees may accept the offer of life insurance, but they may opt in or out of coverage for their spouse and/or dependent school-aged children because they may or may not see value in life insurance on their spouse or their school-aged children. Some employees may be willing to fund the maximum available coverage while others may prioritize maximizing their compensation and only secure half the maximum available coverage. There is therefore substantial variance between potentially comparable employees when it comes to identification of (1) their life insurance benefits and (2) the actual cost of their life insurance benefits.

34.     Similarly, participation in retirement plans varies from employee to employee at third-party clients. Although some hourly-wage employees find participation in a 401(k) or other

retirement plan attractive, a substantial portion refuse to contribute to a retirement plan, even when their employer offers a generous matching contribution, in favor of larger paychecks. Among employees that contribute, the amount contributed typically varies, and it is often below the threshold for a matching contribution. In addition, there are often vesting periods for matching contributions. These variables mean actual cost for any matching contribution varies by employee and changes over time. There is therefore substantial variance between potentially comparable employees when it comes to identification of (1) their retirements benefits and (2) the actual cost of their retirement benefits.

35.    Similarly, participation in health insurance plans varies from employee to employee at third-party clients. Some employees opt out of health insurance coverage, preferring—again—to prioritize maximization of their cash compensation. Other employees are interested in opting in, but they typically have a range of health care options, including plans offer a lower premium and more limited benefits and plans that require payment of a higher premium or larger exposure to out-of-pocket medical expenses. There is therefore substantial variance between potentially comparable employees when it comes to identification of (1) their health care benefits and (2) the actual cost of their health care benefits.

36.    Additionally, participation in leave plans and other fringe benefits varies greatly from employee to employee and company to company. Some employees take advantage of policies that allow uncompensated family leave and others do not. Some employees are in a position to take advantage of leave policies that authorize additional unpaid leave for certain purposes, such as attendance at school events or family bereavement. Others are not. Some employees are in position to take advantage of tuition reimbursement programs and others are not. Some employees need to take advantage of sick leave opportunities and others do not. Some employees take

advantage of carry-over programs that allow unused paid leave days to carry-over to the next year up to a cap. Companies may be subject to differing local, state or federal laws concerning sick leave, protected leave or paid leave depending on the situs of the company or number of employees. Some leave programs use a front-loading approach; others use an accrual approach, such that two companies with the same number of paid days off will have very different actual costs depending on when actual costs are assessed. There is therefore substantial variance between potentially comparable employees when it comes to identification of (1) their leave and other fringe benefits and (2) the actual cost of their leave and other fringe benefits.

37.     The same variance exists for other benefits, including but not limited to dental, vision, employee stock ownership plans, disability plans, and accidental death and dismemberment benefits.

38.     The result of all these options is that the "benefit bundle" for any given employee that qualifies as a potential comparable direct-hire employee at the third-party client of a temporary staffing agency is unique. Nevertheless, the agency must ensure its employees are "paid" the same benefits, or alternatively, the actual cost of the benefits of the singular comparable employee from a pool that often consists of hundreds of potentially comparable employees, all of whom have a unique "benefit bundle" that changes over time. Agencies must do the same when the cohort of potential comparable employees is non-existent, which happens in the relatively common situation where a third-party client has no hourly, direct-hire employees or only has unionized hourly employees with substantial years of experience and commensurate benefits. This calculus is further complicated when the agency's employee works a five-month assignment at one third-party client and then works a five-month assignment at another third-party client within the same twelve-month period. The bundle is subject to change dependent on the assignment.

39. Thus, properly identifying the legally compliant benefits that must be "paid" or even the "actual cost" of the benefits that must be paid is, at least, extraordinarily burdensome, costly, and risky. As a practical matter, it is also impossible.

40. Provisions of a state statute imposing these obligations are impermissible under the uniform scheme of federal regulation of employee retirement and health insurance plans.

41. "Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002) (citing *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712 (1985); U.S. Const. art. VI, cl. 2).

42. The Employee Retirement Income Security Act of 1974 ("ERISA") sets out a comprehensive system for the federal regulation of private employee benefit plans. *See D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992); 29 U.S.C. § 1001 *et seq.*

43. ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "ERISA's pre-emption provision assures that federal regulation of covered plans will be exclusive." *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992). ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a).

44. The Patient Protection and Affordable Care Act ("ACA") also preempts state laws that hinder or impede its implementation of uniform rules governing the provision of health care plans. *See, e.g., UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 91–92 (2d Cir. 2020) ("New York's regulation interferes with, indeed reverses, some of the central 'criteria and

methods' that HHS, acting within its statutory authority, established for implementing a risk adjustment program and methodology" under the ACA).

