**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., TempsNow Employment and Placement Services LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No.: 1:23-cv-16208 |
| Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, | ) ) ) | |
| Defendant. | ) ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR PRELIMINARY INJUNCTIVE RELIEF</u>**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

I.    The Temporary Staffing Industry Plays a Critical Role in the Illinois Economy. .......... 1

II.   Staffing Agencies in Illinois Have Been Regulated Since 2006. ................................ 3

III.  Illinois Recently Amended the DTLSA, and the IDOL Adopted New Regulations. ...... 3

    A.    The Equivalent Benefits Provision Imposes New Obligations. ............................... 4

    B.    The Labor Dispute Provision Imposes New Obligations. ........................................ 6

    C.    The "Interested" Parties Provision Exposes Employers to New Legal Risks. ........... 7

    D.    The Staffing Industry Had No Choice but to Commence this Action. ...................... 7

ARGUMENT ............................................................................................................... 8

I.    Plaintiffs Are Likely to Succeed on The Merits. ........................................................ 9

    A.    Plaintiffs Are Likely to Succeed on Their Claim that the Equivalent Benefits Provision Is Preempted by ERISA. ...................................................................... 9

        1.    The Equivalent Benefits Provision Connects with ERISA Plans. ........................ 10

        2.    The Equivalent Benefits Provision Has a "Reference to" ERISA Plans. ............ 17

    B.    Plaintiffs Are Likely to Succeed on Their Claim that the "Labor Dispute" Provision Is Preempted by the NLRA. ................................................................................ 18

        1.    The Warning Provision Differs from Federal Law. ........................................... 19

        2.    The Anti-Retaliation Provision Differs from Federal Law. ................................ 20

    C.    Plaintiffs Are Likely to Succeed on Their Claim that the "Interested Parties" Provisions of the DTLSA Are Unconstitutional. ................................................... 22

II.   Plaintiffs Have No Adequate Remedy at Law. ........................................................ 24

III.  Plaintiffs Are Suffering, and Will Continue to Suffer, Irreparable Harm. ................. 25

    A.    The Compliance Burden Imposed By A Preempted Law Is Irreparable Harm. ........ 25

    B.    Staffing Agencies Will Be Forced Out of Business Absent Injunctive Relief. ......... 26

    C.    It Is Impossible to Calculate Plaintiffs' Current and Future Harm. ...................... 27

IV.  The Balance of the Hardships Weighs in Favor of Plaintiffs. ................................... 28

V.   The Public Interest Favors Granting Preliminary Injunctive Relief. .......................... 28

CONCLUSION ........................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*520 S. Michigan Ave. Assocs., Ltd. v. Shannon*,
   549 F.3d 1119 (7th Cir. 2008) ........................................................................ 21

*Aetna Health Inc. v. Davila*,
   542 U.S. 200 (2004) ............................................................................... 11, 15

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) ........................................................................ 27

*Air Evac EMS., Inc. v. Dodrill*,
   548 F. Supp. 3d 580 (S.D.W. Va. 2021) ......................................................... 25

*Boomer v. AT & T Corp.*,
   309 F.3d 404 (7th Cir. 2002) .......................................................................... 9

*Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*,
   458 F. Supp. 3d 1044 (E.D. Wis. 2020) ......................................................... 26

*Cannon v. Edgar*,
   33 F.3d 880 (7th Cir. 1994) ........................................................................... 19

*Cannon v. Edgar*,
   825 F. Supp. 1349 (N.D. Ill. 1993), *aff'd*, 33 F.3d 880 (7th Cir. 1994) ........... 21

*Caterpillar v. Lyons*,
   318 F. Supp. 2d 703 (C.D. Ill. 2004) ............................................................. 20

*Chamber of Com. of U.S. v. Brown*,
   554 U.S. 60 (2008) ...................................................................................... 19

*Chamber of Com. of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... 19

*Collins v. Ralston Purina Co.*,
   147 F.3d 592 (7th Cir. 1998) .................................................................... 12, 18

*Cooper v. Salazar*,
   196 F.3d 809 (7th Cir. 1999) .......................................................................... 9

*Cvelbar v. CBI Illinois Inc.*,
   106 F.3d 1368 (7th Cir. 1997) ...................................................................... 18

*D.C. v. Greater Washington Bd. of Trade*,
    506 U.S. 125 (1992) ................................................................ 9, 10, 17

*D.U. v. Rhoades*,
    825 F.3d 331 (7th Cir. 2016) ........................................................... 9

*Doe v. Aetna Inc.*,
    No. 16 C 8390, 2017 WL 118417 (N.D. Ill. Jan. 12, 2017) ................... 11

*Duct-O-Wire Co. v. U.S. Crane, Inc.*,
    31 F.3d 506 (7th Cir. 1994) ...................................................... 26, 28

*Egelhoff v. Egelhoff*,
    532 U.S. 141 (2001) .......................................................... 9, 10, 11, 16

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987) ...................................................................... 18

*Foster v. Ghosh*,
    4 F. Supp. 3d 974 (N.D. Ill. 2013) .................................................. 28

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
    35 F.3d 1134 (7th Cir. 1994) ......................................................... 26

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016) ........................................................... 10, 13, 14

*Gould v. Lambert Excavating, Inc.*,
    870 F.2d 1214 (7th Cir. 1989) ....................................................... 29

*Gov't Suppliers Consolidating Servs., Inc. v. Bayh*,
    734 F. Supp. 853 (S.D. Ind. 1990) ............................................. 24, 25

*Health Ins. Plans v. Hudgens*,
    742 F.3d 1319 (11th Cir. 2014) ...................................................... 25

*Hess Newmark Owens Wolf, Inc. v. Owens*,
    415 F.3d 630 (7th Cir. 2005) ......................................................... 27

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
    471 U.S. 707 (1985) ..................................................................... 9

*Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden*,
    834 F. Supp. 2d 1091 (D. Idaho 2011) ............................................. 27

*Illinois Sporting Goods Ass'n v. Cnty. of Cook*,
    845 F. Supp. 582 (N.D. Ill. 1994) ................................................... 28

*Illusions Too Reality, LLC v. City of Harvey*,
No. 02 C 7272, 2003 WL 260335 (N.D. Ill. Feb. 4, 2003) ................................. 29

*Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*,
904 F.3d 490 (7th Cir. 2018) ............................................................ 18, 19, 20

*Jackson v. E.J. Brach Corp.*,
No. 94 C 6350, 1995 WL 319760 (N.D. Ill. May 26, 1995) ............................. 10

*Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.*,
450 F. Supp. 3d 815 (N.D. Ill. 2020) .................................................... 21

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ............................................................ 25, 27

*Lineback v. Chauffeurs, Teamsters, & Helpers Loc. Union No. 414*,
513 F. Supp. 2d 988 (N.D. Ind. 2007) .................................................... 29

*Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin*
*Emp. Rels. Comm'n*,
427 U.S. 132 (1976) ........................................................................ 19

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
486 U.S. 825 (1988) ........................................................................ 18

*Maine Forest Prod. Council v. Cormier*,
586 F. Supp. 3d 22 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) ........................... 25

*Martini v. Netsch*,
272 Ill. App.3d 693 (1st Dist. 1995) .................................................... 24

*MEDCARE HMO v. Bradley*,
788 F. Supp. 1460 (N.D. Ill. 1992) ...................................................... 29

*Merit Const. All. v. City of Quincy*,
759 F.3d 122 (1st Cir. 2014) .......................................................... 16, 17

*Michigan State AFL-CIO v. Callaghan*,
15 F. Supp. 3d 712 (E.D. Mich. 2014) .................................................... 22

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........................................................................ 25

*Nat'l Foreign Trade Council, Inc. v. Giannoulias*,
523 F. Supp. 2d 731 (N.D. Ill. 2007) .............................................. 24, 25, 29

*Nat'l Inst. of Fam. & Life Advocs. v. Raoul*,
No. 23 CV 50279, 2023 WL 5367336 (N.D. Ill. Aug. 4, 2023) ......................... 28

*NLRB v. Washington Aluminum Co.*,
370 U.S. 9 (1962) ......................................................................... 20

*O'Brien v. Town of Caledonia*,
748 F.2d 403 (7th Cir. 1984) ........................................................ 28

*People v. Federal Tool & Plastics*,
62 Ill. 2d 549 (Ill. 1975) ........................................................... 19, 20

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*,
699 F.3d 962 (7th Cir. 2012) ...................................................... 9, 28

*Pride Ambulance Co.*,
356 N.L.R.B. 1023 (2011) ............................................................. 20

