**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., TempsNow Employment and Placement Services LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | Case No.: 1:23-cv-16208 |
| Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, | ) ) ) | |
| Defendant. | ) ) | |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT .........................................................................................................................2

    I.    Plaintiffs Have a Likelihood of Success as to Each of the DTLSA
        Provisions at Issue..................................................................................................2

        A.    ERISA Preempts Section 42. ..........................................................................2

                1.    The DTLSA Is Not a Mere Wage Statute. ........................................3

                2.    The DTLSA Is Not a "Wage Floor" Statute. ....................................4

                3.    The DTLSA Is Not a Prevailing Wage Statute. ...............................6

                4.    The Cash Payment Option Does Not Save the DTLSA
                      From ERISA Preemption. ..................................................................7

                  5.    Section 42 Is Not An "Incidental" Statute. ......................................9

        B.    The NLRA preempts Section 11 ....................................................................9

                 1.    Machinist Preemption Applies.........................................................10

                2.    Garmon Preemption Applies............................................................12

        C.    Section 67 Violates Due Process. ................................................................14

    II.    There Are No Jurisdictional Flaws Diminishing the Likelihood of Success
        In this Timely Proceeding....................................................................................16

    III.    Plaintiffs Have Shown Irreparable Harm and an Inadequate Remedy at
        Law. .....................................................................................................................18

    IV.    The Balance of the Hardships and the Public Interest Weigh in Favor of
        Issuing an Injunction...........................................................................................19

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*520 Michigan Ave. Assocs., Ltd. v. Devine*,
433 F.3d 961 (7th Cir. 2006) ................................................11

*520 S. Michigan Ave. Assocs., Ltd.*, 549 F.3d at 1119 ....................................13

*Allstate Maintenance, LLC*,
367 NLRB No. 68 (Jan. 11, 2019) ....................................13

*Belknap, Inc. v. Hale*,
463 U.S. 491 (1983) ................................................10

*Bogue v. Ampex Corp.*,
976 F.2d 1319 (9th Cir. 1992) ....................................3

*Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*,
519 U.S. 316 (1997) ................................................2, 6

*Cannon v. Edgar*,
33 F.3d 880 (7th Cir. 1994) ....................................12

*Cannon v. Edgar*,
825 F. Supp. 1349 (N.D. Ill. 1993), *aff'd*, 33 F.3d 880 (7th Cir. 1994) ................13

*Caterpillar Inc. v. Lyons*,
318 F. Supp. 2d 703 (C.D. Ill. 2004) ....................................11

*Chamber of Commerce of U.S. v. Bragdon*,
64 F. 3d 497 (9th Cir. 1995) ....................................11, 12

*Collins v. Ralston Purina Co.*,
147 F.3d 592 (7th Cir. 1998) ....................................3, 4, 5

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015) ....................................4, 5

*E.P.A. v. Pollution Control Bd.*,
579 N.E.2d 1215 (Ill. App. Ct. [5th Dist.] 1991) ....................................18

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001) ....................................3, 8, 9

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987) ................................................................................................3, 8

*Gobeille v. Liberty Mut. Ins. Co.*,
    577 U.S. 312 (2016) ...........................................................................................9, 18

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*,
    546 F.3d 639 (9th Cir. 2008) .............................................................................4, 5

*Hayen v. County of Ogle*,
    101 Ill.2d 413 (Ill. 1983) ......................................................................................11

*Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*,
    997 F.3d 848 (9th Cir. 2021) .............................................................................5, 18

*Illinois Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ..................................................................................2

*Ingersoll–Rand Co. v. McClendon*,
    498 U.S. 133 (1990) ................................................................................................2

*State ex rel. Leibowitz v. Fam. Vision Care, LLC*,
    2020 IL 124754 ......................................................................................14, 15, 16

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
    570 F.3d 849 (7th Cir. 2009) ................................................................................14

*Machinists. Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*,
    904 F.3d 490 (7th Cir. 2018) .....................................................................10, 11, 12

*Marsh v. Mass. Coastal R.R.*,
    214 N.E.2d 388 (Mass. 2023) .................................................................................6

*McCleskey v. CWG Plastering, LLC*,
    897 F.3d 899 (7th Cir. 2018) ..................................................................................1

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ..............................................................................................18

*Merit Construction Alliance v. City of Quincy*,
    759 F.3d 122 (1st Cir. 2014) ...................................................................................8

*Miller Plastic Products, Inc.*,
    372 NLRB No. 134 (Aug. 25, 2023) .....................................................................13

*Nat'l Foreign Trade Council, Inc. v. Giannoulias*,
    523 F. Supp. 2d 731 (N.D. Ill. 2007) ....................................................................20

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ........................................................................................................9

*Northern Ill. Chapter of Builders v. Lavin*,
    431 F.3d 1004 (7th Cir. 2005) ......................................................................................12

*Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*,
    195 F.3d 975 (7th Cir. 1999) ........................................................................................17

*Pride Ambulance Co.*,
    356 N.L.R.B. 1023 (2011) .............................................................................................13

*Retail Industry Leaders Association v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ....................................................................................8, 18

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ......................................................6

*Rutledge v. Pharmaceutical Care Management Ass'n*,
    592 U.S. 80 (2020) ..........................................................................................................9

*Scachitti v. UBS Fin. Servs.*,
    215 Ill. 2d 484, 831 N.E.2d 544 (Ill. 2005) .................................................................14

