```
 1                 UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   STAFFING SERVICES ASSOCIATION         )
     OF ILLINOIS, et al.,                  )
 4                                         )
                        Plaintiffs,        )   Case No. 23-cv-16208
 5   -vs-                                  )
                                           )   Chicago, Illinois
 6   JANE R. FLANAGAN, solely in           )   February 7, 2024
     her capacity as the Director          )   1:03 p.m.
 7   of the Illinois Department of         )
     Labor,                                )
 8                                         )
                        Defendant.         )
 9
                 TRANSCRIPT OF PROCEEDINGS - MOTION
10            BEFORE THE HONORABLE THOMAS M. DURKIN

11   APPEARANCES:

12   For the Plaintiffs:      MR. MATTHEW T. FURTON
                              MR. JOSHUA A. SKUNDBERG
13                            Locke Lord LLP
                              111 South Wacker Drive
14                            Chicago, IL 60606
                              (312) 443-0700
15                            Mfurton@lockelord.com
                              josh.skundberg@lockelord.com
16
     For Plaintiff M.M.D.
17   Inc., d/b/a The
     AllStaff Group:          MR. BRADLEY STEVEN LEVISON
18                            Herschman Levison Hobfoll PLLC
                              401 S. LaSalle Street, Suite 1302G
19                            Chicago, IL  60605
                              (312) 870-5800
20                            Brad@hlhlawyers.com

21

22

23          * * * * * * * * * * * * * * * * * *

24        PROCEEDINGS REPORTED BY CERTIFIED STENOGRAPHER
               TRANSCRIPT PRODUCED WITH A COMPUTER
25
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendant:      MR. JOHN THOMAS HAZINSKI
                             MR. ROBERT HENRY WEAVER
 3                           Illinois Attorney General's Office
                             115 S. LaSalle Street
 4                           Chicago, IL 60603
                             (312) 814-3000
 5                           John.hazinski@ilag.gov
                             Robert.weaver@ilag.gov
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20   Court Reporter:

21            KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                      Official Court Reporter
22               United States District Court
              219 South Dearborn Street, Suite 2328A
23                  Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
24            Kathleen_Fennell@ilnd.uscourts.gov

25
```

1                          I N D E X

2

OPENING STATEMENTS                              PAGE
3
By Mr. Furton                                       5
4   By Mr. Weaver                                      10

5
WITNESSES                                       PAGE
6
CLARICE SHIU
7
Direct Examination By Mr. Furton                   13
8   Cross-Examination By Mr. Hazinski                  56
Redirect Examination By Mr. Furton                 68
9
BYRON FIGUEROA
10
Direct Examination By Mr. Furton                   70
11  Cross-Examination By Mr. Hazinski                  82

12  SCOTT POLEN

13  Direct Examination By Mr. Furton                   96
Cross-Examination By Mr. Hazinski                 106
14

15
CLOSING ARGUMENTS                               PAGE
16
By Mr. Furton                                     115
17  By Mr. Weaver                                     141
By Mr. Furton                                     158
18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2    THE CLERK:  This is Case No. 23-cv-16208, Staffing

3  Services Association of Illinois versus Jane R. Flanagan.

4    May I please ask the attorneys present on behalf of

01:03:42  5  the plaintiff to state their names.

6    MR. FURTON:  Good afternoon, Your Honor.  Matthew

7  Furton on behalf of all the plaintiffs.

8    THE COURT:  Okay.

9    MR. SKUNDBERG:  Good afternoon.  Josh Skundberg on

01:03:55  10  behalf of all the plaintiffs.

11    MR. LEVISON:  Good afternoon, Your Honor.  Brad

12  Levison on behalf of M.M.D., Inc.

13    THE COURT:  Okay.

14    All right.  And for defendants.

01:04:04  15    MR. WEAVER:  Good afternoon, Your Honor.  Henry

16  Weaver for the Department of Labor.

17    MR. HAZINSKI:  Good afternoon, Your Honor.  John

18  Hazinski for defendant.

19    THE COURT:  All right.  We're here for a motion on a

01:04:13  20  preliminary injunction.  My understanding is plaintiffs have

21  some witnesses they want to call.

22    MR. FURTON:  That's correct, Your Honor.

23    THE COURT:  All right.  Do you want to make any type

24  of opening statement or just launch right into the witnesses?

01:04:24  25    MR. FURTON:  Well, Your Honor, we did extensive

1    briefing on the motion, and I believe Your Honor would like to

2    hear oral argument.  I'm willing to do that before the

3    witnesses or after the witnesses.  It seems like it would be

4    more sensibly after the witnesses, but --

01:04:37   5    THE COURT:  I agree.  I would benefit probably from

6    five minutes each side telling me what they expect the issues

7    to be that will have to be decided today and what you expect

8    from your witnesses.  Five minutes is all I need on each side.

9    I've got the briefs, but that would be a good way to start.

01:04:50   10   MR. FURTON:  Happy to do that.  Would you like us to

11   use --

12   THE COURT:  You can do it from counsel table.

13   MR. FURTON:  Okay.  Very good.

14   THE COURT:  That's fine.  And have a seat, that's

01:04:57   15   fine.

16   MR. FURTON:  Very good.

17   THE COURT:  All right.  You may proceed.

18   OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS BY MR. FURTON

19   MR. FURTON:  So, Your Honor, this is Matt Furton on

01:05:08   20   behalf of the plaintiffs.

21   The reason we're here is that the staffing industry

22   is facing a crisis.  The crisis is brought about by a law that

23   violates fundamental rules that govern our constitutional

24   democracy and, that is, we rely on a system of federalism

01:05:26   25   where the federal government has certain powers and the state

1  government has certain powers.  In this instance, the state

2  government has exceeded its powers by passing a statute that

3  includes three provisions that violate its rights under this

4  federalist system.

5        The Supremacy Clause of the United States

6  Constitution says the supreme law of the land is the federal

7  law when Congress determines that it will be the federal law,

8  the only law, and it has determined that when it comes to

9  ERISA, which is the employee retirement income act, as well as

10  the FL -- National Fair Labor Relations Act.

11        THE COURT:  Fair labor -- yeah, NLRB.

12        MR. FURTON:  Yes.  And the third element of our case

13  is a due process challenge.  We are challenging the

14  constitutionality of a statute that allows strangers to bring

15  lawsuits, strangers who are uninjured, who have no connection

16  to the parties.

17        THE COURT:  That's the third section of the --

18        MR. FURTON:  Yes.

19        THE COURT:  -- statute.  I think it's --

20        MR. FURTON:  67.

21        THE COURT: -- Section 67.  Okay.

22        MR. FURTON:  So we will be calling three witnesses

23  here today.  They are leaders of three of the companies who

24  are plaintiffs.

25        One is AllStaff.  AllStaff is a large company in

01:06:52

1 relation to the industry as a whole.  AllStaff will tell you

2 about what the statute requires of a company like AllStaff.

3 And in one word, the statute requires a comparison.  You must

4 compare the benefits that AllStaff is offering its employees

5 with the benefits that a comparable employee, a specific

6 person, receives at the client's site, and it's that

7 comparison that violates the rule that ERISA is to be the sole

8 and exclusive source of regulation for employee benefit plans.

9   She will also tell you about the labor dispute

01:07:16

10 disclosure and employee protection provision.  She will tell

11 you how it is impacting her business, how it is leading to

12 union organization, and how it benefits unions.

13   She will also tell you about how the interested

14 provisions -- interested parties provision, which allows these

01:07:39

15 uninjured third parties to bring actions, will have an adverse

16 impact on their business because we learned through discovery

17 we received last night there have been at least 15 complaints

18 filed with the Illinois Department of Labor that will be

19 litigated soon.  They're just sitting at the Department going

01:08:01

20 through what's called the quiet period, cooling-off period,

21 but they'll lead to a series of lawsuits in this industry

22 regarding the terms of the Day and Temporary Labor Services

23 Act, which is the act at issue.

24   THE COURT:  Who's bringing the lawsuits or the

01:08:19

25 complaints the DOL will turn into lawsuits?

1       MR. FURTON:  So the names were redacted.

2       THE COURT:  I don't mean by names, but what are

3  the -- what's the nature of the complaint?

4       MR. FURTON:  The nature of the complaints are -- the

01:08:29  5  nature of those claims are the operation of the unlicensed Day

6  and Temporary Labor Services Act company.

7       THE COURT:  Is that really what this lawsuit is

8  about?

9       MR. FURTON:  No.

01:08:44  10       THE COURT:  Okay.

11       All right.  Well, we'll get to that.

12       MR. FURTON:  Yes.

13       THE COURT:  Okay.  Very good.  So -- and what is the

14  effective date?  I know I've asked this over the phone, but

01:08:55  15  what is the -- I know part of this is in place now.

16       MR. FURTON:  Yes.

17       THE COURT:  You have regulations that apparently

18  expired January 4th and new ones haven't been brought in yet,

19  maybe Department of Labor can talk about that, but what is the

01:09:09  20  effective date of the most injurious portions of the statute

21  per your clients?

22       MR. FURTON:  So one of -- all of the statute is

23  effective already with one exception, and that is probably the

24  most injurious part, which is the equivalent pay and

01:09:24  25  equivalent benefits provision, Section 42.  That one will go

1   into effect on April 1, but it is already -- the witnesses

2   will be here to say that it is already having a dramatic

3   impact on their business.  One of the witnesses will say that

4   due to the passage of that law and these new regulations,

01:09:49   5   business is down 15 percent already.  Even though it's not yet

6   in force, it is so pernicious when it's applied to their

7   businesses.

8          THE COURT:  And maybe I'm taking more than the five

9   minutes I gave you, but how does it -- they have to pay their

01:10:09   10   employees more.  How does that result in their business being

11   lessened?  Do they have to charge the employers more?

12          MR. FURTON:  No.  The business is lessened because

13   the clients are scared.  Compliance is impossible, and we'll

14   talk about it.  They'll do their best, but getting it right is

01:10:27   15   so hard and the consequences of getting it wrong are so

16   extreme, it's not just wage and hour class actions that you're

17   walking into.  It's also these lawsuits by interested parties

18   who can -- don't need to have -- be limited to one claim.  It

19   could be ten different interested parties bringing one claim.

01:10:47   20          So we have real harm even though there was a delay,

21   there's a second statute passed that delayed implementation of

22   the Section 42 equal pay equal benefits provision.

23          THE COURT:  Okay.  All right.  Well, thank you.

24          MR. FURTON:  There's two more witnesses.  They will

01:11:03   25   testify similarly with respect to all three issues.  They'll

opening - defendant

10

1    cover unique ground though and share their own unique story

2    about what clients have told them they cannot deal with when

3    it comes to this statute because the clients, their clients,

4    also have exposure under the statute.

01:11:20    5         THE COURT:  Okay.  Thank you.

6         MR. FURTON:  Yeah.

7         THE COURT:  All right.  Anything from defendants?

8    OPENING STATEMENT ON BEHALF OF DEFENDANT BY MR. WEAVER

9         MR. WEAVER:  Sure, Your Honor.  Thank you for the

01:11:28    10   opportunity to speak briefly at the outset.  Again, I'm Henry

11   Weaver for the Department of Labor.

12        Your Honor, this is a pre-enforcement facial

13   challenge to a duly enacted statute by the State of Illinois.

14   This Act overall has existed for almost 25 years because of

01:11:46    15   the State of Illinois's policy judgment, the day laborers are

16   particularly vulnerable to the abuse of their labor rights.

17        This is a pre-enforcement challenge on a preliminary

18   injunctive posture to a handful of amendments to that law.

19   Plaintiffs bear an incredibly heavy burden to show that they

01:12:11    20   are entitled to an injunction against enforcement of these new

21   amendments.

22        They need to show that they have a strong likelihood

23   of success on the merits and, of course, that they will suffer

24   irreparable harm if Your Honor does not issue an injunction.

01:12:23    25        To -- to address the merits just briefly, the two

opening - defendant

11

1    main claims we think are the ERISA Supremacy Clause challenge,

2    and the overall reason that it fails as a matter of law in our

3    view is that there's an unbroken string of Circuit Court

4    rulings that essentially wage floor statutes, even if they

5    include some consideration of benefits, are not preempted by

6    ERISA.  The mere fact that some cash equivalent of benefits

7    needs to be calculated and paid out to a worker doesn't turn a

8    wage floor statute into a preempted regulation of ERISA plans,

9    and that's the overall reason that that claim fails as a

10   matter of law.

11            As for the NLRA-challenged Section 11, Section 11 is

12   a neutral notice requirement to employees who are not even

13   employees of the prime employer.  These are sort of third

14   parties to potential labor disputes, and a neutral notice

15   requirement that tells the employee that there's a labor

16   dispute and that they don't have to go work at that labor

17   dispute if they don't want to is not -- does not intrude on

18   the federal domain.

19            So that's a quick summary of our legal position.  We

20   believe that the witness testimony today is mostly just going

21   to be relevant to irreparable harm.  We don't -- we think that

22   the prime legal issues can basically be decided as a matter of

23   law.  So in terms of what we expect from the testimony today,

24   based on the communications that plaintiffs did produce to us

25   from their third-party clients in advance of this hearing, we

1    think the evidence is actually going to be decidedly more

2    mixed than they're portraying it in terms of whether there's

3    an existential threat to their businesses.

4              We have communications where the third-party clients

01:14:36   5    just say that they're intending to hire people predominantly

6    for the first 90 days and then switch to permanent employment,

7    but that doesn't spell the doom of plaintiffs' businesses.

8              And so it is ultimately plaintiffs' burden to show

9    the possible death of their business in order to get a

01:15:01   10   preliminary injunction against these amendments, and we don't

11   think they're going to be able to make that showing.

12             THE COURT:  All right.  Thank you.

13             All right.  Plaintiffs may call their first witness.

14             MR. FURTON:  Thank you, your Honor.

01:15:10   15             Plaintiffs call Clarice Shiu.

16        (Witness sworn.)

17             THE COURT:  Have a seat, please.

18             THE WITNESS:  Thank you.

19             THE COURT:  Mr. Furton, you may proceed.

20             Do you need -- are you going to use the Elmo or any

21   exhibits?

22             MR. FURTON:  I plan to use exhibits with the

23   computer.

24             THE COURT:  Sure.  Let me make sure it's hooked up

01:15:47   25   correctly.

Shiu - direct

```
 1            Should be the HDMI connection.  And I'll turn it off
 2    for everyone until you get to the exhibit you want to go to.
 3            MR. FURTON:  Very good.  And is there a way to turn
 4    this off?
 5            THE COURT:  Yeah, let me do that.  I think there's a
 6    button, of course, down at the bottom.  Should be a -- there
 7    you go.  Okay.  If that's distracting, you can pull it down,
 8    too.  Pull it from the middle toward you.  Pull the middle
 9    toward you and hold the top down.  Other way.  There you go.
10    Okay.
11            Let me know when you need to have it up on the screen
12    for the witness and anyone else who's watching.
13            MR. FURTON:  Thank you.
14            CLARICE SHIU, PLAINTIFFS' WITNESS, DULY SWORN,
15                         DIRECT EXAMINATION
16    BY MR. FURTON:
17    Q.  Good afternoon.
18    A.  Good afternoon.
19    Q.  Could you please state and spell your name for the record.
20    A.  Clarice Shiu.  C-L-A-R-I-C-E.  Last name is Shiu, S-H-I-U.
21    Q.  Could you tell us who you work for?
22    A.  I work for AllStaff.
23    Q.  And does AllStaff have a more formal name?
24    A.  M.M.D.
25    Q.  Okay.  And are you aware of the fact that M.M.D. is a
```

01:16:18
01:16:43
01:16:53
01:16:59
01:17:14

Shiu - direct

14

1    plaintiff in this lawsuit?

2    A.  I am.

3    Q.  Okay.  And what is your role with AllStaff?

4    A.  I'm their CEO.

01:17:24    5    Q.  And how long have you been the CEO?

6    A.  I've been the CEO for around ten years.

7    Q.  How long have you been in the staffing industry?

8    A.  Over 25.

9    Q.  What is M.M. -- or AllStaff's business?

01:17:37    10   A.  Industrial staffing.

11   Q.  What does that mean?

12   A.  So we send employees into industrial environments,

13   anything from packaging, manufacturing, your forklift or

14   assembly for employment.

01:17:55    15   Q.  And when you say send employees in, what kind of -- what

16   do you mean by send employees in?

17   A.  We employ --

18   Q.  Are these your employees?

19   A.  These are our employees, correct.

01:18:05    20   Q.  Okay.

21   A.  And we send them to a host client.

22   Q.  And how many clients do you have?

23   A.  134.

24   Q.  Is that down from what you used to have?

01:18:12    25   A.  Yes.

Shiu - direct

15

1  Q.  And what did you have before?

2  A.  Closer to about 150.

3  Q.  So how many W-2s do you issue in a given year?

4  A.  2023, we issued 6,511 W-2s.

01:18:31  5  Q.  And how many do you issue in a typical week, or how many

6  employees do you put out towards employment at client

7  companies in a week?

8  A.  Over 2,000.

9  Q.  So why do people work for your company instead of working

01:18:51  10  directly for the companies that you serve?

11  A.  The flexibility.

12      MR. HAZINSKI:  Your Honor, I'd just object to

13  foundation.

14      THE COURT:  Overruled.  You can explore why she knows

01:19:02  15  this if you want.  I think given her experience in the

16  industry, it's probably obvious how she knows it, but you can

17  explore it on cross.

18      Go ahead.

19  BY THE WITNESS:

01:19:13  20  A.  The flexibility.

21  BY MR. FURTON:

22  Q.  What about the flexibility; what do you mean?

23  A.  Being a temporary employee, you may not have to follow

24  certain rules regarding attendance or, you know, if you want

01:19:23  25  to go back to your home country for two months, it's okay to

Shiu - direct

16

1    do that and you can -- nine times out of ten the host client

2    is going to bring you back to work.

3           If you're a single mom and you need to work but you

4    can't work 40 hours a week or you can't give the company what

01:19:39    5    they're looking for as a direct hire, they're able to take you

6    on as a temporary employee.  A prime example:  My son came

7    home from college and he needed to work three months, so he

8    went to the client's site for three months and he was done,

9    right, and then he went back to school, so --

01:19:56    10   Q.  So he was an employee of your company instead of the

11   company where he was doing his daily work?

12   A.  Correct.

13   Q.  So do you offer first-, second-, third-shift

14   opportunities?

01:20:08    15   A.  Yes.

16   Q.  What about the candidates; do they need to have experience

17   to do the jobs that you're sending them to?

18   A.  Not all the jobs we send them to.  I mean, there are some

19   that are skilled, right, but there are some that do not need

01:20:23    20   that skill level.

21   Q.  Does your business operate only with unskilled laborers,

22   or do you have a different division where you have different

23   types of employees?

24   A.  We have a professional direct hire division.  That's a

01:20:37    25   small piece of our business.

Shiu - direct

17

1   Q.  What is professional direct hire?

2   A.  Professional is your maybe clerical, your secretaries.

3   Direct hire is directly hired into the organization.

4   Q.  Were you here for a moment ago when I mentioned that

01:20:53   5   Illinois Day and Temporary Labor Services Act?

6   A.  Yes.

7   Q.  Are you familiar with that law?

8   A.  Yes.

9   Q.  Does that law cover the professional employees that you

01:21:02   10   mentioned earlier?

11   A.  Yes.  It -- the new law --

12   Q.  Right.

13   A.  -- is what you're asking; no, it does not.

14   Q.  So what does it carve out?  What types of employees are

01:21:14   15   not covered by that?

16   A.  So your healthcare CNAs are not covered by this new law.

17   Any of your direct hire, anybody that's direct hire does not

18   cover that.  Secretaries, more sitting in that professional

19   space.

01:21:30   20          THE COURT:  How does a direct hire work?  I thought

21   you provide people to a company.  How do they directly hire

22   folks?

23          THE WITNESS:  So how the direct hire program works is

24   they come to us, and it's more like:  Example, an engineer,

01:21:44   25   okay?  They're looking for an engineer.  Our direct hire team

1   will source let's say 10 to 15 different candidates for them.

2   They will go in.  We will set up the interview, and then the

3   host client will make them their offer to be hired

4   permanently, and then we get a fee for doing all the back-end

01:22:04   5   work to --

6               THE COURT:  All right.  So it's a different part of

7   the business than you have where people come in, they make

8   themselves available to work for companies, companies call you

9   and say I need 20 people to work in a manufacturing plant.

01:22:17   10              THE WITNESS:  Correct.

11              THE COURT:  Okay.  And the law, as you understand it,

12  does not apply to these direct hires because they're going to

13  become employees of the company.

14              THE WITNESS:  You're right.

01:22:26   15              THE COURT:  Not your employee, they're going to

16  become the employer's employee.

17              THE WITNESS:  Correct.

18              THE COURT:  Got it.

19              Okay.  Go ahead.

01:22:33   20  BY MR. FURTON:

21  Q.  How about clerical workers, do they -- are they governed

22  by the statute?

23  A.  No.

24  Q.  Do you have clerical personnel?

01:22:39   25  A.  Yes.

Shiu - direct

19

1  Q.  That you place with companies?

2  A.  Correct, yes.

3  Q.  On a temporary basis?

4  A.  Yes.

01:22:44  5  Q.  How about location?  Where are you located?

6  A.  We are -- AllStaff is located in Illinois and Wisconsin.

7  Q.  What percentage of your business is in Illinois; what

8  percentage is in Wisconsin?

9  A.  Percentage of business in -- 80 percent in Illinois,

01:22:58  10  20 percent Wisconsin.

11  Q.  Does your company do any training?

12  A.  Yes.

13  Q.  Does your company have a safety program?

14  A.  We do have a safety program.

01:23:11  15  Q.  Could you tell us about the safety program?

16  A.  We have a full safety team, so we work on a quarterly

17  basis with our clients regarding safety procedures.  We have a

18  safety team that actually goes out and does some -- helps our

19  clients' sites, especially our smaller clients' sites do the

01:23:31  20  forklift training on-site and help them build out their safety

21  programs.

22       And when we get a new business partner, we go

23  on-site, look at their safety and add anything that we feel we

24  may need for our employees.

01:23:43  25  Q.  Thank you.  I mentioned earlier the Illinois Day and

Shiu - direct

20

1    Temporary Labor Services Act.  For convenience sake, I'm just
2    going to call it the Act, is that okay?
3         So are you aware of the Act having a requirement to
4    pay equal pay and equal benefits for certain employees?
01:24:00  5    A.  I am.
6    Q.  Is there a time limit where that requirement kicks in?
7    A.  The Act tells me 90 days.
8    Q.  Okay.  Can you tell us how you plan to comply with this
9    requirement?
01:24:14  10   A.  So I'm going, to the best of my ability, I will look at
11   that 90-day -- assess the 90 days.  I will need to find if --
12   hopefully my host client will give me a roster of their
13   current employees.
14   Q.  Well, you know, let's take it one step at a time.  You
01:24:34  15   mentioned you'd have to look at the 90 days.  Is that just
16   black and white?
17   A.  No, that's not black and white.
18   Q.  Why?
19   A.  Because what if they don't work 40 hours a week?  What if
01:24:43  20   they're part-time?  What if they work six days instead of five
21   days?  I have to see the days they work.
22   Q.  What about if they work for a different agency, does that
23   count towards the 90?
24   A.  That's a really good question.  If they share that
01:24:58  25   information with me, yes; but if they don't share that

Shiu - direct

1    information with me, I'm kind of blind, correct?

2    Q.  Okay.  So first you've got to figure out whether or not

3    somebody has exposure to the 90-day requirement.

4              What's the next step in your process for complying

5    with this statute?

6    A.  The next step is I would have to ask the host client to

7    share their information regarding all of their permanent staff

8    because what I will have to do is I will have to take my

9    employee, employee A, and look at an employee on their roster

10   that has close to the same job, the benefits they're offered

11   and the benefits I offer, and see if they're equivalent.

12   Q.  So let's talk about this process of identifying a

13   comparable employee.

