UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STAFFING SERVICES ASSOCIATION OF ILLINOIS, AMERICAN STAFFING ASSOCIATION, CLEARSTAFF INC., M.M.D. INC. D/B/A THE ALLSTAFF GROUP, INC., TEMPSNOW EMPLOYMENT AND PLACEMENT SERVICES LLC, | No. 23 C 16208 |
| Plaintiffs, | Judge Thomas M. Durkin |
| v. | |
| JANE R. FLANAGAN, SOLELY IN HER CAPACITY AS THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF LABOR, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Temporary staffing agencies and trade associations bring this action against the Director of the Illinois Department of Labor to enjoin the enforcement of several recently-passed amendments to the Illinois Day and Temporary Labor Services Act. For the following reasons, Plaintiffs' motion for a preliminary injunction, R. 21, is granted in part and denied in part.

**Background**

On August 4, 2023, Governor JB Pritzker signed several amendments to the Illinois Day and Temporary Labor Services Act ("DTLSA") into law. The amendments are aimed at enhancing protections for the labor and employment rights of the more than 650,000 temporary workers in the State. *See* 820 ILCS 175/2. Those temporary workers are employed by temporary staffing agencies ("agencies") and sent to third-

1

party client work sites. Plaintiffs, which include two temporary staffing trade associations and three agencies, challenge three of the new provisions.

Section 42, titled "Equal pay for equal work," requires agencies to pay temporary employees who work at a particular site for more than ninety days within a year at least the same wages and "equivalent benefits" as the lowest paid, comparable, directly-hired employee employed by the third-party client.[1] 820 ILCS 175/42. Agencies may alternatively pay "the hourly cash equivalent of the actual cost benefits" in lieu of providing equivalent benefits. *Id.* Section 42 also requires third-party clients to provide agencies with "all necessary information related to job duties, pay, and benefits of directly hired employees" to allow agencies to comply. *Id.* In November 2023, the Illinois General Assembly passed, and the Governor signed, legislation delaying the effective date of Section 42 until April 1, 2024. Pub. Act 103-0564, Sec. 65.

Section 11, titled "Right to refuse assignment to a labor dispute," bars agencies from sending temporary employees to a place where a "strike, lockout, or other labor trouble exists" without first giving written notice of the "labor dispute" and the employees' "right to refuse the assignment without prejudice to receiving another assignment." 820 ILCS 175/11. Section 67 grants a private right of action to an "interested party," which is defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." 820 ILCS 175/5, 67. "Interested parties" may seek

---

[1] Plaintiffs do not challenge the equal wages requirement of Section 42.

statutory penalties and injunctive relief. 820 ILCS 175/67, 70. Sections 11 and 67 are presently in effect.

Plaintiffs seek a preliminary injunction prohibiting the Illinois Department of Labor ("Department") from enforcing Sections 11, 42, and 67 and related regulations.[2] On February 7, 2024, the Court held a hearing on this motion and heard testimony from the three Plaintiff agencies.

## Legal Standard

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Parties seeking such relief must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in their favor; and (4) that an injunction is in the public interest. *Id.* at 20. This Court "must also bear in mind, when a party is seeking to enjoin a statute, that legislative enactments are entitled to a presumption of constitutionality." *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023).

## Discussion

I.    Likelihood of Success on the Merits

---

[2] The emergency rules that Plaintiffs seek to enjoin expired on January 4, 2024. 47 Ill. Reg. at 12,457–80. As such, the request to preliminarily enjoin the now-expired regulations is denied as moot. The Department also published proposed permanent rules in August 2023. *Id.* at 12,316–44. To the extent Plaintiffs seek to enjoin the proposed rules, that request is denied. *See Finch v. Treto*, 82 F.4th 572, 579 (affirming district court decision declining to enjoin proposed Illinois rule and noting that the proposal "was subject (and perhaps likely) to change before final adoption").