45.     Although ERISA is the exclusive source of rules and remedies for private employee benefit plans, and the ACA governs the provision of heath care plans, the amendments to the DTLSA and the related regulations promulgated by the IDOL, purport to require that certain employees be "paid" certain benefits.

46.     Alternatively, the DTLSA and the related regulations promulgated by the IDOL purport to require the disclosure/assessment of information about the comparable employee so that the "actual cost" of the comparable employee's benefits can be paid in lieu of the benefits required by Section 42.

47.     Under Section 70 of the DTLSA, the IDOL has authority to conduct investigations, conduct hearings in accordance with the Illinois Administrative Procedure Act, issue civil penalties ranging from $100 to $18,000 per violation ("DTLSA Penalties"), and/or commence a civil action through the Illinois Attorney General to address violations of Section 42 and other provisions in the DTLSA and related regulations. 820 ILCS 175/70. Non-compliance can result in the IDOL issuing cease and desist orders, suspending or revoking the registration of a staffing agency, and/or imposing DTLSA Penalties.

48.     In addition, and as described more fully below, statutorily defined "interested" parties may commence civil actions under the amendments to the DTLSA against staffing agencies and/or their third-party clients in the event they believe there have been violations of Section 42, regardless of whether the IDOL has investigated the alleged violations and decided they have no merit or have been cured. 820 ILCS 175/67.

49. An interested party, which is defined in Section 5 of the DTLSA as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements" may recover statutory penalties for any non-compliance with Section 42. 820 ILCS 175/5. "In an action brought pursuant to this Section, an interested party may recover against the covered entity any statutory penalties set forth in [S]ection 70 and injunctive relief." 820 ILCS 175/67.

50. Temporary staffing agencies therefore face loss of licensure, substantial and potentially catastrophic statutory penalties, and civil actions by a potentially infinite number of uninjured third parties for perceived violations of Section 42. This liability risk imposes long-term burdensome and costly recordkeeping and compliance obligations, as well as prolonged individualized decision-making concerning benefits.

## B. The Labor Dispute Provision Imposes Impermissible State Regulation.

51. Under Section 11 of the DTLSA, temporary staffing agencies must disclose the existence of strikes, lockouts, and other "labor dispute[s]" at any client site to which an employee is assigned. 820 ILCS 175/11. "Labor dispute[s]" are defined under the related regulations as more than the typical strikes and lockouts; they include "any controversy concerning wages, hours, terms or conditions of employment," a very broad definition that could encompass confidential disputes regarding claims of age discrimination and disputes over modest issues such as debates over the preferred time for a lunchbreak. *See* Ill. Admin. Code tit. 56, § 260.100. These rights exceed the rights that directly-hired employees have to disclosure of this information.

52. In addition to this broad disclosure obligation, the DTLSA bars temporary staffing agencies from taking adverse employment action against any agency employee that refuses an assignment after being apprised of the existence of a "labor dispute."

-14-

53. The Illinois Supreme Court held in *People v. Federal Tool & Plastics*, 62 Ill. 2d 549 (Ill. 1975) that the National Labor Relations Act ("NLRA") preempted an Illinois statute requiring employers to disclose the existence of labor disputes in any advertisement for replacement workers during strikes. Statutes requiring disclosure of the existence of a strike or other labor dispute "encumber[] the employer's right to hire" replacement labor, which is governed exclusively by the NLRA. *Id.* at 554; *see also United Auto Workers v. C.M. Smillie Co.*, 139 Mich. App. 731, 735 (1984) (finding the NLRA preempted a Michigan statute requiring the advertising of labor disputes because such regulation "directly affects the employer's success in hiring replacements," which is a right protected and governed exclusively by the NLRA).

54. In addition to the impermissible disclosure obligations, the NLRA likewise preempts the DTLSA's protection to workers from adverse employment actions. If an agency's employee refuses to break a picket line, replace a locked-out employee, or otherwise work at a worksite that they have been advised is experiencing a "labor dispute," then the staffing agency must provide the temporary employee "another assignment" and refrain from "retaliation," which includes a long list of adverse employment actions. *See* Ill. Admin. Code tit. 56, §§ 260.401(b).