*Retail Industry Leaders Ass'n v. Suffolk County*,
497 F. Supp. 2d 403 (E.D.N.Y. 2007) ...................................... 16, 17

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ........................................................ 26

*Rutledge v. Pharm. Care Mgt. Ass'n*,
141 S.Ct. 474 (2020) .................................................. 10, 12, 14, 17

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
359 U.S. 236 (1959) ................................................................. 21, 22

*Sharif v. City of Chicago*,
530 F. Supp. 667 (N.D. Ill. 1982) ................................................ 29

*Shaw v. Delta Air Lines, Inc.*,
463 U.S. 85 (1983) .......................................................... 10, 11, 12

*Smart v. Loc. 702 Int'l Bhd. of Elec. Workers*,
562 F.3d 798 (7th Cir. 2009) ........................................................ 22

*St. Louis Effort for AIDS v. Huff*,
782 F.3d 1016 (8th Cir. 2015) ...................................................... 14

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ................................................................. 24

*Turnell v. CentiMark Corp.*,
796 F.3d 656 (7th Cir. 2015) ............................................... 9, 25, 28

*United Auto Workers v. C.M. Smillie Co.*,
139 Mich. App. 731 (1984) ........................................................... 20

*Volkswagen AG v. iman365-usa*,
    No. 18-CV-06611, 2020 WL 977969 (N.D. Ill. Feb. 28, 2020) .......................................... 28

*W. Easton Two, LP v. Borough Council of W. Easton*,
    489 F. Supp. 3d 333 (E.D. Pa. 2020).................................................................................... 23

*Win Win Aviation, Inc. v. Richland Cnty., S.C. Sheriff's Dep't*,
    No. 15 C 50051, 2015 WL 1197534 (N.D. Ill. Mar. 16, 2015)............................................ 28

*Wingert v. Hradisky*,
    2019 IL 123201 ............................................................................................................. 23, 24

**Statutes and Rules**

820 ILCS 175/1 ............................................................................................................... 1, 3

820 ILCS 175/2 ................................................................................................................... 1

820 ILCS 175/5 ............................................................................................................. 7, 22

820 ILCS 175/6 ................................................................................................................. 16

820 ILCS 175/11 ............................................................................................... 3, 7, 19, 21

820 ILCS 175/30 ................................................................................................................. 3

820 ILCS 175/42 ........................................................................................................*passim*

820 ILCS 175/45 ................................................................................................................. 3

820 ILCS 175/50 ................................................................................................................. 7

820 ILCS 175/55 ........................................................................................................... 15, 24

820 ILCS 175/67 ........................................................................................................*passim*

820 ILCS 175/70 ........................................................................................................*passim*

820 ILCS 175/95 ............................................................................................................... 19

820 ILCS 175/570 ............................................................................................................. 16

29 U.S.C. § 157 ................................................................................................................. 20

29 U.S.C. § 1001 *et seq*. ..................................................................................................... 9

29 U.S.C. § 1021 ............................................................................................................... 11

29 U.S.C. § 1027 ........................................................................................................... 13, 15

29 U.S.C. § 1132(e) ........................................................................................ 15

29 U.S.C. § 1135 ........................................................................................... 15

29 U.S.C. § 1144 ............................................................................................. 9

29 U.S.C. § 1163 ........................................................................................... 14

I.R.C. § 401 ................................................................................................... 11

Employee Retirement Income Security Act of 1974 ........................................ *passim*

Fed. R. Civ. Proc. § 65 ..................................................................................... 8

Patient Protection and Affordable Care Act ..................................................... 1

Pub. Act 103-0437 ........................................................................................... 3

Pub. Act 103-0564 ........................................................................................... 4

**Other Authorities**

U.S. Const. art. VI, cl. 2 ................................................................................... 9

26 CFR § 54.4980B-4 ..................................................................................... 13

47 Ill. Reg. 12,155, 12,457–80 (Aug. 18, 2023) ............................................. 3

Ill. Admin. Code tit. 56, § 260.100 ......................................................... 1, 7, 22

Ill. Admin. Code tit. 56, § 260.230 ................................................................. 19

Ill. Admin. Code tit. 56, §§ 260.401 ............................................................... 21

Ill. Admin. Code tit. 56, § 260.410 ................................................................. 15

Ill. Admin. Code tit. 56, § 260.420 ........................................................... 15, 16

Ill. Admin. Code tit. 56, § 260.445 ....................................................... 11, 13, 23

Ill. Admin. Code tit. 56, § 260.505 ................................................................. 11

Ill. Admin. Code tit. 56, § 260.540 ................................................................. 19

Ill. Admin. Code tit. 56, § 260.550 ................................................................. 15

Ill. Admin. Code tit. 56, § 401(b) ..................................................................... 7

JCAR, The Flinn Report, 47 ILL. REG. 37, 5 (2023) ........................................ 3

U.S. Census Bureau of Lab. Stats., *Illinois Economy at a Glance*, (2023),
https://www.bls.gov/eag/eag.il.htm.................................................................................. 1

Temporary laborers make up approximately 10% of the Illinois workforce.[1] The total annual payroll for staffing agencies in Illinois in 2022 was about $7.8 billion. Brittney J. Sakata Dec., attached as Ex. A, ¶ 16. Unfortunately, many of these workers and their employers face an uncertain future as a result of recently enacted amendments to the Illinois Day and Temporary Labor Services Act, 820 ILCS 175 *et seq.*, ("DTLSA"), as well as accompanying emergency and proposed regulations, Ill. Admin. Code tit. 56, §§ 260.100 *et seq.*, (together with the DTLSA, the "Temporary Staffing Laws"). Although the temporary staffing industry is regulated by the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001 *et seq.*) ("ERISA"), the Patient Protection and Affordable Care Act (42 U.S.C. §§ 18001 *et seq.*) ("ACA"), and the National Labor Relations Act (29 U.S.C. §§ 151 *et seq.*) ("NLRA"), the Temporary Staffing Laws include three unique provisions that challenge the uniform national regulation of employee benefits and labor relations. Without prompt injunctive relief, the Temporary Staffing Laws will force staffing agencies and their clients in Illinois to incur substantial compliance costs with preempted laws that are already causing a reduction in usage of staffing agency services and triggering expensive and potentially devastating legal processes. The fate of huge numbers of hourly workers is at stake.

## BACKGROUND

### I.    The Temporary Staffing Industry Plays a Critical Role in the Illinois Economy.

Temporary staffing agencies employ about 189,600 people in any given week. Ex. A, ¶ 16. Annual temporary employment figures range from 650,000 to 984,200. 820 ILCS 175/1 (finding at least 650,000 work as temporary employees); Ex. A, ¶ 16 (finding 984,200 work as temps). For

---

[1] *Compare* 820 ILCS 175/2 (stating the legislative finding that at least 650,000 people work as temporary employees in Illinois), *with* U.S. Census Bureau of Lab. Stats., *Illinois Economy at a Glance*, (2023), https://www.bls.gov/eag/eag.il.htm (showing about 6.5 million people work in Illinois).

workers, employment as a "temp" meets a need for short-term, flexible employment. Ex. A, ¶ 3; Byron Figueroa Dec., attached as Ex. B, ¶¶ 16–17; Clarice Shiu Dec., attached as Ex. C, ¶¶ 11–12. Because temporary workers can refuse assignments and take extended—and even last minute—breaks from working, "temping" can provide the flexibility needed to balance work with other commitments, such as family responsibilities, school, and other employment. Ex. B, ¶¶ 16; Ex. C, ¶¶ 11. Temping is also useful for people looking to enter or re-enter the workforce. Ex. B, ¶¶ 17; Ex. C, ¶¶ 12. Temping is attractive to many already vulnerable Illinois workers, such as stay-at-home parents, workers with seasonal jobs, students, immigrants, and retired workers. *See* Ex. B, ¶¶ 16–17; Ex. C, ¶¶ 11–12. Employment with a temporary staffing agency also gives workers opportunities to obtain experience and training, explore the local labor market, and test a variety of job settings before making permanent commitments. Ex. B, ¶¶ 18–19; Ex. C, ¶¶ 13–14.