*Simas v. Quaker Fabric Corp.*,
    6 F.3d 849 (1st Cir. 1993) ..............................................................................................3

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ......................................................................................................16

*Westrock Co. & Victory Packaging, LP v. Dillon*,
    No. 21-CV-05388, 2021 WL 6064038 (N.D. Ill. Dec. 22, 2021) ..................................2

*Wingert v. Hradisky*,
    2019 IL 123201 .............................................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................................19

*Wisconsin Dept. of Industry v. Gould Inc.*,
    475 U.S. 282 (1986) ...............................................................................................11, 13

**Statutes and Rules**

740 ILCS 92/15 ......................................................................................................14, 15

740 ILCS 92/15(a) .........................................................................................................14

740 ILCS 175/4 ................................................................................................15

740 ILCS 175/4(b)(1) ........................................................................................14

820 ILCS 105/1 et seq.........................................................................................4

820 ILCS 130/1 ..................................................................................................6

820 ILCS 175/2 ..................................................................................17, 19, 20

820 ILCS 175/42 ................................................................................................3

820 ILCS 175/50 ..............................................................................................17

820 ILCS 175/67 ..................................................................................13, 14, 15

29 U.S.C. § 157 ................................................................................................12

29 USC 1144(c) ..................................................................................................2

U.S. Code § 1132(g) ........................................................................................17

**Other Authorities**

56 Ill. Admin. Code § 260.401(e) ....................................................................13

47 Ill. Reg. 12,155, 12,457–80 (Aug. 18, 2023) ............................................17

Ill. Admin. Code tit. 56, §§ 260.100 ..............................................................12

Ill. Admin. Code tit. 74, § 721.360 (effective November 16, 2023)................8

## INTRODUCTION

The Director of the Illinois Department of Labor's response brief (ECF #32) is intransigent and reflects willful blindness. The Director insists the role of the federal government in managing ERISA plans and labor relations is not broad enough to encompass, and thus pre-empt, the amendments to the Day and Temporary Labor Services Act ("DTLSA"). That is untrue. ERISA and the NLRA are two federal statutes with the broadest possible preemption. *See McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 902 (7th Cir. 2018).

The Director also argues DTLSA Section 42 is "traditional state regulation" akin to wage statutes that impose mere "bookkeeping" challenges. The undisputed factual record, however, shows that staffing agencies' ERISA plan administrators will need to engage in prolonged, individual, costly, burdensome, and discretionary decision making under Section 42. ERISA does not permit states to impose such burdens.

The Director also insists the "labor disputes" provision (i.e., Section 11) is not preempted because it is very narrow legislation that does not affect labor relations or address rights under the NLRA. The Director's position, however, is inconsistent with the broad mandate of Section 11 that changes the legal rights of employees in ways that affect labor relations.

Finally, the Director argues that uninjured, "interested parties" can bring suit because they are akin to *qui tam* relators acting on an assignment of rights from the State of Illinois. That is inaccurate. So-called "interested parties" are merely interlopers without an assignment from the IDOL or the State.

Plaintiffs explain below what the DTLSA is, and what is not, in plain and simple terms. What is clear from all of this is that the staffing industry, its employees and clients, and the Illinois economy need urgent protection from governmental overreach. No issue raised by the Director

should deter this Court from entering an Order prohibiting the Director and all parties acting in concert with the Director, including "interested parties," from enforcing certain provisions of the DTLSA pending a trial.

**ARGUMENT**

**I.      Plaintiffs Have a Likelihood of Success as to Each of the DTLSA Provisions at Issue.**

At the preliminary injunction stage, "the applicant need not show that it definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). The movant needs to make a "strong showing," which is less than "proof by a preponderance." *Id.* The movant must only show it has "'some chance' of success." *Westrock Co. & Victory Packaging, LP v. Dillon*, No. 21-CV-05388, 2021 WL 6064038, at *5 (N.D. Ill. Dec. 22, 2021) (citation omitted). Plaintiffs exceed this modest standard.

**A.      ERISA Preempts Section 42.**

The Director does not contest that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter related to any employee benefit plan . . . ." 29 USC 1144(c); ECF #32, p. 13. Similarly, the Director does not contest the purpose of ERISA preemption is "to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government" and to reduce "the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990). The Director suggests there is a presumption against ERISA preemption (ECF #32, pp. 13–14), yet the Supreme Court repeatedly characterizes Section 1144(a)'s text as "clearly expansive," having an "expansive sweep," "conspicuous for its breadth," "deliberately expansive," and "broadly worded." *See Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 324 (1997) (internal quotation marks and citations omitted) (cataloging statements in prior precedents).

Section 42 satisfies both options for ERISA preemption—it has both an impermissible reference to, and connection with, ERISA plans. ERISA preempts any state-imposed, ongoing administrative program for determining and handling employee benefits, including Section 42. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11 (1987); *Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998) (noting the "important point" requiring a finding of preemption is that the company's executives were required to make "nonclerical 'judgment calls'" (citation omitted)); *see also Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853–54 (1st Cir. 1993) (finding prolonged, individualized, non-mechanical decisions about benefits to be a statutory imposition preempted by ERISA); *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1322 (9th Cir. 1992) (finding a corporate policy requiring "ongoing, particularized, administrative, discretionary analysis" to be an ERISA plan). "[D]iffering state regulations affecting an ERISA plan's 'system for . . . paying benefits' impose 'precisely the burden that ERISA pre-emption was intended to avoid.'" *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001). Therefore, a preemption finding is mandated.