14             What is your expectation of what that will entail?

15   A.  So I would hope that my host client would share that

16   information with me, and I would have to dig in and see

17   exactly what they're taking from the benefits offered and what

18   I offer, and whatever is not offered, I will have to then

19   offer to the client or I will have -- offer to my employee or

20   I will have to figure out somehow to the best of my ability

21   what the costs around that is.

22   Q.  So let me ask you about your largest account.

23             How many people do you send to your largest account

24   on a daily basis?

25   A.  800 people.

Shiu - direct

1    Q.  And will they all have the same comparable employee on the

2    other side at the client site?

3    A.  No.

4    Q.  Why do you say that?

01:26:43    5    A.  Because I have already started trying to collect this

6    data.

7    Q.  Well, do they all have the same level of seniority and job

8    description?

9    A.  Not the same level of seniority, no.

01:26:53    10   Q.  So you'll have to find somebody with the same level of

11   seniority and the same skills and job requirements as the

12   person you're sending in; is that right?

13   A.  That's what the law tells me, yes.

14   Q.  Okay.  Do you expect that to be an easy process?

01:27:13    15   A.  No.

16   Q.  Why do you say that?

17   A.  Because some of our host clients are willing to share that

18   information and some are not willing to share that

19   information.

01:27:22    20   Q.  Does that information ever change?

21   A.  Of course.  It changes all the time.  Benefits could

22   change all the time.  I can have a life-changing event, and

23   the person -- let's say I'm -- the employee that I'm comparing

24   them to that has the equal time and is on the same job, they

01:27:39    25   have a life-changing event then.  And they might not be taking

Shiu - direct

23

1   benefits at that time, but there's a baby born and they take

2   benefits.  Now that employee has changed for me and it looks a

3   little different.

4   Q.  Okay.  So you mentioned looking at people's benefits.

01:27:55   5   Tell us about AllStaff's benefits.  Do you guys have a

6   retirement plan?

7   A.  We do have a retirement plan.

8   Q.  Could you tell us some of the characteristics of the

9   retirement plan?

01:28:04   10   A.  We have a 401(k) with a 3 percent match.  After a year,

11   you can start -- you're vested in and --

12   Q.  So what does that mean, a 3 percent match?  What does

13   that -- what do you do?

14   A.  So they -- let's say they have a thousand dollars.  We

01:28:22   15   give 30 to their account.

16   Q.  Okay.  And is that mandatory or discretionary?

17   A.  That's something we offer.

18   Q.  Sorry, do you -- do you -- do you retain the right to not

19   donate the 3 percent in the event that, like, the company has

01:28:38   20   a terrible year?

21   A.  Yes.

22   Q.  You mentioned that it requires one year of earning in to

23   this program?

24   A.  One year or a thousand hours within that year time period.

01:28:52   25   Q.  Okay.  And do you get the matching funds; are you vested

Shiu - direct

24

1    in to them immediately?

2    A.  After that year time period, yes.

3    Q.  Is there a three-year vesting period?

4    A.  No, I don't believe so.

01:29:05    5    Q.  Okay.  Do you know what the -- who operates that

6    retirement plan?

7    A.  That's a really good question.  I'm not sure.

8    Q.  Do you know anything about the investment opportunities

9    that are in that retirement plan?

01:29:25    10    A.  Do I know, like --

11    Q.  Like what do they offer?  Is it mutual funds or company

12    stock?

13    A.  With our 401(k) match?

14    Q.  Yes.

01:29:35    15    A.  Company stock.

16    Q.  Okay.  So what will you -- when you do this comparison and

17    you have an employee who chooses not to participate in the

18    retirement plan and an employee who chooses to participate in

19    the retirement plan, how -- do you plan to treat them

01:29:54    20    differently in terms of what their benefits are, or are they

21    the same?

22    A.  That's a really good question, and I'm not sure.  I

23    have -- I have customers currently that have a 401(k) with a

24    2 percent, and I have 401(k) with 3 percent match.  I have

01:30:13    25    people that don't take it.  I have people that take it.  So,

Shiu - direct

25

1   again, I'm going to have to assess my situation and come up

2   with the best of my ability to follow the law.

3   Q.  So in addition to a retirement plan, do you have a health

4   insurance plan?

01:30:29   5   A.  I do have a health insurance plan.

6   Q.  Okay.  At this time, I'm going to show you a document.

7   The document is marked on the bottom right A-179.  It's a

8   19-page document.

9          Can you tell me if your -- what this document is?

01:30:48   10   A.  This is our health benefits.

11   Q.  Is it a brochure?

12   A.  Yes.  This is something when they -- when an employee

13   comes to apply with us, they get a copy of this.

14   Q.  Okay.

01:31:01   15          THE COURT:  Is there an exhibit number on this again?

16          MR. FURTON:  It doesn't have an exhibit number.

17          THE COURT:  Why don't you call it Plaintiffs' 1.

18          MR. FURTON:  I'm sorry?

19          THE COURT:  Why don't you just call it Plaintiffs' 1.

01:31:10   20          MR. FURTON:  We'll call it Plaintiffs' 1.  Thank you.

21   BY MR. FURTON:

22   Q.  So this is the cover page.  I'm going to advance the

23   document through the table of contents, through the how to

24   enroll page to the fifth page of 19, where it says benefit

01:31:25   25   options overview, and there are three blue boxes here.  Can

1    you see that from your screen?

2    A.  I can.

3    Q.  Can you tell us what those three blue boxes are?

4    A.  Those are our three benefits that we offer.  We have an

5    ESC plan, we have a MEC plan, and we have an MVP plan that we

6    currently offer.

7    Q.  Okay.  Could you tell us what the costs are for these

8    three different types of insurance plans?

9    A.  I can.  For the ESC plan, employee only is 19.98.

10    THE COURT:  Actually, I can see them, so that's fine.

11    I'll take it that the numbers here represent what it costs for

12    an employee to -- what do you do, take it out of their salary?

13    THE WITNESS:  Correct.

14    THE COURT:  Got it.  Go ahead.

15    BY MR. FURTON:

16    Q.  And is that the only cost for securing this coverage, or

17    is there an employer contribution?

18    A.  We do have an employer contribution.

19    Q.  Okay.  Does it depend -- so there's pricing here on the

20    left, but there's pricing that is different for employee only

21    versus employee plus child and employee plus spouse and

22    employee plus family, and the prices are different.

23    Does the corporate contribution change based on who

24    is covered by the health insurance?

25    A.  No.

Shiu - direct

1  Q.  It's the same employer contribution?  And how much is that

2  employer contribution?

3  A.  Around 10 percent.

4  Q.  10 percent of the total premium for the policy?

01:32:50  5  A.  Uh-huh.

6  Q.  So the employee contribution is around 90 percent?

7  A.  Correct.

8  Q.  Okay.  I'm going to advance this document to page 14.

9  Page 14, which is actually A-194, and page 16 of 19 on the PDF

01:33:23  10  is titled MVP Summary of Benefits.  Can you tell us what this

11  is?

12  A.  This explains what the individual deductible would be,

13  family deductible, if you choose the MVP plan, and this also

14  explains what is covered on -- what the plan pays.

01:33:40  15  Q.  And have you talked to any of your clients about what they

16  offer in terms of health insurance?

17  A.  I have.

18  Q.  Have you found anybody with this same plan?

19  A.  No.

01:33:52  20  Q.  How many different clients do you have?

21  A.  134.

22  Q.  How many different types of benefits packages did you --

23  do you think there are out there as a result of talking to

24  your clients?

01:34:03  25  A.  There's a lot of different plans.  Of all the plans that

Shiu - direct

28

1    I -- host clients have allowed me to view, I have not found

2    one that is identical.

3    Q.  So when you're seeking to comply with a statute that

4    requires equivalent benefits to be provided, will you be

01:34:23    5    looking at the benefits for emergency room visits, or will you

6    be looking at the deductible, or will you be looking at the

7    employee contribution, or will you be looking at the corporate

8    contribution to the cost?

9    A.  I'm going to have to look at everything, and I'm going to

01:34:39    10    have to try to assess what that looks like to the best of my

11    ability for my operation.

12    Q.  In addition to health insurance, do you offer other

13    benefits?

14    A.  We do offer other benefits.  We have dental and we have

01:34:59    15    accidental.

16    Q.  Very good.

17            THE COURT:  A couple questions.  Is your pay equal to

18    what the employers pay the equivalent workers?

19            THE WITNESS:  Yes.

01:35:15    20            THE COURT:  Okay.

21            THE WITNESS:  Some, Your Honor, is more than they pay

22    their permanent employees.

23            THE COURT:  All right.  But the equal pay portion of

24    this Act is not the rub from your perspective.

01:35:26    25            THE WITNESS:  Correct.

1        THE COURT:  All right.  And out of the -- out of all

2  the employees you have, are most of them out for over 90 days

3  on their assignments, or are the assignments -- can you break

4  up the number of your employees that work 90-day -- less than

01:35:50    5  90 days for an employer?

6        THE WITNESS:  There are some that are out there

7  90 days.  There are some that go to a client's site and if

8  they don't like it, they're gone in two weeks, right?  So it

9  just all depends on the client's site and what the employee

01:36:04  10  chooses if they want to stay longer or if they want to go

11  somewhere else.

12        THE COURT:  And do you interpret the 90 days as

13  consecutive, or, you know, someone works there for one month,

14  takes a month off, a second month, takes a month off and a

01:36:16  15  third month?  What do you do?

16        THE WITNESS:  So the way I'm interpreting it right

17  now is 90 days worked.  So 90 days worked in the facility.

18        THE COURT:  Consecutively or over a calendar year?

19        THE WITNESS:  Over a calendar year.

01:36:29  20        THE COURT:  Okay.

21        All right.  Go ahead.

22  BY MR. FURTON:

23  Q.  So in connection with these additional benefits, will you

24  be looking at the value of the benefits from the perspective

01:36:42  25  of the employee who maybe has serious dental needs, or will

Shiu - direct

30

1   you be looking at the cost to the company for providing dental

2   coverage?

3   A.  I will have to look at both plans and assess both plans

4   from the plan's perspective, not unfortunately the employee's

5   perspective.

6   Q.  When your -- when your employees join, are they also given

7   benefits that go beyond just retirement, health insurance,

8   dental, accidental, death and disability insurance?  Do they

9   have leave rights?

10  A.  Currently, we do not offer that.

11  Q.  Do they -- are they entitled to take unpaid leave?

12  A.  Yes.

13  Q.  Is the unpaid leave limited?

14  A.  No.

15  Q.  Are they -- do they earn any paid holidays?

16  A.  At some client sites, yes.

17  Q.  So is it client by client for paid holidays?

18  A.  Uh-huh.  We do have the new 40 hours, the Illinois law,

19  and everybody does get that new Illinois law of 40 hours of

20  paid time off.

21  Q.  Now, is that all accrued on one day, or is that accrued

22  over the course of time?

23  A.  That is accrued over the course of time.  So every

24  40 hours an employee works, they receive one hour of paid time

25  off.

Shiu - direct

31

01:38:31

01:38:48

01:38:59

01:39:18

01:39:33

1  Q.  Okay.  So when you're evaluating your equivalent benefits

2  for a specific employee, are you going to figure out where

3  they are in the year in terms of how much of their paid leave

4  they've already captured and put that into the equation, or

5  will you have to -- or will you do something else?

6  A.  It will be very hard for me, no, because the employee

7  would need to communicate that with me; and if they do not

8  communicate that with me, I would have to start them at like

9  they're a new employee with me from day one.

10 Q.  Now, how about the information about the comparable

11 employee, that is, the person whom you have never met, do not

12 know, does not work for you, they might have paid leave

13 rights, too, right?

14 A.  Correct.

15 Q.  Do you know where they will be on their year's worth of

16 accruing for their paid leave benefits?

17 A.  If my host client shares that with me.

18 Q.  And do you know whether they value dental insurance

19 because they have a dental issue or not?

20 A.  I will not have access to that information.

21 Q.  So you might, though, learn what they pay for dental

22 insurance?

23 A.  Correct.

24 Q.  But you won't know whether or not they perceive value in

25 dental insurance, right?

1    A.  That's correct.

2    Q.  Well, what if they decline dental -- they're offered

3    dental insurance -- this is the comparable employee -- but

4    they decline it.  That could have been worth $20, let's say,

5    but they decline it.

6           Will you use the $20 that they could have achieved in

7    your equivalency determination, or will you use zero, which is

8    what they actually received?

9    A.  Like I explained to you earlier, the hard thing for me

10   will be is I will have to make that assessment on a daily

11   basis because they could change -- for a life-changing event,

12   a benefit could change.  So that individual that day could

13   be -- that I am looking at Employee A from their side,

14   Employee A from my side.  If they're not taking it that day,

15   that benefit they chose to not take, I will have to assess

16   that at that time, but I'll have to know, I will have to hope

17   that my host -- the host client will share information with me

18   that changes sometimes daily.

19   Q.  Do you have any employees who have a spouse?

20   A.  I'm sure I do, yes.

21   Q.  Do you have any that have children?

22   A.  Yes.

23   Q.  Do you know if any of those opt in to your health

24   insurance plan that covers spouse and/or children if they

25   want?

01:39:48

01:40:03

01:40:22

01:40:39

01:40:50

1    A.  Yes.

2    Q.  Will you use the value of the coverage to the spouse and

3    the children that comes at a different price when you do this

4    equivalent benefits calculation with the comparable employee?

01:41:02    5    A.  Well, I would have to know if the comparable employee

6    takes -- has a spouse, has children under this.  And, again,

7    that could change.

8            What if my employee over here didn't have children,

9    and they have a baby and they now need to add a spouse or the

01:41:19    10    spouse, a life-changing event happens, and the spouse had a

11    job and this employee was under the spouse's insurance and

12    now needs to go -- loses their job and needs to go under this

13    insurance.

14            So, again, it would kind of be a daily thing for me

01:41:32    15    to be able to have to -- it would be like a rinse and repeat

16    daily and what I would have to offer.

17    Q.  What do you mean rinse and repeat daily?  Why do you have

18    to do this more than once?

19    A.  Because things change.  What if the employee that I have

01:41:46    20    comparable to at my host client leaves, and now I don't have

21    an employee.  The employee that I was using as my comparable

22    is no longer there.  Now I need data from my host client to

23    show me another comparable employee to my employee.

24    Q.  Are any of your clients unionized?

01:42:06    25    A.  I do have a client that is unionized, yes.

Shiu - direct

34

1 Q. And do the employees receive benefits from their employer

2 or from the union or both?

3 A. Their employees?

4 Q. Yeah.

01:42:17  5 A. They receive benefits from both.

6 Q. Does the statute give you any right to demand information

7 from the union about how -- whether or not the person has been

8 using benefits and what their benefits are so that you can do

9 the equivalency calculation?

01:42:30  10 A. It does not.

11 THE COURT: But the statute does allow you to --

12 well, it penalizes a third-party client that doesn't provide

13 the information.

14 Okay. I'm sure you're going to get into that. Go

01:42:44  15 ahead.

16 MR. FURTON: Well, that's a good question.

17 BY MR. FURTON:

18 Q. Are you in the client service business?

19 A. I am in the client service business.

01:42:50  20 Q. So are you in a position to demand information from your

21 clients easily?

22 A. No.

23 Q. Does it create tension? Is it awkward? Is there a

24 problem?

01:43:01  25 A. Of course, it creates tension, especially with your larger

Shiu - direct

35

1   clients who aren't wanting to, per se, share that.  Unions

2   don't always want to share what their offerings are.

3   Q.  Is there --

4   A.  Can I push?  Sure, but then I have a chance of losing my

5   business.

6   Q.  Is there a -- is there -- is there a sensitivity around

7   the fact that this is person specific?  We're not talking

8   about the average employee on the client side, we're not

9   talking about the type of employee doing the certain type of

10  job.  You're talking about one person.

11  A.  Correct.

12  Q.  So you need to know that one person's benefits.  You need

13  to know whether or not they care about dentistry, they care

14  about their health insurance.

15          Have you -- has anybody told you, have you talked to

16  anybody about whether or not they have sensitivities around

17  sharing information about the benefits of specific human

18  beings?

19  A.  There's a lot of sensitivity over around that.

20  Q.  Have any of your clients expressed it to you?

21  A.  I have had multiple clients express that to me.

22  Q.  But you're trying to meet your obligations under a statute

23  that requires you to pay comparable benefits or equivalent

24  benefits.

25          Do you tell them that this isn't your choice, this is

Shiu - direct

36

1    something you're being forced to do?  Doesn't that work?

2    A.  I wish it did work.  It does not work.  I try to explain

3    that all I'm trying to do is comply with the law.

4    Q.  Okay.  So you mentioned that you provide a 3 percent

5    match.  Do you know whether or not your clients all provide a

6    3 percent match for their 401(k) retirement?

7    A.  Not all of my clients.  I have clients that offer more.  I

8    have clients that offer less.  I have some clients that are

9    smaller clients that don't have the ability to offer 401(k).

10   Q.  Do any of them offer an ESOP program?

11   A.  I do have a client that offers an ESOP program.

12   Q.  Are you able to offer that type of benefit?

13   A.  At that client's site, I do offer that type of benefit,

14   yes.

15   Q.  How about corporate stock, are you able to provide

16   corporate stock in your client's company to employees?

17   A.  I cannot do that.

18   Q.  Are there -- are there benefits -- strike that.

19        The statute gives you two options.  You can provide

20   equivalent benefits, or you can provide the actual cost of the

21   differential between your benefits and their benefits.

22        So have you investigated the possibility of

23   potentially adopting -- you said you have, I think, 134

24   clients?

25   A.  That's correct.

Shiu - direct

37

1  Q.  You could adopt 134 different ERISA plans, right?  You

2  could just offer the same thing as them.  Can't you just

3  piggyback on their plans?

4  A.  I can't piggyback off of their plan.

01:46:01  5  Q.  Why not?

6  A.  It's not allowed.  It's not -- I can't just piggyback off

7  their plan.  And if I put an employee into a healthcare, they

8  choose -- they go to Client A and they're there for two weeks

9  and they decide that this isn't for them and I have them in

01:46:19  10  this healthcare plan and this benefits plan and they leave

11  Client A and we have something at Client B, when they go to

12  Client B, the benefits would look different, and I would have

13  to pull them out of that plan and then offer them this plan --

14  Q.  Okay.

01:46:38  15  A.  -- that Client C was offering.

16  Q.  So let's say you didn't want to offer equivalent benefits,

17  you wanted to use the cash payment option.

18          Do you have to do the comparison that we've been

19  talking about, where you value your benefits and you value

01:46:50  20  your clients' benefits as to specific human beings?

21  A.  I would have to try to the best of my ability to make that

22  decision and figure out that math.

23          MR. FURTON:  Your Honor, can I take a moment to

24  confer with my colleague for a second?

01:47:14  25          THE COURT:  Sure, sure.

1       (Counsel conferring.)

2    BY MR. FURTON:

3    Q.  Ms. Shiu, we talked about some of your health insurance

4    plans.  Do you know whether or not whether the MEC plan or the

01:48:01    5    less robust benefit plans offered in the health insurance

6    area, do you know whether or not all of those come with a

7    corporate contribution, or are some of them exclusively paid

8    for by the employees?

9    A.  On my plan?

01:48:14    10   Q.  Yeah.

11   A.  If all three plans that I offer --

12   Q.  Yeah.

13   A.  I know the MVP plan does.  We do pay a percentage.

14   Q.  You have a contribution for that?

01:48:27    15   A.  Correct.

16   Q.  How about the --

17       MR. FURTON:  Your Honor, we can probably turn off the

18   screen.

19       THE COURT:  All right.

01:48:33    20   BY MR. FURTON:

21   Q.  The other plans, the one that's $19 a month for the

22   employee?

23   A.  We have a contribution.

24   Q.  You have a contribution, or you don't have a contribution?

01:48:42    25   A.  We have a contribution to our plans.  We have a

1    contribution to our MVP plan.  Our other ones are not, I don't

2    believe we have a contribution.

3    Q.  Okay.  So that's an example of an employee benefit that

4    you provide that costs the company zero.  My question for you

01:48:59    5    is if you're given the opportunity to pay out cash, the actual

6    difference based on the actual cost, versus adding more

7    benefits, is sometimes it cheaper to add more benefits

8    especially when those benefits don't come with a cost, such as

9    the benefit you just mentioned, the health insurance plan?

01:49:24    10    MR. HAZINSKI:  Objection to leading, Your Honor.

11    THE COURT:  Overruled.  Go ahead.

12    THE WITNESS:  I'm sorry, can you ask the question

13    again?

14    MR. FURTON:  Sure.

01:49:32    15    BY MR. FURTON:

16    Q.  In your mind, are you ambivalent between offering a

17    benefit or offering cash?  Which -- are they always the same

18    price?

19    A.  No, they're not always going to be the same price.

01:49:42    20    Q.  Why do you say that?

21    A.  Because some of my -- I have client sites where they, like

22    you just said, that maybe the benefit, because they don't take

23    it, is zero.  Do I say that it's zero because they didn't take

24    the benefit, or do I say it's the 19.99 because that's what

01:50:00    25    the benefit says?

Shiu - direct

40

01:50:13

01:50:30

01:50:47

01:51:01

01:51:20

1    Q.   Okay.  Are you familiar with the labor dispute provision

2    in the statute?

3    A.   I am.

4    Q.   And what does the labor dispute provision require?

5    A.   It requires me to inform employees if there's a labor

6    dispute at my host client.

7    Q.   And how -- in your experience, do your clients always know

8    about the existence of a labor dispute?

9    A.   They may not know.

10   Q.   Are your clients reluctant to provide you that

11   information?

12   A.   So, yes.  I have been told that they -- if they're not --

13   they wouldn't even share it with their permanent employees, so

14   why would they share it with me to share it with my field

15   employees?

16   Q.   Why is that a sensitive piece of information?

17   A.   It's a very good question, but it's sensitive to them.

18         We had a situation that there was a labor dispute

19   that we learned about.  We did share it with our employees,

20   and we shared it with other agencies that were at the client's

21   site.  And two days later, there was a union on-site.  Two to

22   three days later there was a union on-site threatening our

23   employees telling them if they did not sign up with the union

24   that they would be let go.

25   Q.   So is this a mechanism for labor unions to discover the

Shiu - direct

41

1   existence of labor disputes where their services might be more

2   welcome than in an ordinary employer situation?

3          THE WITNESS:  In my opinion --

4          MR. HAZINSKI:  Objection.

01:51:34  5          THE COURT:  Can you ask that question again?  I

6   don't -- well, sustained, I don't understand it.

7          Go ahead.

8          MR. FURTON:  Sure.  I'll rephrase.

9   BY MR. FURTON:

01:51:42  10  Q.  Are any of your employees, do they collaborate with labor

11  union or labor union affiliated organizations?

12  A.  Yes.

13          MR. HAZINSKI:  Objection to foundation.

14          THE COURT:  Well, ask her how she knows.

01:51:55  15  BY MR. FURTON:

16  Q.  Okay.  How do you know?  How do you know that they have

17  this affiliation or connection?

18  A.  We have been told by the employees.

19  Q.  They tell you.  Okay.

01:52:02  20        And is the disclosure to them of the existence of a

21  labor dispute at a particular company, is that a piece of

22  information that you think might be valuable to a labor union

23  who is wondering where to concentrate their resources?

24          MR. HAZINSKI:  Objection, Your Honor.  I think that

01:52:20  25  calls for speculation.

1          THE COURT:  Sustained.  And why -- why would a labor

2     union want to know about the existence of a labor dispute

3     through one of the part-time staffing attorneys presumably

4     when the staffing attorney learns it, it's because the labor

01:52:37    5     union already knows.  Maybe I'm misunderstanding the dynamics

6     here.

7          MR. FURTON:  Well, the labor union might not know.

8     They might not know that people are unhappy about, say, the

9     way they're being treated at a company.

01:52:48    10          THE COURT:  Oh, well, all right.  That's -- maybe I'm

11    misinterpreting a labor dispute.