Plaintiffs argue that Sections 11 and 42 are preempted by federal statute and Section 67 violates due process. Although Plaintiffs need not demonstrate likelihood of success by a preponderance of the evidence, they must "make a 'strong' showing that reveals how they propose to prove their case." *Id.* (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). A mere possibility or "better than negligible" chance of success is not enough. *Id.* (citations omitted).

A. Section 42

Section 42 requires agencies to pay temporary employees who work at a particular site for more than ninety days within a year either "equivalent benefits" as the lowest paid, comparable, directly-hired employee at the third-party client or "the hourly cash equivalent of the actual cost benefits." 820 ILCS 175/42. It also requires third-party clients to provide agencies with "all necessary information related to job duties, pay, and benefits of directly hired employees" so that agencies can comply. *Id.* As a preliminary matter, the fact that Plaintiffs have standing to challenge the obligations Section 42 imposes on them does not necessarily mean they have standing to challenge the obligations it imposes on their clients. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross."). Plaintiffs do not offer any argument in reply about how they suffer "concrete, particularized, and actual or imminent" injury from the third-party disclosure obligations. R. 38 at 17 (the proposition that plaintiffs cannot vindicate third-party rights "may be accurate but [] is irrelevant"). Therefore, Plaintiffs do not have

4

standing to challenge that part of Section 42.[3] As such, for the purpose of this section and those that follow, "Section 42" refers only to the portion of that provision requiring agencies to pay "equivalent benefits" or the "cash equivalent."

Plaintiffs contend that Section 42 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). A state law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001). To determine whether a state law has an "impermissible connection" with an ERISA plan, courts look to ERISA's objectives "as a guide to the scope of the state law that Congress understood would survive." *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997). With ERISA, "Congress sought 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law,' thereby 'minimiz[ing] the administrative and financial burden of complying with conflicting directives' and ensuring that plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

In this way, ERISA is "primarily concerned with preempting laws that require providers to structure benefit plans in particular ways, such as by requiring payment

---

[3] The challenge to this part of Section 42 should come from the agencies' third-party clients.

5

of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status" or if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* at 86–87 (cleaned up) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983); *Egelhoff*, 532 U.S. 141; *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)). ERISA also preempts state laws that provide "alternative enforcement mechanisms." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995). As a "shorthand" for these considerations, courts ask whether a state law "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Rutledge*, 592 U.S. at 87 (citation omitted).

Plaintiffs have made a sufficiently strong showing that Section 42 fits the bill. The provision "dictates the choices facing ERISA plans." *Egelhoff*, 532 U.S. at 150 (quoting *Dillingham*, 519 U.S. at 334). Agencies must determine the value of many different benefit plans and then determine whether to provide the value in cash or the benefits themselves by modifying their plans or adopting new ones. Such a direct and inevitable link to ERISA plans warrants preemption.

The Department maintains that the cash alternative is Section 42's saving grace because it allows agencies a way of complying with the DTLSA without touching its ERISA plans. But "[e]ven if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Retail Indus. Leaders Ass'n v. Fiedler*, 475 F.3d 180, 193 (4th Cir. 2007). *Egelhoff* is instructive on

this point. In that case, the Supreme Court held that ERISA preempted a state law requiring plan administrators to pay benefits to the beneficiaries chosen by the state law, rather than those identified in the plan documents, as provided by ERISA. *Egelhoff*, 532 U.S. at 147. Even though the state law had an opt-out provision, plan administrators would have to "maintain a familiarity with the laws of all 50 States so that they can update their plans as necessary to satisfy the opt-out requirements of other, similar statutes" and monitor the interpretation of those statutes by state courts. *Id.* at 151. Such "'tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction' [was] exactly the burden ERISA seeks to eliminate." *Id.* (quoting *Ingersoll-Rand*, 498 U.S. at 142).