55. Plaintiffs do not challenge the concept that employees should not suffer retaliation for refusing a work assignment for a valid reason. However, this new statutory right to protection, after refusing to accept an assignment, impermissibly encroaches on an area of labor law exclusively regulated by the federal government. The NLRA protects nonunion employees—such as temporary employees—under certain circumstances. *See, e.g.*, *NLRB v. Washington Aluminum Co.,* 370 U.S. 9 (1962). For example, nonunion employees that refuse to cross a picket line are protected under Section 7 of the NLRA. *See e.g., Pride Ambulance Co.,* 356 N.L.R.B. 1023, 1040 (2011) (holding that employer violated Section 8(a)(3) by terminating non-union employee who

refused to replace a striking worker); *Beth Israel Med. Ctr.,* 292 N.L.R.B. 497, 498–99 (1989) (finding non-union employee's refusal to cross picket line to be protected union activity). Section 7 states: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . ." 28 USC § 157. So-called *Garmon* preemption prevents states from regulating conduct that is protected or prohibited, or even arguably affected by, Section 7 of the NLRA. *See San Diego Bldg. Trades Council, Millmen's Union v. Garmon*, 359 U.S. 236, 246–47 (1959).

56. The DTLSA and related regulations impermissibly expand the rights of temporary employees who refuse to participate in a labor dispute or work for a struck, picketed, or locked-out employer by granting them a right to be reassigned. "Labor law preemption applies . . . when a State acts 'as regulator of private conduct' with an 'interest in setting policy' that is different from the policy of the federal government." *Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018) (citing *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 229 (1993)).

        **c.    The "Interested" Parties Provision Violates Due Process Requirements Because It Is Arbitrary, Capricious, Unreasonable, and Oppressive.**

57. Under Section 67 of the DTLSA, one or more "interested" parties, which are "organizations" that are "attentive to compliance" with "statutory requirements," may commence lawsuits against any staffing agency and/or their third-party client whenever they believe the DTLSA has been violated. 820 ILCS 175/67. These "interested" parties may recover "any statutory penalties set forth in Section 70" of the DTLSA as well as secure injunctive relief, presumably in favor of individuals who are not participating in the proceeding.

-16-

58.     Nothing in the DTLSA requires these interested parties to be injured or subject to potential injury. Furthermore, nothing in the DTLSA would stop two or more interested parties from asserting the same claim against the same agency or third-party client. Perhaps more troubling, interested parties have the right to commence civil actions after a cooling off period even after the IDOL determines the violation the interested party believes to exist is unjustified or that the named party has cured the alleged violation to the satisfaction of the IDOL Director. 820 ILCS 175/67.

59.     As a result, the DTLSA authorizes lawsuits by third parties without injury that have no nexus to the defendant or the conduct at issue. Similar laws have been found to be unconstitutional because they are oppressive, arbitrary, and unreasonable. *See, e.g.*, *Wingert by Wingert v. Hradisky*, 2019 IL 123201, ¶¶ 28-29, 131 N.E.3d 535, 542 (observing that statutes must "require a direct and transactional relationship between the plaintiff and the defendant").

60.     The DTLSA is particularly arbitrary, oppressive, and unreasonable because it exposes temporary staffing agencies and their clients to potentially infinite lawsuits, from an infinite number of organizations, which claim to monitor statutory requirements. This is because the penalties the organizations can recover are substantial, and settlements with a particular interested party do not extinguish the defendant's exposure for its alleged statutory violation to other so-called interested parties.

61.     The problem with the "interested" parties provision is not merely hypothetical. An organization, the "Chicago Workers Collaborative," filed a DTLSA complaint in October 2023 with the IDOL. Even if the IDOL considers the complaint unjustified or that the violations have been cured to its satisfaction, the Chicago Workers Collaborative will nonetheless be able to file a civil action regarding their Complaint and seek compensation in return for dismissing its claim.

**IV.    The DTLSA Amendments and Related Regulations Are Causing Irreparable Harm**

62.     Plaintiffs are led by SSAI and ASA. SSAI and ASA are, respectively, Illinois and national trade associations consisting in whole or in part of members that are temporary staffing agencies operating throughout Illinois, including within this District.

63.     SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs are currently suffering and will continue to suffer irreparable harm because of the DTLSA amendments and related regulations. Specifically, the DTLSA amendments and related regulations have caused clients of temporary staffing agencies, such as the Staffing Agency Plaintiffs, to refrain from using Staffing Agency Plaintiffs', and members of the Trade Association Plaintiffs', services for longer-term needs out of fear that compliance with the DTLSA's equal pay and equal benefits provision is impossible and the legal consequences of non-compliance are potentially catastrophic.