Staffing agencies promote the growth of commerce and industry in Illinois. Ex. B, ¶ 11; Ex. C, ¶ 5; *see also* Ex. A, ¶ 4; Frank Auriemma Dec., attached as Ex. D, ¶ 5. Temporary staffing agencies hire individuals as employees and then offer company clients staffing, candidate screening, and the opportunity to consider potential hires before committing to direct-hire employment arrangements. Ex. A, ¶ 4; Ex. B, ¶ 13, 19; Ex. C, ¶ 6. Temporary staffing agencies also allow employers to ramp up personnel quickly and scale down rapidly, as needed per operational and other needs. Ex. D, ¶ 4; *see also* Ex. B, ¶¶ 9, 11 Ex. C, ¶¶ 4–5. Reliance on staffing agencies allows light industrial companies, such as manufacturers and distributers, the chance to compete in the marketplace more effectively by focusing on growth and innovation, while outsourcing the difficult task of finding qualified individuals to perform needed work. Ex. B, ¶¶ 9–12; Ex. C, ¶¶ 4–6; Ex. D, ¶ 5.

## II. Staffing Agencies in Illinois Have Been Regulated Since 2006.

The DTLSA has regulated Illinois' temporary staffing industry since 2006. *See* 820 ILCS 175/1 *et seq.* It has historically required staffing agencies to register with the Illinois Department of Labor ("IDOL") to operate in Illinois. 820 ILCS 175/45. The DTLSA and the IDOL have also long required staffing agencies to take various steps to protect the interests of their employees, such as by providing each employee with an itemized pay statement and paying a minimum of four hours of pay whenever they are assigned to, but ultimately not engaged by, a client. 820 ILCS 175/30(a), (g).

## III. Illinois Recently Amended the DTLSA, and the IDOL Adopted New Regulations.

The Illinois General Assembly passed amendments to the DTLSA in the Spring of 2023 that were signed into law on August 4, 2023. Pub. Act 103-0437. Among other things, the amendments triple the registration fees for staffing agencies, increase the civil penalties for DTLSA violations, and impose several new obligations on both staffing agencies and their clients. *See, e.g.*, 820 ILCS 175/11, 42, 45, 70. Emergency regulations were immediately effective on August 7. DTLSA, 47 Ill. Reg. 12,155, 12,457–80 (Aug. 18, 2023). The IDOL published substantially identical proposed permanent rules on August 18. *Id.*, 12,316–44.

The bicameral, bipartisan Joint Committee on Administrative Rules ("JCAR") promptly and unanimously objected to the IDOL's emergency rules, explaining that "the rulemaking is too vague to provide meaningful guidance to employers looking to comply with its requirements, especially small businesses." JCAR, The Flinn Report, 47 ILL. REG. 37, 5 (2023) (questioning the alleged emergency and stating the IDOL "has created immediate confusion, rather than workable standards regulated entities can use to demonstrate compliance"). The IDOL nevertheless advanced the rule making process, received numerous comments from the staffing industry, (Ex. D, ¶ 9), and has issued no Second Notice of Rulemaking to date.

Without any public explanation, the General Assembly passed, and the Governor signed, legislation in mid-November 2023 to delay the effective date of the DTLSA's equivalent pay and benefits provision (820 ILCS 175/42) until April 1, 2024. Pub. Act 103-0564, Sec. 65. The rest of the DTLSA, as amended, and the related emergency rules, are already effective. *See id.* While the staffing industry is open to sensible regulation, several of the new DTLSA provisions are currently beyond unworkable and incompatible with federal law and/or constitutional requirements.

### A.     The Equivalent Benefits Provision Imposes New Obligations.

The equivalent pay and benefits provision is the most pernicious provision in the Temporary Staffing Laws:

> A day or temporary laborer . . . assigned to work at a third party client for more than 90 calendar days shall be paid not less than the rate of pay and equivalent benefits as the lowest paid directly hired employee of the third party client with the same level of seniority . . . and performing the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility . . . performed under similar working conditions. If there is not a directly hired comparative employee . . . the day or temporary laborer shall be paid not less than the rate of pay and equivalent benefits of the lowest paid direct hired employee of the company with the closest level of seniority . . . . A day and temporary labor service agency may pay the hourly cash equivalent of the actual cost benefits [sic] in lieu of benefits required under this Section. Upon request, a third party client to which a day or temporary laborer has been assigned for more than 90 calendar days [must] . . . . timely provide the day and temporary labor service agency with all necessary information related to job duties, pay, and benefits of directly hired employees necessary for the day and temporary labor service agency to comply with this Section.

820 ILCS 175/42. Although titled "[e]qual pay for equal work," this provision goes beyond pay. This provision mandates temporary employees be given the equivalent benefits as those received by the lowest paid, comparable, directly-hired employee of the temporary staffing agency's third-party client whenever the temporary employee works for the client for more than ninety days within a twelve-month period. *Id.* Alternatively, an agency "may pay the hourly cash equivalent

of the actual cost benefits [sic] in lieu of benefits required under this Section." *Id.* Attempted compliance with either option is extraordinarily burdensome and ultimately futile.

As an initial step, staffing agencies must identify the comparable client employee (*i.e.*, someone with the same seniority and skill that performs substantially similar work) for each temporary employee. Ex. B, ¶ 52; Ex. C, ¶ 35; Scott Polen Dec., attached as Ex. E, ¶ 38. Many staffing agencies have more than 500 employees at over 100 different clients, each of whom has between zero and hundreds of potentially comparable employees. *See, e.g.*, Ex. B, ¶¶ 53–54; Ex. C, ¶¶ 3, 7. The actual cost of benefits varies from candidate to candidate and depends on individual employee decisions. Ex. B, ¶¶ 34, 46, 56–57, 69; Ex. C, ¶¶ 24, 31, 36, 45; Ex. E, ¶¶ 11, 16, 20, 21–24. Individual employees can (1) accept or reject benefits, (2) have individual circumstances that affect their benefits, such as having a spouse and/or child(ren), and (3) have preferences for more coverage or less coverage. *See, e.g.*, Ex. B, ¶¶ 32, 63, 65, 69; Ex. C, ¶¶ 19, 28–29, 31; Ex. E, ¶¶ 15, 23, 28–30.

Next, the staffing agency must assess the value of the benefits it provides to the affected temporary employee. Perceptions as to the value of benefits differ from person to person. Ex. B, ¶¶ 69–70; Ex. C, ¶ 36; Ex. E, ¶ 11. Some see value in contributing to a retirement plan with a matching contribution and others prefer to maximize their cash compensation. Ex. B, ¶ 24, 65; Ex. C, ¶ 46; Ex. E, ¶¶ 32–33. Similarly, perceptions of value change over time as employees' personal circumstances (e.g., sick family members, having children, etc.) evolve. *See, e.g.*, Ex. B, ¶¶ 69, 73; Ex. E, ¶ 32.

The staffing agency must next assess the value of the benefits paid to each of the client's relevant directly-hired employees. To do so, benefit plan administrators must request, obtain, assess, and maintain information and documents not otherwise gathered or kept in the ordinary

course of business. 820 ILCS 175/42; *see also* Ex. B, ¶¶ 54, 68; Ex. C, ¶ 38; Ex. E, ¶¶ 26, 31. The information and documents must be sourced from clients with a duty to provide the requested information and, potentially, from labor unions with no such duty. *See* 820 ILCS 175/42. The assessment must be reassessed constantly, as any change in benefits, could cause one or the other employer's benefits bundle to become more or less valuable in the eyes of the relevant individuals. *See, e.g.*, Ex. B, ¶¶ 53, 73; Ex. E, ¶ 27. "Paying" the benefits provided by another employer requires design and administration of a plan for each client that mimics, to the extent possible, the client's benefit plan. 820 ILCS 175/42; *see also* Ex. B, ¶ 54; Ex. C, ¶ 36.

The alternative means of complying is paying the actual cost of benefits provided by the staffing agency's client to the comparable employee. This requires determining the actual cost of rejected benefits as well as accepted benefits. 820 ILCS 175/42; *see also* Ex. B, ¶¶ 55, 69. This also requires determining the actual cost of providing unpaid leave, which can vary from zero to the cost of a replacement temporary employee. *See, e.g.*, Ex. B, ¶ 70. This also requires determining the actual cost of the health insurance plan choices the employee made, such as the cost of coverage for a spouse and family regardless of whether the temporary employee has a spouse or family. *See* Ex. B, ¶¶ 58–60; Ex. E, ¶¶ 22–24. This also requires determining the actual cost of a particular comparable employee's fringe benefits such as embroidered, company-branded clothing not provided to temporary employees. *See, e.g.*, *See* Ex. B, ¶¶ 51. The Temporary Staffing Laws require paying the higher of the value of the actual employer's plan and the actual cost of the comparable directly-hired employee. 820 ILCS 175/42.