### 1. The DTLSA Is Not a Mere Wage Statute.

The Director inaccurately characterizes Section 42 as a mere wage statute outside the scope of ERISA's preemption provision because it addresses an area of "traditional state regulation." ECF #32, pp. 13–14. Section 42 is not limited to wages. Indeed, this lawsuit does not challenge the "equivalent wages" portion of Section 42. Rather, this suit relates to the non-wage provision of Section 42, which states certain staffing agency employees:

> [S]hall be paid not less than the … **equivalent benefits** as the lowest paid directly hired employee of the third party client with the same level of seniority at the company and performing the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and that are performed under similar working conditions.

820 ILCS 175/42 (emphasis added). This provision dictates that each staffing agency employee's benefits must be individually assessed. Staffing agency plan administrators must do this under

circumstances where some employees reject some or all the offered benefits while others accept them and fund them at different levels that are often dependent on the employee's family situation, risk tolerance, and preference for current income. *See* ECF #23, p. 14. These administrators must decide what those benefits are worth to each person, given each person's individual choices. *See id.* This is a difficult exercise to do correctly, as it presumes the staffing agency knows why an individual employee made specific choices.

Once the plan administrator decides the value of the staffing agency's benefits for its own employee, they need to do the same for whomever is the comparable employee on the client side. The plan administrator's decisions depend on the information provided to the staffing agency by the client about a stranger. This is fraught with danger because the client's plan administrator is unlikely to know why the comparable employee made a particular choice in terms of accepting, rejecting, or funding one or more benefits. Section 42 impermissibly imposes discretionary decision making, and quite a bit of it, on staffing agency ERISA plan administrators that must decide whether the benefits offered to each agency employee are equivalent to the benefits offered to a "comparable" stranger. *See Collins*, 147 F.3d at 597 (7th Cir. 1998) ("Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it."). Section 42 is not a wage law. *See, e.g.*, 820 ILCS 105/1 et seq. (establishing minimum wages).

## 2.    The DTLSA Is Not a "Wage Floor" Statute.

Section 42 is also not a "wage floor" (ECF #32, p. 17) statute like those that were found to be outside the scope of ERISA preemption in *Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 546 F.3d 639 (9th Cir. 2008) and *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015). In *Golden Gate*, the Ninth Circuit held ERISA did not preempt a San Francisco ordinance mandating employers either (1) give employees payments for "health care expenditures" or (2) pay the city a pre-determined cash payment. 546 F.3d at 646–47. If employers

-4-

chose the cash payment option, then the ordinance required them to pay, for example, an additional $1.76 per hour, which the Court considered to be "mechanical record-keeping" associated with "fixed" payments due at "known times" that "do not depend on contingencies." *Id.* at 651; *see also Howard Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*, 997 F.3d 848, 861 (9th Cir. 2021) (noting that *Golden Gate* is limited to "non-discretionary administrative obligations"). Section 42, on the other hand, imposes the opposite of a mechanical process. It mandates a series of actions by ERISA plan administrators that need to be undertaken, repeatedly, with judgment and discretion for each employee.

Similarly, the court in *Concerned Home Care Providers* found a New York statute that set a minimum amount of total compensation for home health care workers that could be reached through any combination of wages and benefits to be outside ERISA's scope. 783 F.3d at 88–90. The statute only had an "attenuated allusion" and "remote bearing" to ERISA plans since it could be satisfied solely by actual wages, thereby remaining "agnostic" towards employee benefits. *Id.*

Illinois staffing agencies face a different kind of statute. Section 42 requires staffing agencies to compare and contrast the value of their own benefit offerings to specific employees with the package offered by clients to a particular employee. As demonstrated in Plaintiffs' declarations, a person-by-person analysis, that must be constantly revisited, is required. *See* ECF #23, pp. 13–15. It is evident that Section 42 (unlike a wage statute, such as the Illinois Minimum Wage Law) impermissibly imposes discretionary decision making on staffing agency ERISA plan administrators. *See Collins*, 147 F.3d at 597 ("Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it."). The DTLSA impermissibly references ERISA.

### 3. The DTLSA Is Not a Prevailing Wage Statute.

The Director speciously argues that Section 42 lacks a "connection with" ERISA plans because it is akin to a prevailing wage statute. ECF #32, p. 15–19. That is an inappropriate analogy. Prevailing wage acts concern labor conditions on public works projects, which has long been recognized as embodying a unique, legitimate *state* interest. *See* 820 ILCS 130/1 (noting the policy of the State of Illinois is to pay "the general prevailing hourly rate" for workers "engaged in public works."). Every prevailing wage act case cited by the Director was evaluated for ERISA preemption purposes through a highly deferential lens because states have been using prevailing wage laws to protect the public's unique interests for many decades before ERISA was passed. *See* ECF #32, pp. 16–17; *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 332 (1997) (explaining the deferential treatment for prevailing wage act statutes). A recent case provides the historical context:

> Recognizing that prevailing wage laws are a powerful mechanism for States, as market participants, to direct public policy on their own public works projects by controlling how to spend public funds to achieve the States' policy objectives, *see, e.g.*, *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 332, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (State prevailing wage law provided incentive to utilize employee apprenticeship programs on public works projects), and that such laws fall within the "historic police powers of the States," *id.* at 331, 117 S.Ct. 832, *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), the United States Supreme Court has expressed reluctance to find a congressional intent to preempt such laws even where Federal legislation includes a broad preemption provision. *See, e.g., Dillingham Constr., N.A., Inc., supra* at 334, 117 S.Ct. 832 (rejecting argument that State's prevailing wage law was preempted by broad preemption clause of Federal Employee Retirement Income Security Act [ERISA], which expansively preempted all State laws that have "connection with" or "relate to" employee benefit plans, absent clearer indication of congressional intent to usurp State's public works policy).