12          If conditions of employment are a matter of

13    complaint, if that's what you mean by a labor dispute, that's

14    fine.

01:52:59    15          MR. FURTON:  Yeah.

16          THE COURT:  I thought you meant an actual union at an

17    employer or that has employees at an employer or is attempting

18    to organize at an employer and the witness's employees, she

19    tells them about that.  I thought this is what the statute is

01:53:16    20    dealing with.

21          MR. FURTON:  It's true, but it starts with two or

22    three guys complaining about the terms and conditions of

23    employment, and then it spreads as the group becomes more and

24    more organized so that they can form a union, right?  But

01:53:30    25    it's -- the statute requires disclosure of it at the -- at all

1    stages.

2          So there's a mechanism for discovery of this

3    information about a particular labor dispute.  Sometimes it's

4    front page news.  Other times, it's quiet.

01:53:47    5          THE COURT:  All right.  Well, go ahead.

6          MR. FURTON:  Okay.

7          THE COURT:  And your argument is not evidence.

8          MR. FURTON:  I understand.

9          THE COURT:  All right.  Go ahead.

01:53:54    10   BY MR. FURTON:

11   Q.  You mentioned that you had a situation where two days

12   after you disclosed the existence of a labor dispute, there

13   was a union-organizing activity.

14          Was that at your office or at the office or facility

01:54:14    15   of your customer?

16   A.  It was at the client site.

17   Q.  Okay.  And you believe that the disclosure of the -- the

18   existence of the labor dispute in compliance with the statute

19   played a role in the -- in that strike situation?

01:54:29    20   A.  That's correct.

21   Q.  Were there handout cards being passed around in that

22   instance?

23   A.  Yes, there were.

24   Q.  Did it lead to a picket?

01:54:40    25   A.  No picket.

1  Q.  You mentioned though that people were threatened?

2  A.  They were.

3  Q.  Was there an Unfair Labor Practices Act filed?

4  A.  There was.

01:54:48  5  Q.  You mentioned doing business with some unionized

6  companies.  Do you have any unionized companies that have

7  given you rules about how long your employees could work in

8  their facility?

9  A.  So the current union that I work with, the facility I work

01:55:08  10  with, they have a rule that an employee can work 90 days.

11  After 90 days, they have to be out of the facility for

12  30 days, and then they are allowed to come back after the

13  30 days and work another 90-day stint.

14       Currently, the talks are that because of this new

01:55:27  15  law, they would like to go where the employee works 90 days

16  and instead of just being out of the facility for 30 days to

17  come back --

18       MR. HAZINSKI:  Objection.

19  BY THE WITNESS:

01:55:37  20  A.  -- they would have to be out a year to come back and do

21  another 90-day.

22       THE COURT:  And how do you know this?

23       THE WITNESS:  The client has shared that information

24  with me.

01:55:45  25       THE COURT:  All right.  Well, if you're going to be

1    offering -- the names of these clients are not confidential,

2    are they?

3              MR. FURTON:  Yes, they are, Your Honor.

4              THE COURT:  Why?

01:55:54    5    MR. FURTON:  This is an entire industry that competes

6    with each other, so they are quite careful about who they

7    service.

8              THE COURT:  All right.  Well, the name of the client

9    is not important to me right now.

01:56:05   10    MR. FURTON:  Right.

11              THE COURT:  But I read this statute as, at least the

12    plain language is, the witness has to warn her employees if

13    they're going to a place where a strike, lockout or other

14    labor trouble exists, and telling them that -- and then

01:56:25   15    telling them they have a right to refuse the assignment

16    without prejudice, without getting terminated from her company

17    because they refused to go to a place that has a strike,

18    lockout, or other labor dispute going.

19              I'm not understanding this, what relevance there is

01:56:43   20    to telling a union about an employee complaining or to a union

21    or talking about conditions of employment.  I thought this is

22    just a matter of she needs to warn her employees you're going

23    to a place with a strike.  You might encounter pickets.  And

24    if the employee says I don't want to go there, I don't want to

01:57:02   25    cross a picket line, she can't fire them.

| | | |
|---|---|---|
| | 1 | Am I -- am I overly simplifying the statute?  But |
| | 2 | that's how I read it. |
| | 3 | MR. FURTON:  So, yes. |
| | 4 | THE COURT:  Yes, I'm oversimplifying it, or yes, I'm |
| 01:57:15 | 5 | right? |
| | 6 | MR. FURTON:  I think you're describing one particular |
| | 7 | instance. |
| | 8 | THE COURT:  Okay. |
| | 9 | MR. FURTON:  It can have multiple instances.  It can |
| 01:57:21 | 10 | have lots of different effects, right? |
| | 11 | So the statute -- and my colleague, Brad, is a labor |
| | 12 | lawyer, so I'll let him speak in a moment. |
| | 13 | THE COURT:  All right. |
| | 14 | MR. FURTON:  But really briefly, that is absolutely |
| 01:57:34 | 15 | true, but there are other instances as well.  Since the |
| | 16 | disclosure of the labor dispute provides information, it -- it |
| | 17 | exposes essentially something which otherwise might not be |
| | 18 | well known. |
| | 19 | THE COURT:  All right.  Well, let me ask, I'll hear |
| 01:57:50 | 20 | from you in a second, but can employees refuse an assignment? |
| | 21 | THE WITNESS:  Absolutely. |
| | 22 | THE COURT:  And can they refuse an assignment because |
| | 23 | they don't want to cross a picket line? |
| | 24 | THE WITNESS:  Absolutely. |
| 01:57:59 | 25 | THE COURT:  And do you fire them when they don't |

Shiu - direct

47

1   cross the picket line?

2          THE WITNESS:  No.

3          THE COURT:  All right.  And you warn employees if an

4   employee is going someplace where they have to report at 4:00

01:58:10   5   in the morning in a neighborhood they don't want to go to,

6   they can refuse to go there, correct?

7          THE WITNESS:  You're correct.

8          THE COURT:  And that happens frequently, or at least

9   -- not -- it happens occasionally?

01:58:19   10          THE WITNESS:  Occasionally, yes.

11          THE COURT:  All right.  But you don't take

12   retaliatory measures against them because they, for whatever

13   reason, they don't want to work at a particular place.

14          THE WITNESS:  No.

01:58:27   15          THE COURT:  Okay.  Go ahead.

16          MR. LEVISON:  And, Your Honor, I just want to

17   address, I think you're not oversimplifying this.  You're

18   actually looking through the lens of traditional labor law.

19          When you hear the term labor dispute because you're

01:58:41   20   familiar with the body of law, you're thinking NLRA, NLRB

21   matters, a ULP.

22          The problem is that's not what the statute covers.

23   The statute here says "other labor disputes," which can mean

24   anything.  And so the question is when we look through this

01:58:56   25   through traditional labor lens, you're correct, that is

1    picketing, that is strikes.  Those are the things that fall

2    within the sole governance of the NLRA.

3         However, the question arises is a sexual harassment

4    investigation a labor dispute under this law that impacts the

5    working conditions there?  There is an argument to be made

6    that if you have a client who's looking at this, not from the

7    lens of a lawyer, not through the lens of a traditional labor

8    attorney, that they will not want to disclose is this a labor

9    dispute that I have to deal with.

10        THE COURT:  Well, it's called "other labor trouble."

11        MR. LEVISON:  And, again, this is in state law, this

12   is a law that is not tied to the NLRA.  This is a law that's

13   trying to create extra rights.  And so when making that

14   decision about is this a labor dispute rises tension with the

15   client because the client has to first make the judgment of is

16   what going -- what is happening here something that's a labor

17   dispute?

18        Something as simple as they don't like the lighting

19   in the bathroom, clients, you know, employees have complained

20   about that, is that a labor dispute that has to be notified?

21   And then when we add the interested party component of this

22   that where the employees themselves are not bothered by this,

23   that a third party can come in and say, ah-hah, here is one

24   employee that complained about this issue, that falls into the

25   broad gambit of an "other labor dispute" and then can bring a

01:59:15

01:59:32

01:59:54

02:00:09

02:00:29

1    claim, you can see why the businesses themselves are concerned

2    with, well, what -- am I doing this right?  How do I comply

3    with this law?

4             And if this was a true labor dispute, there is a

5    mechanism for that.  They can go to file an unfair labor

6    practice charge with the NLRB.  There is a mechanism that

7    controls this.  And under the NLRB, the fact that an employee

8    knows about a picket line and you say, fine, you don't want to

9    work here, I don't need to give you a job, doesn't make you

10   have to say I'm not going to give you this job, and I have a

11   requirement that I have to give you another job.

12            In traditional labor law, someone doesn't want to

13   cross a picket line, they don't need to work there and you can

14   say thank you, then this isn't the job for you.  You don't

15   have a requirement then to find them a comparative job.  And

16   if you do that, you're retaliation.  Because if you say, hey,

17   I put you back into the pool of candidates, do I have to give

18   them special treatment because this person got a notice that

19   said there's labor dispute?

20            THE COURT:  This seems very hypothetical.  The real

21   complaint you have is on the words "other labor trouble"?

22            MR. LEVISON:  So --

23            MR. HAZINSKI:  Your Honor, can I be heard briefly on

24   this?

25            THE COURT:  You'll get a chance to cross, but I --

02:00:43

02:01:00

02:01:14

02:01:30

02:01:41

1    how much more do you have on direct?

2         How much more do you have on direct?

3         MR. FURTON:  I have about 15 minutes.

4         THE COURT:  All right.  Why don't you do that, and

02:01:56    5    I'll let the defendants cross-examine at that point.

6         I'm interspersing argument with testimony, and we

7    ought to let these witnesses testify and complete their

8    testimony.

9         Go ahead.

02:02:10   10         MR. FURTON:  Very good.

11   BY MR. FURTON:

12   Q.  So you understand that the statute also has an interested

13   parties provision, right?

14   A.  I do understand that.

02:02:19   15   Q.  Who do you expect to be a complaining interested party?

16   A.  Attorneys.

17   Q.  Attorneys.  Who would they be representing though?

18   A.  Themselves.  It's an interested party.  They can --

19   because they think that maybe I'm not doing something right, I

02:02:35   20   can have a lawsuit.  It can be anybody.

21         MR. FURTON:  Okay.

22         MR. HAZINSKI:  Your Honor, just object to the extent

23   that's calling for a legal interpretation.

24         THE COURT:  Well, sustained.  This portion of the Act

02:02:44   25   is not in place right now.

Shiu - direct

51

1    MR. FURTON:  No, the interested parties provision is
2  in place.
3    THE COURT:  Have there been lawsuits by interested
4  parties?

02:02:52
5    MR. FURTON:  There have been 15 complaints on file
6  with the Illinois Department of Labor that are going through
7  the 90-day waiting period, cooling-off period, that will then
8  be ripe for lawsuits.

9    THE COURT:  This is what you spoke about in the
02:03:03
10  opening.  Okay.

11    MR. FURTON:  Right.

12    THE COURT:  All right.  Have you been the subject of
13  a complaint to the Department of Labor under this statute?

14    THE WITNESS:  Not yet.

02:03:13
15    THE COURT:  Okay.

16    THE WITNESS:  Not to my knowledge, Your Honor.

17    THE COURT:  All right.

18  BY MR. FURTON:

19  Q.  Have you had interactions, though, with organizations that
02:03:18
20  you expect to -- that you believe would meet the definition of
21  an interested party under the statute?

22  A.  I have.

23  Q.  Why -- what is your experience with those organizations?

24  A.  They're not great experiences.  One of the major one is
02:03:33
25  the BIPA.  We've had to deal with the BIPA claims and BIPA

Shiu - direct

52

1   lawsuits even though we're compliant.

2          So sometimes on a weekly basis, we are explaining

3   that we're compliant, and I'm having to pay somebody to

4   respond to those allegations.

02:03:52    5          THE COURT:  Well, that has nothing to do with this

6   section, does it?  I thought BIPA is a -- BIPA -- I won't tell

7   you my own views of BIPA, but the law allows a private right

8   of action, and I don't see that as being -- intersecting with

9   this particular statute.  But if there is, you can tell me.

02:04:09    10         MR. FURTON:  This is a private right of action for

11  strangers with attorneys' fees, so it is the new BIPA in

12  their --

13         THE COURT:  Oh, I see.  Okay.  You're analogizing it

14  to BIPA.

02:04:20    15         MR. FURTON:  Yes.

16         THE COURT:  But BIPA has its own parade of --

17         MR. FURTON:  Yes.

18         THE COURT:  -- road blocks.

19         Go ahead.

02:04:29    20  BY MR. FURTON:

21  Q.  So can I ask you about your expected compliance expense in

22  the event that the -- when the equivalent pay equivalent

23  benefits provision becomes effective?  Do you expect to spend

24  more money on compliance?

02:04:45    25  A.  Absolutely.

1  Q.  And tell us about the nature of that expenditure?

2  A.  Well, I'm going to -- again, there's going to be multiple

3  plans.

4          At this time, I have 134 plans to go through.  I, you

02:04:59  5  know, my busiest location can, when they are -- let's say at

6  peak time, they could send out 200 people a week, right?  They

7  could see 300 new associates come through the door.  It's

8  going to be an ongoing compliance issue.  So at this time, I

9  know that I will have to add some internal individuals to my

02:05:24  10  organization.

11  Q.  Do you have risk under the statute that you could lose

12  your license or be sued by strangers?

13  A.  Yes.

14  Q.  How about your interaction with clients regarding this new

02:05:39  15  statute.  What have you learned from interacting with clients

16  regarding this new statute?

17  A.  Unfortunately, we have some clients -- so when this new

18  statute came out, the Illinois Department of Labor, there was

19  a date it was supposed to go in effect.  After that date, it

02:05:55  20  was supposed to go in effect, when that date dropped, I had

21  clients that let go of all of my field employees.

22          Shortly after the Illinois Department of Labor came

23  out with an extension.  Unfortunately, it was too late, and

24  those field employees had lost their positions because the

02:06:11  25  clients -- there's a lot of emotion around it, and the clients

1   don't understand it.  So they are shying away from having

2   field employees, afraid of this third party, not wanting to

3   give all the benefits, not understanding who even in their

4   environment would -- I have a client where the -- it's a CEO,

02:06:37   5   it's a smaller client and it's the CEO, and he has four

6   employees.  So he is -- it was a client that was scared.  He

7   doesn't have a comparable.

8   Q.  What do you mean he doesn't have a comparable?  Who would

9   be -- there's always a comparable.

02:06:50   10   A.  He's the CEO.

11   Q.  He's the only comparable?

12   A.  Yes.

13   Q.  So you'd have to pay a temp the amount that the CEO earns?

14   A.  In this law, yes.

02:07:01   15   Q.  Okay.  And you'd have to provide the temp with the

16   benefits that the CEO receives, right?

17   A.  Correct.

18   Q.  So how many clients have stopped doing business with you

19   as a result of this bill?

02:07:10   20   A.  About 15 percent of my business.

21        THE COURT:  15?

22        THE WITNESS:  15.

23   BY MR. FURTON:

24   Q.  15 percent of your business?

02:07:16   25        Has it affected your sales opportunities for the

1  future?

2  A.  It has.

3  Q.  In what way?

4  A.  We're out doing sales.  We have clients that are waiting

02:07:29  5  to see what happens next with this law.

6  Q.  Have temps lost their employment because of this law?

7  A.  Yes.  Just like I explained to you because of when the

8  date was supposed to -- when the law was supposed to go in

9  effect, the Illinois Department of Labor did not extend that

02:07:47  10  date until the original date.  So I had clients that let all

11  of their field employees go.

12          MR. FURTON:  Okay.  I have no further questions.

13          THE COURT:  All right.  Cross-examination.

14          MR. HAZINSKI:  Do you need your -- is this your

02:08:06  15  computer here?

16          MR. FURTON:  Yeah.

17          THE COURT:  Are you going to use any documents?

18          MR. HAZINSKI:  I may use the Elmo.

19          THE COURT:  All right.

02:08:13  20          MR. HAZINSKI:  Depending on how it goes.

21          MR. FURTON:  I'm okay with just leaving it here, or

22  are you --

23          MR. HAZINSKI:  Fine with me.

24          MR. FURTON:  Okay.

25          MR. HAZINSKI:  Thanks.

1          CROSS-EXAMINATION

2     BY MR. HAZINSKI:

3     Q.  Good afternoon, Ms. Shiu.

4     A.  Good afternoon.

02:08:20   5     Q.  I just have a few questions for you.  My name is John

6     Hazinski.  I'm an attorney for the defendant in this case.

7     It's a pleasure to meet you.

8     A.  Okay.

9     Q.  AllStaff employees dedicated human resources personnel,

02:08:30   10    correct?

11    A.  We employee industrial staffing, and we employee a small

12    part of direct hire and professional, 10 percent.

13    Q.  I mean specifically an administrative staff that's

14    internal to AllStaff, that includes human resources

02:08:49   15    professionals, right?

16    A.  We do have human resource professionals, correct.

17    Q.  So that includes a director of human resources, right?

18    A.  Correct.

19    Q.  That person is required to have a working knowledge of

02:09:02   20    federal and state employment laws, right?

21    A.  We have attorneys for that.

22    Q.  So you have attorneys in that role, but also the human

23    resources director has to have that knowledge, too, right?

24    A.  They have attorneys that they can go to for -- if they

02:09:11   25    need questions answered.

Shiu - cross

1  Q.  Okay.  And, in fact, the job description for the director

2  of human resources says they have to have that knowledge of

3  state and federal employment laws, right?

4  A.  I have not seen my recent director of human resources job

02:09:28  5  description.

6  Q.  Well, you also employ someone in the role of HR business

7  partner, that job title, right?

8  A.  We have HR business partners, correct.

9  Q.  Okay.  That person is responsible for tracking -- among

02:09:47  10  other things, tracking and maintaining employee information,

11  correct?

12  A.  Correct.

13  Q.  Those people, there's more than one I should say?

14  A.  Correct.

02:09:55  15  Q.  And the director and the business partner, they supervise

16  and support AllStaff's other human resources employees, right?

17  A.  Can you rephrase that?

18  Q.  So the HR director and the HR business partner that work

19  for AllStaff, part of their responsibilities is to supervise

02:10:15  20  the other employees of AllStaff who work on human resources

21  issues.

22  A.  Correct.

23  Q.  Thank you.

24      And those employees collectively are responsible,

02:10:26  25  among other things, for making sure that AllStaff follows

Shiu - cross

58

1  employment laws, right?

2  A.  Correct.

3  Q.  That includes laws about pay, benefits, and

4  antidiscrimination rules, right?

02:10:37  5  A.  Correct.

6  Q.  So one of the benefits that AllStaff offers to clients is

7  that AllStaff can manage that complicated administrative

8  process so that the clients don't have to.  Is that fair to

9  say?

02:10:51  10  A.  In our current process with our current benefits, that's

11  correct.

12  Q.  And currently, AllStaff has to track and manage certain

13  information under, for example, the Illinois Wage Payment and

14  Collection Act, right?

02:11:07  15  A.  Correct.

16  Q.  And there are preexisting obligations that predate the

17  amendments from last year under the Day and Temporary Labor

18  Services Act, right?

19  A.  Correct.

02:11:18  20  Q.  Those laws require you to track, for example, where

21  employees work on what days and what their hourly wage is,

22  correct?

23  A.  That's correct.

24  Q.  And part of gathering that information involves having

02:11:32  25  cooperation with the clients who share information with you,

1   correct?

2   A.  The information of the employees that are working for us,

3   we already have that information because they're working

4   directly for us.

02:11:45   5   Q.  For example, when certain employees are sent to a certain

6   job site, you have to get information about the location of

7   that job site from the client, correct?

8   A.  Correct.

9   Q.  Similarly, their hourly wage.  That's information the

02:11:59   10   client has to provide to you.

11   A.  Correct.

12   Q.  You mentioned that AllStaff places employees in industrial

13   staffing, but you also place workers into administrative and

14   clerical roles, correct?

02:12:17   15   A.  90 percent of my business is industrial staffing, and

16   about 10 percent is that clerical direct hire piece.

17   Q.  Okay.

18           THE COURT:  So the current laws require the employer

19   to provide you with the information about what they -- what

02:12:33   20   the pay is for your employees.

21           THE WITNESS:  Correct.

22           THE COURT:  And that's not an additional burden

23   caused by this new law.  That's something you've been doing.

24           THE WITNESS:  That's something, yes, correct.

02:12:44   25           THE COURT:  All right.  Go ahead.

BY MR. HAZINSKI:

Q.  You mentioned the direct hire placement just now, and that's a service that you offer to clients, the ability to place your employees or new employees into direct hire roles with your clients, correct?

A.  Correct.

Q.  And so as part of that arrangement, AllStaff receives a fee, correct?

A.  Correct.

Q.  Okay.

THE COURT:  And that portion of your business is not implicated by this law either.

THE WITNESS:  It is not, no.

THE COURT:  You're almost an employment agency for that.

THE WITNESS:  Correct.

THE COURT:  And they get hired directly by the employer, and there's no requirement to see what kind of benefits they offer people because it's all in their hands.

THE WITNESS:  Correct.

THE COURT:  Got it.

Go ahead.

BY MR. HAZINSKI:

Q.  So companies interested in doing more direct hiring might come to AllStaff to help you -- so that you can help

Shiu - cross

61

1  facilitate that process; is that fair?

2  A.  The direct hire pieces we receive are more of a skilled,

3  like I was explaining, like an engineer, a plant manager.

4  But, yes, they will come to me for more -- the direct hire is

02:13:42  5  more of a professional, skilled individual.

6  Q.  You were talking about the characteristics of the

7  temporary workers at AllStaff.

8        Is it true that some temporary workers use temping as

9  an on ramp to permanent direct hire employment?

02:14:08  10  A.  I think that a temporary employee comes to an agency for

11  the flexibility.  They go through a process.  They go through

12  an interviewing process, and if they are looking for that type

13  of employment, we are definitely going to try to put them in a

14  role that would fit that for them.

02:14:23  15  Q.  And that's some employee's preference rather than staying

16  in a temping role permanently.

17  A.  They would let us know if that was their preference.

18  Q.  And some do?

19  A.  Some do.

02:14:37  20  Q.  You -- you provided a declaration earlier on in this case,

21  do you recall that?  A written declaration that you signed and

22  submitted?

23  A.  Yes.

24  Q.  In that declaration, you didn't provide any data about

02:14:55  25  reductions in worker placements or lost revenue to AllStaff in

Shiu - cross

62

1    2023, correct?

2    A.  I cannot recall.  I do, however, feel that I did do that

3    declaration before the law was actually the date of the law on

4    -- was at its end date, like, when it was supposed to start.

02:15:19    5    And then like I explained earlier, the Illinois

6    Department of Labor came after the date of that start and it

7    did the extension.

8    Q.  So your declaration is dated December 21st, 2023.  Do you

9    recall that?

02:15:31    10    A.  I don't remember the date, but I do remember the

11    declaration.

12    Q.  So is it your testimony that the lost revenue and the

13    consequences you're describing have occurred since December

14    21st?

02:15:44    15    A.  That is correct.

16    Q.  Okay.  So 15 percent of your business dropped off in

17    approximately the last six weeks?

18    A.  Correct.

19    Q.  Okay.  Now, when you prepared your declaration, you also

02:15:58    20    didn't refer to any financial records you used to quantify the

21    amount of lost business, correct?

22    A.  I cannot recall.

23    Q.  And in preparing your declaration, did you rely on a

24    financial model or a mathematical projection about the likely

02:16:19    25    effect of the law on your business?

Shiu - cross

63

1   A.  I do not recall.

2   Q.  And you also didn't provide any correspondence with

3   clients who said that they were stopping their partnership

4   with AllStaff due to the amendments to the statute, correct?

02:16:37   5   A.  I would not provide client information just because it

6   needs to stay confidential.

7   Q.  Are you aware that we issued a request to your attorneys

8   in this case for all the correspondence with AllStaff's

9   clients about these issues?