The same applies here. Even with the choice between providing benefits or cash, Section 42 denies agencies the ability to administer its ERISA plans uniformly. For employees who work in Illinois, agencies have to collect and analyze benefit plan information from their client for a comparable employee, compare those plans to their existing plans, and determine whether to modify or supplement their plans, calculate and pay the cost of any benefits they do not presently provide, or both. Agencies also have to track how long each employee works at each client site. Agencies would not have to undertake any of these activities for their employees from other States. Relevant here, two Plaintiff agencies do business in Wisconsin. R. 44 ("Tr.") at 19, 98. "Such balkanization of benefit administration is exactly the sort of outcome ERISA was designed to prevent." *See Merit Const. All. v. City of Quincy*, 759 F.3d 122, 130 (1st Cir. 2014) (availability of "non-ERISA avenue to compliance" did not save

ordinance from ERISA preemption); *Fiedler*, 475 F.3d at 193 (state law requiring certain employers to spend percentage of their payrolls on employees' health insurance costs or pay the balance to the State was preempted by ERISA).

The cash alternative does not shield Section 42 from preemption for another reason too. Making the Section 42 choice necessarily requires an ongoing administrative scheme involving individual judgments. In *Fort Halifax Co., Inc. v. Coyne*, 482 U.S. 1, 12 (1987), the Supreme Court held that a state law requiring employers who terminated or relocated operations to pay a one-time, lump-sum payment to employees was not preempted by ERISA because it did not establish or require employers to maintain "an ongoing administrative program for processing claims and paying benefits." Applying this reasoning, in *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595–97 (7th Cir. 1998), the Seventh Circuit found that a company's retention agreements providing payouts based on certain eligibility criteria implicated ERISA because they required "[p]rolonged individualized decision-making concerning benefits." *See also Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir. 1993) (Massachusetts "tin parachute" statute requiring employers to pay severance benefits to employees who lost their jobs within two years of a corporate takeover was preempted by ERISA because it required "prolonged, individualized decisions" about eligibility).

Here, Section 42 requires agencies to make judgment calls about employees' eligibility and level of benefits on an individualized and ongoing basis. Initially, agencies must identify employees that have worked more than 90 days at a particular

8

client in the last year. Because that 90 days would include an employee's work for any number of agencies, and any number of clients, each agency has to collect data about each employee's historical work assignments and make an individualized determination of eligibility. Next, to identify the comparable employee at the client site, agencies must engage in qualitative assessments about seniority and the similarity of work and working conditions. *See* 820 ILCS 175/42. To provide "equivalent benefits," agencies must determine the value of the benefits given to a directly comparable employee and the value of the benefits given to its own employees. That appraisal is complex and particularized, as is the determination of how the benefits stack up to each other. For the cash alternative, agencies must calculate the "actual cost" of both sets of benefits, which can be computed in several ways, such as by taking into account a particular person's selections or using a formula based on metrics like headcount and hours of service. Deciding which method to use is inherently discretionary, and applying it is particularized to the benefits and employees involved. In short, by mandating "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation," *Fort Halifax*, 482 U.S. at 11, Section 42 raises the very concern ERISA preemption seeks to address.

The Department casts Section 42 as a "state rate regulation[] that merely increase[s] costs or alter[s] incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Rutledge*, 592 U.S. at 88 (citing *Travelers*, 514 U.S. at 668). But unlike the statutes in *Rutledge* and *Travelers*, Section

42 does not "merely affect[] costs." *Rutledge*, 592 U.S. at 87. It directly affects plan administration by requiring the consideration and analysis of individual plans in a way that impedes uniformity. And it does not just create "operational inefficiencies," *id.* at 91, but forces agencies to create an administrative scheme to conduct the ongoing, discretionary analysis required.

The Department's attempt to analogize Section 42 to prevailing wage and other statutes that have survived preemption fares no better. Prevailing wage statutes are similar to Section 42 in that they mandate a minimum wage—including a base pay component and a cash-equivalent benefits component—for employees on public works projects. *E.g.*, 820 ILCS 130/2. However, such statutes are afforded particular deference because public works projects are an area of traditional state regulation. *Dillingham*, 519 U.S. at 330 (applying presumption against ERISA preemption to California's prevailing wage statute). Such deference does not apply here. Additionally, prevailing wage statutes often come with a public schedule of wages that makes compliance far different from and less difficult than the discretionary and individualized determinations that Section 42 requires.