64.     SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs are currently suffering and will continue to suffer irreparable harm by being subjected to the unconstitutional provisions of the DTLSA and related regulations. The unconstitutional provisions of the DTLSA and related regulations have also substantially increased operating costs and impaired the equity value of staffing agencies operating in the State of Illinois, including SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs.

65.     These ongoing injuries are redressable by enjoining Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the unconstitutional provisions of the amendments to the DTLSA and the related proposed rules.

66.     Plaintiffs have no adequate remedy at law.

67.     None of the issues raised in this action relate to worker safety or worksite hazards. The issues raised herein are purely economic matters.

### COUNT ONE
**Violation of the Supremacy Clause of the United States Constitution—
Preemption by the Employee Retirement Income Security Act of 1974**

68.     Plaintiffs repeat and reallege paragraphs 1–67.

69.     The Employee Retirement Income Security Act of 1974 ("ERISA") (29 U.S.C. §§ 1001 *et seq.*) is a federal statute governing the regulation and administration, as well as compliance enforcement, of employee benefits plans established or maintained by private employers in the United States.

70.     ERISA does not obligate employers to establish benefits plans.

71.     Section 42 of the DTLSA amendments require temporary staffing agencies to pay their employees either the (1) equivalent benefits received by the lowest paid, comparable, and directly hired employee of the employer or (2) the actual cost of those benefits. 820 ILCS 175/42.

72.     The equivalent benefits provision and related regulations of the DTLSA therefore relate to ERISA plans. 820 ILCS 175/42; Ill. Admin. Code tit. 56, § 260.445.

73.     As discussed above, agencies face two nonviable options. Option one forces temporary staffing agencies to design and administer additional ERISA plans, which is prohibited by ERISA.

74.     Option two is connected with, and references, ERISA plans. This option forces temporary staffing agencies to incur the burden and expense of gathering and assessing information. This option also imposes a duty to make discretionary calculations about the design and administration of ERISA and non-ERISA benefits to identify the actual cost of the two possible benefit regimes, as well as the benefits owed to affected temporary employees.

75.     The equivalent benefits and actual cost provisions of Section 42 and its related amendments are therefore preempted by ERISA. Plaintiffs respectfully request this Court preliminarily and permanently enjoin Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the equivalent benefits and actual cost provisions of Section 42.

### COUNT TWO
### Violation of the Supremacy Clause of the United States Constitution—
### Preemption by the Patient Protection and Affordable Care Act

76.     Plaintiffs repeat and reallege paragraphs 1–75.

77.     State laws that hinder or impede the implementation of the Patient Protection and Affordable Care Act ("ACA") (42 U.S.C. §§ 18001 *et seq.*) are preempted under the Supremacy Clause of the United States Constitution.

78.     The ACA contains an employer mandate that urges companies to offer health insurance by imposing penalties if they fail to do so. *See generally* 26 U.S.C. § 4980H.

79.     Compliance with the employer mandate is typically achieved by embracing a statutory "safe harbor" that requires uniform and consistent treatment of all similarly situated employees.

80.     The equivalent benefits provision of the DTLSA amendments prevent large employers such as the agency Plaintiffs from taking advantage of the ACA's safe harbor by mandating different health plans for different employees depending on their assignments.

81.     Likewise, Illinois' new statutory requirement in connection with the equivalent benefits mandate that agencies open a new enrollment window anytime a person works as a temporary employee in the same worksite for more than ninety days in a twelve-month period hinders and impedes the ACA's uniform implementation. In a given twelve-month period a person

could work as a temporary employee at numerous worksites thereby entitling that employee to multiple new enrollment windows in contravention of the ACA's uniform implementation. This is also yet another example of where a temporary laborer will have more rights than a directly-hired employee.

82.     The equivalent benefits and actual cost provisions of Section 42 and its related amendments are therefore preempted by the ACA. 820 ILCS 175/42; Ill. Admin. Code tit. 56, § 260.445. Plaintiffs respectfully request this Court preliminarily and permanently enjoin Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the equivalent benefits and actual cost provisions of Section 42.

## COUNT THREE
### Violation of the Supremacy Clause of the United States Constitution—Preemption by the National Labor Relations Act

83.     Plaintiffs repeat and reallege paragraphs 1–82.

84.     The National Labor Relations Act governs labor relations among private employers and employees in the United States.

85.     Section 11 of the DTLSA amendments and accompanying regulations requires temporary staffing agencies to give temporary employees advance written notice of "labor dispute[s]" at their assigned employers. "Labor dispute[s]" include strikes, lockouts, or other "labor trouble." 820 ILCS 171/11; Ill. Admin. Code tit. 56, §§ 260.400(a)(9).