## B. The Labor Dispute Provision Imposes New Obligations.

Section 11 of the DTLSA amendments, sometimes known as the "labor dispute" provision, requires staffing agencies to ascertain whether each client they serve is experiencing "any controversy concerning wages, hours, terms or conditions of employment" and then announce the

existence of any "labor dispute" to any staffing agency employee prior to assigning them to work for the client. 820 ILCS 175/11; Ill. Admin. Code tit. 56, § 260.100. The provision covers much more than traditional labor law notions of strikes and lockouts—it demands disclosure of limitless other controversies regarding the terms and conditions of work, such as confidential age discrimination disputes or concerns over the sequencing of break times. *Id.* Section 11 also guarantees workers another assignment and protects them from adverse employment actions in the event the employee takes action that supports union bargaining or organizing efforts at an agency's client. *See* Ill. Admin. Code tit. 56, §§ 260.100, 401(b).

C.      **The "Interested" Parties Provision Exposes Employers to New Legal Risks.**

Section 67 of the DTLSA amendments, the "interested parties" provision, grants a private right of action to "interested parties" (defined as "organizations" that are "attentive to compliance" with "statutory requirements") to commence lawsuits against any staffing agency and/or their third-party client whenever the "interested party" believes the DTLSA has been violated. 820 ILCS 175/5, 67. These "interested parties" may recover statutory penalties under the DTLSA and secure injunctive relief in favor of unrelated non-parties. 820 ILCS 175/67, 70. The Temporary Staffing Laws do not require "interested parties" to be injured, and there is likewise nothing stopping dozens of "interested parties" from asserting the same claim against the same agency or from initiating civil actions after the IDOL has determined no violation has occurred or a violation has been cured. 820 ILCS 175/67.

D.      **The Staffing Industry Had No Choice but to Commence this Action.**

The DTLSA empowers the IDOL to revoke the registration of staffing agencies that violate the new laws. 820 ILCS 175/50. The DTLSA also authorizes interested parties to file civil actions to collect civil penalties for violations of the Temporary Staffing Laws. 820 ILCS 175/67. Indeed, an "interested party" has already started the cooling-off period with respect to an alleged violation

by one company. Ex. D, ¶ 10. Thus, the members of the Trade Association Plaintiffs as well as the Staffing Agency Plaintiffs are forced to incur the costs of compliance with the Temporary Staffing Laws while facing the possibility of losing their right to conduct business and being dragged into litigation proceedings that would not exist under applicable federal statutory schemes. The staffing industry has already seen a reduction in demand and anticipates a further reduction in demand for its services when the equal benefits provision becomes effective. Ex. A, ¶¶ 14–15; Ex. B, ¶¶ 83–87; Ex. C, ¶¶ 47–49; Ex. E, ¶ 40.

Facing this potentially existential threat, the staffing industry—represented in this case by its national trade association, the American Staffing Association, and a leading Illinois trade association, the Staffing Services Association of Illinois (collectively, the "Trade Association Plaintiffs"), as well as three Illinois-based staffing agencies, ClearStaff Inc. ("ClearStaff"), M.M.D. Inc. d/b/a The AllStaff Group, Inc. ("AllStaff"), and TempsNow Employment and Placement Services LLC ("TempsNow")—brought this case to secure essential injunctive relief against enforcement of the three aforementioned Temporary Staffing Laws. (Dkt. 1.) Plaintiffs respectfully submit the following argument and request an evidentiary hearing to provide further evidence in support of their motion for preliminary injunction.

## ARGUMENT

Plaintiffs seek a preliminary injunction prohibiting Defendant and all parties acting in concert with Defendant, including so-called "interested parties," from enforcing certain provisions of Sections 11, 42, and 67, together with their related regulations, of the DTLSA. This injunction is necessary pending a trial where Plaintiffs will seek a permanent injunction pursuant to Federal Rule of Civil Procedure 65. The Seventh Circuit weighs five factors when considering a motion for preliminary injunction: (1) plaintiffs' reasonable likelihood of success on the merits, (2) whether a legal remedy is adequate, (3) whether the plaintiffs face irreparable harm, (4) whether

the balance of the equities weigh in plaintiffs' favor, and (5) whether preliminary injunctive relief is in the public interest. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). All five factors counsel in favor of granting an injunction in this case.

## I.     Plaintiffs Are Likely to Succeed on The Merits.

Plaintiffs seeking preliminary injunctive relief must establish a "reasonable likelihood of success on the merits." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). "The threshold for this showing is low. Plaintiffs need only demonstrate a 'better than negligible chance of succeeding.'" *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (citations omitted); *see also D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). Here, Plaintiffs have far better than a negligible chance of success on the merits. The DTLSA as amended is breathtaking in its usurpation of power from the federal government and its embrace of an unprecedented litigation mechanism that deputizes strangers to enforce the law.

### A.     Plaintiffs Are Likely to Succeed on Their Claim that the Equivalent Benefits Provision Is Preempted by ERISA.

"Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT & T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002) (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712 (1985)); U.S. Const. art. VI, cl. 2. A state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Egelhoff v. Egelhoff*, 532 U.S. 141, 156 (2001) (citation omitted). ERISA sets out a comprehensive federal system for the regulation of employee benefit plans. *See D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992); 29 U.S.C. § 1001 *et seq.* To ensure exclusive federal regulation and thereby facilitate minimized administrative and financial burdens on plan administrators, ERISA generally preempts "any and all State laws" that "relate to" employee benefit plans. 29 U.S.C. §

1144(a); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016); *Greater Washington Bd. of Trade*, 506 U.S. at 127. "A law 'relates to' an employee benefit plan," and is preempted, "if it has a [1] connection with *or* [2] reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (italics added). The equal benefits provision has both.

### 1. The Equivalent Benefits Provision Connects with ERISA Plans.

ERISA's preemption provision minimizes "the administrative and financial burden of complying with conflicting directives" and ensures "plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge v. Pharm. Care Mgt. Ass'n*, 141 S.Ct. 474, 480 (2020) (citation omitted). A state law may be subject to preemption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* (citation omitted). ERISA therefore preempts state laws setting specific rules for administrators when determining beneficiary status or requiring payment of specific benefits, as those laws have a "connection with" ERISA plans. *Id.* To determine whether a state law has an impermissible "connection with" ERISA plans, this Court examines "both the objectives of the ERISA statute . . . as well as the nature of the effect of the state law on ERISA plans." *Egelhoff*, 532 U.S. at 147.

ERISA preempts state laws that "interfere[] with nationally uniform plan administration." *Gobeille*, 577 U.S. at 320 (citation omitted); *see also Jackson v. E.J. Brach Corp.*, No. 94 C 6350, 1995 WL 319760, at *6 n.6 (N.D. Ill. May 26, 1995) ("ERISA is a comprehensive statute, one of the main purposes of which is to replace the preexisting web of conflicting obligations imposed by fifty states' benefits laws with a uniform national regulatory system."). It provides exclusive regulation as to reporting, recordkeeping, and disclosure of benefits. *See Gobeille*, 577 U.S. at 323 (finding ERISA preempted Vermont law requiring certain disclosures, explaining preemption "is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting [and

recordkeeping obligations] on plans."). ERISA also provides the sole source of regulation as to benefit determinations. *See Egelhoff*, 532 U.S. at 150 (finding ERISA preempted Washington law requiring plans to revoke a spouse's designation as a beneficiary upon divorce because it was inconsistent with ERISA regulations that allow reliance on a plan's documents and procedures). ERISA's civil enforcement mechanism is the sole and exclusive remedy for inaccurate benefit determinations or improper disclosures. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.").

This requirement for national uniformity is impossible to square with the DTLSA's equivalent benefits provision. The conflicts include at least the following:

- The DTLSA impermissibly requires disclosure of benefit plan information by staffing agency clients to staffing agencies, 820 ILCS 175/42, when ERISA does not require that disclosure. *See, e.g.*, 29 U.S.C. § 1021; Ill. Admin. Code tit. 56, § 260.505.

- The DTLSA impermissibly requires a staffing agency to change an employee's ERISA plan based on where the employee is sent to work, which means that staffing agency ERISA administrators will be unable to treat their employees in a uniform, non-discriminatory manner as required by federal law. *Compare* 820 ILCS 175/42, *with* I.R.C. § 401(a)(4), *and* Ill. Admin. Code tit. 56, § 260.445.