*Marsh v. Mass. Coastal R.R.*, 214 N.E.2d 388 (Mass. 2023).

The DTLSA does not present any similar public works policy concerns. Section 42 is a brand-new statute that governs the private sector, where there are no prevailing wage statutes. It

has no public schedule of wages that makes administration relatively easy. *See, e.g.*, Cook County Prevailing Wage Rates, Ill. Dept. Lab. (2024), https://labor.illinois.gov/content/dam/soi/en/web/idol/laws-rules/conmed/documents/fy24/20240125/Cook.pdf. Indeed, the DTLSA could not have a schedule analogous to a prevailing wage act schedule because the benchmark under Section 42 is the actual cost of a staffing agency's client's benefits for a particular person. Thus, a company like Plaintiff AllStaff will face different benchmarks for each comparable employee at each of the 140 or so companies it serves. ECF #23-3, p. 2, ¶3. For these reasons, Director's reliance on prevailing wage act preemption decisions is misplaced.

### 4. The Cash Payment Option Does Not Save the DTLSA From ERISA Preemption.

Section 42 allows staffing agencies to pay the cash equivalent of benefits in lieu of providing the benefits themselves. No court has considered preemption of a statute dictating payment of certain benefits or their actual cash value where the cash option is computed by reference to the actual costs of a particular person's benefits. Section 42 is the first of its kind and thus a bellwether.

This cash payment option is only an alternative after the staffing agency and client plan administrators have gone through all the work described above. Pursuit of the cash payment option does not relieve any of the administrative burdens the law imposes. The cash payment amount is set by reference to the amount that the actual cost of the client's benefits exceeds the value of the agency's benefits, both with reference to specific employees. The amount of the cash payment is neither fixed nor tied to an objective benchmark. Rather, the amount of the cash is computed by determining the "actual cost" of the client's benefits to a particular person. And that "actual cost" for the comparable employee is a dynamic number influenced by a myriad of factors including changing preferences (e.g., opting into health insurance), changing life status (e.g., marriage or

birth), changing plan designs (e.g., changing the dental coverage), and changing laws (e.g., Ill. Admin. Code tit. 74, § 721.360 (effective November 16, 2023)).

A similar opt-out of an impermissible intrusion into ERISA plans was rejected in *Egelhoff*, 532 U.S. at 149–50. In *Egelhoff*, a state statute required pension payments to be directed in a manner potentially inconsistent with the written directives of a plan participant in the event of divorce. *See id.* The statute permitted plans to opt out of its requirements, but the Court held the "statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it." *Id.* at 150. Other courts have similarly rejected statutes that contain an opt-out alternative to otherwise ERISA-preempted option. In *Retail Industry Leaders Association v. Fielder*, the Fourth Circuit affirmed a district court ruling finding a state statute preempted where it required payment of certain benefits or an unreasonable payment to the state. 475 F.3d 180, 196–97 (4th Cir. 2007). "Even if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Id.* at 193.

Similarly, in *Merit Construction Alliance v. City of Quincy*, the First Circuit considered a statute that either allowed compliance via (1) adoption of a training program with certain benefits through modification of an existing ERISA plan or (2) adoption of a non-ERISA plan. 759 F.3d 122, 129–30 (1st Cir. 2014). The statute required the ERISA plan administrator to structure its "administrative practices according to a set of uniform guidelines" provided by a state statute. *Id.* at 130 (quoting *Fort Halifax Packing Co.*, 482 U.S. at 13). The court found the statute preempted because it had the effect of "destroying the benefit of uniform administration that is among ERISA's principal goals." *Id.* at 131. Section 42 similarly undermines national uniformity and increases the costs of benefits because ERISA plan administrators at staffing agencies will need to

make reference to a client's ERISA plan and engage in information gathering, assessment, and decision making for employees working in Illinois.

### 5. Section 42 Is Not An "Incidental" Statute.

The Director cites *Rutledge v. Pharmaceutical Care Management Ass'n*, 592 U.S. 80, 87–89 (2020) for the proposition that ERISA does not preempt a law that merely increases costs. ECF #32, p. 16. This reliance is misplaced. Unlike the statute setting reimbursement rates for pharmaceuticals that *Rutledge* held not preempted because it was merely a form of cost regulation, Section 42 imposes systematic burdens on the administration of staffing agency ERISA plans as described above. This is not merely incidental, nor is it merely a matter of cost. Unlike the *Rutledge* statute that did not dictate plan choices (592 U.S. at 88), Section 42 binds plan administrators to conduct the comparison process outlined in the statute. A state law, such as Section 42, has a "connection with" ERISA plans when it "'governs . . . a central matter of plan administration' or 'interferes with nationally uniform plan administration.'" *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (quoting *Egelhoff*, 532 U.S. at 148). Section 42 is preempted because it "governs the payment of benefits, a central matter of plan administration," *Egelhoff*, 532 U.S. at 148, and "mandates employee benefit structures or their administration." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995).