02:16:54   10   A.  Again, I would like my client information to stay

11   confidential.

12   Q.  So are you saying you do have such correspondence, but it

13   wasn't provided?

14   A.  I'm saying that I've had conversations with clients.  Some

02:17:06   15   of the information they have given me, I have been -- made me

16   sign a NDA.

17        THE COURT:  Some clients have dropped you, and

18   they've done it by a phone call?

19        THE WITNESS:  No, no.

02:17:18   20        THE COURT:  By email?

21        THE WITNESS:  Yes.

22        THE COURT:  Generally?

23        THE WITNESS:  Yes.

24        THE COURT:  All right.  And those are the emails

02:17:23   25   you've asked for that apparently haven't been provided, and so

1  be it.

2        Okay.  Go ahead.  We have witness testimony she's

3  lost 15 percent of her business.  If you've got a basis to

4  challenge it, you know, we'll go forward with that.

02:17:37  5  BY MR. HAZINSKI:

6  Q.  Ms. Shiu, do you have any sense of whether 2023 was a year

7  of growth or retraction for the staffing services industry as

8  a whole in this country?

9  A.  As a whole?  I would say that it was -- I don't know the

02:18:00  10  exact number.  So to give you a number, I do not know.

11  Q.  Do you have any idea of how your reduction in business

12  that you testified about compares to industry trends across

13  the country?

14  A.  I do not.

02:18:13  15  Q.  Is it your testimony that every client that you have lost

16  between, as you testified, December 21st of 2023 and today

17  told you that the reason they were stopping using you, using

18  AllStaff's services, is because of the Act?

19  A.  I didn't say every client that we -- I did not say that.

02:18:33  20  Q.  So how many of those clients told you that?

21  A.  I would have to -- I don't want to give you an exact

22  number.  I would have to look.

23  Q.  Okay.

24  A.  I have 134 clients.

02:18:43  25  Q.  So if they didn't tell you that, does that mean that not

1  all the loss you've experienced you can directly attribute it

2  to the Act?

3  A.  The 15 percent I can attribute to the Act, yes.

4  Q.  If they didn't tell you, how do you know that?

02:18:55  5  A.  The 15 percent of business that I have lost was due to the

6  Act.

7          THE COURT:  And how do you know that?  Did they tell

8  you that?

9          THE WITNESS:  They've told me that.

02:19:05  10         THE COURT:  All right.  And that's the

11  correspondence by email --

12         THE WITNESS:  We are letting them go because today is

13  the day that the law has went into place, and we no longer

14  want field employees because we do not know how to comply with

02:19:17  15  this law.

16         THE COURT:  Okay.  And that's your experience with --

17  well, 15 percent can you quantify that?  I can multiply

18  15 percent by 130-something, but how many clients have you

19  lost numberwise?

02:19:27  20         THE WITNESS:  So we have lost around -- I think we're

21  up to about 17, 18 clients that we've lost.

22         THE COURT:  All right.  How many employees would that

23  involve that were placed and that are no longer placed?

24         THE WITNESS:  So I think we are up to about 85

02:19:51  25  employees that are no longer placed at that client, right,

1  because we may have been able to place some other places.

2       THE COURT:  All right.

3       Okay.  Go ahead.

4  BY MR. HAZINSKI:

02:20:01  5  Q.  In your declaration, you wrote that you expect that

6  AllStaff may close some or all of its Illinois operations.  Do

7  you recall that?

8  A.  We have closed one of our Illinois locations.

9  Q.  When was that?

02:20:16  10  A.  About two months ago.

11  Q.  Okay.  And which location?

12  A.  The Elgin location.

13  Q.  Okay.

14       THE COURT:  Was that because of the statute or

02:20:29  15  because of just business?

16       THE WITNESS:  We closed it because of the statute

17  because the one larger client that we have that has the union

18  inside, we had opened it for that client, and we can support

19  it under another location.

02:20:44  20       THE COURT:  Okay.  Go ahead.

21  BY MR. HAZINSKI:

22  Q.  The business that was being done out of the Elgin

23  location, you just testified I believe that that business can

24  be handled now out of a different location; is that correct?

02:20:55  25  A.  We are handling it out of another location because of --

1    the business has gone down.

2    Q.  Okay.  Your -- this is I think my last question -- your

3    contention that you might have to close some or all of your

4    Illinois operations going forward, was that based on any

02:21:22    5    financial models or projections that you prepared when you

6    were putting your declaration together?

7    A.  That's based on some of our clients expressing -- we have

8    a large client base out of Lake County, and that is some of

9    our clients expressing that they will move just across the

02:21:39    10    border to Wisconsin.  They have already had some facilities

11    that they have moved there, and it will be easy for them to

12    move the rest of their facilities across the border.

13                MR. HAZINSKI:  Your Honor, may I just have a quick

14    moment?

02:21:52    15                THE COURT:  But they'd still be able to use your

16    agency.

17                THE WITNESS:  Yeah, correct, because I'm in

18    Wisconsin, correct.

19                THE COURT:  Right.  So the employees that work there

02:21:59    20    now would continue to work there, they'd just have to drive a

21    little further?

22                THE WITNESS:  Correct.

23                THE COURT:  Okay.  Got it.

24          (Counsel conferring.)

02:22:17    25                MR. HAZINSKI:  Your Honor, I have nothing further for

1    Ms. Shiu.  I would just make a record that we would object to

2    any testimony based on correspondence that wasn't produced in

3    response to our requests.

4              THE COURT:  All right.  Well, this is really just

02:22:28    5    going to irreparable harm.  I'll note your objection, and

6    we'll see whether there needs to be any compliance on any type

7    of motion to compel to make any difference.

8              I don't think the names of these employers are all

9    that relevant.  She wants to keep them confidential

02:22:44    10   understandably, the witness does, and I don't find their

11   exposure in a public courtroom to be necessary for me to

12   decide any issue in this case.

13             MR. HAZINSKI:  Absolutely, Your Honor, we don't

14   disagree.  Just so you're aware, we did receive similar

02:22:57    15   correspondence from the other two testifying witnesses, and

16   the information is redacted.  So that's consistent.

17             THE COURT:  All right.  And there's a protective

18   order in the case, too.

19             MR. HAZINSKI:  That's right.

02:23:04    20            THE COURT:  Any redirect?

21             MR. FURTON:  Just one topic, Your Honor.

22             THE COURT:  Go ahead.

23                      REDIRECT EXAMINATION

24   BY MR. FURTON:

02:23:10    25   Q.  Ms. Shiu, is your business down more than 15 percent?

1  A.  It is down more than 15 percent.

2  Q.  What do you estimate your business to be down by?

3  A.  My business is probably down about 30 percent.

4          MR. FURTON:  I have no further questions.

02:23:24    5          THE WITNESS:  Thank you.

6          THE COURT:  By business down, you're talking about

7  your number of people you place, the number of locations you

8  place them at, your overall profits, your overall revenue?

9  How do you measure it?

02:23:33   10          THE WITNESS:  My revenue and profits currently are

11  down.

12          THE COURT:  Got it.  And there's no way, or do you

13  have a way or any kind of -- other than gut feeling, but do

14  you have any way of precisely measuring that revenue and

02:23:47   15  profit loss and attributing it to clients who don't want to

16  employ your people because of the new law?

17          THE WITNESS:  Yes.  There's some clients, you know,

18  some of my business is down.  I have an employer that works

19  with -- we'll call it a cereal company that had a salmonella

02:24:08   20  outbreak.  And unfortunately because they don't have any

21  products to pack, I know that that business is down because of

22  that loss in volume and there is no -- right now, I'm not sure

23  when it's going to come back.

24          So, yes, there is ways to tell why I'm down if it's

02:24:26   25  because of the law or if it's because of a business situation

Figureroa - direct

70

1    like the salmonella poisoning or --

2           THE COURT:  But you don't have anybody internally,

3    and I don't think your lawyers have hired some expert from --

4    an economic expert or anyone to attribute the overall loss of

02:24:43    5    revenue and profit to one single cause.

6           THE WITNESS:  No.

7           THE COURT:  Okay.  Anything else by either side?

8           MR. HAZINSKI:  No, nothing, Your Honor.

9           THE COURT:  Thank you, ma'am.

02:24:54    10          THE WITNESS:  Thank you.

11          THE COURT:  You're excused.

12       (Witness excused.)

13          THE COURT:  All right.  Call your next witness.

14          MR. FURTON:  Your Honor, the plaintiffs call Byron

02:25:00    15   Figueroa.

16          THE COURT:  All right.

17        (Witness sworn.)

18          THE COURT:  Have a seat, please.

19        BYRON FIGUEROA, PLAINTIFFS' WITNESS, DULY SWORN,

02:25:17    20                  DIRECT EXAMINATION

21   BY MR. FURTON:

22   Q.  Good afternoon.

23   A.  Good afternoon.

24   Q.  Could you please state and spell your name for the record.

02:25:22    25   A.  Byron Figueroa.  First name B-Y-R-O-N.  Last name spelled

1    F-I-G-U-E-R-O-A.

2    Q.  Mr. Figueroa, by whom are you employed?

3    A.  I'm employed by ClearStaff, Inc.

4    Q.  And what's your position there?

02:25:36    5    A.  General manager.

6    Q.  And how long have you been general manager?

7    A.  Since approximately 2017.

8    Q.  And how long have you been in the staffing industry?

9    A.  25 years.

02:25:46    10    Q.  And what is your -- what is your responsibility as general

11    manager of ClearStaff, Inc.?

12    A.  As general manager, I'm responsible for the daily

13    operations of the business and the financial impact and

14    improvement.

02:26:01    15    Q.  Can you tell us about ClearStaff's business?

16    A.  We are light industrial, primarily manufacturing,

17    warehouse, logistics, and food manufacturing.

18    Q.  Thank you.

19         MR. FURTON:  Your Honor, if we can turn off the

02:26:21    20    screen, we'll turn it on in a moment.

21         THE COURT:  It is off to anyone other than counsel.

22    Do you not want --

23         MR. FURTON:  Understood.  I have a unique experience

24    where I can see it but everybody else can't.

02:26:32    25         THE COURT:  No one else can.  What you see over right

Figureroa - direct

72

1    in front of the jury box --

2              MR. FURTON:  That's what everybody else sees.

3              THE COURT:  -- that's what everybody else can see.

4              MR. FURTON:  Very good.  Thank you.

02:26:40    5    BY MR. FURTON:

6    Q.  So where are you located?  Where is ClearStaff located?

7    A.  We are in Illinois, nine locations throughout the Chicago

8    metropolitan area.

9    Q.  And how many clients do you have?

02:26:51   10    A.  Currently we service about 160 clients actively.

11    Q.  And are you a member of the Staffing Services Association

12    of Illinois?

13    A.  That is correct.  SSAI.

14    Q.  Why do clients use ClearStaff?

02:27:07   15    A.  Clients use ClearStaff because there's a lot of small

16    businesses, small businesses that sometimes have last-minute

17    orders, last-minute orders that the clients cannot meet or go

18    out and recruit a number of workers needed for that specific

19    rush.  They call ClearStaff because we recruit proactively,

02:27:33   20    and since we recruit proactively, we're constantly looking for

21    workers that want just flexibility in their schedule.

22              Flexibility is something you continue to hear

23    throughout today's testimony because that's the truth.  When

24    you look at today's work force in the U.S., there's a growing

02:27:49   25    number of workers who look for flexibility that will fit their

Figureroa - direct

73

1   lifestyle, that will fit their availability for the week based

2   on whatever needs they have at home.

3   Q.  Do some of your employees have other jobs?

4   A.  Yes, they do.  They come to ClearStaff as a supplement

02:28:05   5   income to either increase their savings or pay for their car

6   or pay for tuition, whatever the case may be.

7   Q.  Do you think that has an influence on the number of people

8   who choose to get benefits through your company?

9   A.  Yes.

02:28:17   10  Q.  How many employees do you have in a typical year?

11  A.  8,000.

12  Q.  And how many do you have out on a given week working for

13  clients?

14  A.  Any given week currently, we have about 2,500 employees

02:28:36   15  assigned.

16  Q.  And can you tell me an exemplary type of assignment that

17  you might send them to do?

18  A.  Assignment would be someone who does non-skill worker,

19  worker, rather, doing some picking, packing, working on the

02:28:52   20  production line, may take only 15 minutes to learn the trade

21  or just, you know, put Object 1 into the box and package it.

22  Q.  Okay.  And does ClearStaff offer its hourly employees that

23  it offers as temps to clients benefits?

24  A.  Yes, we do.

02:29:11   25  Q.  Could you tell me about -- before you do that, do you have

Figureroa - direct

74

1    also clerical temps?

2    A.  It's a very small percentage, maybe 1 percent.

3    Q.  1 percent.

4          Do you have professional temps?

02:29:27   5    A.  We do not.

6    Q.  You do not.

7          So tell me about the benefits that ClearStaff offers.

8    Do you have a health insurance offering?

9    A.  We do.  We have Aetna.  We provided the summary of

02:29:45  10   benefits and coverage.  Any worker who averages 30 hours a

11    week in the first 90 days is eligible for healthcare.

12    Q.  So they have to earn into it after 90 days of work?

13    A.  Correct.

14    Q.  What if they had previously worked at a temporary agency

02:30:02  15   and been assigned to a particular client for 85 days and then

16    came to you and you assigned them to the same place so that

17    they're reaching the 90-day rule five or so days later.

18          Would you -- are you prepared to adjust your benefits

19    to offer them health insurance earlier in time than you used

02:30:26  20   to?

21    A.  Because the worker was working for another agency, that

22    agency was the employer of records.  This person comes to work

23    for us, we are now the employer of records.  That means that

24    by the agency rule we have to start counting the 90 days,

02:30:46  25   ClearStaff.

1    MR. FURTON:  So I'm going to ask the Court to turn on

2    the monitor here.

3         On the monitor, I have a document that is marked in

4    the bottom right-hand corner C 33.  It is also Exhibit A to

02:31:05    5    Mr. Figueroa's declaration filed with the Court in connection

6    with our preliminary injunction motion.  I'll identify this

7    for purposes of our proceeding as Plaintiffs' Exhibit 2.

8         THE COURT:  Okay.

9    BY MR. FURTON:

02:31:25    10   Q.  This document in front of you, could you tell us if you're

11   familiar with it?

12   A.  Yes, I am.

13   Q.  What is it?

14   A.  Summary of benefits and coverage for healthcare.

02:31:34    15   Q.  Okay.  It says up at the top Open Choice Med Sure 60, 50,

16   $6K.  What does that mean to you?

17   A.  The 60, 50 -- it's a PPO, by the way.  60 percent Aetna

18   pays, and 40 percent out of pocket for in network.

19   Q.  And is there a deductible?

02:31:57    20   A.  Yes.  6,000.  6,000 for individuals, 12,000 for family.

21   Q.  How much does this cost an individual worker for

22   ClearStaff?

23   A.  We charge our employees the max of $29.  Doesn't matter

24   what wage, hour wage they have, and it doesn't matter the age

02:32:18    25   or gender or ZIP code of the employee.  As with healthcare,

1  the costs for employee varies depending on the age, gender and

2  ZIP code.

3  Q.  Okay.  When you say the costs vary by age, gender and ZIP

4  code, what do you mean?  Does each employee cost the company a

02:32:44  5  different amount of money?

6  A.  What it means is that if I hire five employees today and

7  their ages, their gender and their ZIP code is spread amongst

8  all five -- 21-year-old, 30-year-old, 40-year-old and

9  60-year-old -- those five individuals will pay $29 max every

02:33:04  10  week, but the cost for ClearStaff costs will increase based on

11  the age, gender and ZIP code.

12       THE COURT:  Let me interrupt.  Is Department of Labor

13  challenging the irreparable harm prong?

14       MR. HAZINSKI:  We are, Your Honor.

02:33:17  15       THE COURT:  You are.  All right.

16       I mean, my impression is this is a law that creates a

17  huge burden on the temporary staffing agencies.  That is what

18  it is and that the Illinois legislature decided apparently

19  that's the law and it creates a huge burden on them, but that

02:33:37  20  by itself doesn't constitute necessarily preemption.

21       We'll talk about that during oral argument.  But if

22  it's irreparable harm, what I need to hear and probably get

23  right to the point on this is what effect this law has had on

24  their business so far, what effect they expect it to have on

02:33:55  25  the business going forward such that it satisfies irreparable

Figureroa - direct

1   harm, the irreparable harm portion that needs to be proven by

2   the plaintiffs for at least one of the elements they have to

3   prove for issuance of an injunction.

4           So if you can get to that part of it, I appreciate

02:34:11   5   the first witness because she explained more about the

6   staffing industry than I knew before.

7           MR. FURTON:  Yep.

8           THE COURT:  I don't know that this witness or your

9   next witness is going to add anything different.  I think I

02:34:20  10  have a very rudimentary understanding of the staffing

11  industry.  If there's something particular that needs to be

12  brought out, fine.

13          But, otherwise, I'd get to what effect has this law

14  had both on Prongs 1, 2 and 3 on -- Sections 1, 2 and 3 on

02:34:37  15  what they believe to be their losses so far and going forward

16  what they expect.

17          MR. FURTON:  Excellent.  I will move to it.  I do

18  want to show you the document that he was referring to when he

19  was speaking just now, which is just the one other document on

02:34:54  20  my screen here.

21          THE COURT:  Okay.

22          MR. FURTON:  We can mark this as --

23          THE COURT:  The health insurance plan, all that, I

24  get it in the sense that it's an enormous task to go off to

02:35:05  25  the people that are your clients and say show me your books.

1      MR. FURTON:  Yeah.

2      THE COURT:  And I understand that.  That's a burden.

3  And that's the nature of the law, and I'm sure lobbyists

4  pointed this out to the Illinois legislators when they passed

02:35:19    5  this law.  But that I get, which is why I'm trying to move

6  past the health insurance that a company offers, et cetera.

7      The benefits -- there's benefits offered by the

8  staffing agencies, benefits offered by the employers.  How you

9  match them is a difficult sometimes impossible process, and it

02:35:37   10  also causes a rub with the -- with your client saying let me

11  see what you do.

12      I -- I think that's clear from the testimony I've

13  heard so far.

14      MR. FURTON:  Then I will accelerate my examination

02:35:49   15  and move right on to that.

16      THE COURT:  Okay.

17  BY MR. FURTON:

18  Q.  Mr. Figueroa, may I ask you then about the harm that your

19  company has suffered.

02:36:02   20      So have you -- are you aware of your company,

21  ClearStaff, losing any business as a result of the passage of

22  the equivalent benefits and labor disputes and interested

23  parties provisions of this statute?

24  A.  Yes.

02:36:16   25  Q.  Please tell us about that, what you know.

A.  We have firsthand knowledge from clients who directly told our branch managers in two forms, one verbally and others in an email when the law came out sometime around September. Just because of the burden of the law, they do not want to share sensitive information with us.  Therefore, they were ending the assignments of our employees.

Q.  What type of company was this?

A.  One is a baking company, very big name known throughout Chicagoland.

The second one is a paper and plastic tube insert manufacturer.

Third one is a metal fabricator.

And there's a fourth one that is a plastic bottle, shampoo bottle manufacturer in Melrose Park.

THE COURT:  About how many employees did you place, you typically place at these places that have dropped you as a client?

THE WITNESS:  Combined total is about a hundred employees.  How do we figure out the total loss?  We can run reports just for those individuals current year of 2023 and year lookback at 2022 and so on.  When we look at that comparison, that is the total loss of revenue that we will suffer.

THE COURT:  All right.  And have you been able to place the majority of these hundred employees in other -- with

Figureroa - direct

1    other clients?

2            THE WITNESS:  We have been able to place some, not

3    all 100.

4            THE COURT:  All right.  Go ahead.

02:37:49   5    BY MR. FURTON:

6    Q.  How about -- how about the reprieve that was issued by the

7    Illinois legislature when they delayed enforcement of the

8    action, did you ever have any conversations with clients about

9    the delay in the enforcement?

02:38:07  10    A.  The conversations that I had is some clients who were

11    thinking about ending the assignments, since the effective

12    date was pushed further to April 1st, they decided to continue

13    using workers.

14    Q.  They decided to continue using workers?

02:38:22  15    A.  Correct.

16    Q.  Did you take from that that they expected to cease

17    continuing to use workers once the law went into effect again?

18    A.  That is my clear understanding.

19    Q.  Yeah.  Is it affecting your sales opportunities going

02:38:36  20    forward?

21    A.  It will affect -- it has already affected us since it went

22    into effect on August 4th.  We're down 8 percent and, again,

23    the way we measure that is by running reports and knowing

24    which clients are the ones that dropped us for this specific

02:38:52  25    reason, and we anticipate more as soon as April 1st come

1    around.

2                 THE COURT:  You're down 8 percent because clients

3    have dropped you because of the statute, or your business is

4    overall down 8 percent, and some portion of that is

02:39:02   5    attributable to the statute?

6                 THE WITNESS:  We measure it because we know which

7    clients dropped us because of the law, and we're able to run

8    reports to look at those volume.

9                 THE COURT:  So 8 percent -- 8 percent of what,

02:39:13   10   revenue, profit?

11                THE WITNESS:  Revenue.

12                THE COURT:  8 percent of revenue has been dropped,

13   and you've attributed it to the clients that have dropped you

14   because of the law.

02:39:22   15                THE WITNESS:  That is correct.

16                THE COURT:  Okay.

17   BY MR. FURTON:

18   Q.  Have you -- do you anticipate incurring additional

19   compliance costs in the event that the equivalent benefits

02:39:31   20   provision comes into force?

21   A.  Yes, we do, because we have a small HR group at corporate.

22   We have a controller, and for -- in able for us to find the

23   value of the employees' cost, ClearStaff's costs and then the

24   costs of the comparable worker from our client, it's a very

02:39:55   25   tedious process and we have to try and get as close as

1    possible to be accurate.

2    Q.  Do you expect to incur costs as a result of third parties

3    who are uninjured by your conduct bringing lawsuits against

4    your company?

02:40:08   5    A.  It's an open market, I guess, where anyone can come in and

6    file a lawsuit even if they had no harm.

7              MR. FURTON:  Okay.  Your Honor, are there other

8    topics that you'd like me to get into?

9              THE COURT:  No, that's fine.  I think -- well, unless

02:40:25   10   there's something he's going to say that's different than what

11   Ms. Shiu said, which I --

12             MR. FURTON:  No, he was going to talk about the

13   comparison that he would have to do, but we don't have to do

14   that.

02:40:34   15            THE COURT:  Okay.  No, this is -- covers the topic

16   that I'm most interested in.

17             MR. FURTON:  We can probably terminate the --

18             THE COURT:  Sure.  Any cross-examination?

19             MR. HAZINSKI:  Yes, your Honor.

02:40:44   20            THE COURT:  All right.

21                       CROSS-EXAMINATION

22   BY MR. HAZINSKI:

23   Q.  Good afternoon, Mr. Figueroa.

24   A.  Good afternoon.

02:40:52   25   Q.  I'm going to do my best to expedite things and cut to the

1    chase here.

2           THE COURT:  Before we go any further, is what's up on

3    the screen for the attorneys, is that something confidential?

4    If it is, you need to turn your computer off.

02:41:05    5           MR. FURTON:  I might as well.

6           THE COURT:  It looks like it's all redacted.  If it's

7    something DOL has, no big deal, but --

8           MR. HAZINSKI:  We do.

9           THE COURT:  You have it?  All right.  Never mind

02:41:13    10   then.   That's fine.  It just seemed very employee-specific,

11   and I didn't want to -- it's not out on any public screen.

12   Very good.

13          Proceed.

14          MR. HAZINSKI:  Thank you.

02:41:23    15  BY MR. HAZINSKI:

16   Q.  Mr. Figueroa, in 2022 ClearStaff had a revenue of

17   $120 million, correct?

18   A.  That is correct.

19   Q.  I want to jump right to the questions about the harm to

02:41:42    20  ClearStaff.

21          One reason staffing services agencies exist is

22   because demand for temporary labor fluctuates, correct?