Similarly, the two other examples cited by the Department did not involve the discretionary decision-making required by Section 42. In *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 655–56 (9th Cir. 2008), the Ninth Circuit held that an ordinance requiring employers to make minimum healthcare payments on behalf of their employees did not have a "connection with" ERISA plans because employers could comply by contributing to an ERISA plan, paying the City, or a

10

combination of the two. But the employer's administrative burden was mere "mechanical record-keeping" and the payments to the City were fixed. *Id.* at 651. Likewise, in *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 89 (2d Cir. 2015), the Second Circuit held that a state law mandating a minimum rate of total compensation for home health aides was not preempted because employers could comply through any mix of wages and benefits that equaled or exceeded the specified minimum rate. While this case is somewhat closer, it is not binding on this Court and is factually distinguishable. Unlike the state law at issue in *Concerned Home*, Section 42 cannot "be easily satisfied through means unconnected to ERISA plans." *Id.* (citation omitted). As described, whether agencies choose to provide "equivalent benefits" or pay cash, they must analyze their own and third parties' ERISA plans and engage in ongoing, particularized, discretionary analysis to comply with Section 42.

As discussed previously, a state law "relates to" an ERISA plan, and is thus preempted, "if it has a connection with or reference to such a plan." *Egelhoff*, 532 U.S. at 147. Because the Court finds that Plaintiffs have made a strong showing that Section 42 has a "connection with" ERISA plans, the Court declines to consider whether the provision impermissibly references ERISA plans.

### B. Section 11

Section 11 prohibits agencies from sending temporary employees to a place where a "strike, lockout, or other labor trouble exists" without first giving written notice of the "labor dispute" and the "right to refuse the assignment without prejudice

to receiving another assignment." 820 ILCS 175/11. Plaintiffs argue that Section 11 is preempted by the National Labor Relations Act ("NLRA") under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), or, alternatively, *Int'l Ass'n of Machinists and Aerospace Workers v. Wisconsin Emp't Relations Comm'n*, 427 U.S. 132 (1976).

### 1. *Garmon* Preemption

Under *Garmon*, States cannot regulate conduct that the NLRA protects, prohibits, or arguably protects or prohibits. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (citing *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986)). This form of preemption is rooted in the "determination that in enacting the NLRA Congress intended for the [NLRB] generally to exercise exclusive jurisdiction in this area." *Int'l Longshoremen's Ass'n, AFL–CIO v. Davis*, 476 U.S. 380, 391 (1986).

In deciding whether *Garmon* preemption applies, the first question is what conduct Section 11 regulates. On its face, it requires disclosure. Agencies must inform employees in writing that a labor dispute exists at a potential work site and that they have a right to refuse that assignment without prejudice to receiving another. 820 ILCS 175/11. Implicit in the latter part of the disclosure is a guarantee of an alternative work assignment. Altogether then, there are two activities regulated by Section 11: disclosure and work assignments.

Neither of those two activities is arguably protected by Section 7 of the NLRA. That section protects an employee's right to form, join, or assist labor organizations;

collectively bargain through a representative of the employee's choosing; engage in concerted activity, e.g., striking or picketing; or refrain from engaging in such activities. 29 U.S.C. § 157. It does not say or suggest anything about an employee's right to notice or an alternative work assignment. It also does not say or suggest anything about an employer's right to not give notice or an alternative work assignment. *Cf. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. C.M. Smillie Co.*, 139 Mich. App. 731, 734 (1984) ("advertising for strike replacements is not conduct prohibited by § 8 of the NLRA, nor is freedom from such advertising protected by § 7").