86.     If a temporary employee refuses to work for a client experiencing a "labor dispute," then the temporary staffing agency must provide the temporary employee "another assignment" and refrain from retaliation. 820 ILCS 171/11; Ill. Admin. Code tit. 56, §§ 260.401(b).

87. The labor-dispute warning provision regulates economic and bargaining positioning despite Congress' decision to leave such matters to the discretion of private employers and employees. *See Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140 (1976)). States may not regulate "areas that Congress left to the free play of economic forces. By protecting against state interference with policies implicated by the structure of the NLRA, *Machinists* preemption preserves Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons." *Cannon v. Edgar,* 33 F.3d 880, 885 (7th Cir. 1994) (citation omitted).

88. The DTLSA amendments and regulations also impermissibly increase employees' protected Section 7 rights under the NLRA. *See Keehr v. Consol. Freightways of Delaware, Inc.,* 825 F.2d 133, 136 (7th Cir. 1987) (stating *Garmon* preemption "prohibits states from regulating conduct protected, prohibited or arguably affected by sections 7 and 8" of the NLRA).

89. The NLRA preempts Section 11 and its associated regulations. 820 ILCS 171/11; Ill. Admin. Code tit. 56, §§ 260.100, 401. Plaintiffs respectfully request this Court preliminarily and permanently enjoin Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing Section 11.

### COUNT FOUR
### Violation of the Due Process Clauses of the United States and Illinois Constitutions

90. Plaintiffs repeat and reallege paragraphs 1–90.

91. Section 67 of the DTLSA amendments and its related regulations authorize "interested" parties to commence a civil action against both temporary staffing agencies and the clients of temporary staffing agencies if the interested party has a reasonable belief there has been

a violation of the Temporary Laws. 820 ILCS 175/67; Ill. Admin. Code tit. 56, §§ 260.100, 200, & 220.

92.     Section 67 is arbitrary, capricious, unreasonable, and oppressive.

93.     Section 67 therefore violates the Due Process Clauses of the Illinois and United States Constitutions. U.S. Const. amend. XIV, § 1; Ill. Const. art. I, § 2. Plaintiffs respectfully request this Court preliminarily and permanently enjoin Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing Section 67 of the DTLSA.

## PRAYER FOR RELIEF

94.     Plaintiffs respectfully request this Court enter an Order and Judgment granting the following relief:

A.     Preliminarily and permanently enjoining Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the "equivalent benefits" and "actual costs" provisions of the DTLSA (820 ILCS 175/42; Ill. Admin. Code tit. 56, §§ 260.100, 445) due to being preempted by ERISA (29 U.S.C. §§ 1001 *et seq.*) and the ACA (42 U.S.C. §§ 18001 *et seq.*);

B.     Preliminarily and permanently enjoining Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the "labor dispute" warning and anti-retaliation provisions of the DTLSA and related amendments (820 ILCS 171/11; Ill. Admin. Code tit. 56, §§ 260.100, 401) due to being preempted by the NLRA (29 U.S.C. §§ 151 *et seq.*);

C.      Preliminarily and permanently enjoining Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the interested parties provision of the DTLSA (820 ILCS 175/67; *see also* Ill. Admin. Code tit. 56, §§ 260.100, 200, & 220) due to violating the Due Process Clauses of the United States and Illinois Constitutions (U.S. Const. amend. XIV, § 1; Ill. Const. art. I, § 2);

D.      Award Plaintiffs their reasonable expenses, including attorneys' fees, pursuant to 5 ILCS 100/10-55(c); and

E.      For any other relief this Court deems appropriate.

DATED:  November 22, 2023                    Respectfully Submitted,

                                             /s/ *Matthew T. Furton*
                                             Matthew T. Furton
                                             (mfurton@lockelord.com)
                                             Julie C. Webb
                                             (jwebb@lockelord.com)
                                             Heidi L. Brady
                                             (heidi.brady@lockelord.com)
                                             Joshua A. Skundberg
                                             (josh.skundberg@lockelord.com)
                                             Locke Lord LLP
                                             111 South Wacker Drive
                                             Chicago, IL 60606

                                             AND

                                             Carl C. Scherz, *Pro Hac Vice Forthcoming*
                                             (cscherz@lockelord.com)
                                             Locke Lord LLP
                                             2200 Ross Avenue
                                             Dallas TX, 75201
                                             *Attorneys for Plaintiffs*

                                             AND

Bradley S. Levison
(brad@hlhlawyers.com)
Herschman Levison Hobfoll PLLC
401 S. LaSalle St.
Ste. 1302G
Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc.*