- The DTLSA requires staffing agencies to design, administer, and disclose many different plans, with each hourly employee being potentially entitled to benefits under several different plans in any given year, 820 ILCS 175/42, which is inconsistent with ERISA's obligations. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 108 (1983) (noting states "may not require an employer to alter its ERISA plan"); *see also* Ill. Admin. Code tit. 56, § 260.445.

- The DTLSA subjects staffing agencies to judicial remedies such as fines for making improper benefit determinations under 820 ILCS 175/67, 70 even though ERISA is the exclusive source of civil enforcement remedies for improper benefit determinations. *See, e.g.*, *Doe v. Aetna Inc.*, No. 16 C 8390, 2017 WL 118417, at *3 (N.D. Ill. Jan. 12, 2017); 820 ILCS 175/42, 70; Ill. Admin. Code tit. 56, § 260.505.

A chronological walk-through of the challenges facing staffing agencies in Illinois demonstrates some of these conflicts.

Before passage of the Temporary Staffing Laws, Staffing Agency Plaintiffs offered all hourly employees in Illinois the same benefits. *See* Ex. B, ¶¶ 54, 68; Ex. E, ¶ 31. The Temporary Staffing Laws, however, now require, as of the delayed enforcement date, Staffing Agency Plaintiffs to differentiate between employees in terms of providing benefits. 820 ILCS 175/42. Some will remain subject to their employer's plan while others will be paid benefits that correspond to the benefits paid by a particular client. This means the staffing agency may be designing and administering hundreds of different plans and moving employees from one benefit plan to another multiple times per year.

Requiring a staffing agency to cease offering its retirement or health insurance coverage in favor of a different retirement program or different set of health insurance options, if required in a particular person's situation, is an impermissible imposition of a specific benefit program. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998) ("Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it."). ERISA prohibits states from dictating particular benefit programs. *See, e.g., Rutledge*, 141 S. Ct. at 480 (noting ERISA preempts "laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status" and laws whose "acute, albeit indirect, economic effects . . . force an ERISA plan to adopt a certain scheme of substantive coverage") (citations omitted); *Shaw*, 463 U.S. at 100 (finding a statute requiring a specific benefit to be preempted).

Additionally, the DTLSA requires that assessing whether to swap one plan for another mandates a disclosure from staffing agency clients about the benefits it provides to directly-hired

employees. 820 ILCS 175/42; Ill. Admin. Code tit. 56, § 260.445. Section 42 requires clients provide staffing agencies with "all necessary information" related to the benefits offered so that staffing agencies can make discretionary decisions (further described below) about whether two retirement plans that each offer several domestic large-cap stock funds but offer them through different investment managers with different fee structures are identical or different. *Id.* ERISA has multiple reporting and disclosure requirements, *see, e.g.,* 29 U.S.C. § 1027, but this new type of disclosure is not one of them.

In *Gobeille v. Liberty Mutual Insurance Co.*, the Supreme Court held that ERISA's "connection with" preemption applies when a state law imposes disclosure and recordkeeping requirements on top of ERISA's disclosure and recordkeeping requirements. 577 U.S. 312 (2016). The Court explained:

> [R]eporting, disclosure, and recordkeeping are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA. . . . . Vermont's reporting regime, which compels plans to report detailed information about claims and plan members, both intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration.' The State's law and regulation govern plan reporting, disclosure, and—by necessary implication—recordkeeping. These matters are fundamental components of ERISA's regulation of plan administration. Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability. Pre-emption is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting requirements on plans.

*Id.* (citation omitted). Government agencies at the state level are simply not allowed to impose "disuniform" state disclosure laws. *Id.*

If staffing agencies are required to process information to comply with a statute dictating which of two potential benefit plans must be offered, staffing agencies would run into another intractable conflict. "Paying" a staffing agency employee the benefits offered by a client means enrolling employees in different benefit plans at times when enrollment is not permitted under the ACA. *See* 26 CFR § 54.4980B-4. Plans cannot treat working at the same assignment for 90 days

-13-

as a qualifying event to change coverage, (29 U.S.C. § 1163), and state laws that attempt to upend the administration of health care plans in the United States are preempted. *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) ("[S]tate laws that 'hinder or impede' the implementation of the ACA run afoul of the Supremacy Clause.").

Even if that impossibility was ignored, ERISA does not permit the imposition of administrative costs on ERISA plan administrators and sponsors by a state statutory scheme. *Gobeille*, 577 U.S. at 323 ("Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability."). The administrative costs imposed by the Temporary Staffing Laws cannot be overstated. The DTLSA requires staffing agencies to switch from providing a singular set of benefits for all employees to providing unique, person-specific benefits because staffing agencies, by definition, send their employees to dozens of different clients, all of whom offer different benefits. Ex. B, ¶¶ 58–60; Ex. E, ¶¶ 22–24. Since an insurance company will not enroll company A's employees in the plans provided to company B, staffing agencies will need to set up dozens or hundreds of benefit plans, each with its own life insurance, health insurance, disability insurance, leave policies, etc. that are duplicates of their client's plans—but this is an impossible task. Ex. B, ¶ 48; Ex. C, ¶ 28; Ex. E, ¶ 17.

Further costs arise from the dynamic nature of the temporary staffing industry. A temporary employee assigned to company A may be needed long enough to trigger the equivalent benefits provision, but they are not, by definition, permanent and thus will need to be assigned at least once and possibly several more times in any given year to another client where the same process and same costs will repeat. *See* Ex. B, ¶ 23; Ex. C, ¶ 8; Ex. E, ¶ 3. States are not permitted to impose this type of burden and cost on plan administrators. *See, e.g.*, *Rutledge*, 141 S. Ct. at 480

(reiterating that ERISA preempts laws whose "acute, albeit indirect, economic effects . . . force an ERISA plan to adopt a certain scheme of substantive coverage").

Not surprisingly, the DTLSA imposes recordkeeping requirements related to this process that are different from and in addition to ERISA's extensive recordkeeping requirements. *See, e.g.*, 29 U.S.C. §§ 1027 & 1135 (requiring plan administrators to maintain certain documentation to support benefit determinations). The IDOL's rules require staffing agencies to keep "all records, including information provided by third party clients, used to determine compensation and *benefits.*" Ill. Admin. Code tit. 56, § 260.410(m) (emphasis added). These rules likewise require third-party employers to maintain records relating to the comparison needed to identify the comparable directly-hired employee. Ill. Admin. Code tit. 56, § 260.550(d). Finally, staffing agencies and their clients must maintain the records on-site and disclose them to the IDOL on demand for at least three years. Ill. Admin. Code tit. 56, § 260.420(a), (c).

Beyond the actual steps needed to comply with the equivalent benefits provision of the Temporary Staffing Laws, the equivalent benefits provision imposes enforcement risks that far exceed the risk staffing agencies face under ERISA. ERISA provides a comprehensive scheme of remedies and exclusive federal court jurisdiction, *See, e.g.*, 29 U.S.C. § 1132(e). ERISA also limits the actors permitted to bring actions to plan participants and beneficiaries only. *Id.* This regulation is exclusive. Any state law claim that "duplicates, supplements, or supplants the ERISA civil enforcement remedy" is preempted. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004). Yet the equivalent benefits provision empowers the IDOL to enforce the DTLSA and associated regulations. 820 ILCS 175/55 ("It shall be the duty of the Department to enforce the provisions of this Act."). The IDOL may revoke the registration of a staffing agency and/or impose "civil penalties" for a violation, which would include an inaccurate decision about whether the benefits

of a comparable employee are equivalent. *See* 820 ILCS 175/570. Additionally, "interested parties," which may be any organization that claims to monitor statutory compliance, are authorized to commence civil actions against staffing agencies and their clients, and they may recover the civil penalties provided in the statute. 820 ILCS 175/6, 67, 70; *see also* Ill. Admin. Code tit. 56, § 260.420.

The "cash equivalent" option (a false option by all practical accounts) does not save the statute from preemption. State laws can have an impermissible "connection with" ERISA plans even if they do not require employers to amend or alter their ERISA plans.

> We do not believe that the statute is saved from pre-emption simply because it is, at least in a broad sense, a default rule. . . . Plan administrators must either follow Washington's beneficiary designation scheme or alter the terms of their plan so as to indicate that they will not follow it. The statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it.

*Egelhoff v. Egelhoff*, 532 U.S. 141, 150–51 (2001). In any event, burdensome, impractical, and disuniform opt-out provisions do not save otherwise preempted state laws. In *Retail Industry Leaders Association v. Fielder*, the Fourth Circuit held a Maryland law requiring large employers to spend 8% of their total payrolls on employee health insurance costs—or pay the balance directly to the State of Maryland—had an impermissible connection to ERISA plans. 475 F.3d 180, 192–93 (4th Cir. 2007). "Even if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Id.* at 193.