### B. The NLRA preempts Section 11.

The Director argues Section 11 of the DTLSA does not "regulate conduct that the NLRA protects or prohibits, and it does not impermissibly restrict the use of replacement workers during strikes." ECF #32, p. 23. This position is inconsistent with the plain language of Section 11, as well as the scope of NLRA preemption.

1.     *Machinist* **Preemption Applies.**

The Director contends Section 11 "does not affect the free play of economic forces" that govern labor/management relations under the NLRA. ECF #32, p. 27. This assertion, however, does not square with the facts. "The law makes it easier for workers to sue temp agencies, unionize, and strike." David Struett, *Temp Worker Advocates Hail Illinois Law that Promises Equal Pay*, Chi. Sun-Times, (Oct. 3, 2023), https://chicago.suntimes.com/voices-labor/2023/10/3/23901849/ temp-worker-fairness-safety-act-permatemping. Tim Drea, the President of the AFL-CIO, said that the law "outlaws retaliation against temp workers who refuse to cross picket lines." *Id.* He continued, "[t]he bill stops pitting neighbor against neighbor, brother against brother, because if there's a picket line, you can refuse not [sic] to cross that picket line." *Id.* President Drea thus recognized the new statute changes the economic forces that are supposed to be the exclusive regulator of labor relations.

The Director also argues the statute is too remote from union activity to have any impact. ECF #32, p. 27. The Director insists Section 11 has only "an indirect effect on the ability to hire replacement workers" because it merely regulates potential replacement workers. *Id.* In making this point, the Director relies heavily on *Belknap, Inc. v. Hale*, 463 U.S. 491, 511–12 (1983), which held that certain state-law claims brought by replacement workers were not preempted. The Director's reliance on *Belknap* is misplaced. The *Belknap* Court held *Machinists* did not preempt replacement workers' state law breach of contract claims when their new employer allegedly lied to them about their roles being permanent, rather than temporary, in connection with a strike. *Id.* at 496, 500. That scenario has nothing to do with this case. *Belknap* dealt with employees' offensive claims. Section 11 provides workers with rights. Those rights could affect whether management holds out during protracted negotiations over a collective bargaining agreement.

-10-

Those rights also could determine if an employer can withstand a strike by hiring replacement workers.

Seventh Circuit courts have repeatedly found Illinois statutes to be preempted under the NLRA when they interfere with employers' ability to hire temporary staffing employees as replacement workers during labor disputes. *See 520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 965 (7th Cir. 2006) (holding the NLRA preempted Illinois law criminalizing employers' use of temporary staffing agency employees as replacements); *Caterpillar Inc. v. Lyons*, 318 F. Supp. 2d 703, 709 (C.D. Ill. 2004) ("By depriving employers of an economic weapon of self-help, i.e., the hiring of professional strikebreakers and the use of third party day and temporary labor agencies, the ESA upsets Congress' intended balance of power between labor and management."). The DTLSA targets a unique industry – the temporary staffing industry – that management in the light industrial industry uses to counter the leverage of any labor union.

Likewise, courts have found similar attempts to use prevailing wage concepts in the private sector preempted under *Machinists*. *See, e.g., Chamber of Commerce of U.S. v. Bragdon*, 64 F. 3d 497, 501 (9th Cir. 1995) (holding that a statute applying the "prevailing wage concept, which was developed for use by government entities when they are acting as proprietors" to the private sector was preempted under *Machinists* because it interfered with the free play of economic forces in the private construction industry). Prevailing wage laws, unlike the DTLSA, involve the State acting as a proprietor and participant in the marketplace, rather than a regulator. *See Bragdon*, 64 F. 3d at 501–03.; *see also generally Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 289 (1986) (explaining the distinction between states acting as buyers of services and states acting as regulators); *Hayen v. County of Ogle*, 101 Ill.2d 413, 422 (Ill. 1983) (explaining the procedural history of the Illinois Prevailing Wage Act). A state may avoid preemption when it acts as a market

-11-

participant rather than a regulator. *Northern Ill. Chapter of Builders v. Lavin*, 431 F.3d 1004, 1005 (7th Cir. 2005). In contrast, when a state acts as a regulator, as the IDOL admits in this action, ECF #32, p. 8, its actions are subject to preemption. *See Bragdon*, 64 F. 3d at 501–03.

Finally, the Director improperly attempts to minimize the scope of *Machinists* by suggesting the doctrine does not apply unless a statute prohibits conduct. ECF #32, p. 27. That is not the law. Regulation, rather than outright prohibition, is all that is needed to run afoul of *Machinists*. *Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 499 (7th Cir. 2018) ("Even State laws with indirect effects on bargaining can be preempted under *Machinists*."). Section 11 is preempted because it regulates labor relations in the light industrial industry, which is all that is required. *See Cannon v. Edgar*, 33 F.3d 880, 885 (7th Cir. 1994).

## 2. *Garmon* Preemption Applies.

The Director argues Section 11 is not preempted under *Garmon* since the "NLRA does not arguably protect the right of potential replacement workers to receive an alternative work assignment if they decline to work at a struck jobsite." ECF #32, p. 24. This is an unduly restrictive reading of Section 11.