23   A.  It's two reasons, the demand from the customer side and

24   demand from the worker side.

02:41:58    25  Q.  Is it fair to say demand for temporary labor can fluctuate

Figureroa - cross

1   year to year because of overall labor market conditions?

2   A.  It can fluctuate.

3   Q.  And your business is designed to withstand those

4   fluctuations, correct?

02:42:12   5   A.  Everyone's always busy, especially food manufacturers, so

6   those seem to always thrive.

7   Q.  Year to year, ClearStaff's job placements and revenue are

8   not exactly the same, correct?

9   A.  There's some small changes.

02:42:27   10   Q.  You wrote in your declaration that ClearStaff's job

11   placements went down in November 2023 compared to

12   November 2022.  Do you recall that?

13   A.  I do.

14   Q.  And that was the source of the 8 percent number you were

02:42:40   15   talking about, right?

16   A.  Yes.

17   Q.  So paragraph 83 of your declaration said 8 percent fewer

18   job placements year over year in November, right?

19   A.  That is correct.

02:42:49   20   Q.  That data you provided, it showed that the number of

21   workers you placed went down in some locations, but it also

22   went up in other locations, correct?

23   A.  The locations you are referring to are -- is a location

24   that has a client that is seasonal.  That seasonal client has

02:43:05   25   a big jump just for four to six weeks during that period, and

Figureroa - cross

1   that's what you're looking at.

2   Q.  But you compared them year to year the same season of

3   different years, right?

4   A.  The client that I am referring to is a cosmetic customer,

02:43:21   5   and I think we all know that any time the economy tanks,

6   cosmetic always gets busy and that's why the increase is

7   there.

8   Q.  Fair enough.

9         So you placed more workers out of your branches in

02:43:35   10   Crest Hill, Midlothian and Villa Park in 2023 than 2022; is

11   that correct?

12   A.  That's correct.

13   Q.  Now, as the general manager of a large staffing services

14   agency, you generally have to stay up to date on industry

02:43:49   15   trends; is that fair?

16   A.  That is correct.

17   Q.  But in your declaration, you didn't say anything about how

18   the changes in ClearStaff's business compared to national

19   trends for the industry as a whole, right?

02:44:01   20   A.  National trends is something that we -- I think every

21   business owner looks at and every general manager, but you

22   apply to your own market.

23   Q.  Fair enough.  In your declaration, you didn't do a

24   comparison, seeing how did ClearStaff fare compared to the

02:44:20   25   industry overall?

Figureroa - cross

1  A.  I can only look at my financials and what I've lost.

2  Q.  2021 and 2022 were years of major growth for the staffing

3  industry.  Is that fair to say?

4  A.  What year again?

02:44:30  5  Q.  2021 and 2022.

6  A.  There was some growth.

7  Q.  By comparison, 2023 was a very bad year for the industry;

8  is that fair?

9  A.  2023 is about the same as 2022.

02:44:44  10  Q.  Mr. Figueroa, one of the organizations that gathers and

11  publishes industrywide data is the American Staffing

12  Association, correct?

13  A.  I am aware of ASA.

14  Q.  And they're a plaintiff in this case, right?

02:44:58  15  A.  You would have to ask my attorney.  I'm not sure.  I

16  believe so.

17  Q.  Well, we'll -- I'll proffer that to you that they're a

18  plaintiff.

19        MR. HAZINSKI:  I'd like to use the Elmo, Your Honor,

02:45:10  20  to show a document if I might.

21        THE COURT:  All right.  Have you got it?  Okay.

22  BY MR. HAZINSKI:

23  Q.  What I'm showing you here is a document with Bates stamp

24  IDOL 77, and this is -- this is a press release or a news item

02:45:43  25  from the American Staffing Association.

Figureroa - cross

1       Mr. Figueroa, I want to direct your attention to the

2  third paragraph of this news item that says on a

3  year-over-year basis, staffing jobs declined 14.1 percent.  Do

4  you see that?

02:46:02  5  A.  I do.

6  Q.  And do you see that it -- it also notes that the furious

7  pace of hiring in 2021 and 2022 slowed to a new normal of slow

8  and steady growth.  Do you agree with that?

9  A.  I agree, and the unemployment rate has remained the same.

02:46:21  10  Q.  Okay.  So the data you mentioned in your declaration is

11  consistent with those broader trends; would you agree?

12  A.  This trend here that they're referring to, I think it

13  covers the entire country.  I only speak for my local area.

14  Q.  Fair enough.

02:46:38  15       So nationwide, there's been a downturn.  ClearStaff,

16  there's also been a downturn, right?

17  A.  We've had some loss, and my losses, as I said, is related

18  directly from my testimony from my client who told us the

19  reason why they were dropping us.

02:46:56  20       What you're showing me here is entire market for the

21  U.S. which I am not aware.  I'm not a member of ASA.

22  Q.  All right.  Well, we'll get there.

23       Now, just the data you cited, the numbers themselves,

24  they don't tell you one way or another the reason for the

02:47:11  25  decline in business to ClearStaff, do they?

A.  The numbers show what they show based on usage.  Again,
the numbers that I am referring to are correct -- directly
correlated to the clients who specifically told us why they
were letting go our workers.

Q.  Okay.  I want to get to that.  First I want to show you
one more document just to clarify one point.

And this is, for the record, with a Bates stamp C-17.
Mr. Figueroa, do you recognize this document?

A.  Yes, I do.

Q.  Is this what you were testifying about when you were
talking about --

A.  Yes.

Q.  -- change in revenue?

A.  Yes.

Q.  Okay.  So this reflects between 2022 and 2023 lost
business in the amount of about $270,000, correct?

A.  That is correct.

Q.  And these are from the clients that said they were
reducing their business with you because of the Act, right?

A.  That is correct.

Q.  So that's about an 11 percent reduction in profits from
those specific clients, right?

A.  Yes.

Q.  And $270,000 is about .2 percent of the total revenue that
ClearStaff earned in 2022, correct?

1  A.  You're looking at it from a standpoint as an entire year.

2  These numbers, or at least when the customers decided to let

3  the workers, this is towards the end.  We've had already

4  billed at least 10 months.  So when you look at the total

02:48:41  5  number we calculate our financials for the entire year, they

6  would not look like this.

7        THE COURT:  So you have a pro forma that carries

8  forward to the calendar year --

9        THE WITNESS:  A run rate.

02:48:53  10        THE COURT:  -- December 31st.

11        THE WITNESS:  Exactly, a run rate.

12        THE COURT:  And the 8 percent that you said was

13  attributable to the lost clients, that would be reflected if

14  you had a sales loss chart that went through 12/31?

02:49:07  15        THE WITNESS:  That is correct.

16        THE COURT:  And obviously they're all lost in 2024

17  because they've --

18        THE WITNESS:  They've gone away.

19        THE COURT:  All right.  But that 8 percent of revenue

02:49:13  20  is what's attributable -- that loss is attributable to the

21  clients you have redacted here?

22        THE WITNESS:  That is correct.

23        THE COURT:  All right.  Go ahead.

24  BY MR. HAZINSKI:

02:49:22  25  Q.  So I want to turn now to the reasons those -- for those

1    business changes.

2         Your attorneys produced correspondence with some of

3    ClearStaff's clients who were reducing their business with

4    you.  Are you aware of that?

5    A.  I am.

6    Q.  And for some of those clients, they made the decision to

7    hire ClearStaff's workers on as direct permanent hires at

8    their businesses, correct?

9    A.  They made a decision to hire some depending on the

10   availability of spots they had open to hire.

11   Q.  Yeah.  And in some cases, they made that decision for

12   reasons that didn't have to do with the Act at all, right?

13   A.  They made that decision because perhaps they forecasted

14   their business to grow so they can justify hiring a worker.

15   Q.  So not directly attributable to the Act but maybe other

16   economic factors?

17   A.  Attributed to the Act because most employers or

18   third-party client that uses ClearStaff or any other staffing

19   agency is solely because they can't forecast if the sudden

20   crease of business will sustain.  So they use the workers

21   temporarily for the assignment needed.

22   Q.  I'd like to show you another document, and this one has

23   the Bates stamp C-18.  This is the first page, and it's an

24   email chain.

25        Do you recognize these emails?

Figureroa - cross

91

1    A.  I do.

2    Q.  I'm going to flip to the second page, C-19, and this shows

3    an email from a client to -- to ClearStaff, right?

4    A.  Correct.

02:50:55    5    Q.  And it's dated October 23rd, and it says that they've made

6    a decision to start doing direct hiring, converting from

7    temporary to permanent, in consideration of the challenges of

8    labor markets in recent months, even years in some cases,

9    correct?

02:51:15    10    A.  That's what the email says.

11    Q.  Right.  And ClearStaff doesn't discourage its employees

12    from moving on to direct employment with your clients, do

13    they?

14    A.  We encourage.

02:51:29    15    Q.  Your website advertises both direct-hire placements and

16    temp-to-hire arrangements as a service you offer your clients,

17    correct?

18    A.  That is correct.

19    Q.  And under Illinois law, ClearStaff is allowed to charge

02:51:41    20    placement fees when a client directly hires a ClearStaff

21    employee, right?

22    A.  Are we talking about direct hire or temp to hire?

23    Q.  Temp to hire.

24    A.  We do not charge a placement fee.

02:51:50    25    Q.  But you're allow to under the law if you --

1  A.  We're allowed to, but we do not.  It's actually stated on

2  our check stubs, so when our workers get their weekly checks,

3  it shows that we do not charge a placement fee.

4  Q.  But if you -- it's legally permitted if you wanted to

02:52:07  5  negotiate with a client to say, you know, they can work

6  temporarily, and if you decide to bring them on full-time, we

7  receive a fee.  That would be appropriate and allowed for you

8  to do?

9          MR. LEVISON:  Objection.  Calls for a legal

02:52:19  10  conclusion.

11          THE COURT:  If he knows.

12  BY THE WITNESS:

13  A.  If you're asking for any other staffing agency.  You're

14  asking me as a ClearStaff employee, we do not.

02:52:26  15  BY MR. HAZINSKI:

16  Q.  Others -- based on your knowledge of the industry, other

17  agencies do have those arrangements?

18          MR. LEVISON:  Objection.  Calls for hearsay.

19          THE COURT:  If he knows.

20          Go ahead.

21  BY THE WITNESS:

22  A.  I don't know what their business practice is.

23  BY MR. HAZINSKI:

24  Q.  Other ClearStaff clients, instead of terminating their

02:52:45  25  business with you, they just transitioned to using workers who

Figureroa - cross

1  would work for them for fewer than 90 days, correct?

2  A.  Repeat that again?

3  Q.  Yeah.  So some of the clients where their business

4  relationship changed with ClearStaff, they, instead of cutting

02:53:01  5  off all business, they just chose a different set of temporary

6  workers, preferring to use ones that hadn't worked up to that

7  90-day threshold, right?

8  A.  I am not aware of what you're talking about.  I don't

9  understand your question.

02:53:14  10  Q.  Let me try it through a document here.  I'll show you

11  what's been marked as C-21 with the Bates stamp.

12            Mr. Figueroa, do you recognize this email chain?

13  A.  Yes.

14  Q.  Now, I'll flip later in this email chain, and this is a

02:53:37  15  correspondence between ClearStaff and one of ClearStaff's

16  clients, right?

17  A.  Uh-huh, correct.

18  Q.  Here I'm at the bottom of page 25, and the client

19  indicated to you in an email that "I will still be ordering

02:53:53  20  temps on a regular basis.  They just need to be temps that

21  have worked less than 90 days here, please," correct?

22  A.  That's what the client said, yes.

23  Q.  Right.  Okay.  And other clients made a similar decision,

24  right?

02:54:07  25  A.  To my knowledge, I am only aware of what you're seeing.

Figureroa - cross

94

1    I'm pretty sure there may be some other ones, but it's not

2    firsthand knowledge.

3         THE COURT:  Presumably they're reacting to the 90-day

4    limit that's imposed in the law --

02:54:23  5         THE WITNESS:  That is their concern.

6         THE COURT:  That's pretty clear from the timing.

7         Go ahead.

8    BY MR. HAZINSKI:

9    Q.  So does ClearStaff still earn money when clients decide to

02:54:40  10   use workers who have worked fewer than 90 days as opposed to

11   above 90 days?

12   A.  Any one hour or four hours, we earn some money.  It's a

13   low-margin business.

14   Q.  So in total, your attorneys produced correspondence with

02:54:53  15   three ClearStaff clients.  Are you aware of that?

16   A.  I am.

17   Q.  One of those clients transitioned to direct hires.  That

18   was that first document I showed you, right?

19   A.  Yes, correct.

02:55:04  20   Q.  And then the other two, they transitioned to using

21   ClearStaff employees who worked fewer than 90 days, correct?

22   A.  That is correct.

23   Q.  So there was no correspondence with any client who -- who

24   completely cut off their business in the sense of, you know,

02:55:22  25   refusing to offer opportunities to any ClearStaff employees?

1   A.  Not that I'm aware of.

2   Q.  And no client told you that they were transitioning their

3   business because of the provision of the law dealing with

4   labor disputes; is that correct?

02:55:37   5   A.  Overall because of the new law, HB 2862, the amendment.

6   Q.  And none told you specifically it had anything to do with

7   the labor disputes provision; is that correct?

8   A.  It's because of the benefits and sharing sensitive

9   information.

02:55:54   10           THE COURT:  I'm confused.  You have three clients,

11   one who transitioned to full-time -- hiring the temps as

12   full-time, two that restricted their hiring to people working

13   under 90 days.  How does that relate to the five clients you

14   said you've lost?

02:56:10   15           THE WITNESS:  The other clients just ended the

16   assignment.

17           THE COURT:  I see.  Okay.  So this is in addition to

18   those five --

19           THE WITNESS:  That's in addition.

02:56:15   20           THE COURT:  -- you've got three that have modified

21   their hiring practice.

22           THE WITNESS:  Yes.

23           THE COURT:  Got it.  Okay.

24   BY MR. HAZINSKI:

02:56:22   25   Q.  And you don't have any correspondence with any of those

1    five clients saying the reason why they ended the business

2    relationship?

3    A.  This was done in person.

4          MR. HAZINSKI:  Nothing further, Your Honor.

02:56:29   5          THE COURT:  Any redirect?

6          MR. FURTON:  No, Your Honor, although I did not move

7    to admit the documents that I had identified as exhibits.

8          THE COURT:  They're admitted.

9          MR. FURTON:  As the prior witness as well?

02:56:41   10          THE COURT:  Yes, just as the emails that defendants

11   have offered will be admitted.

12          Off the record.

13       (Discussion held off the record.)

14          THE COURT:  All right.  Why don't we call your last

02:56:51   15   witness so we get the testimony out of the way.

16          MR. FURTON:  Very good.

17          Your Honor, at this time the plaintiffs call Scott

18   Polen.

19          THE COURT:  Okay.

02:57:11   20       (Witness sworn.)

21          THE COURT:  Have a seat, please.

22          SCOTT POLEN, PLAINTIFFS' WITNESS, DULY SWORN,

23                    DIRECT EXAMINATION

24   BY MR. FURTON:

02:57:22   25   Q.  Good afternoon.  Could you please state and spell your

Polen - direct

97

1    name for the record.

2    A.  Good afternoon.  My name is Scott Polen, S-C-O-T-T,

3    P-O-L-E-N.

4    Q.  Mr. Polen, can you tell us who you're employed by?

02:57:37    5    A.  TempsNow Employment and Placement Services.

6    Q.  And what do you do for TempsNow?

7    A.  I am one of the owners, and I'm the president.

8    Q.  And as the owner and president, what are your

9    responsibilities?

02:57:49    10    A.  My responsibilities are making sure that the company is

11    run properly, making sure that my staff and my temporary

12    employees are doing what they're supposed to be doing, making

13    sure that there's no issues, and just making sure that

14    everything runs smoothly.

02:58:11    15    Q.  Okay.  How many employees do you have?

16    A.  I have ten full-time employees that work for me.  I'm one

17    of the small guys here.

18    Q.  And how many temporary employees or employees that you

19    have that you allow clients to use on a temporary basis?

02:58:36    20    A.  I have about 200 people out a week.

21    Q.  Okay.  Can you tell me who your client base is; describe

22    them generally.

23    A.  Like the other two, I am also light industrial, mainly

24    light industrial, mainly unskilled.  We do provide skilled

02:58:58    25    labor, if necessary.  We will provide clerical, if necessary.

1    I mean, truth of the matter is if a client asked me

2    for anything, I will try to find it for them.  I'm not -- I'm

3    not that picky.

4    So -- but mainly it's light industrial.  We work in

02:59:20    5    factories.  We work in warehouses.  We work in chemical

6    factories.

7    Q.  And where is your business located?  Where are these

8    clients located?

9    A.  We're in Lake County.  I'm up in Gurnee, Illinois.

02:59:32    10    Q.  And do you have any business across the border in

11    Wisconsin?

12    A.  I have an office in Kenosha.

13    Q.  So I won't have you describe for us your benefits and the

14    comparison process, but just really briefly, would you tell us

02:59:48    15    what benefits are offered to your employees?

16    A.  We offer whatever the government mandates us to offer.  So

17    right now, we offer the ACA and Illinois Secure Choice.

18    Q.  And Illinois Secure Choice is a retirement plan?

19    A.  Correct.

03:00:02    20    Q.  And the ACA refers to health insurance?

21    A.  Correct.

22    Q.  Okay.  Is there also other types of insurance associated

23    with that ACA program you mentioned?

24    A.  I know the ACA also offers short-term disability.  I know

03:00:18    25    it offers dental.  It offers vision.  I think it offers maybe

Polen - direct

99

1    a life insurance.  I'm pretty sure that's -- and they offer it

2    for the employee, employee and spouse, employee and their

3    family, or employee and child as well.

4    Q.  It has been suggested in this case by the Director that

03:00:43    5    the burden associated with determining whether or not somebody

6    has been provided with equivalent benefits is a mere matter of

7    bookkeeping.

8         Do you agree with that?

9    A.  No.

03:00:53   10    Q.  Why do you say that?

11    A.  Everybody who comes to apply with us is offered the ACA

12    plan.  They go to an external website and without us being

13    involved, they go on and they choose whatever they like to

14    choose.  We submit a weekly payroll to our third party

03:01:28   15    administrators, and they let us know what the employees have

16    picked or declined.

17         Most of the time, our employees decline coverage.

18    And so when it comes to an equal benefit situation, where I

19    now have to compare to somebody at one of my clients, what am

03:01:56   20    I supposed to do?  There's no guidance on what am I supposed

21    to do.

22         What if I've offered somebody benefits, and he's

23    declined it, and now he goes to work for a client, but after

24    90 days, he's allowed to get the cash equivalent of their

03:02:09   25    benefit package.  If he declined mine, why is he allowed to

Polen - direct

100

1  get theirs?

2          So there's -- and if he accepts mine, then now I have

3  to figure out what the client has, how it's different.  I

4  can't do that.  I don't have anybody in my organization that

03:02:33  5  can do that.

6          I'd have to hire somebody who has specialized

7  knowledge in this when more guidance comes out from the state

8  because there's absolutely no guidance on how to formulate

9  this.

03:02:51  10  Q.  Do you expect to be able to rely on your clients' data in

11  this process?

12  A.  I'll have no choice.  I won't have any other data to use,

13  so if they give me incorrect data, then I'm using incorrect

14  data.  There's no way for me to verify if whatever they give

03:03:10  15  me is true or not.

16          So I have to take their data and just use it.  If

17  it's wrong and I make a mistake, now this interested party can

18  come after me and litigate against me.

19          If they give me wrong information and I find out next

03:03:29  20  week that it is wrong and I fix it and I make it right, they

21  can still come after me because even if I've remedied the

22  situation, a third party can still litigate against me.

23  That's in the Act.

24          And they can file a complaint with the Department of

03:03:48  25  Labor, and the Department of Labor can say that I've done

Polen - direct

101

1    nothing wrong, and they can still litigate against me.

2    Q.  Can't you just absorb these additional costs?

3    A.  No.

4    Q.  Why do you say that?

03:03:59    5    A.  Because legal fees are very expensive.

6    Q.  What about the additional compliance costs, can you absorb

7    the additional compliance costs?

8    A.  I probably won't be able to charge additional costs to my

9    clients because I can't compete as a small -- like I said, I'm

03:04:24    10    one of the small guys.

11        There are bigger companies out there that have, you

12    know, their own departments, and they're going to have to

13    retool as well.  But they'll be able to absorb it more than I

14    will.  I mean, if I have to shell out $250,000 a year on a

03:04:40    15    specialist or a company to do this type of compliance for me,

16    there's no way I'm going to recover that.

17    Q.  How is your company doing financially right now?

18    A.  This is our first year in the red after 25 years.

19    Q.  Have you experienced any injury with specific companies as

03:05:00    20    a result of the passage of the amendments to the Day and

21    Temporary Labor Services Act?

22    A.  Yes.  I've provided the emails.  I'm sure the Department

23    of Labor has them.  I have emails showing where clients have

24    told me specifically that they are no longer going to use

03:05:19    25    temporary staffing or temps or they're not going to use

1    agencies at all because of this new law.

2            And I have other clients who have already dropped us.

3    One dropped us before the extension happened, and when we

4    emailed them to say, hey, great news, there's an extension on

5    this, they said, oh, no.  We just got rid of your people, and

6    we hired these other people in full-time.

7            But they asked for a few more because of the

8    extension, but that doesn't preclude them from doing the same

9    thing once April 1st comes around.

10   Q.  And do you expect them to stop using your company come

11   April 1st?

12   A.  Yes.  And these clients are just the tip of the iceberg.

13   I mean, just because there's only -- for me, it's four right

14   now.

15   Q.  Four what?

16   A.  Four clients.

17   Q.  That have told you what?

18   A.  That either they're going to stop using us or they have

19   stopped using us, they've gotten rid of people, they've

20   brought in people, that this law is going to affect the way

21   they do business with us.

22           And the reason we're getting this injunction now is

23   because we don't want to wait until it's actually happened for

24   all our clients to decide that.

25           So it's a trend.  It's not -- all our clients haven't

Polen - direct

103

1    jumped ship, but it's the beginning, and we don't want to wait

2    until the actual Act is in place for it to happen.

3    Q.  Could you state one of those companies' names?

4    A.  King Wire.

03:06:51  5    Q.  What type of a company is that?

6    A.  They make industrial cabling and wiring for the

7    construction industry, and as a matter of fact, my best friend

8    is the president of the company.

9    Q.  What is your understanding of what they are -- their

03:07:06  10   reaction is to the statute?

11   A.  They don't even want to deal with it.  It's just too

12   complicated.  Like I said, there's no -- right now, there's no

13   guidance, so there's not even a way to figure out how to

14   comply with it.  Even if we wanted to comply with it, we don't

03:07:24  15   know how to comply with it because there are no rules.

16   Q.  How about another company, could you name another company?

17   A.  ISS.

18   Q.  And what's your understanding of what ISS's view is?

19   A.  ISS did the same thing.  They -- I mean, all in all, it's

03:07:41  20   about 10 to 15 percent of my business that has been affected

21   because of this Act, and they hired in 15 of my people

22   full-time.

23        And I even have an email, you'll see it or not see

24   it, where I talked to her about, hey, we had a great quarter

03:08:10  25   with you guys and now it's really nothing.  And she said,

Polen - direct

104

1   well, yeah, this new law, we're probably not going to be

2   getting up to where we were.  And, you know, that's -- like I

3   said, that's just the tip, and we can't wait for this Act to

4   get into place because it will be too late by then.

03:08:30   5   Q.  Were there any other companies?

6   A.  Burnhard Woodworking.  They're a furniture maker.

7   Q.  Have you done business with them over the years?

8   A.  Yes.

9   Q.  And what is your understanding of the situation at that

03:08:43   10   company?