Plaintiffs argue that *Garmon* applies because Section 11 is "an anti-retaliation statute" and "[p]rotection against retaliation for supporting or refusing to support collective action is the essence of Section 7 of the NLRA." R. 38 at 12. But that "conclusory assertion" about the conduct Section 11 regulates and the conduct Section 7 protects is not enough. *Glacier*, 598 U.S. at 776 (quoting *Davis*, 476 U.S. at 394). The word "retaliate" does not appear in Section 11, and while Plaintiffs cite to the definition of "retaliate" in the now-expired emergency rules and proposed rules, neither is in effect.

Plaintiffs suing under Section 11 do not need to show that they declined their work assignment to support a strike or other collective action. Indeed, plaintiffs suing under Section 11 do not even need to show that they declined an assignment at all, so long as they did not receive the required written notice. *See* 820 ILCS 175/11(b) ("The failure by [an] agency to provide any of the information required by this Section

shall constitute a notice violation under Section 95."). That a Section 11 violation and an NLRA violation might hypothetically arise "in the same factual setting" does not mean Section 11 is pre-empted outright. *Cf. Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978) ("The critical inquiry . . . is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board.").

Plaintiffs also argue that *Garmon* preemption applies because Section 11 creates new remedies for conduct arguably protected or prohibited by the NLRA. True, *Garmon* prevents States from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by" the NLRA. *Gould*, 475 U.S. at 286. But as stated, Plaintiffs have not shown that Section 11 regulates conduct arguably protected or prohibited by the NLRA, so they have not made a strong showing that *Garmon* preemption applies.

### 2. *Machinists* Preemption

*Machinists* preemption forbids States from regulating "conduct that Congress intended 'be unregulated because [it] left [the conduct] to be controlled by the free play of economic forces.'" *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Machinists*, 427 U.S. at 140). It is based on the idea that "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Machinists*, 427 U.S. at 140.

14

Plaintiffs argue that Section 11 is preempted under *Machinists* because it regulates an "economic weapon" available to employers during strikes and lockouts: hiring replacement workers. Under federal labor law, employers are free to hire either temporary or permanent replacements. *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 965 (7th Cir. 2006). In Plaintiffs' view, by requiring agencies to disclose the existence of strikes, lockouts, and other "labor disputes" at any client site where a temporary employee is assigned and issuing penalties for violations, the provision curtails those clients' ability to hire replacement workers when necessary.

But Section 11 does not bar employers from hiring replacement workers, or punish them for doing so. *Cf. id.* (*Machinists* preemption applied to state law that criminalized hiring of replacement workers). Nor does Section 11 prohibit temporary employees from accepting positions as replacement workers. It merely requires agencies to give their employees information about a potential work site and the right to an alternative assignment.

It is true that state laws with indirect effects on bargaining can be preempted under *Machinists. See Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 499-500 (7th Cir. 2018). But it is hardly a given that a Section 11 disclosure would discourage a temporary employee from taking a work assignment at an employer with an existing labor dispute. And Plaintiffs offer no evidence tending to suggest any effect of Section 11 on employers' ability to hire replacement workers. *Cf. Belknap, Inc. v. Hale*, 463 U.S. 491, 502 (1983) (holding that *Machinists* did not preempt replacement workers' breach of contract and fraudulent misrepresentation

claims and rejecting argument that such suits would "make it more difficult for the employer to hire replacements"); *see also Kapiolani Medical Center for Women and Children v. Hawaii*, 82 F. Supp. 2d 1151 (D. Haw. 2000), *order amended*, 103 F. Supp. 2d 1233 (D. Haw. 2000) (declining to declare preempted portion of state law requiring advertisements for replacement workers to disclose labor disputes where plaintiffs did not offer any evidence of interference with the right to hire replacement workers). Without more, Plaintiffs have not made a strong showing that *Machinists* preemption applies.

### C. Section 67

Section 67 gives a private right of action to any "interested party," defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." 820 ILCS 175/5, 67. Plaintiffs argue that Section 67 violates constitutional due process guarantees because there is no requirement that the "interested party" be injured by the complained-of violation.