The First Circuit similarly rejected an argument that employers could avoid an ordinance's apprentice training requirements by establishing and coordinating "a separate [non-ERISA] plan into which such apprentices would be funneled." *Merit Const. All. v. City of Quincy*, 759 F.3d 122, 130 (1st Cir. 2014). "Even though a non-ERISA option might be available for compliance with the Ordinance, the availability of such an option does not save the Ordinance: its mandate still has

the effect of destroying the benefit of uniform administration that is among ERISA's principal goals." *Id.* at 131; *see also Retail Industry Leaders Ass'n v. Suffolk County,* 497 F. Supp. 2d 403, 416 (E.D.N.Y. 2007) (holding ERISA preempted a state law allowing employers to opt out of providing specific benefits by paying specific amounts of money).

        **2.      The Equivalent Benefits Provision Has a "Reference to" ERISA Plans.**

ERISA likewise preempts the equivalent benefit provision because it requires reference to ERISA plans. A law refers to ERISA plans if it "acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Rutledge,* 141 S.Ct. at 481. In *D.C. v. Greater Washington Bd. of Trade,* 506 U.S. 125, 130 (1992), the Supreme Court held ERISA preempted a Washington D.C. law requiring "employers who provide health insurance for their employees to provide equivalent health insurance coverage for injured employees eligible for workers' compensation benefits." 506 U.S. at 126–27. Since the D.C. law imposed "requirements by reference to" employers' ERISA plans by requiring employers with ERISA plans to involuntarily provide *more* insurance coverage, the Court held the law "must yield to ERISA." *Id.* at 130–31.

The equivalent benefits provision is no different. It requires staffing agencies to either create a new ERISA plan superior to their existing plan or pay a certain amount that would be computed by *reference to* the benefits and actual cost of another employer's ERISA plan benefits (plus other non-ERISA benefits, such as leave policies). Specifically, staffing agencies must use their ERISA plans (*i.e.*, health, vision, life, and dental insurance, as well as retirement programs) as reference points when comparing their value and/or actual cost to third-party employers' benefits, including their ERISA-governed health, vision, life, and dental insurance, as well as retirement programs. *See generally* Ex. B, ¶ 22–38, 52–73; Ex. C, ¶¶ 16–36; Ex. E, ¶¶ 5–17, 19. This specific "reference to" ERISA plans on both sides of an engagement renders the equivalent

benefits provision of the DTLSA preempted regardless of which of the two compliance options is being pursued by the staffing agency. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829 (1988).

ERISA's comprehensive regulatory scheme pre-empts statutes that create an "ongoing administrative scheme" that require managerial discretion. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987); *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997). The obligation to exercise discretion over two competing ERISA plans demonstrates the problem with the DTLSA and ERISA pre-emption. Under the Temporary Staffing Laws, staffing agencies must constantly assess their ERISA plans' value to each employee and assess each of their clients' ERISA plans to determine which offers more value and/or to compute the actual cost of the clients' plans. 820 ILCS 175/42; *see also* Ex. A, ¶ 14; Ex. B, ¶¶ 53, 73; Ex. E, ¶ 27. For example, this process requires individualized assessment of the value of a retirement savings program to a particular person and/or the value/cost of a high-deductible health insurance plan to a certain person. *See, e.g.*, Ex. B, ¶¶ 34, 46, 56–57, 69; Ex. C, ¶¶ 24, 31, 36, 45; Ex. E, ¶¶ 11, 16, 20, 21–24. "Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it." *Collins*, 147 F.3d at 597. Such ongoing discretion is present here. Ex. B, ¶¶ 61–62; Ex. C, ¶ 45; Ex. E, ¶ 38.

### B. Plaintiffs Are Likely to Succeed on Their Claim that the "Labor Dispute" Provision Is Preempted by the NLRA.

"Labor law preemption applies . . . when a State acts 'as regulator of private conduct' with an 'interest in setting policy' that is different from the policy of the federal government." *Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018) (citation omitted). Section 11 of the DTLSA sets two policies that differ from federal policy.

### 1.    The Warning Provision Differs from Federal Law.

Courts have interpreted the NLRA to have two different types of preemption, one of which is called *Machinists* preemption. "*Machinists* pre-emption is based on the premise that 'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'" *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 65 (2008) (citation omitted). *Machinists* preemption forbids states from regulating "areas that Congress left to the free play of economic forces" by prohibiting states from altering the "balance between the power of management and labor to further their respective interests by use of their respective economic weapons." *Cannon v. Edgar*, 33 F.3d 880, 885 (7th Cir. 1994).

One "economic weapon" in this ongoing balance between management and labor is the ability to hire replacement workers during strikes and lockouts. *See generally Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wisconsin Emp. Rels. Comm'n*, 427 U.S. 132, 153 (1976) (stating that the hiring of permanent replacements is an "economic weapon" for employers); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (invalidating executive order curtailing government contractors' ability to hire replacements was "pre-empted by the NLRA, which guarantees the right to hire permanent replacements").

Section 11 and its regulations require temporary staffing agencies to disclose the existence of strikes, lockouts, and other "labor disputes" at any client site to which an employee is assigned. 820 ILCS 175/11; Ill. Admin. Code tit. 56, § 260.540. There are penalties for violations, the number of actions of which are uncurbed by the Temporary Staffing Laws. 820 ILCS 175/11, 67, 70, 95; Ill. Admin. Code tit. 56, § 260.230; Ex. B, ¶ 74–79. Courts have found this type of "warning" provision impermissibly curtails employers' ability to hire replacement workers when necessary to address a strike or lockout. In *People v. Federal Tool & Plastics*, the Illinois Supreme Court evaluated an Illinois statute requiring any advertisements seeking temporary replacements

to disclose the existence of labor disputes strikes. 62 Ill. 2d 549, 550 (Ill. 1975). The court held the statute was subject to *Machinists* preemption because it "encumbers the employer's right to hire employees with a requirement that he publicize the existence of the strike." *Id.* at 554. Illinois' desire to protect replacements "from unwittingly becoming involved in a potentially hostile situation" was an insufficient reason to upset Congress's balance of power between labor and management. *Id.*; *see also United Auto Workers v. C.M. Smillie Co.*, 139 Mich. App. 731, 735 (1984) (holding that the NLRA preempted a state statute requiring the notification of potential replacements of the existence of strikes or lockouts). Indeed, Illinois has repeatedly enacted laws with good intentions that were preempted by *Machinists* preemption because they represented an attempt to affect the balance of power between labor and management. *See, e.g., Caterpillar v. Lyons,* 318 F. Supp. 2d 703, 705–06 (C.D. Ill. 2004) (finding the NLRA preempted a state statute making it harder to replace striking workers). The warning provision falls into this category and is subject to *Machinists* preemption.

### 2.    The Anti-Retaliation Provision Differs from Federal Law.

Section 7 of the NLRA protects employees' rights to "assist labor organizations" or "refrain from" assisting such organizations. 29 U.S.C. § 157. Section 7 states in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities.

*Id.* Section 7 of the NLRA applies equally to union and non-union employees. *See NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 15 (1962) (applying Section 7 protections to unorganized employees); *see also Pride Ambulance Co.*, 356 N.L.R.B. 1023, 1023, 1040 (2011) (protecting non-union employee who refused to replace striker). States may not enact laws that expand the rights protected by Section 7 of the NLRA. *See Int'l Assoc. of Machinists Dist. Ten v. Allen*, 904

F.3d 490, 512 (7th Cir. 2018). The National Labor Relations Board ("NLRB") has primary jurisdiction in cases involving rights under Section 7 of the NLRA—not state or federal trial courts, or an administrative agency. *See 520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1125 (7th Cir. 2008).

But Section 11 of the DLTSA grants additional rights to workers who take actions to assist unions engaged in a strike, lockout, or some other "labor dispute." Under Section 11, if a staffing agency's employee refuses to cross a picket line, replace a locked-out employee, or otherwise work at a worksite that they have been advised is experiencing a "labor dispute," the temporary staffing agency must provide the employee "another assignment" and refrain from "retaliation." 820 ILCS 175/11; Ill. Admin. Code tit. 56, §§ 260.401(b). This legal protection goes beyond the protection the NLRA provides. The Temporary Staffing Laws are therefore preempted by what is known as *Garmon* preemption. *Shannon*, 549 F.3d at 1125. *Garmon* preemption protects the NLRB's primary jurisdiction over Section 7 rights under the NLRA. *Id.* "State jurisdiction must yield" when state statutes purport to regulate activities "clearly protected" by Section 7 of the NLRA; and when it is unclear "whether the particular activity regulated by the State[]" is governed by Section 7 of the NLRA, then state courts must yield to the "exclusive competence of the" NLRB. *Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.*, 450 F. Supp. 3d 815, 829 (N.D. Ill. 2020) (emphasis added) (citations omitted).