Section 11 is an anti-retaliation statute. The Director cannot credibly contend otherwise. The now-expired emergency rules and the proposed permanent rules outline in detail what "retaliation" is forbidden by Section 11. Ill. Admin. Code tit. 56, §§ 260.100 ("'Retaliate' means to reprimand, discharge, suspend, demote, deny a work assignment, or change the terms or conditions of the laborer's assignment with a third party client because of the laborer's involvement in protected activities . . . ."). Protection against retaliation for supporting or refusing to support collective action is the essence of Section 7 of the NLRA. *See* 29 U.S.C. § 157.

Section 11 also provides new remedies. In the event a worker is subjected to retaliation for under Section 11, an interested party can commence a circuit court lawsuit seeking injunctive

relief, such as a reinstatement remedy, or statutory penalties and attorneys' fees. 820 ILCS 175/67. This cannot coexist with the NLRB, which has exclusive jurisdiction over claims for retaliation. *520 S. Michigan Ave. Assocs., Ltd.,* 549 F.3d at 1119. "The *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA]." *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986).

The Director also argues that the NLRA does not extend to "employment disputes involving unrelated workers who are hired to replace striking employees[.]" ECF #32, pp. 24–25. This position is inconsistent with governing law. Section 7 of the NLRA covers all employees, union and non-union. *Pride Ambulance Co.*, 356 N.L.R.B. 1023, 1023 & 1041 (2011). Section 7 covers a plethora of activities, not simply the replacement of striking employees. *See Miller Plastic Products, Inc.*, 372 NLRB No. 134 (Aug. 25, 2023) (overturning *Allstate Maintenance, LLC*, 367 NLRB No. 68 (Jan. 11, 2019)). And it applies to individual actions, contrary to the Director's suggestion that Section 7 only applies to actions of groups. *See id.*; ECF #32, p. 25.

The Director also suggests that *Garmon* does not apply because the causes of action may not be identical, and facial challenges face a substantial burden. ECF #32, pp. 18–19. Again, this position ignores what the proposed regulations demonstrate: Section 11 is an anti-retaliation and new remedy statute that only comes into play in the wake of a temporary employee refusing an assignment to a client experiencing a labor dispute. 56 Ill. Admin. Code § 260.401(e). *Garmon* preemption is extraordinarily broad, reaching statutes that even "arguably" affect Section 7 rights under the NLRA. *See Cannon v. Edgar*, 825 F. Supp. 1349, 1354 (N.D. Ill. 1993), *aff'd*, 33 F.3d 880 (7th Cir. 1994). Section 11 arguably affects Section 7 rights and is therefore preempted.

-13-

C.      **Section 67 Violates Due Process.**

The Director incorrectly contends Section 67 cannot violate due process principles because it is a standard *qui tam* statute. ECF #32, pp. 30–31. Section 67 is fundamentally different from a *qui tam* statute. Most importantly, claim ownership is different. "It 'is called a "*qui tam* action' because the plaintiff states that he sues *as well* for the state as for himself.'" *Scachitti v. UBS Fin. Servs.*, 215 Ill. 2d 484, 494, 831 N.E.2d 544, 551 (Ill. 2005) (emphasis in original) (citation omitted); *see also U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009) (noting the same observation and stating that the "procedural differences between personal and *qui tam* litigation are so great"). Both Illinois *qui tam* statutes expressly state than "[t]he action shall be brought in the name of the State." *See* 740 ILCS 175/4(b)(1) (False Claims Act or "FCA"); 740 ILCS 92/15(a) (Insurance Claims Fraud Prevention Act or "ICFPA"). Section 67 does not. 820 ILCS 175/67 (authorizing so-called "interested parties" to file lawsuits in their own name).

Control of the claim is also radically different. Illinois' ownership interest is protected under an actual *qui tam* statute by procedural safeguards ensuring the relator is acting in the state's best interest. For example, the ICFPA states: "The action may be dismissed only if the court and the State's Attorney or the Attorney General, whichever is participating, gives written consent to the dismissal stating their reasons for consenting." 740 ILCS 92/15; *see also* 740 ILCS 175/4(b)(1) (substantially similar); *see also U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009) ("[T]he United States needs protection from bumbling relators."). Section 67 contains no similar mechanism. Instead, Section 67 allows any so-called "interested parties" to pursue claims for alleged violations of the DTLSA, including cured violations, however they wish. 820 ILCS 175/67. Under Section 67, neither the IDOL nor the Attorney General can stop an interested party from pursuing a weak claim through trial or settling a strong claim without a fair resolution. *Id.* That structure violates the Constitution. *See State ex rel. Leibowitz v. Fam. Vision Care, LLC*,

-14-

2020 IL 124754, ¶ 76. "The legislature may add to the powers of the attorney general, but it cannot reduce the attorney general's common-law authority in directing the legal affairs of the State. Thus, legislation that usurps the common-law powers of the attorney general is invalid." *Id.* (internal citations omitted). Frankly, it is surprising that the Attorney General is defending the validity of the interested parties mechanism in this case.