11   A.  I was -- I think I was talking with the boss's secretary

12   or something, and they didn't want to deal with it.  I think

13   they mentioned that they would do something before their

14   90 days hit, to your point about the 90-day number.  Whether

03:09:12   15   it's bringing them in full-time or getting rid of them and

16   bringing somebody else in, I don't -- I don't know.  I don't

17   think they specified in the email what they said.

18          But they're changing the way they do it because of

19   that as well.

03:09:32   20   Q.  And how about any other company -- you've mentioned four,

21   who's the fourth?

22   A.  Brilliant Gifts.

23   Q.  And have you been working with them for a long time?

24   A.  Yes.

03:09:41   25   Q.  And what is your understanding of the situation at

Polen - direct

105

1   Brilliant Gifts?

2   A.  I think that's -- I think that's the one where I said we

3   emailed them -- I didn't, my account manager who ended up

4   leaving to find other work because -- partly because of this

03:09:58   5   new law and the difficulty of getting new business, he wanted

6   to get out of the staffing business.  So he had -- so now I

7   have no sales accountant.

8       But he had an email with them to explain to them,

9   hey, good news, there was a delay on the implementation of

03:10:21   10   this part of the law.  And I think she replies, oh, no, we

11   just let go some people and we just hired in some full-time

12   people because they thought the law was going into effect.

13      And I just want to say that 90 days is -- we do make

14   some money, but we make money when a temp is there longer

03:10:49   15   because we have recruiting costs, and it's those beginning

16   days where we recoup our recruiting costs.

17      So if someone's there and we just recoup our

18   recruiting costs and then we lose them, that -- that really

19   doesn't help us.

03:11:03   20   Q.  So the longer-term placements are an important part of

21   your profit?

22   A.  Yes.

23   Q.  Okay.  You mentioned this being the tip of an iceberg.

24   What do you mean by that?

03:11:14   25   A.  Well, like I said, so far, it's been four clients with me.

Polen - cross

106

1    And we have about 20 or so clients, so, I mean, that's a

2    significant percentage of my client -- I don't have 134

3    clients.

4    Q.  Yeah.

03:11:30    5    A.  You know, four clients out of 20-something is a big deal,

6    and fortunately -- one of them is one of our bigger ones, the

7    ISS one is.  Fortunately, the other ones aren't as big, but if

8    a couple of my bigger ones said it, I'd be done.

9         MR. FURTON:  Okay.  I have no further questions for

03:11:51    10   this witness.

11        THE COURT:  All right.  Cross-examination.

12        MR. HAZINSKI:  Just briefly, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. HAZINSKI:

03:11:56    15   Q.  Good afternoon, Mr. Polen.

16   A.  Hi.

17   Q.  Thank you for being here.

18   A.  Sure.

19   Q.  So one of the services that TempsNow provides to clients

03:12:22    20   is handling personnel administration responsibilities so the

21   clients don't have to; is that correct?

22   A.  Such as what?

23   Q.  Human resources administration, for example.

24   A.  Like what part of it?

03:12:33    25   Q.  Well, let's focus specifically on --

Polen - cross

107

1   A.  We do -- we pay people.

2   Q.  And you manage personnel?

3   A.  What does that mean?

4   Q.  Payroll, for example?

03:12:46   5   A.  Yeah, we do payroll, sure.

6   Q.  And provide benefits?

7   A.  We don't have benefits.

8   Q.  No benefits.

9       You also offer clients the ability to do cost

03:12:58   10   analysis, right?

11   A.  No, I don't offer that.  I show on my website -- I show on

12   my web page what an actual cost of an employee is.  It's not

13   just what a person's wage is.  It just -- it's a graph that I

14   show that there are different aspects to a person's wage.

03:13:19   15   It's not just how much they make.  You know, there's other

16   hidden costs, but I don't go out of my way to teach that to a

17   client.

18   Q.  You don't ever perform that analysis for a client?

19   A.  No.

03:13:34   20       MR. HAZINSKI:  I want to jump ahead a bit.

21       Your Honor, may I use the Elmo?

22       THE COURT:  All right.

23       MR. HAZINSKI:  Just need a moment here.

24   BY MR. HAZINSKI:

03:14:00   25   Q.  Well, I'll start with this.  So this is the cost analysis

Polen - cross

1    website portion that I was talking about --

2    A.  Right.

3    Q.  -- right?

4    A.  Yep.

03:14:07    5    Q.  And so this identifies that there are what are called soft

6    dollar costs that aren't obvious, right?

7    A.  Correct.

8    Q.  So one of the things that you sort of pitch to clients is

9    the fact that TempsNow can take away some of those soft costs

03:14:30    10    that the client might not be aware of, right?

11    A.  I just -- I just have this up there so clients can see

12    that there's other things associated with having an employee

13    other than paying a wage.

14           THE COURT:  Have you got a Bates number or exhibit

03:14:46    15    number on this?

16           MR. HAZINSKI:  Yes, apologies, Your Honor.  IDOL-124.

17    And I haven't been giving exhibits numbers here, but that's

18    the Bates stamp.

19           THE COURT:  That's fine.

03:14:57    20    BY MR. HAZINSKI:

21    Q.  I'll move on here.

22           So TempsNow assigns some workers to employment and

23    clerical and professional roles, correct?

24    A.  I'm sorry, say that again?

03:15:10    25    Q.  TempsNow assigns some of its workers to clerical or

Polen - cross

1    professional roles, correct?

2    A.  Very, very few.  Maybe a couple.

3    Q.  You recall you provided a declaration in this case?

4    A.  Yes.

03:15:25  5    Q.  That declaration didn't quantify the amount of business

6    that AllStaff lost in 2023, right?

7    A.  I'm not AllStaff.

8    Q.  I'm so sorry.  TempsNow provided in 2023.

9        Let me restate the question.

03:15:37  10   A.  Sure.

11   Q.  I apologize for my mistake.

12       Your declaration didn't quantify the amount of

13   business that TempsNow lost in 2023, correct?

14   A.  I don't think so.

03:15:45  15   Q.  And in preparing your declaration, you didn't use any

16   financial models or projections to mathematically estimate

17   future losses, correct?

18   A.  It's a no, impossible to do so.

19   Q.  And in your declaration and your testimony here today, you

03:16:01  20   didn't try to differentiate the effects on TempsNow's business

21   compared to overall industry trends, correct?

22   A.  I'm not trying to.

23   Q.  I want to talk now about some of the correspondence with

24   your clients.

03:16:18  25   A.  Sure.

Polen - cross

110

1    Q.  Now, some clients shifted their model with you to just

2    bring on workers who had been there for fewer than 90 days,

3    correct?

4    A.  Right.  That was the one I mentioned, yeah.

03:16:29    5    Q.  Yeah.  And other clients brought on the TempsNow workers

6    as permanent direct hires, right?

7    A.  Yes.

8    Q.  Under the law if you wanted to, you could have a placement

9    fee arrangement for that type of hiring, right?

03:16:41    10    A.  I do.

11    Q.  You do have such an arrangement?

12    A.  I do.

13    Q.  Did your declaration provide any information about the

14    fees that TempsNow earned as a result of those decisions?

03:16:52    15    A.  No, because my fees are before 90 days.

16    Q.  But you could charge fees after 90 days if you chose to,

17    right, legally speaking?

18    A.  I don't -- I'd have -- I think this new law -- I don't

19    think we can now.  I could be wrong, but I don't think we can

03:17:16    20    now.

21    Q.  Is the reason that you don't charge those fees because you

22    think it wouldn't be lawful?

23    A.  No, it's competitive with other agencies.

24    Q.  Among the correspondence we received was an email from

03:17:36    25    August of last year, where you sent an email to your clients

Polen - cross

1   notifying them about the new requirements under the statute.

2   Do you recall that?

3   A.  Yes.

4   Q.  And you told at least one of the clients that the clients

5   needed to work together with TempsNow to make the process

6   successful but that once things were in place, you had

7   confidence that things would run smoothly.  Do you recall

8   that?

9   A.  Can you put that up?

10  Q.  Absolutely.

11          So this, for the record, will be email chain produced

12  at T1.

13          Do you recognize this email chain, Mr. Polen?

14  A.  Yes, this is what -- yes, this is with King Wire.

15  Q.  Okay.  And I'll turn now to an email with your signature

16  here, and do you see where it says:  "This is an ongoing

17  process.  We need to work together to make it successful.

18  Once things are in place, I have confidence that things will

19  run smoothly."

20          Do you see that?

21  A.  I do.

22  Q.  Okay.  And that's how you characterized the law to your

23  clients?

24  A.  I was being optimistic.  I wasn't going to tell them that

25  things are going to be chaotic and things are going to go to

1   heck and we're all going to go crazy.  No.  I didn't want to

2   say that to them.

3   Q.  Understood.  Did you think that the description you gave

4   of the law to them was reasonably accurate?

03:19:10    5   A.  In the previous paragraphs?

6   Q.  The -- your assessment of the law.  Do you think it was

7   reasonably accurate?

8   A.  What month was that email?

9   Q.  August of 2023.

03:19:30    10          MR. FURTON:  Objection.  Calls for a legal

11  conclusion.

12          THE COURT:  No, he's asking whether the statement he

13  made to his clients were -- was accurate.  And he asked what

14  date it was, August 2023, and now he's going to answer.

03:19:43    15  BY THE WITNESS:

16  A.  So when you say accurate, what do you mean by accurate?

17          THE COURT:  Maybe that was my word.

18  BY THE WITNESS:

19  A.  Ask me again.

03:19:51    20  BY MR. HAZINSKI:

21  Q.  I think it was mine as well.  The way you characterized

22  the law to your client in that email, do you believe as you

23  sit here today that it was reasonably accurate?

24  A.  I believe what I told him in the paragraphs above that I

03:20:04    25  took from the Act itself and copied and pasted it to him was

1　accurate.

2　　　　　THE COURT:  No reasonable company owner is going to

3　tell the people that hire them that let me tell you about this

4　horrible law that's going to make our relationship untenable.

03:20:21　5　I'm not -- I don't take much from him saying I hope we can

6　make this work out.  That's -- of course, he's going to say

7　that.

8　　　　　MR. HAZINSKI:  Fair enough, Your Honor.

9　　　　　THE COURT:  There's nothing -- I don't view that as

03:20:32　10　important relevant evidence.

11　　　　　MR. HAZINSKI:  Fair enough.

12　　　　　Nothing further, Your Honor.

13　　　　　THE COURT:  Any redirect?

14　　　　　MR. FURTON:  No, Your Honor.

03:20:40　15　　　　　THE COURT:  All right, sir.  Thank you.

16　　　　　THE WITNESS:  Thank you.

17　　　　(Witness excused.)

18　　　　　THE COURT:  Why don't we take a 15-minute break.

19　That completes the presentation of evidence, correct?

03:20:47　20　　　　　MR. FURTON:  With one exception, Your Honor.

21　　　　　There is a video.  It is recorded by the state IDOL

22　where they held a public hearing and --

23　　　　　THE COURT:  Have a seat, sir.  Go ahead.

24　　　　　MR. FURTON:  -- members of the public showed up who

03:21:06　25　were members affiliated with staffing agencies, and they

1   expressed concerns.

2         THE COURT:  How long is the video?

3         MR. FURTON:  It's, like, two hours and it's a

4   difficult watch, I'm not going to, you know, characterize it

03:21:17   5   any other way.  But some of these people get into the harm to

6   their business.  Some of them are crying.  It is --

7         THE COURT:  Well, all right, if you're going to offer

8   it, I can watch it, not this afternoon, but I can watch it.

9   If there's parts of it, particular parts that last 15 minutes

03:21:34   10   or less that you've cued up, I'll do that, but I'd rather get

11   to oral argument, ask some questions, have you answer some of

12   my questions.

13         MR. FURTON:  I think that's a fine idea.  It's SSAI 1

14   is the Bates number of the video.

03:21:47   15         THE COURT:  Okay.  Was that submitted to us?  I know

16   we got a number of exhibits.

17         MR. FURTON:  It's not because it's a video, and we

18   would need to get you exhibits that we showed here today, as

19   well as that video.

03:21:57   20         THE COURT:  All right.  Well, let's take a 15-minute

21   break.  We'll talk about how evidence is going to be

22   presented, and we'll hear argument.

23         MR. FURTON:  Very good.

24         THE COURT:  Okay.  It's 3:22, so see you in

03:22:06   25   15 minutes.

closing - plaintiffs

1      MR. FURTON:  Thank you.

2      THE COURT:  Thank you.

3    (Recess from 3:22 to 3:39 p.m.)

4      THE COURT:  All right.  Parties ready to proceed?

03:39:51    5      MR. FURTON:  Yes, your Honor.

6      THE COURT:  Let's hear first from the movant.  I

7  don't have time limits set, but you've extensively briefed

8  this so I may have some questions, but keep your presentations

9  relatively brief so you're not going over things I've either

03:40:13   10  read in the brief or I'm going to re-examine in light of what

11  I've heard today.

12    CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS BY MR. FURTON

13      MR. FURTON:  I understand, Your Honor.  I won't

14  repeat the briefs.  I appreciate the Court's attention to

15  these things.

16      I think the briefs actually do lay out the situation

17  quite well.  We have a statute here that represents

18  governmental overreach in three different areas.  It is

19  unfortunate because we have an industry that's really, really

03:40:33   20  struggling with the fact that it has to deal with this.

21      THE COURT:  And this raises my first question, which

22  is -- and I've said this over the phone, maybe your clients

23  haven't heard it, but I've said it over the phone.

24      Whether this is an ill-advised law or not, whether

03:40:49   25  it's an unworkable law practically speaking or not, that's

1    really a matter for the Illinois legislature.  My job isn't to

2    in any way infect the law with my view of its wisdom or not.

3    It's either preempted or not.  It's either a violation of the

4    labor laws or not --

03:41:15   5          MR. FURTON:  Right.

6          THE COURT:  -- and there's either a due process

7    violation or not.  But the overall wisdom of the law, you

8    know, I have my own opinions, but they're not relevant.  The

9    opinions are of the state legislators and the governor, and

03:41:26   10   if -- I'm assuming your clients had lobbyists down there and

11   made their views known to the legislators, they passed it

12   anyway, and I wonder whether the real remedy here is in

13   Springfield, not in this courtroom.

14          MR. FURTON:  I understand, Your Honor.  I'm not here

03:41:49   15   complaining about a law that is not wise.  That is for a

16   different process.

17          We are here about because the law crossed the line

18   into unconstitutional.  It is preempted because it crossed the

19   line, and it crossed the line not because it imposes burden

03:42:05   20   only.  It crossed the line because it imposes burden that is

21   associated with judgment and discretion.

22          The witness said it a couple of times.  You have to

23   make judgment calls.  You have to use your discretion.  You

24   have to decide are my benefits equivalent to their benefits?

03:42:21   25   It's the word "equivalent."

1    THE COURT:  Well, that again goes to the, you know,

2    possibly the lack of guidance from the Department of Labor, no

3    regulations implementing this, which I'm going to ask you when

4    they're coming if they are coming, but we're back -- does the

03:42:39    5    area you're saying crossed the line, where it's unclear how to

6    proceed under this law, does that make it something that is

7    preempted by ERISA?

8    MR. FURTON:  The answer is yes.

9    THE COURT:  Okay.

03:42:50    10    MR. FURTON:  The reason is that they have to provide

11    equivalent benefits, and there's no regulation that's going to

12    say what the word equivalent means.  It means equal.  Equal is

13    equal.

14    They have to figure out do they have benefits that

03:43:04    15    are the same, equal, equivalent, or better, and to do that,

16    you have to decide, you have to make all these judgment

17    decisions, all these decisions that require discretion.  They

18    are nonmechanical.  They require a thoughtful, educated person

19    to look at an ERISA benefit plan and say this one is worth

03:43:25    20    37.2 units, and that one is worth 37.3 units, so I'm .1 unit

21    short or 10 cents short or one dollar short, so now I need to

22    make decisions as the ERISA plan administrator as to what I'm

23    going to do.

24    Am I going to go out and procure some life insurance

03:43:47    25    benefit so that I can add some more money onto my side even if

1    it doesn't cost my company anything, it will be funded

2    entirely by the employee, I will use my judgment to say that's

3    how I will comply.

4         I will -- I will add a 3 percent match or I will move

03:44:07  5    around my 3 percent match, I'll reduce it, and increase my

6    short-term disability benefit because I've decided that that's

7    a more cost-effective way to allocate my scarce resources.

8         That's the activity that violates ERISA, and it can't

9    be avoided because you have to do this for every employee, for

03:44:34  10   every comparable employee endlessly because situations are

11   always changing.

12        And that is exactly what the *D.C. v. Greater*

13   *Washington Board of Trade* case, 1992, Supreme Court, it was an

14   equivalence benefits case.  The court said, hey, if you're

03:44:52  15   giving health insurance to your employees and you've got an

16   employee who's out but he's on worker's comp, you've got to

17   give him health insurance that's an equivalent benefit.

18        And the court said that's imposing an ERISA plan on

19   them because you're making them evaluate this plan and its

03:45:10  20   coverage and who the beneficiaries are.  And that's exactly

21   what is happening here.

22        We have to evaluate, but our worker might not have a

23   spouse, might not have kids, the other comparable employee

24   might have a spouse and kids.  We've got to decide, well --

03:45:24  25        THE COURT:  No, I was convinced by the testimony of

1   the witnesses this is, if not unworkable, very, very

2   difficult.

3          MR. FURTON:  It is very difficult.

4          THE COURT:  So I'm -- that I think is in my mind not

03:45:36   5   really a huge question.  The question is whether ERISA

6   preempts the state law and what is the hook that allows you to

7   argue that ERISA preempts the state law.

8          MR. FURTON:  And I would say the hook is that it's a

9   nonclerical judgment regarding benefits.  That is a law that

03:45:54   10   relates to a benefit plan.  It is prolonged, individualized,

11   nonmechanical decisions about benefits.  It is ongoing,

12   particularized, administrative discretionary analysis.  These

13   are all quotes that are found in our briefs.

14          THE COURT:  That you've taken from cases.

03:46:19   15          MR. FURTON:  That we've taken from Supreme Court

16   cases, the *Fort Halifax* case 1987, which doesn't actually

17   reach the conclusion that is favorable to our side, but it

18   describes the type of plan that is preempted.  And it says

19   it's one that has an ongoing administrative program for

03:46:36   20   determining and handling benefits.

21          That's what an equivalent benefits program is.  We

22   have to provide this equivalence benefits, and it's constantly

23   forcing us in the position of doing this comparison even if

24   the result isn't to change our benefits, it's to figure out

03:46:51   25   how much we have to pay.

1       So our benefits administrator are constantly looking

2    at our own benefits, but not like once a year for all

3    employees.  It's for each employee for each assignment.  So if

4    they're at one place for 120 days and they move to another

03:47:06   5    place, they've got to look at that same employee again and

6    figure out, well, has he now had a baby or had a divorce, had

7    a marriage, has he changed his contribution to the 401(k)

8    program, has he earned into the opportunity to contribute to

9    the 401(k).

03:47:24   10      So it's -- it's an ongoing administrative burden here

11   that's not incidental, it's substantial, it's ongoing.  This

12   is more than just cost, it is -- it is judgment, and the

13   problem is these people, I'm reluctant to say but they might

14   get it wrong.  They might mess it up.  They might be tempted

03:47:47   15   to swap this benefit for that benefit because in the grand

16   scheme of things, they're going to help the employee, but, you

17   know, you're mixing up the package of benefits that you're

18   providing for the purpose of achieving this equivalent

19   benefits.

03:48:01   20      THE COURT:  Well, does ERISA require nonclerical

21   judgments that relate to benefits?  You're not allowed under

22   ERISA to have discretion related to --

23      MR. FURTON:  No, you are, you absolutely are, but

24   when you do have decisionmaking regarding let's say a

03:48:19   25   retirement plan, it is governed exclusively by ERISA.  You

1    can't have a state, you can't have 20 red states and 20 blue

2    states out there making different rules that will cause the

3    companies to have to operate differently in Oregon than they

4    do in Illinois.

03:48:36    5    THE COURT:  Well, how would you suggest -- how would

6    you have suggested the legislature pass a law that allows

7    temporary staffers to get medical benefits equivalent to or

8    similar to those of full-time employees?  Is there a way that

9    could have passed a law that would pass muster under ERISA --

10    MR. FURTON:  I --

11    THE COURT:  -- or is it just they're out of luck, all

12    these temporary employees?

13    MR. FURTON:  They're not out of luck under any

14    circumstances because if the United States Congress says that

03:49:11    15    temporary employees nationwide should get those kinds of

16    benefits, then they can get those kinds of benefits.

17    THE COURT:  All right.  That's what I thought the

18    answer was, that the --

19    MR. FURTON:  It's a federal issue.  It's just not a

03:49:22    20    state issue.

21    THE COURT:  It's a federal -- has the federal

22    government ever acted on this issue?

23    MR. FURTON:  On this issue about temporary employees,

24    no, but --

03:49:32    25    THE COURT:  Have any state's plans similar to this

1    with temporary employees been found unconstitutional or at

2    least preempted by ERISA?

3         MR. FURTON:  I'm not aware of any cases involving

4    temps.

03:49:46    5         THE COURT:  Okay.  All right.  Go ahead.

6         And, by the way, you're only challenging -- I mean, I

7    don't know, so I'll ask, but I assume you're only challenging

8    the equivalent benefit part, not the part about the rate of

9    pay.

03:49:59    10         MR. FURTON:  Correct.

11         THE COURT:  Okay.

12         MR. FURTON:  The rate of pay, Your Honor, is a -- is

13    a wage law.

14         THE COURT:  Yes.

03:50:05    15         MR. FURTON:  States have control over passing wage

16    laws.  If they want to set the minimum wage at $15 an hour in

17    Illinois, that's their -- ERISA doesn't speak to that.

18         ERISA relates to plan administration.  ERISA relates

19    to benefits.  It's -- so we only challenge the benefits side

03:50:21    20    of this statute, not the equal pay side.

21         THE COURT:  Got it.

22         MR. FURTON:  And I will tell you, Your Honor, the

23    equal pay is not well received by the industry.  They're not

24    huge fans of it, but it is what it is.  That's a matter of

03:50:33    25    wisdom.  That's a matter for people in Springfield, not a

1    matter for a court.

2          THE COURT:  All right.  And is there -- well, go

3    ahead.  I understand your argument on this.

4          MR. FURTON:  Okay.  So we have a number of different

03:50:48    5    cases that we cite in the statute.  I mean, the one that

6    hasn't come up here so far in our discussion is the *Gobielle*

7    case from 2016.

8          THE COURT:  Right.

9          MR. FURTON:  *Gobielle* talks about the importance of a

03:50:58   10    nationally uniform plan administration.  You know, that is

11    itself important here under ERISA.

12          ERISA's whole goal was to avoid 50 different states

13    and endless numbers of municipalities imposing their vision of

14    the right retirement program.

03:51:17   15          THE COURT:  Yeah, *Gobielle* says ERISA preempts a

16    state law that has an impermissible connection with ERISA

17    plans, meaning a state law that governs a central matter of

18    plan administration or interferes with nationally uniform plan

19    administration.  A state law also might have an impermissible

03:51:36   20    connection with ERISA plans if acute, albeit indirect,

21    economic effects of the state law force an ERISA plan to adopt

22    a certain scheme of substantive coverage or effectively

23    restrict its choice of insurers.

24          Now, here there's no national uniform plan for

03:51:50   25    part-time workers, correct?

1      MR. FURTON:  No, no, no, but you have companies that

2   are operating in a multi-state fashion.  They're operating in

3   Illinois, they're operating in Wisconsin, and they need to be

4   able to offer the same thing to all their employees.  That's

5   the -- that's the rub here is that you've got a guy working in

6   Kenosha, you've got a guy working in Waukegan.  You want to be

7   able to offer the same benefits to both employees because it's

8   national legislation that governs the benefits program.

9      So you don't have state-specific benefits.  You might

10  have state-specific compensation, wages.  That's different.

11  You only have one program for benefits at the company level.

12  It's not that there's federal, like, legislation micromanaging

13  the way they're doing it, it's the companies.