Plaintiffs point to cases where Illinois courts considered whether the state laws in question violated the Illinois Constitution by giving "interested" parties the right to sue. *See State ex rel. Leibowitz v. Family Vision Care*, LLC, 2020 IL 124754 ¶ 76 (qui tam statute allowing private right of action for "interested person[s]" did not "usurp the common-law powers of the attorney general"); *Winger v. Hradisky*, 2019 IL 123201 ¶ 37 (statutory provision exceeded the limits of substantive due process under the Illinois Constitution because it did not require any transactional

16

relationship between the parties for liability to attach). But as the Department correctly points out, Plaintiffs' claim arising under the Illinois Constitution against the Director in her official capacity is barred by sovereign immunity. *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984)). Plaintiffs do not contest that argument in reply, and neither *Winger* nor *Family Vision Care* considered whether the state laws at issue ran afoul of federal due process.

While the parties spend much of the papers arguing about the extent to which Section 67 makes the DTLSA a qui tam statute, characterization is beside the point. Plaintiffs have not identified any case holding that a statute like this one, giving a private right of action to "interested parties," exceeds the limits of federal due process. That is likely because, in reality, Plaintiffs' argument is about standing, not due process. The Court cannot judge whether standing is proper in a future, hypothetical suit. If and when such a suit is filed, the court where it is pending can determine whether a supposed "interested party" has standing. Accordingly, Plaintiffs have not made a strong showing that federal due process bars Section 67.

## II. Irreparable Harm

With Plaintiffs' likelihood of success on the merits of their ERISA preemption challenge to Section 42, the Court considers whether they have shown irreparable harm. Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared

17

to the harm suffered.'" *Id.* A mere possibility of irreparable harm will not suffice. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009).

Plaintiffs have demonstrated more than a mere possibility of irreparable harm. To comply with Section 42, Plaintiffs will be forced to incur the expense and burden of determining the relevant values of benefits and creating, selecting, modifying, or supplementing existing ERISA plans or paying the difference. Plaintiffs anticipate having to develop new administrative systems and processes and augment their human resources staff to accomplish these tasks, the costs of which at least one agency cannot absorb. R. 23-2 ¶ 71; R. 23-3 ¶ 45; R. 23-5 ¶ 39; Tr. 52–53, 81, 100–01. If Plaintiffs do not or cannot comply, they face the threat of fines. *See* 820 ILCS 175/70. Such effects go beyond the minimal bookkeeping disruption that the Department suggests and constitute irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (holding that a plaintiff would suffer "irreparable harm" if forced to choose to incur either the civil enforcement liability of violating a preempted state law or the costs of complying with the law during the pendency of the proceedings); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) (affirming preliminary injunction in ERISA preemption case where "[a]bsent an injunction, [plaintiff's] members will be forced either to incur the costs of compliance with preempted state law or face the possibility of penalties").

Open questions about how agencies will ascertain and pay equivalent benefits or their actual cost makes the financial harm difficult to compute. But that difficulty only serves to support the irreparable nature of the harm. *See Life Spine*, 334 F.3d at

546 ("[I]t is precisely the difficulty of pinning down what business has been or will be loss that makes an injury 'irreparable.'"). In fact, Plaintiffs have already suffered business losses ahead of the law going into effect on April 1, 2024. ClearStaff, AllStaff, and TempsNow have each lost clients and revenue due to Section 42. Tr. 54–55, 62, 64–65, 78–79, 95, 101–06. ClearStaff is down 8% in revenue compared to the same period last year, with five clients who have stopped using the agency entirely accounting for approximately 100 employees and three clients who have transitioned to full-time employees or restricted assignments to less than 90 days. *Id.* 80–81, 95. The clients explained that they were ending temporary assignments because they did not want to share sensitive information with the agencies, as required by the law. *Id.* 79. AllStaff, for its part, has seen a 15% reduction of business that its clients have directly attributed to Section 42, specifically because they did not know how to comply with the statute, with approximately 85 employees without work. *Id.* 54, 64–65. And four out of TempsNow's 20 or so clients have either stopped doing business with the agency, stated that they will stop, or indicated that they will shift to hiring full-time employees or restricting assignments to less than 90 days. *Id.* 101–06.