*Garmon* preemption is extraordinarily broad, reaching statutes that even arguably affect Section 7 rights under the NLRA. *See Cannon v. Edgar*, 825 F. Supp. 1349, 1359 (N.D. Ill. 1993), *aff'd,* 33 F.3d 880 (7th Cir. 1994) When activity is "expressly protected and governed by specific federal rules, direct state regulations that establish additional, local conditions threaten to upset the sensitive balance established by federal labor law." *Id.* The right to refrain from action that assists

union organized events such as strikes is conduct within Section 7's scope. *See Michigan State AFL-CIO v. Callaghan*, 15 F. Supp. 3d 712, 718 (E.D. Mich. 2014). Similarly, the authorization of state courts (or a state administrative agency) to adjudicate disputes arising from whether employees exercised their rights under the labor dispute provision properly violates the NLRB's primary jurisdiction. *See San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 245 (1959) ("When an activity is arguably subject to [Section 7], the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted."); *Smart v. Loc. 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 806 (7th Cir. 2009) ("The primary rationale for the courts' decisions is that Congress not only 'strip[ped] state courts of adjudicatory authority' with respect to activity arguably subject to sections 7 and 8, 'in the very same breath it also deprive[d] federal courts of that authority.'" (citation omitted)).

**C.    Plaintiffs Are Likely to Succeed on Their Claim that the "Interested Parties" Provisions of the DTLSA Are Unconstitutional.**

The DTLSA authorizes "interested parties" to "initiate a civil action" whenever they believe that the Act has been violated. 820 ILCS 175/67. The DTLSA defines an "interested party" as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." 820 ILCS 175/5; Ill. Admin. Code tit. 56, § 260.100. The DTLSA authorizes "interested parties" to recover statutory penalties and injunctive relief. 820 ILCS 175/67. Nothing in the Temporary Staffing Laws, however, require "interested parties" to be injured by a violation of the statute. Interested parties are, by definition, strangers to any alleged violation. *See* Ex. B, ¶¶ 80–82.

DTLSA's extension of liability to so-called "interested parties" is unconstitutional. This is an unprecedented and unusual enforcement mechanism. 820 ILCS 175/67. There is no limit on the

number of strangers that can bring DTLSA civil actions. *See id.* Nothing in the Temporary Staffing Laws prohibit "interested parties" from suing on the same violation as another "interested party," potentially subjecting staffing agencies and their clients to endless liability for a single perceived violation. Not even the IDOL can stop an interested party from bringing a lawsuit, as the statute authorizes the filing of a suit even if the IDOL finds "the allegation is unjustified" or "the named party has cured the alleged violation to the satisfaction of" Defendant. *See* Ill. Admin. Code tit. 56, § 260.445; *see also* 820 ILCS 175/67. Nothing requires "interested parties" to share any portion of any settlement with the State or the workers who suffered the actual injury.

In *Wingert v. Hradisky*, the Illinois Supreme Court explained that statutes authorizing private rights of action must "require a direct and transactional relationship between the plaintiff and the defendant." 2019 IL 123201, ¶¶ 28–29. To permit statutes to extend liability for violations to uninjured persons disconnected from the alleged violation "pushes past the limits of what due process permits." *Id.* at ¶¶ 34–37 (refusing to uphold provision of statute that would have allowed plaintiffs to recover "substantial civil damages" from defendants with whom they had no relationship). This type of statute is arbitrary, capricious, and unreasonable and thus violates the due process clause of both the Illinois and US Constitution. *Id.*; *see also W. Easton Two, LP v. Borough Council of W. Easton*, 489 F. Supp. 3d 333, 376 (E.D. Pa. 2020).

It is similarly unconstitutional to subject agencies and third parties to infinite liability for a single violation, to provide a private right of action to pursue claims the IDOL has determined are unjustified or moot, and to permit "interested parties" to keep any funds obtained in a settlement without sharing any settlement proceeds with the State or the party that suffered the injury. These provisions create perverse incentives and lack any rational connection to the stated purpose of the DTLSA. As the *Wingert* court explained, even where the legislature is attempting to address

significant public policy challenges, courts "simply cannot countenance the sacrifice of fundamental legal principles" or "close [their] eyes to … serious constitutional flaws." *Id.* at ¶ 38.[2] This court should not permit the Temporary Staffing Laws to run roughshod over Plaintiffs' due process rights. The IDOL has the power to receive complaints, conduct investigations, compel production of records, conduct hearings, and assess civil penalties against alleged violators. 820 ILCS 175/55. There is therefore no danger the DTLSA will go un-enforced. Authorizing private actions by "interested parties" with no nexus to the victim or the alleged perpetrator is an unconstitutional deprivation of due process rights.

## II.     Plaintiffs Have No Adequate Remedy at Law.

Plaintiffs do not, and cannot, seek compensatory damages from Defendant. *See generally Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 750–51 (N.D. Ill. 2007) (granting permanent injunction based on Illinois law violating federal Supremacy Clause; "[P]laintiffs have no adequate remedy at law. Defendants are state officials who have sovereign immunity from suits for damages."). Defendant is an Illinois official acting in her official capacity. State officials have sovereign immunity from suits for damages. *See, e.g.*, *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 734 F. Supp. 853, 863 (S.D. Ind. 1990) (finding no adequate legal remedy because plaintiffs sought preliminary injunction against governor and state, but "[Plaintiffs] are barred from recovering damages from the state due to the doctrine of sovereign immunity and the eleventh amendment"). Plaintiffs' remedy can therefore only come through

---

[2] Notably, lawsuits brought by "interested parties" will face serious, if not fatal, standing problems. Parties lacking an injury and nexus to the defendant or disputed conduct do not have standing to sue in federal or state court. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200, 2203 (2021) ("No concrete harm, no standing."); *Martini v. Netsch*, 272 Ill. App.3d 693, 695 (1st Dist. 1995) (plaintiffs must show "some injury in fact to a legally recognized interest" to establish standing). A legislature cannot "enact an injury into existence." *TransUnion*, 141 S. Ct. at 2204-05.

preliminary and permanent injunctive relief. *See Giannoulias*, 523 F. Supp. 2d at 750–51; *Bayh*, 734 F. Supp. 863.

## III. Plaintiffs Are Suffering, and Will Continue to Suffer, Irreparable Harm.

Preliminary injunctive relief is appropriate when Plaintiffs "will suffer irreparable harm in the interim prior to a final resolution." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "Harm" is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.'" *Id*.

### A. The Compliance Burden Imposed By A Preempted Law Is Irreparable Harm.

Being forced to incur compliance costs imposed by a preempted federal law is sufficient to establish irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 and 390-91 (1992) (affirming preliminary injunction where plaintiff was forced to incur (1) financial losses for violating a preempted state law or (2) the costs of complying with the law throughout proceedings challenging it); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 and n.19 (11th Cir. 2014) (affirming irreparable harm finding in ERISA preemption case that "[a]bsent an injunction, [plaintiff's] members will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties." (citation omitted)); *see also Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 62–63 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022) ("[Movant] is likely to experience irreparable harm by having to choose between following federal law, which opens him up to liability under state law, or complying with an unconstitutional state law." It is irreparable harm for a company to be potentially "subject to fines; forced to spend time, money, and resources to comply with the new requirements and regulations under [the new law] that may later be struck down . . . ." *Air Evac EMS., Inc. v. Dodrill*, 548 F. Supp. 3d 580, 595 (S.D.W. Va. 2021).

**B.      Staffing Agencies Will Be Forced Out of Business Absent Injunctive Relief.**

Preliminary injunctive relief is particularly appropriate when, without it, Defendant's actions will cause Plaintiffs' businesses (including those members of the Trade Association Plaintiffs) to shut down or lose a significant portion of their business. *See generally Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) ("[Movant's] irreparable harm is that it will lose sales and the opportunity to maintain and develop relationships with existing and potential customers of [its] products."); *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1063 (E.D. Wis. 2020) (finding "irreparable harm based on the likelihood that [movant] will go out of business").