The General Assembly knows how to enact a statute establishing *qui tam* procedures. But it did not do so here. Although the Director suggests there is a partial assignment of the government's claim in the DTLSA (ECF #32, p. 24), that is false. There is no language in Section 67 indicating interested parties take any assignment of the State's interest. The process for pursuing a Section 67 claim is different from the process established in the two Illinois *qui tam* statutes:

| Qui Tam Actions | DTLSA § 67 |
|---|---|
| Interested party files complaint under seal | Interested party files complaint with the IDOL |
| State can elect to intervene, eliminating further action by interested party | Interested party can file lawsuit regardless of IDOL determination or action |
| If the State does not file and the interested party does, the State retains right to intervene, file motions and must approve any dismissal or settlement | Neither the State nor IDOL have any continuing involvement, and play no role in settlement. |

*Compare* 740 ILCS 92/15 *and* 740 ILCS 175/4, *with* 820 ILCS 175/67.

The DTLSA's unprecedented private enforcement scheme appears to be an amalgam of three different procedural devices: a *qui tam* claim (because of the 90/10 split of the spoils if there's a trial), a putative unfair labor practices claim (because of the substance of the claim), and an Illinois Human Rights Act claim (because of the cooling-off period). This approach violates numerous due process principles that are so basic there are no cases describing them other than *Leibowitz* and *Wingert v. Hradisky*, 2019 IL 123201. The *Wingert* decision is particularly

-15-

persuasive because it addressed a similarly unprecedented Illinois statute that empowered strangers to sue strangers. The Illinois Supreme Court stated: "In a truly unprecedented legislative move, section 25(b)(2) allows a plaintiff to recover substantial civil damages from a defendant who not only was not the proximate cause of the plaintiff's damages but who also has no relationship with or connection to the [injured party]." *Id*. at ¶34. The Court held that this procedural mechanism was "both arbitrary and unreasonable." *Id*. at ¶30. Similarly, authorizing uninjured third parties to bring lawsuits on unfounded or even cured claims, with no limit on duplicative recovery, no role for the Court's discretion, no involvement by the State, and no requirement to share any settlement proceeds with the State, exceeds the limits of constitutional due process.

At its core, the due process clause protects individuals from the coercive power of the government by ensuring that adjudication processes are fair and impartial. A duly enacted statute doing away with the pesky concept of proximate cause denies a party a fair and impartial process. "Article III grants federal courts the power to redress harms that defendants cause plaintiffs." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (citation omitted). No legislature can enact injuries into existence. *Id*. at 426. Despite this clarity, Section 67 authorizes strangers to use their own judgment to pursue alleged violations the Director considers to be cured. Under these circumstances, this Court should not hesitate to find that Section 67 is unconstitutional.

## II. There Are No Jurisdictional Flaws Diminishing the Likelihood of Success In this Timely Proceeding.

The Director's response correctly notes Plaintiffs do not include light industrial manufacturers or distributors. ECF #32, pp. 32–33. The Director argues Plaintiffs have no standing to "vindicate the constitutional rights of some third party." *Id*. at 32. This may be accurate, but it is irrelevant. It may be the case that staffing agency clients are improperly burdened by the DTLSA and would benefit from any injunction entered in this proceeding. But that is not a "jurisdictional

flaw." That is simply a reality. Third parties to this action, including many of the 650,000+ people in Illinois that chose to work as temporary employees (820 ILCS 175/2), stand to gain from an injunction in this proceeding, which was brought by Plaintiffs whose standing is unchallenged.

The Director also argues Plaintiffs have moved too soon to enjoin enforcement of legislation she considered so time-sensitive that she needed to use emergency rule making. ECF #32, pp. 33–34; 47 Ill. Reg. 12,155, 12,457–80 (Aug. 18, 2023). Although the delayed enforcement of Section 42 provides some reprieve, the General Assembly has not withdrawn Section 42. Businesses need to budget, hire, and plan around it. Moreover, the rest of the DTLSA amendments are currently effective. The Director has authority to investigate and suspend staffing agencies' registrations for violations of the recent amendments to the DTLSA. 820 ILCS 175/50. The Director also has authority to issue right to sue letters to interested parties. *Id.* 175/67. Staffing agencies are actively investigating labor disputes and disclosing their existence to employees who currently enjoy new legal rights arising from those disclosures. *See, e.g.*, ECF #23-2, pp. 12–13; ECF #23-3, p. 7, ¶¶ 39–43.

Moreover, the threat posed by Section 42 cannot be overstated. Agencies and their clients will soon take on radically different exposure for clerical errors relating to benefit determinations. Soon, a staffing agency will not face a federal action with curtailed discovery and a deferential standard of review (*see, e.g.*, *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981–82 (7th Cir. 1999)) or limited damage exposure and prevailing party attorneys' fees (*see* 29 U.S. Code § 1132(g)) as is the case under ERISA. Instead, staffing agencies will face, *inter alia*, loss of registration from their primary regulator.

> [W]here threatened action by *government* is concerned, **we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat**—for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law

eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (bolded emphasis added). Under ERISA, "a plan need not wait to bring a pre-emption claim until confronted with numerous inconsistent obligations and encumbered with any ensuing costs." *Gobeille*, 136 S. Ct. at 945; *see also Howard Jarvis,* 2019 WL 1430113, at *6 (rejecting a ripeness defense to an ERISA preemption claim where the movant would not be affected for 36 months).