14     THE COURT:  Understood, but if this law interfered

15  with a national plan or a plan that's -- well, a national plan

16  of some kind, it would be a clear -- clearly be preempted.

17  There is no national plan.

18     MR. FURTON:  Right, right, but the national plan here

19  is not the national plan of the federal government.  It's the

20  national plan of the company.  It's the multi-state plan of

21  the company.  So --

22     THE COURT:  Are any of these companies -- they employ

23  both Illinois and Wisconsin employees?  I guess one of your --

24     MR. FURTON:  Yes.  Clarice Shiu testified that

25  80 percent of her company is Illinois, 20 percent is

1    Wisconsin.  And Scott Polen of TempsNow testified that he's in

2    Lake County, a significant portion of his business is across

3    the border in Wisconsin as well.

4                THE COURT:  All right.  Go ahead.

03:53:31  5                So the people that work in -- well, how does that

6    work in effect, in practical effect?  Mr. Polen's employees up

7    in Wisconsin don't have to -- anybody working up there does

8    not have to -- he, on behalf of them, doesn't have to go call

9    the employers and say what are you paying your full-time

03:53:51  10   employees by way -- or what benefits are you providing your

11   full-time employees; he doesn't have to do it for the

12   Wisconsin clients?

13               MR. FURTON:  That's correct.

14               THE COURT:  Okay.  How about Wisconsin -- Illinois

03:54:00  15   residents working in Wisconsin, same?

16               MR. FURTON:  The statute, as I understand it, it

17   involves physical location where the person -- where the work

18   is done --

19               THE COURT:  Okay.

03:54:10  20               MR. FURTON:  -- not where the person resides.

21               THE COURT:  All right.  So it sounds like you're

22   arguing that clients -- some of the plaintiffs here have

23   employees that work in a location up in Wisconsin, they're not

24   bound by this law; they work in Illinois, they're bound by

03:54:28  25   this law.

closing - plaintiffs

126

1          MR. FURTON:  Yes.

2          THE COURT:  Okay.  All right.

3          MR. FURTON:  And what it means is that they will --

4   the corporate headquarters will have to differentiate between

03:54:35   5   how they handle benefits.  Some employees will be getting

6   Benefit Package A and some employees will be getting Benefit

7   Package B, which is unprecedented, you know, in America.

8          There are companies that will make a distinction,

9   have two different benefit plans, one for the white collar

03:54:51   10   work force and one for the hourly work force; but once you

11   make that distinction, you don't make subdistinctions, and you

12   don't have all kinds of different plans for -- within your

13   company.

14          THE COURT:  And your argument is, yeah, there's

03:55:03   15   different wages, there's different minimum wages in different

16   states, but that's not -- that is not implicated by ERISA.

17          MR. FURTON:  Correct.

18          THE COURT:  Okay.

19          All right.  Go ahead.

03:55:11   20          MR. FURTON:  So -- and it came out in the testimony

21   today, I think we have many different ways that the statute

22   actually violates the exclusive regulation that takes place at

23   the federal level when it comes to benefits.  The five ways

24   are the requirement to pay equal benefits.  That's one.

03:55:30   25          The second is the new enforcement remedy.  If you

1 screw it up, you get dragged into state court in Illinois.

2 You don't go to -- you don't have an ERISA action in federal

3 court.  That is the norm if you screw up paying of benefits.

4   Third, there's a disclosure obligation.  The clients

03:55:49 5 here have to cough up information about benefit programs.

6 That is exactly -- in *Gobielle,* it was the reporting

7 obligation, the companies had to report what they were

8 spending on health insurance to the state and the

9 government -- and the federal -- the Supreme Court said no

03:56:08 10 state -- I'm sorry, the court reporter asked me on the break

11 to slow down.  I need to remember that.

12   No state is permitted to add another burden on to an

13 ERISA administrator even if it -- we think it's wise and

14 prudent and fair, like the state just wants information about

03:56:30 15 health insurance.  They're not allowed to impose that

16 obligation.

17   The fourth is the imposition of administrative costs.

18 Administrative costs is a problem in and of itself.

19   And the fifth is there's a recordkeeping obligation.

03:56:45 20   So there's so many ways this statute crosses the

21 line.  And it might be wonderful policy that could be enacted

22 at the federal level, but it hasn't been.  It's just not

23 Illinois's prerogative or Indiana's or Wisconsin, any state's

24 prerogative to enact this type of legislation.

03:57:03 25   THE COURT:  Okay.

1          MR. FURTON:  So most of that discussion relates to

2     connection to, which is one of the two types of preemption

3     that courts have decided that "related to" is too vague.  They

4     broke down related to ERISA plans to be "reference to" or

03:57:25    5     "connection with."  Most of what I've talked about is

6     "connection with," but it's also a "reference to" violation,

7     and the reason is that you have two reference points here.

8          When you're doing the comparison, you've got the

9     staffing agency side doing its reference to the ERISA plan,

03:57:42   10     and you've got the client side and you're referencing the

11     ERISA plan.  Both times the existence of the ERISA plan is

12     essential to the operation of the statute.  It imposes an

13     ongoing administrative scheme that requires managerial

14     discretion.  There's a Seventh Circuit case, *Cvelbar v. CBI*,

03:58:05   15     from Seventh Circuit in '97.

16          So, you know, I've talked about this topic a long

17     time.  If you're okay with it, Your Honor, I'd move on to the

18     labor dispute provision.

19          THE COURT:  Yeah, go ahead.

03:58:15   20          MR. FURTON:  Okay.  So the labor dispute is a

21     different, separate, independent problem.  We've brought our

22     lawsuit and preliminary injunction for the purpose of

23     enjoining enforcement of the labor disputes provision.

24          The labor disputes provision imposes, say, four

03:58:28   25     obligations.  One is the company, the client, needs to ferret

1      out the existence of these things;

2              Second, it needs to disclose them;

3              Third, the company, the agency, needs to disclose the

4      existence of the labor dispute; and

03:58:42   5      Fourth, the employee receives new rights.  They're no

6      longer an at-will employee.  They are protected from

7      retaliatory behavior.

8              THE COURT:  Do -- well, at least Ms. Shiu says that

9      she doesn't fire anybody if they don't want to cross a picket

03:59:01  10      line.

11             MR. FURTON:  But she has the right to.  She doesn't

12      because you know why?  She thinks it's in her company's best

13      interests, but this statute changes her rights.  She now is

14      unable to do something that she could do and she might find

03:59:14  15      sometime need to do, which is enforce her company's rights to

16      not assign somebody to a job or assign them to a job that they

17      might think is less desirable.

18             THE COURT:  Yeah, and the Department of Labor can

19      address this, but it seems -- how does a temporary staffing

03:59:34  20      agency know when they send somebody out to one of the 136

21      companies they service that there's a picket line, a labor

22      dispute, a lockout, a strike or other labor trouble, which can

23      mean anything.

24             It seems to put an obligation on them to send

03:59:51  25      investigators out.  And you can address that when it's your

1     turn, but it seems awfully difficult to enforce in a -- in

2     practice, which is common with many laws.  Once they're

3     passed, people try and perform under them and realize it just

4     doesn't work in real life.

04:00:08    5         Go ahead.

6         MR. FURTON:  And, Your Honor, I'll just mention our

7     brief says, as extensive as they were, they failed to cite

8     Section 90 of the statute, which is about retaliation.  It

9     existed before the amendments, and it says essentially there

04:00:24    10    is a claim in the event that there is a retaliation.  That's

11    precisely what Section 7 of the NLRA protects is retaliation

12    claims.

13         And preemption is about protecting the jurisdiction

14    of the National Labor Relations Board.  It is the exclusive

04:00:40    15    arbiter of disputes about whether or not someone's action is a

16    violation of the NLRA.  And instead, this statute is going to

17    give a private right of action in state court, maybe federal

18    court, also an administrative proceeding in the Illinois

19    Department of Labor, all for retaliation, which is exactly

04:01:07    20    what the NLRA already governs.

21         THE COURT:  Well, no, there's no private right of

22    action in federal court.  It says in the county where the

23    alleged offense has occurred.

24         So happily if there are lawsuits filed relating to

04:01:21    25    this, it's not coming before me.

1          MR. FURTON:  That might be the silver lining here is

2    that you get to avoid these suits.

3          THE COURT:  Well, that's how I read the statute

4    anyway.

04:01:33   5          Go ahead.

6          MR. FURTON:  So labor dispute as a phrase is the

7    exact same phrase, it's defined under federal law.  29 U.S.C.

8    152(9).  That defines what a labor dispute is.

9          There are three cases that we've cited to the Court

04:01:52  10    where the disclosure of the existence of a labor dispute, a

11    strike, a lockout, has already been addressed and has been

12    found to be preempted by the NLRA:  The *520 South Michigan*

13    case, the *Caterpillar* case and the *Laborers' Pension* case.

14    One of those is an Illinois Supreme Court case.

04:02:16  15          But this statute goes further than -- that's only one

16    of the four things that it does.  It does three more things,

17    and it does it in a context where interested parties now have

18    the right to claim violations.  So it is particularly

19    pernicious because you're not just talking about one person.

04:02:41  20    You're talking about these disinterested organizations who are

21    advocating or -- they could have any type of agenda.

22          THE COURT:  The word "interested" party though

23    doesn't change the rule, I don't think, that you have to have

24    a stake in the outcome.  You have to be -- you have to have

04:02:58  25    standing.

1       MR. FURTON:  I agree, you have to have standing, and

2    they don't have standing and -- but the statute provides them

3    with standing, so --

4       THE COURT:  Well, there's still a standing

5    requirement that a court has an independent obligation to

6    police, and the word "interested" party may encompass people

7    who have standing, but just because you're interested, you're

8    a person on the street, you're an attorney who wants to make

9    some fees, you don't have a client at all, you just think

10   there's a violation, you want to be an independent -- a

11   private attorney general, that -- I'm not sure the word

12   interested party gets you past the standing argument that

13   every court has to enforce.

14      MR. FURTON:  I happen to agree.  I happen to agree

15   that they don't have standing, but the problem is that they

16   have the right to commence these lawsuits and to impose costs

17   and to require everybody to assert a standing defense when it

18   is a mechanism that the Illinois Supreme Court, moving on to

19   the interested parties topic, has found to be improper, to

20   violate the Constitution, to violate due process because it is

21   arbitrary, it's capricious to have somebody who has no stake

22   in the matter bringing a lawsuit against someone and trying to

23   recover as a result of it.

24      THE COURT:  Well, the cases you cite, do they

25   invalidate a statute, or do they just enforce the well-known

1  standing rules?

2      MR. FURTON:  The *Wingert* case invalidates the

3  statute.

4      THE COURT:  All right.

04:04:30  5      MR. FURTON:  It's an Illinois Supreme Court case.

6      THE COURT:  And are you required to go to the

7  Department of Labor to exhaust before you -- well, hang on,

8  I'll let you talk to your colleague.

9      (Counsel conferring.)

04:04:42  10      THE COURT:  Go ahead.

11      MR. FURTON:  I'm sorry, I missed that.

12      THE COURT:  Well, go ahead if there's a point you

13  want to make based on this.  Go ahead.

14      MR. FURTON:  Well, just -- the definition of an

04:04:53  15  interested party means an organization that monitors or is

16  attentive to compliance with public or worker safety laws,

17  wage and hour requirements, or other statutory requirements,

18  so an organization that monitors compliance with other

19  statutory requirements.

04:05:09  20      THE COURT:  Where is that from?

21      MR. FURTON:  That's the definition within the Act,

22  Section 5.

23      So there's actually -- there is a definition of who

24  these entities are and what characteristics they need to have.

04:05:40  25      THE COURT:  All right.

1    MR. FURTON:  It's not just left to chance.  It's

2  basically worker centers which are adjacent to labor unions.

3  They are in the business of pressuring employers on behalf of

4  employees.

04:06:01    5    THE COURT:  Okay.  All right.  Well, I'm looking for

6  that definition.

7    MR. FURTON:  Section 5, it's the fifth -- one, two,

8  three -- fifth definition.  Section 5.

9    THE COURT:  All right.  I'm looking at Section 67.

04:06:20   10    MR. FURTON:  Right.  It's not in 67.  It's in the

11  definition section, which is earlier in the statute --

12    THE COURT:  Okay.

13    MR. FURTON:  -- Section 5.

14    THE COURT:  Okay.  All right.

04:06:28   15    Okay.  All right.  Proceed.

16    MR. FURTON:  Okay.  So -- well, we actually got ahead

17  of ourselves a bit in talking about interested party.  I still

18  want to talk about labor disputes, and the reason is that the

19  temporary worker industry is unique in that they're the

04:06:44   20  obvious alternative to the work stoppage opportunity that

21  workers have when they act collectively.

22    It's obvious that if you go after the alternative to

23  a work stoppage, that you are affecting the leverage of labor

24  unions.  And we submitted a *Sun-Times* article in which the

04:07:05   25  AFL-CIO president crowed about the passage of the law, and the

closing - plaintiffs

1  article observed that it will make organizing, union

2  organizing, easier and strikes more effective.

3  That is going to be the impact of this law, and the

4  disclosure, the warning provision that has been found improper

04:07:24  5  in multiple cases, including *People v. Federal Tool & Plastic*

6  and *UAW v. Smillie*, Illinois Supreme Court case from '75 and a

7  Michigan appellate court case from '84, respectively, both

8  found that those type of warning provisions violate the -- are

9  preempted by the NLRA. Just the warning provision. And this

04:07:44  10  statute does three additional things beyond the warning

11  provision.

12  And then it has this anti-retaliation element to it,

13  which violates the fact that states may not enact law that

14  expands the rights protected or even arguably protected by

04:08:03  15  Section 7 of the NLRA. Here, the expansion is both

16  substantive in that it changes the workers' rights under the

17  at-will employment doctrine, and it is also procedural in the

18  sense that it is -- it provides a new remedy in front of a

19  different authority. Instead of being in federal court --

04:08:28  20  instead of being in the NLRB, it will give rise to a state law

21  claim that can be pursued in state court for anti-retaliation.

22  So in closing, I'll just say that the right to

23  refrain from action that assists unions, union-organized

24  events, such as strikes, is conduct within the scope of

04:08:52  25  Section 7, and it's -- so the federal government is the

1   exclusive regulator.  Again, this might be great policy, and

2   if the federal government wants to enact it, they can enact

3   it.  But a state cannot enact this because if they can,

4   there's going to be 20 other states that enact the opposite of

04:09:12   5   this statute, Your Honor.  That's the problem here is we can't

6   allow America to divide on an area where we've decided that

7   there's only going to be one authority, and that is the

8   federal government.

9          THE COURT:  Okay.

04:09:27   10          MR. FURTON:  Moving on to the interested parties

11   piece, this is an unprecedented, novel, unusual remedy to give

12   these strangers the opportunity to commence lawsuits is

13   just -- it's never been done before.

14          The Director has defended the statute through saying

04:09:51   15   it's a simple *qui tam*; it's a *qui tam* statute; it's a relator;

16   it's a whistleblower statute; my gosh, we've had these for a

17   couple hundred years; it's the same thing.  And that is simply

18   not accurate, Your Honor.

19          It's not true because every *qui tam* statute has the

04:10:11   20   same structure, which is the state owns it and the state

21   controls it.  They let a relator go, but they don't let the

22   relator do something they don't approve of.  They control that

23   relator to ensure that the state's best interests are

24   protected.

04:10:27   25          Here we don't have that.  We have interested parties

1     off on their own doing whatever the heck they want.  They can

2     enter into a settlement, and they don't have to tender the

3     funds to the state.  They can take a matter to trial even if

4     the Illinois Department of Labor considers the matter to be

04:10:42    5     lacking merit or to be cured in its entirety.

6           You know, this -- and the costs associated with

7     defending these are creating an existential crisis.  You heard

8     Scott Polen say four out of his 20 clients have already left

9     him, and the law hasn't even come into effect yet.  They ran

04:11:04    10    as soon as they saw it.

11          The others have lost significant business as well.

12    We've lost 15 percent, one witness testified, Ms. Shiu, from

13    Allstate -- AllStaff, and Mr. Figueroa testified that he also

14    lost several clients.

04:11:18    15          THE COURT:  Well, and they have nobody to sue.  The

16    question of irreparable harm, is it money damages or is it

17    something that can't be repaired?  They really don't have a

18    money damage case because they can't sue the state.

19          MR. FURTON:  That's right.  They can't sue the state.

04:11:33    20          THE COURT:  So the state can address that, but

21    normally where you have business losses or even -- not just

22    business losses, but loss of the business, you sue somebody

23    and you get money damages for the -- for those types of

24    injuries.

04:11:49    25          But when the state's the defendant, I don't know

1 where you can get any type of recompense for this.

2 MR. FURTON: Yeah. Mr. Polen's business is small

3 enough that losing a couple more, he won't have the critical

4 mass to continue existing. I mean, this is -- this is

5 threatening his business, many other businesses.

6 I'm here on behalf of two trade associations because

7 they have members who are smaller than TempsNow, one of the

8 plaintiffs in this case.

9 THE COURT: On the other hand, there's laws passed

04:12:19   10 all the time in the wisdom of some legislature that put people

11 out of business.

12 MR. FURTON: Yes.

13 THE COURT: So, you know, the irreparable harm is --

14 we've talked about the issues on that, but --

04:12:30   15 MR. FURTON: And they could do that here. They could

16 set a minimum age of a hundred dollars an hour.

17 THE COURT: Right.

18 MR. FURTON: And that would be -- you could

19 actually -- you could actually have a serious debate whether

04:12:42   20 or not that violates the NLRA because it's probably an attempt

21 to effect unionization or the effectiveness of union

22 collective action, it probably is, but it wouldn't be a

23 violation of ERISA to do that.

24 THE COURT: Okay. Go ahead.

04:13:02   25 MR. FURTON: So, you know, I think we heard the

1  evidence regarding irreparable harm.  I won't repeat it.

2  There's obviously a lot of lost business accounts.  You have

3  compliance costs.  You have lost customers.

4       THE COURT:  Why didn't Ms. Shiu turn over emails, as

04:13:16  5  the other two witnesses did?

6       MR. FURTON:  I don't know, Your Honor.

7       THE COURT:  It looks like your colleague wants to say

8  why.

9       MR. LEVISON:  I can address that, Your Honor.

04:13:26  10       THE COURT:  Briefly, because I want to hear from the

11  Department of Labor.

12       MR. LEVISON:  When we learned, for example, of a

13  labor dispute, discovered a labor dispute, were informed of

14  one, and we told other staffing agency also provided there the

04:13:41  15  customer then threatened us with tortious interference.  When

16  they gave us their benefits information, they told us that if

17  you disclose this to anyone, that will be a breach of the

18  employment -- of your contract with us, that we'll sever the

19  relationship.  There have been numerous customers that have

04:13:56  20  said we are only providing this under NDAs, which we haven't

21  signed and still haven't gotten the information, and the ones

22  that we have have all put it under we're providing this to you

23  subject to an NDA, subject to confidentiality, and so --

24       THE COURT:  So why not her customers turning it over

04:14:14  25  pursuant to a protective order?

1          MR. LEVISON:  If we -- if we were ordered to produce

2    it, we will.  We, you know, because of the truncated

3    discovery, I mean, this was only served on us, you know,

4    within the last week.

04:14:27    5          THE COURT:  No, this is just for an injunction

6    hearing.  There's a lawsuit that follows.  Whether I grant or

7    deny the injunction, there's discovery that's going to take

8    place.  It's not a motion to dismiss the case.

9          It will proceed as normal litigation would.  There

04:14:42   10    will be a discovery schedule.  There will be compliance.  Lack

11    of compliance will be dealt with by way of a motion to compel

12    and I'll decide it, and then I assume at some point, we're

13    going to get to cross-motions for summary judgment and this,

14    for purpose -- it was a question that isn't dispositive.  It

04:15:01   15    was just more of a -- I wanted to know the reason.

16          So, okay, fair enough.

17          MR. HAZINSKI:  Your Honor, I'd just note for the

18    record because they didn't let us know that they were

19    withholding anything on the basis of the concerns that

04:15:13   20    Mr. Levison identified, and obviously doesn't comply with

21    Rule 34, so in that respect.

22          THE COURT:  All right.

23        (Counsel conferring.)

24          THE COURT:  Why don't you wrap it up.

04:15:24   25          MR. FURTON:  Yeah, I'll wrap it up.  I was just

1    corrected on one thing.

2         The federal government does require health benefits

3    for temporary workers in the sense that the federal government

4    has passed the Americans with Care Act -- I'm sorry, the

5    Affordable Care Act, the ACA, which is why you'll find that

6    these companies -- well, I don't know if it's why, I don't

7    know if it's the motivating reason, but these companies all

8    testified that they offer health insurance to their employees

9    because federal law requires employers to offer health

10   insurance to their employees.  Maybe they offer it because

11   that's what's needed to compete in the labor markets.  I don't

12   know their motivation, but the federal law does require it.

13        THE COURT:  Okay.  Very good.

14        MR. FURTON:  And real -- we believe the inadequate

15   remedy of law, we've talked about it.  The urgency is

16   everything here, Your Honor, and if there's a -- if there's

17   any other questions, I'm happy to answer them.

18        THE COURT:  Thank you.

19        All right.  Let's hear from the Department of Labor.

20   CLOSING ARGUMENT ON BEHALF OF DEFENDANT BY MR. WEAVER

21        MR. WEAVER:  Thank you, Your Honor.  Henry Weaver for

22   the Department of Labor.

23        So as I said in my opening, this is a pre-enforcement

24   challenge to certain amendments to the Act, and so on the

25   merits, plaintiffs bear the heavy burden of showing that it

closing - defendant

142

1   has no constitutional application under any circumstances, and

2   then on this preliminary posture, plaintiffs have the heavy

3   burden of showing that they will suffer irreparable harm in

4   the absence of an injunction.

04:17:05  5   THE COURT:  Is this law good without implementing

6   regulations, which apparently have expired in January,

7   January 4th, and you don't have new ones issued?  Do you

8   intend to issue new ones, and is this case even ripe until

9   those are issued?

04:17:21  10   MR. WEAVER:  Sure, I'm happy to address that, Your

11   Honor.

12   First, I'll say what I know about the pending

13   regulations, which is not comprehensive, but then I'll explain

14   why I don't think it's really legally relevant at this

04:17:34  15   juncture.

16   THE COURT:  All right.

17   MR. WEAVER:  So there were a first proposal for

18   regulations back in the fall.  As we explained in our brief,

19   under Illinois law regulations actually go through two

04:17:46  20   proposals, unlike federal law.  So we would be preparing for

21   the second proposal.

22   Frankly, the Department did pause moving forward on

23   the second proposal because this litigation was filed and it

24   created uncertainty, but there was a hearing about the first

04:18:08  25   proposal that, in fact, plaintiffs participated in and

1    provided comments about their thoughts on the first proposal,

2    and the Department will be following the normal regulatory

3    process under Illinois law to accept those comments, consider

4    revisions.  So that process is simply ongoing.

04:18:24    5    THE COURT:  Is the Department going to enforce the

6    law as of April 1st if there's still a pending case in front

7    of me, at least an injunction motion pending?

8    MR. WEAVER:  Yes, so relating to ripeness.  We are

9    not challenging the ripeness of the suit as to the statute

04:18:38   10    itself.  The statute does have independent force, and we're

11    not contesting that, so I think it is ripe.

12    That said, a lot of plaintiffs' sort of thematic

13    complaints about how vague they view Section 42 as obviously

14    will be helped by the regulation when it comes along.

04:18:57   15    However, that is -- we're talking about their, like,

16    a Fourteenth Amendment void for vagueness challenge, and

17    plaintiffs simply haven't brought it.

18    THE COURT:  Well, back to my question.

19    If this motion for preliminary injunction is pending

04:19:10   20    as of April 1st, are you going to start enforcing the law, or

21    are you going to suspend enforcing it until there's a ruling

22    on the preliminary injunction?