The Department presented some evidence that there is a nationwide decline in temporary staffing, that agencies have alternative avenues for business like direct placement, and that agencies still make money for placements of less than 90 days. But such evidence does not negate the fact that agencies will have to incur the costs of compliance or face the penalties of noncompliance. *See Morales*, 504 U.S. at 381; *Hudgens*, 742 F.3d at 1334. Further, there is no way for Plaintiffs to recover these

19

costs or penalties in the event Section 42 is permanently enjoined. Sovereign immunity prevents Plaintiffs from seeking compensatory damages from the Department. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (citing *Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929)) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *see also Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D. Ind. 2020); *Minerva Dairy, Inc. v. Brancel*, 2017 WL 3575710, at *1 (W.D. Wis. Aug. 18, 2017).

The Department argues that Plaintiffs have an adequate remedy at law because they can present their preemption argument as a defense in future civil suits or state enforcement actions. That does not resolve the inability to recover damages from the State. And the single Seventh Circuit case the Department cites for this proposition did not involve a pre-enforcement challenge. *See Buntrock v. S.E.C.*, 347 F.3d 995, 997 (7th Cir. 2003) (plaintiff "attempt[ed] to derail the SEC's suit [against him] by filing his own suit against the SEC rather than seeking relief in that suit"). With the costs of complying, potential penalties for not complying, business losses incurred thus far, and the inability to recoup losses, Plaintiffs have established more than a mere possibility of irreparable harm.

III.    Balance of the Equities

Since Plaintiffs have shown a likelihood of success on the merits and irreparable harm, the Court weighs the harm of denying an injunction to Plaintiffs against the harm to the Department of granting one. *Life Spine*, 8 F.4th at 539. In

balancing the harms, the Court also considers the public interest. *Id.* This test is done on a "sliding scale": if Plaintiffs are more likely to win on the merits, the balance of the harms need not weigh as heavily in their favor. *Id.*

Here, because Plaintiffs have made a strong showing of likelihood of success on the merits, the balance of equities does not need to weigh as heavily in their favor. As previously discussed, the harm to Plaintiffs of denying the injunction is substantial. Plaintiffs are poised to incur significant costs of compliance and face the possibility of penalties if they do not or cannot comply. As to the public interest, Plaintiffs point to the potential departure of agencies from Illinois if Section 42 goes into effect and the accompanying loss of job opportunities for the hundreds of thousands of temporary workers they employ.

The Department argues that granting the injunction harms both its and the public's interests because Section 42 creates important protections for temporary workers who "are particularly vulnerable to abuse of their labor rights." 820 ILCS 175/2. The Department cites the practice of "permatemping," or hiring temporary workers long term without paying them the wages and benefits they would be entitled to if hired directly. A 2022 report found that more than a third of temporary workers surveyed had been in their current assignment for over a year, and 8% of those workers received a retirement benefit compared with 72% of American workers overall. *See* R. 32 at 29 (citing National Employment Law Project report). But the Court must balance the public interest represented by the Department with the public interest represented by the Supremacy Clause and Congress' decision to

21

ensure the uniformity of law related to ERISA plans. *See Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009); *Professional Towing & Recovery Operators of Ill. v. Box*, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11. 2008) (The public "does not have an interest in the enforcement of state laws that conflict with federal laws."). In view of these considerations, the Court concludes that the balance of equities tips in Plaintiffs' favor.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for a preliminary injunction. The parties are to jointly submit a proposed preliminary injunction order consistent with this opinion to the Court's proposed order inbox by or before March 15, 2024.


ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: March 11, 2024