Here, the more modest staffing agencies face a potentially existential crisis. *See, e.g.*, Ex. E, ¶¶ 35, 38–40. Staffing agencies without a human resources and legal staff cannot afford to hire people to manage the dozens of ERISA plans they will need to adopt and/or make cost-accounting decisions towards. *Id.* Similarly, the potentially extreme consequences for non-compliance with Sections 11 and 42 has already caused the Staffing Agency Plaintiffs to lose clients. Ex. B, ¶¶ 85–86; Ex. C, ¶¶ 47–48; Ex. E, ¶¶ 38–40. Clients are scared of being sued for not properly providing documents needed to calculate equivalent benefits, as well as being jointly liable for incorrect equivalent benefits calculations. Ex. B, ¶¶ 83–87; Ex. C, ¶¶ 44–49; Ex. E, ¶¶ 35, 38–40. Clients are likewise terrified of the liability they face for inadvertently failing to disclose a labor dispute (*e.g.*, controversies known only to employees regarding the sequencing of breaktimes). *See* Ex. B, ¶ 79; Ex. C, ¶¶ 43, 46; Ex. E, ¶ 35.

### C.   It Is Impossible to Calculate Plaintiffs' Current and Future Harm.

Harm is irreparable when injury to the business cannot be reliably estimated. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)). Here, the DTLSA amendments have caused businesses that typically rely on the Staffing Agency Plaintiffs' services to now refrain from doing business with them. Ex. A, ¶¶ 14–15; Ex. B, ¶¶ 85–86; Ex. C, ¶¶ 47–48; Ex. E, ¶¶ 38–40. Staffing agencies believe this number will substantially increase when the delayed "equal pay and benefits" provision becomes effective on April 1, 2024, and the 90 day calculation periods commence. *See* Ex. B, ¶ 87; Ex. C, ¶ 49; *see also* Ex. E, ¶¶ 38–40. Compliance costs and lost business opportunities have caused and will cause financial harm in an indeterminate amount. Ex. A, ¶¶ 14–15; *see also* Ex. B, ¶¶ 82–86; Ex. C, ¶¶ 49; Ex. D, ¶ 7; Ex. E, ¶¶ 38–40. *See Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden*, 834 F. Supp. 2d 1091, 1102 (D. Idaho 2011) (finding plaintiffs were irreparably harmed because they forwent "activity that is at least arguably protected by federal law").

In addition to these business losses, Staffing Agency Plaintiffs face potential fines that could be catastrophic, considering the Temporary Staffing Laws permit fines of up to $18,000, and staffing agencies often book hundreds of employees per day. 820 ILCS 175/70; Ex. B, ¶¶ 4, 8; Ex. C, ¶ 7; Ex. D, ¶ 7; Ex. E, ¶ 3. For these high-volume, low-margin businesses, even modest changes in demand and a single inaccurate decision about the actual costs of a client's benefits could cause financial havoc. Ex. B, ¶¶ 83–87; Ex. C, ¶¶ 44–49; Ex. E, ¶¶ 35, 38–40.

**IV.     The Balance of the Hardships Weighs in Favor of Plaintiffs.**

Seventh Circuit courts utilize an equitable "sliding scale" approach in weighing the balance of the potential harms against the movant's likelihood of success—"the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015); *see also Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). On the one hand, Plaintiffs have established significant and irreparable harm. *Supra*, Section III. On the other hand, Defendant has little (if any) interest in enforcement of unconstitutional laws. *See, e.g.*, *Volkswagen AG v. iman365-usa*, No. 18-CV-06611, 2020 WL 977969, at *8 (N.D. Ill. Feb. 28, 2020) ("[E]njoining the Defendant from violating the law cannot, by its very nature, cause the Defendant any harm."). Courts routinely grant injunctive relief against state officials where refusing to grant the injunction would have catastrophic effects on a plaintiff's ability to conduct business.[3]

**V.     The Public Interest Favors Granting Preliminary Injunctive Relief.**

Preliminary injunctive relief serves the public interest when used to correct ongoing violations of constitutional rights. *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984) ("[T]he public has a strong interest in the vindication of an individual's constitutional rights."). Northern District of Illinois courts routinely follow this directive. *See, e.g., Foster v. Ghosh*, 4 F.

---

[3] *See, e.g.*, *Illinois Sporting Goods Ass'n v. Cnty. of Cook*, 845 F. Supp. 582, 592 (N.D. Ill. 1994) (granting preliminary injunction; "If the injunction is denied, plaintiffs face the potential loss of their businesses."); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, No. 23 CV 50279, 2023 WL 5367336, at *10 (N.D. Ill. Aug. 4, 2023) (granting preliminary injunction; "The harm to [the Illinois Attorney General] and the public is minimal . . . and the conduct is already covered by the existing Consumer Fraud Act."); *Win Win Aviation, Inc. v. Richland Cnty., S.C. Sheriff's Dep't*, No. 15 C 50051, 2015 WL 1197534, at *4 (N.D. Ill. Mar. 16, 2015) (granting temporary restraining order; "[T]he potential harm is very high, including default on current contracts, loss of future contracts, and a potential of going out of business."); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) ("[Plaintiffs] irreparable harm is that it will lose sales and the opportunity to maintain and develop relationships with existing and potential clients of [its] products.").

Supp. 3d 974, 984 (N.D. Ill. 2013) (finding preliminary injunction in the public interest since "Illinois taxpayers have a vested interest in ensuring that the constitutional rights of its citizens are protected").[4] The public interest is also served by enjoining ongoing violations of the Supremacy Clause of the United States Constitution. *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 751 (N.D. Ill. 2007) (granting permanent injunction in preemption case; "[T]he public interest is served by any abatement of unconstitutional activity.").

This case affects the livelihoods of nearly a million Illinois workers in an industry with an annual payroll of about $7.8 billion. Ex. A, ¶ 16. According to the ASA, staffing agencies employed 984,200 workers in Illinois in 2022, with a weekly average of 189,600 workers. *Id.* Absent an injunction prohibiting enforcement of the challenged provisions of the Temporary Staffing Laws, temporary staffing will become untenable and light industrial work—such as manufacturing and distribution—will migrate across the border into neighboring states. The public interest is served by avoiding this kind of dislocation in the employment markets, and the outflux of potentially hundreds of thousands of jobs from Illinois to other states.[5]

---

[4] *See also Illusions Too Reality, LLC v. City of Harvey*, No. 02 C 7272, 2003 WL 260335, at *8 (N.D. Ill. Feb. 4, 2003) (granting a temporary restraining order and finding "the public interest is served by preventing the violation of a party's constitutional rights"); *Sharif v. City of Chicago*, 530 F. Supp. 667, 671 (N.D. Ill. 1982) ("This preliminary injunction will serve the public interest by vindicating constitutional rights.").

[5] *See, e.g., Lineback v. Chauffeurs, Teamsters, & Helpers Loc. Union No. 414*, 513 F. Supp. 2d 988, 999 (N.D. Ind. 2007) ("The harm to the public interest would be that those towns in which Aggregate facilities are located could potentially lose a business and the jobs and taxes that come with having the business located there."); *MEDCARE HMO v. Bradley*, 788 F. Supp. 1460, 1473 (N.D. Ill. 1992) (granting permanent injunction; "[M]any Medicaid recipients will be underserved if MEDCARE were to go out of business abruptly."); *see also Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1221 (7th Cir. 1989) (affirming preliminary injunction; "[O]ne of the expressed purposes of ERISA is to ensure the protection of millions of employees covered by pension plans.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court enter an Order preliminarily enjoining Defendant and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the "equivalent benefits" provision, the "labor dispute" provision, and the "interested party" provisions of the Temporary Staffing Laws, and grant such other relief this Court deems appropriate.

DATED: December 21, 2023          Respectfully Submitted,


/s/ *Matthew T. Furton*
Matthew T. Furton
(mfurton@lockelord.com)
Julie C. Webb
(jwebb@lockelord.com)
Heidi L. Brady
(heidi.brady@lockelord.com)
Joshua A. Skundberg
(josh.skundberg@lockelord.com)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

Carl C. Scherz, *Pro Hac Vice Forthcoming*
(cscherz@lockelord.com)
Locke Lord LLP
2200 Ross Avenue
Dallas TX, 75201
*Attorneys for Plaintiffs*

AND

Bradley S. Levison
(brad@hlhlawyers.com)
Herschman Levison Hobfoll PLLC
401 S. LaSalle St.
Ste. 1302G
Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc.*