The fact that the DTLSA's emergency regulations implementing Section 42 have expired and final regulations have not yet been promulgated by the Director does not render this case premature. As the Fourth Circuit noted in an ERISA challenge that was allegedly unripe, "Regulations could not alter the Act's provisions." *Fielder*, 475 F.3d at 183. Final regulations from the Director could not change the existing statutory obligations. *See, e.g.*, *E.P.A. v. Pollution Control Bd.*, 579 N.E.2d 1215, 1217 (Ill. App. Ct. [5th Dist.] 1991).

## III.    Plaintiffs Have Shown Irreparable Harm and an Inadequate Remedy at Law.

Plaintiffs have satisfied the irreparable harm standard by showing that compliance with Sections 11, 42, and 67 is already causing them to lose business, and that it is impossible to determine what effect this ongoing compliance will have on their collective ability to remain operational in Illinois. ECF #23, pp. 34–36. Plaintiffs are not saying sovereign immunity—by itself—justifies an injunction. Plaintiffs have instead established that they cannot recover money damages from Director (*id.*, pp. 33–34), which demonstrates they lack an adequate legal remedy for the losses stemming from their compliance with a preempted statute, thereby justifying preliminary injunctive relief while the constitutionality of Sections 11, 42, and 67 is determined.

The Director also incorrectly argues Plaintiffs have not demonstrated their irreparable harm is certain, great, or actual. *See* ECF #32, p. 35. While compliance with a preempted law is itself

irreparable harm (ECF #23, p. 34 (collecting cases)), compliance with a preempted law that requires prolonged and individualized determinations about the adequacy of ERISA plans is not mere "bookkeeping" or "modified human resources processes," as the Director suggests. ECF #32, p. 35. Instead, the DTLSA's imposition of an employee benefits regime at every temporary staffing agency operating in Illinois—that is riddled with unprecedented, ongoing, discretionary, and burdensome benefits determinations–constitutes extraordinary irreparable harm. For example, Plaintiff ClearStaff saw a year-to-year decline of 8% in placements for November 2023, the month Section 42 was originally to take effect, despite opening a new branch in 2023. ECF #23-2, p. 13, ¶83. Plaintiff TempsNow "does not have the size necessary to absorb both the loss in business and the additional expense and risk caused by" the challenged DTLSA amendments and will therefore likely close without preliminary injunctive relief. ECF #23-5, p. 8, ¶39. Plaintiff AllStaff may be forced to close "some or all of its Illinois operations" without a preliminary injunction. ECF #23-3, p. 8, ¶49. Plaintiff American Staffing Association's members have lost business, and will continue to lose business, because of the challenged amendments. ECF #23-1, p. 4, ¶¶ 14–15. The Director does not contest these facts. There is no doubt Plaintiffs have demonstrated that irreparable injury is likely in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## IV.    The Balance of the Hardships and the Public Interest Weigh in Favor of Issuing an Injunction.

The balance of hardships decidedly weighs in the favor of granting preliminary injunctive relief. As noted by the Director, the amendments are intended to provide incentives (ECF #32, pp. 15–16) to an industry that went from employing 300,000 in 2006 to over 650,000 in 2023. 820 ILCS 175/2. The means chosen, however, are improper. Dictating daily decisions to ERISA plan administrators and granting rights to workers supporting a strike violate the exclusive role of the

federal government in regulating retirement plans and labor/management relations. Similarly, opening the courthouse doors to litigants without an injury proximately caused by the target of their lawsuit violate Plaintiffs' right to due process under the U.S. Constitution. The public interest is served by abatement of unconstitutional activity. *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 751 (N.D. Ill. 2007) (citation omitted).

The General Assembly noted the potential for abuse of temporary workers, but it never actually found any such abuses. *See* 820 ILCS 175/2. Thus, no actual abuses need to be prevented. In contrast, if it is true that "more than a third of temporary workers [have] been in their current assignments for over a year," as stated by the Director (ECF #32, p. 36), then the impact of Section 42 on the Plaintiffs is enormous. The Plaintiffs will need to assess the value and potentially change the benefit plan for more than 200,000 people because of Section 42. *Compare id.*, *with* 820 ILCS 175/2. The cost and burden of complying with this preempted statute alone will lead to dislocation in the employment markets in the State of Illinois.

This action was brought to secure an efficient resolution. The staffing industry is willing to live with reasonable regulations, as evidenced by the limited scope of this lawsuit. The Court should not allow unconstitutional portions of the statute, which interfere with ERISA plans, labor relations, and fundamental tenants of due process, to stand. If the General Assembly wants to set a $20 minimum wage for temporary workers as a means of forcing light industrial companies to hire more employees directly, so be it. That legislation may not be popular enough to pass, but at least it would be constitutional.

DATED:  January 30, 2024                  Respectfully Submitted,

/s/ *Matthew T. Furton*
Matthew T. Furton
(mfurton@lockelord.com)
Julie C. Webb
(jwebb@lockelord.com)
Heidi L. Brady
(heidi.brady@lockelord.com)
Joshua A. Skundberg
(josh.skundberg@lockelord.com)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

Carl C. Scherz, admitted *Pro Hac Vice*
(cscherz@lockelord.com)
Locke Lord LLP
2200 Ross Avenue
Dallas TX, 75201
*Attorneys for Plaintiffs*

AND

Bradley S. Levison
(brad@hlhlawyers.com)
Herschman Levison Hobfoll PLLC
401 S. LaSalle St.
Ste. 1302G
Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc.*