23    MR. WEAVER:  The law will go into effect.

24    THE COURT:  All right.  That's fine -- not fine.

04:19:22   25    That's your answer.  Go ahead.

1        MR. WEAVER:  As a practical matter, no client company

2   will be required -- or no staffing agency will actually be

3   required to provide that comparable pay until July 15 because

4   that's 90 days after April 1st to the extent that's a relevant

04:19:38   5   factor for Your Honor.

6        THE COURT:  Well, it is.

7        MR. WEAVER:  That's 15 six-day work weeks after

8   April 1st.

9        I would like to give a sort of quick overview of

04:19:52   10   other provisions of this law that we think are relevant

11   context.  There's Section 5, which exempts professional and

12   clerical employees entirely from the coverage of the law.

13   Some of our questions got toward that point.

14        Second, the staffing agencies already have a number

04:20:12   15   of reporting and recordkeeping obligations under the law as it

16   existed before the amendments that you can see in Sections 10

17   and 12.

18        And then finally, under Section 40 of the law,

19   staffing agencies are entitled to charge placement fees for

04:20:29   20   employees who got permanently placed with the third-party

21   clients.  So that's general background.

22        And then turning to the ERISA claims, so turning to

23   the merits, we would like to sort of resummarize what

24   Section 42 even does because we think that there's been lack

04:20:48   25   of clarity about that.

1        The motivation here is that the Illinois legislature

2  saw inequity between permanent employees and long-term

3  temporary laborers, and so then what Section 42 requires is

4  greater than or equal to wage payments and then also

04:21:07    5  equivalent benefits.  However, crucially, the benefits can --

6  every staffing agency has free and clear the option to pay out

7  the actual cost of the equivalent benefits.

8        THE COURT:  How do they find out the equivalent

9  benefits?

04:21:22   10        MR. WEAVER:  So as I believe Your Honor observed

11  earlier in this hearing, the staffing agencies do have a cause

12  of action created by Section 42 to get whatever information

13  they might need.

14        THE COURT:  They're going to sue their clients?

04:21:37   15        MR. WEAVER:  Well, I hope it won't be necessary for

16  them to actually sue their clients, but the point --

17        THE COURT:  What if the clients -- this comes down to

18  practical aspects of this.  If the client says I don't want to

19  show you my books, oh, great, they have a cause of action.

04:21:51   20  But they're not going to sue their client.  They'll never have

21  that client again.  And, yet, they have to provide equivalent

22  benefits without the knowledge of what the employer provides

23  to their employees.  I just don't understand how that is

24  workable.

04:22:06   25        Now, maybe that's, again, a problem for Springfield

1    and they should have thought of it, but maybe Department of

2    Labor can think of it.  So how did they do that?

3            MR. WEAVER:  So on that specific question, Your

4    Honor, I guess I'm not willing to -- I don't have a position

5    here and now whether that might be a defense in an action

6    under Section 42, that it was simply impossible because they

7    didn't have the relevant information; but it's not relevant to

8    the ERISA preemption claim that they're trying to bring today

9    to strike down this law.

10           So, I guess, to focus on what plaintiffs are bringing

11   in their reply specifically in their ERISA claim, to

12   characterize what they view as their strongest argument for

13   ERISA preemption, the focus in the reply is on these

14   "nonclerical judgment calls."  They draw that language from

15   the *Collins v. Ralston* case from the Seventh Circuit.

16           I can sort of reconstruct this argument a bit and

17   then explain why I don't think -- why I don't think it's

18   correct.

19           So plaintiffs are arguing that through kind of

20   ongoing discretion and then the requirement to pay out cash,

21   that that, in fact, amounts to an ERISA plan.  That is what I

22   understand them to be arguing when they cite, like, the *Fort

23   Halifax* case and the *Collins v. Ralston* case from the Seventh

24   Circuit.

25           This argument fails as a matter of law.  So the --

1     there is an actual definition under ERISA of what an employee

2     welfare benefit plan is that plaintiffs do not cite.  It's

3     found at 29 U.S.C. 1002(1), and the definition is a "plan,

4     fund or program established for the purpose of paying out a

04:24:04     5     certain list of benefits."

6          The key reason that -- whatever Section 42 requires

7     is not an ERISA plan under this definition, the key reason is

8     that that phrase, "plan, fund or program," has been

9     interpreted to mean some sort of separate funding mechanism,

04:24:25     10     so something in the nature of a trust that the funds flow

11     through to the employees.  In the *Dillingham* case from the

12     Supreme Court, the Supreme Court said that ERISA is

13     "unconcerned" with "benefits paid out of an employer's general

14     assets."

04:24:42     15          So in short, whatever ongoing discretion there might

16     be, there is no separate plan here.  What we have here is a

17     payroll practice.  All that Section 42 requires is cash to be

18     paid directly from the general treasury of plaintiffs to their

19     employees.  That is not, under the statutory definition, an

04:25:06     20     employee welfare benefit plan.

21          And, in fact, the Department of Labor, the federal

22     Department of Labor, which interprets ERISA, has explicitly

23     excluded what it calls payroll practices from the definition

24     of employee welfare benefit plans, and I have that regulatory

04:25:26     25     citation if you would like it.

closing - defendant

148

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 04:25:35 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 04:26:06 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 04:26:23 | 15 |

1      THE COURT:  Is it in your brief anywhere?

2      MR. WEAVER:  It is not because we didn't really know

3  we needed to respond to this point.

4      THE COURT:  Go ahead.

5      MR. WEAVER:  It is 29 C.F.R. Section 2510.3-1(b).

6      So that's why that argument fails.  There are various

7  other arguments that plaintiffs have raised.  I won't address

8  all of them, but maybe to focus on kind of another variant of

9  the discretionary judgment calls.

10      Plaintiffs argue that the discretionary calls

11  distinguish this case from the many cases holding that wage

12  floors are not preempted by ERISA.  It doesn't distinguish

13  this case.

14      So we cite in our brief a series of cases about why

15  wage laws have sort of a presumption against preemption, and

16  that's well established under Supreme Court case law.  The

17  leading Supreme Court case, page 7 of our brief, it's called

18  *Massachusetts v. Morash*, it was a case about vacation benefits

19  and about an ongoing duty to keep track of accrual of vacation

20  benefits and then to pay them out in cash, and that was held

21  to not be an ERISA plan, to not be preempted.

22      THE COURT:  So your argument is just the mere words

23  insurance or medical, health benefits doesn't automatically

24  turn this into an ERISA plan.

25      MR. WEAVER:  Absolutely, Your Honor.  And the fact

04:26:45

04:27:04

1    that any employer, any staffing agency has a pure option to

2    value the actual cost of the benefits and then pay that out

3    instead.

4         Plaintiffs, both in their complaint and at various

04:27:22    5    times during the live testimony, have sort of talked about the

6    subjective value that an employee might attach to benefits and

7    how, like, we can't possibly know different people value

8    things at different amounts, but the statutory standard is

9    actual cost, and that is determinable.

04:27:41    10    The Department is willing to admit that there might

11    be edge cases where it's messy, but it's determinable, and it

12    means that there is a feasible option to comply with this law

13    through the payment of cash without -- without creating an

14    ERISA plan, without touching an ERISA plan.  So it certainly

04:28:00    15    does not interfere with uniform national administration of

16    ERISA plans.

17         A final point I want to make about the -- the level

18    of discretion that the plaintiffs say they labor under in

19    identifying comparator employees.  It is worth noting that the

04:28:26    20    language in Section 42 for who a comparator employee is drawn

21    directly from a law that's been in place since 1963.  It's the

22    Equal Pay Act which forbids sex discrimination across

23    comparator employees.  It's a federal law.  It also has a

24    state analog.

04:28:48    25    And the language here in Section 42 about who counts

closing - defendant

1    as a comparator is just the language from the Equal Pay Act

2    verbatim.  And so all employers, including plaintiffs here,

3    since 1963 have had to figure out who comparators are and then

4    pay out equal wages to those comparators.

04:29:05
5            THE COURT:  It's a lot simpler though than any type

6    of benefit plan.

7            MR. WEAVER:  Well, it's worth noting that you violate

8    the Equal Pay Act if you don't pay out equivalent benefits as

9    well, so -- and there's no argument that the Equal Pay Act is

04:29:20
10   preempted by ERISA.

11           So statutory requirements akin to these have existed

12   for a long time, even if this is a recent amendment.

13           Those are the main points I wanted to make about

14   ERISA in response to plaintiffs' reply.  I would move on to

04:29:38
15   the NLRA arguments.

16           THE COURT:  Go ahead.

17           MR. WEAVER:  So first I do want to address another

18   point in the reply which plaintiffs didn't discuss in their

19   oral argument just now, but at pages 11 to 12 of the reply, I

04:29:55
20   see what the Department interprets as actually an argument

21   that Section 42 is preempted by the NLRA, and I don't know if

22   plaintiffs are emphasizing this, but we do want to say that

23   Section 42 is also not preempted by the NLRA.

24           This is the discussion of the *Bragdon* case from the

04:30:17
25   Ninth Circuit.  Your Honor actually discussed this principle

1   in a case from 2021.  It was the *Building Owners v. Chicago*

2   case about the Chicago predictive scheduling ordinance.

3          Your Honor discussed how a sort of gerrymander meant

4   to deliver a victory just to one work site can violate the

5   NLRA.  So we just want to quickly say that that doesn't

6   describe Section 42 at all.

7          Plaintiffs work statewide at many sites in several

8   different industries, and this is not the situation discussed

9   in *Bragdon*, discussed in Your Honor's opinion in *Building

10  Owners v. Chicago* where a legislature essentially tries to

11  narrowly target one particular union fight.

12         So that's what I'd like to say about that topic.

13         And then I'll move on to the main target of

14  plaintiffs' NLRA challenge here, which obviously is Section 11

15  of the law.

16         So here's what Section 11 requires.  Section 11

17  requires a notice to employees in two parts.  It requires a

18  notice that there is a labor dispute at the site where the

19  temporary employee could be going, and then it requires

20  telling that temporary employee that they don't need to go to

21  the site of the primary labor dispute and may accept an

22  alternate assignment if they wish.

23         So this does not violate either the machinists prong

24  of NLRA preemption or the Garmon prong.  Machinists is the

25  principle that Congress has left clear a zone for the free

1    play of economic forces.  So essentially that a union and an

2    employer and their fight with each other have to be left free

3    to use economic weapons against each other.

4            But there are neutral purposes for this disclosure

04:32:27  5    requirement totally unrelated to that battle between a union

6    and an employer.  The *Bardane* case, which we cite in our

7    brief, discusses the general mandate to keep the peace, which

8    is certainly the case here with disclosing the existence of a

9    labor dispute.

04:32:48  10            And then there's just the general state interest in

11    truthful advertising in the labor market.  So this is a

12    disclosure that something is happening in a work site.

13    Third-party employees to the labor dispute could certainly be

14    interested in that information.

04:33:06  15            So with those neutral purposes, this -- the

16    Department's position is just that the Supreme Court's case in

17    *Belknap* controls this case.  The *Belknap* decision, it held

18    that replacement workers can bring breach of contract claims

19    when an employer basically lies to them during the course of a

04:33:31  20    strike.

21            So we're talking about replacement workers, innocent

22    third parties to the ongoing labor dispute.  The NLRA does not

23    preempt their claims against the employer if they've been

24    mistreated.

04:33:44  25            Interestingly in the *Belknap* case, both the employer

closing - defendant

153

1    and the AFL-CIO took the same side at the Supreme Court and

2    said that they were entitled to -- basically to misuse

3    innocent bystanders to a labor dispute in order to win their

4    fight with each other, but the Supreme Court says no.  The

5    Supreme Court said that neither employers or unions are "free

6    to injure innocent third parties without regard to the normal

7    rules of law governing those relationships."

8        And that's what plaintiffs' employers are here.  They

9    are innocent third parties to labor disputes, and the State of

10   Illinois has given them a right to receive a notice.

11       Following this basic logic, the district courts in

12   *Bardane* and *Kapiolani* upheld disclosure requirements in Hawaii

13   and Pennsylvania, much like this one here.  Plaintiffs don't

14   cite those cases in their reply brief.  Plaintiffs can't

15   distinguish *Belknap*.

16       So that's why the machinists claim fails.

17       Then there's the Garmon claim.  Garmon broadly

18   prevents state duplication of an NLRA cause of action or an

19   NLRA prohibition, so *Belknap* actually again controls here.

20   *Belknap* discussed a Garmon argument against a similar law.

21   *Belknap* said that the standard is whether the controversy that

22   would be presented to the state court is "identical with that

23   which could be presented to the board."  That's at 463 U.S.

24   510.

25       There is no arguable right to receive this notice or

04:34:06

04:34:29

04:34:51

04:35:15

04:35:36

1    not to receive it under the NLRA.  The elements of a claim

2    under Section 11 would be different than the elements of a

3    claim presented to the board, not identical to a claim

4    presented to the National Labor Relations Board.

04:36:00    5    The key distinguishing feature is that an employee

6    who wants to plead a Section 11 claim doesn't need to say

7    anything about concerted activity.  Concerted activity is like

8    the lodestar of the NLRA.  You have to get together with your

9    colleagues.

04:36:19    10    But a Section 11 plaintiff just needs to say I was

11    entitled to this notice.  I didn't get this notice.  I wasn't

12    offered an alternative assignment.  It doesn't trespass on the

13    federal domain.

14    So that's why we think there definitely is no NLRA

04:36:38    15    claim here as a matter of law.

16    Next, the due process claim, so the due process

17    challenge to Section 67.  I'll be brief on this.

18    Plaintiffs only have a federal due process claim.

19    They cannot bring a state due process claim in this court.

04:36:57    20    That's the rule in *Pennhurst*.  They don't say anything about

21    it on reply.  The only cases they cite supporting their case

22    are state constitutional law cases.

23    This Court cannot enjoin the State of Illinois based

24    on a state law argument.  So I'll just leave it at that unless

04:37:19    25    the Court is interested in hearing more about Section 67.

1          THE COURT:  No, thank you.

2          MR. WEAVER:  So the last topic is irreparable harm.

3          THE COURT:  All right.

4          MR. WEAVER:  I want to say off the bat that we -- we

04:37:33  5   do disagree with something that Your Honor said during the

6   argument that plaintiffs delivered.  We disagree that the fact

7   that the state is immune means that there's no adequate remedy

8   here, that there's irreparable harm here.

9          We discuss this at page 27 to 28 of our brief.

04:37:53  10  Starting, I guess, with the adequate remedy prong, we -- we

11  cite case law that presenting a constitutional defense in a

12  future enforcement action is a perfectly legitimate adequate

13  remedy at law even -- and we cite case law that that's the

14  case, even though states are immune.

04:38:15  15         As Your Honor observed, I mean, states pass

16  regulations all the time that cost private businesses money,

17  but that's not enough.  There's a Seventh Circuit case that

18  says that there is irreparable harm if the business can show

19  the uncompensated death of its business.  That's the *Cavel*

04:38:38  20  case, 500 F.3d at 546.

21         So it's a much higher standard than we're going to

22  lose some money and the state will be immune.  It's the

23  uncompensated death of its business.

24         So on this point, the evidence -- plaintiffs have the

04:38:57  25  burden obviously to show their entitlement to the

1  extraordinary remedy of a preliminary injunction.  What

2  plaintiffs have presented here is actually quite mixed

3  evidence.

4       So taking their testimony for all that it's worth,

5  and we obviously have some disagreements that we drew out on

6  cross, the three plaintiffs discussed a 15 percent reduction

7  in their business, an 8 percent reduction in their business,

8  and a 10 to 15 percent reduction in their business.  That is

9  not the uncompensated death of their business.

10       More generally, you know, we saw communications.

11 Some clients said that they were just moving away from

12 temporary labor for unrelated reasons.  Some clients said that

13 they would comply with this law by only hiring temporary labor

14 for the first 90 days, which, you know, it could easily cause

15 a reduction in plaintiffs' business, but plaintiffs haven't

16 shown that it would cause the death of their business.

17       And more generally, you know, a lot of the evidence

18 that Your Honor has heard today about what clients believe and

19 what they're going to do, clients who are not here in court,

20 it was hearsay, and we understand that hearsay is admissible

21 in this preliminary posture, but we do think that Your Honor

22 can consider it for what it's worth and discount it.

23       For instance, with Mr. Figueroa's testimony, he said

24 that there were -- that there were five clients whom he did

25 not name who had cut him off entirely.  But then the only

closing - defendant

1    communications that he produced were from three clients who

2    were not cutting him off entirely.

3            So we think there are real questions about the

4    evidentiary showing here.

04:40:53    5            Finally, when it comes to irreparable harm, similar

6    burdens already existed under the law.  This is not totally

7    novel.  Plaintiffs have been having to comply with this thing

8    since before the amendments.

9            There was testimony from Ms. Shiu that paperwork,

04:41:11   10    administration, human resources, this is the value that

11    plaintiffs provide, in fact, to their clients.  They know how

12    to do this work.

13            As I mentioned earlier, the Equal Pay Act is word for

14    word the same test for comparable employees, and plaintiffs

04:41:28   15    comply with civil rights law.  So they have to have been doing

16    this process already to some extent.

17            THE COURT:  Well, and they were pretty clear that

18    this is a burden that's different in magnitude than anything

19    they've had to handle in the past.

04:41:47   20            MR. WEAVER:  Certainly.  And I think that Your Honor

21    can credit that testimony and still conclude that there's not

22    a strong showing of irreparable harm, that the administrative

23    hassles that this law may require doesn't create irreparable

24    harm, and it doesn't cause ERISA preemption.

04:42:05   25            So unless there are further questions, Your Honor, I

1   would just summarize that we think there's no likelihood of

2   success on the merits of any of these claims and that there's

3   no irreparable harm.

4           THE COURT:  All right.  Thank you.

04:42:17   5           MR. WEAVER:  Thank you.

6           THE COURT:  All right.  I don't really -- unless you

7   want to make rebuttal argument, I don't need to hear it.  I've

8   gotten the briefs.

9           If there's a point you want to make in five minutes

04:42:29   10  or less, you can do it, but that's about all I need.

11          MR. FURTON:  I'll be brief, Your Honor.

12          THE COURT:  Go ahead.

13     REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFFS BY MR. FURTON

14          MR. FURTON:  There were a couple of things that I

04:42:36   15  just think should be addressed.

16          First is on the topic of irreparable harm.  We quoted

17  the *Morales* case from the United States Supreme Court, being

18  forced to incur compliance costs with a preempted law is

19  sufficient to establish irreparable harm in and of itself,

04:42:55   20  1992.

21          When it comes to the *Belknap* case, it's a U.S.

22  Supreme Court case, I submit it's completely irrelevant.  It's

23  a totally different scenario.  These were offensive claims

24  that the individual employees wanted to assert.

04:43:11   25          This is different.  We're talking about retaliation

1      claims.   The statutory definition of retaliation, Section 90,

2      and the NLRA Section 7, Section 8, protections for retaliation

3      for concerted activity, these are Venn diagrams that

4      completely overlap.

04:43:33  5          You have -- those -- that *Belknap* case is really --

6      it sounds like it might be interesting because it involves

7      temporary workers, but it really has no application here.

8          This case is not like the case you faced a couple

9      years ago, the *Building Owners Management Association*.   It's

04:43:55  10     very different, and in the *Bragdon* case, it was a narrow

11     target.   Well, we have a narrow target here, too.   We have a

12     specific industry, the temporary staffing industry, and we

13     have the related industry that's also affected, which is their

14     clients.   Both of them are affected by this law.

04:44:16  15         Briefly when it comes to the -- there was a reference

16     to the Equal Pay Act as being the source of the language for

17     the comparative employee.   That's been in place for 50,

18     60 years, everybody knows how to find a comparative employee.

19         It goes to the nature of the statutes.   It's a bit of

04:44:33  20     a Frankenstein from the labor movement's greatest hits.   Yes,

21     they copied those words, but those words are used within a

22     company, not between companies.   Within a company, it's easy

23     to find a comparative employee.   Between companies, it's much

24     harder.

04:44:47  25         And that gets at the nub of the issue here, which is

rebuttal - plaintiffs

1　it's not just that it's hard.  It's not just that it's

2　burdensome.  It's not just that it's costly.  It's all three

3　of those things, but it also requires us to make judgment

4　decisions.  So if you have 20 guys and 19 of them have

04:45:07　5　accepted expensive benefits and one guy rejects everything, we

6　choose the one guy.

7　　　　In the old days, you'd get yourself sued under ERISA,

8　but now, because of this statute, you get yourself sued in

9　state court for violating the equivalent benefits provision.

04:45:27　10　That's what's different is if you make a mistake about your

11　judgment, you get exposed to a whole different legal regime.

12　　　　There was also discussion about the opt-out, the cash

13　payment here.  And the cash payment, of course, requires that

14　comparison.  There's no avoiding that.  And that -- but it

04:45:49　15　gets at the real issue, which is what numbers do you look at?

16　　　　We heard about an employee who paid 29 bucks, and we

17　heard about a company that paid 340 bucks.  Same insurance.

18　Which is the number you look at when you're looking at the

19　actual cost?  And if you get that wrong under the old statute,

04:46:09　20　you catch an ERISA suit, which has limited discovery,

21　limited -- deferential standard of review, you have federal

22　court jurisdiction only, and you have recovery of attorneys'

23　fees in the event you're falsely accused of improperly

24　violating the statute.

04:46:29　25　　　　None of those protections are here.  You're going to

rebuttal - plaintiffs

161

1      be dragged into state court because you chose the 29 instead

2      of the 340 under a situation where you don't know what it

3      means to be equivalent, and there's nothing anybody could say

4      in a rule that defines equivalent.  Equivalent means

04:46:44   5      equivalent.  It means equal, it means same, it means benefits.

6               Those are the points that I want -- oh, and finally

7      *Dillingham.  Dillingham* is a prevailing wage act case, and

8      this case has nothing to do with prevailing wage act cases.

9               Those cases are really unique in the sense that they

04:47:00  10      deal with governments acting as buyers on government

11      contracts.  It allows an elimination of the competition

12      between the bidders on the cost of labor.  It has nothing to

13      do with this statute.  It's a -- it's a distraction.  And much

14      like the wage act cases that were also mentioned as parallel

04:47:18  15      to this, this is not a wage case.  This is not a wage statute.

16      It is a statute that regulates ERISA benefit plans.

17               THE COURT:  All right.  Well, thank you.

18               All right.  I'm not ruling today, of course.  I'm

19      going to consider your arguments, reread the briefs, note any

04:47:35  20      cases or cites you've given me today that were not in the

21      briefs, and I'll try and give you a prompt ruling,

22      understanding the urgency of the imminent effective date of

23      the Act, although it sounds like it's not going to be until

24      July 15th rather than April 1st.

04:47:56  25               MR. FURTON:  Well, yes and no.  Obviously, the

1    90 days actually -- the way it is going to be computed, it

2    can't start until April 1.  It will start obviously for

3    anybody much faster thereafter because you don't know whether

4    or not your employee incurred 80-some days at a different

04:48:14    5    employment situation.  But the rest of the statute is in

6    place.  It's just the equivalent benefits that's been delayed.

7         THE COURT:  Well, explain the July 15th date, I

8    believe it was.

9         MR. FURTON:  Because that's the earliest that

04:48:28    10    somebody could incur 90 days.  The commencement of the 90-day

11    clock begins April 1.

12         THE COURT:  I see.  Okay.  I understand now.  Thank

13    you.

14         All right.  Give you a ruling as promptly as we can.

04:48:46    15    If there's anything I need to report to you or further

16    questions I have, we'll get you on the phone.  Thank you all.

17         MR. FURTON:  Thank you, your Honor.

18         MR. WEAVER:  Thank you, your Honor.

19      (Which were all the proceedings heard.)

20                          CERTIFICATE

21      I certify that the foregoing is a correct transcript from

22    the record of proceedings in the above-entitled matter.

23    /s/Kathleen M. Fennell          February 22, 2024

24    Kathleen M. Fennell                    Date
      Official Court Reporter

25