IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Staffing Services Association of Illinois; American Staffing Association; ClearStaff Inc.; M.M.D. Inc. d/b/a The AllStaff Group, Inc.; TempsNow Employment; and Placement Services LLC,<br><br>   Plaintiffs,<br><br>     v.<br><br>Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor,<br><br>   Defendant. | Case No. 1:23-cv-16208<br><br>Hon. Thomas M. Durkin |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO MODIFY THE PRELIMINARY INJUNCTION OR TO ISSUE AN INDICATIVE RULING**

   In their moving papers, the Staffing Associations firmly established that the Court should modify the Decision and Order to take into account the New Benefits Provision's changes to Section 42 of the DTLSA or, in the alternative, issue an indicative ruling, and nothing in Defendant's opposition demonstrates otherwise. In fact, Defendant agrees that: (1) the Court has the authority to make the requested modification; and (2) the Court's preliminary injunction analysis of the Original Benefits Provision is also generally applicable to the New Benefits Provision. (ECF No. 63, 1, 4–7 [hereinafter "Opp'n Br."].) As Defendant notes, "[n]othing more is needed to resolve [this] current motion." (*Id.* at 5.) Consequently, the Court may properly grant the Motion and extend the preliminary injunction to specifically cover the New Benefits Provision.

   The parties only truly part ways on whether the Court should take an additional step and update its preliminary injunction analysis to address the revised language of the New Benefits Provision. (*See id.* at 1, 8–12.) According to Defendant, this is unnecessary because the New Benefits Provision is merely a "clarifying" amendment that does not make any substantive changes

to the Original Benefits Provision and that, if anything, makes it easier for Agencies to comply with the law. (*Id.*) The Staffing Associations do not quibble with the notion that the Illinois Legislature may have primarily intended the suite of amendments to the DTLSA that includes the New Benefits Provision to be "clarifying" amendments. But the language of the New Benefits Provision does, in fact, work substantive changes to the statutory text that merit amendment of the Court's injunction analysis. Specifically, it is more difficult for Agencies to comply with the New Benefits Provision than the Original Benefits Provision due to the four changes discussed below. All of these changes counsel in favor of the Court revising the Decision to reflect that the New Benefits Provision is even more clearly properly enjoined than the Original Benefits Provision, which will aid the Seventh Circuit in the pending appeal by maintaining the status quo and clarifying that there is no mootness problem here. (*See* ECF No. 60, 6–8 [hereinafter "Pls.' Br."].)

### A. One Comparable Employee Became a Class of Employees.

Like the Original Benefits Provision, the New Benefits Provision requires Agencies to assess the benefits received by their own employee, place a dollar figure on that employee's benefits, and then review comparable employees' benefits on the client side, place a dollar figure on those benefits, and then decide whether to match those benefits by amending or adopting a new plan or by providing cash in lieu of benefits. (*E.g.*, ECF No. 45, 6; ECF No. 60-1 ¶¶ 5–9 [hereinafter "Villarreal Decl."]; Pls.' Br. 5–6.) The New Benefits Provision, however, changes the Original Benefits Provision's requirement that Agencies compare the benefits their relevant employee receives to those received by *one* comparable employee of a client to a requirement that Agencies compare their employee's benefits to an entire *category* of employees. (*E.g.*, Villarreal Decl. ¶¶ 7–9; Pls.' Br. 5–6.) Oddly, Defendant asserts that this is somehow easier and less

burdensome for Agencies because they need only calculate the "average" cost of benefits in a category. (Opp'n Br. 10–11.)

But to find an "average," Agencies must make a value calculation for every single employee in a particular classification and then divide that number by the number of employees assessed. *See Average*, MERRIAM-WEBSTER.COM (relevantly defining "average" as "a single value (such as a mean, mode, or median) that summarizes or represents the general significance of a set of unequal values" and "an estimation of or approximation to an arithmetic mean"), https://shorturl.at/Mzs3z. Perhaps this is not difficult when it comes to calculating *wages*, as that would involve only a set of simple numbers. Not so when it comes to *benefits*. For that, Agencies must do a calculation that requires an assessment of individualized decisions across an array of decision points for every single employee within a category—and the number of employees that must be assessed can reach into the hundreds. (*E.g.*, Villarreal Decl. ¶¶ 7–9; *see* ECF No. 23-2 ¶¶ 52–73; ECF No. 23-5 ¶¶ 21–33.) Moreover, in making these calculations, Agencies will often have to make judgment calls and apples-to-oranges comparisons about the value of benefits because there is no guarantee that the ERISA plans Agencies and their clients offer are homogenous and different individuals make different benefits decisions. (*See* ECF No. 23-2 ¶¶ 52–73; ECF No. 23-5 ¶¶ 21–33.)

Consider, for example, the group of forklift drivers Defendant postulates. (*See* Opp'n Br. 10.) Some of these drivers may reject opportunities for health plans; some of them may fund health plans just for themselves; others may fund health plans for some or all eligible members of their families, which may vary in size; some drivers may get matching 401(k)s; others may have opted out of this matching; some drivers may have company stock options that vest only upon them staying at the company for two more years; and some may get company stock if, and only if, their

3

company hits certain performance metrics six months from now. (*See generally* ECF No. 23-2 ¶¶ 52–73; ECF No. 23-5 ¶¶ 21–33.) It is impossible to calculate the average value of these benefits without assessing each individual employee's benefits and putting a dollar value on each benefit every individual was offered or received, as well as an accurate dollar figure on all benefits that are contingent or will vest in the future. (*See generally* Villarreal Decl. ¶ 15; ECF No. 23-2 ¶¶ 52–73; ECF No. 23-5 ¶¶ 21–33.)

Notably, this construction of the New Benefits Provision's requirements is not, as Defendant asserts, an improper attempt to "prop up [a] facial challenge by 'construing the law in the most expansive way imaginable.'" (*See* Opp'n Br. 11 (citation omitted) (cleaned up).) This is math. It is also the reality of how Agencies must comply with the New Benefits Provision, as demonstrated by the sworn statement of a twenty-year veteran of the staffing services industry. (*See* Villarreal Decl. ¶¶ 1–9.) Similarly, Defendant's assertion that the Staffing Agencies have essentially made up a burden here because they "must merely take the information provided to [them] by third party clients regarding the benefits provided to their relevant employees" is without merit. (*See* Opp'n Br. 10–11.) Under the plain statutory language, Agencies have a "responsibility and duty" "to calculate and determine" the value of benefits, must ensure that the information they receive from their clients is "accurate and complete," and are ultimately responsible—and liable—for compliance with the New Benefits Provision. *See* S.B. 3650 (P.A. 103-1030), 103rd Gen. Assemb. § 42(b)–(c) (Ill. 2024), https://shorturl.at/szmdk.

### B. A New Duty Trigger Was Added.

The New Benefits Provision also adds an entirely new "duty trigger," requiring Agencies "to calculate and determine . . . the benefits it" offers to temporary employees "[u]pon receipt of . . . accurate and complete information" regarding benefits "from the third party client." *Id.* § 42(c);

4

*e.g.*, Villarreal Decl. ¶¶ 10–11; Pls.' Br. 5.  Defendant rather glibly suggests that "[a]ny ambiguity" here "hardly makes [the New Benefits Provision] 'more difficult' to comply with, in any practical sense" because Agencies can simply "ask the client to clarify" if they are "not sure whether a client's data is 'accurate' or 'complete'" or "rely on any such failure as a defense in an enforcement action."  (Opp'n Br. 10–11.)

But Defendant's suggestions in no way alleviate the heavy compliance burden on the Agencies.  There is no statutory guidance for what Agencies are to do if they believe their client's employee-benefit information is inaccurate or incomplete—or even how to make those determinations.  *See* S.B. 3650 (P.A. 103-1030), § 42(c); *e.g.*, Villarreal Decl. ¶¶ 10–11.  So unless Agencies blindly accept that any benefits information they receive from their clients is always "accurate and complete," as a practical matter, Agencies must make the calculations described above, place dollar values on benefits, and compare those dollar values to those they receive from their clients in order to even determine whether the client's information may be inaccurate or incomplete.  (*See* Villarreal Decl. ¶¶ 10–11.)  Yet Agencies cannot blindly accept that any benefits information they receive is always "accurate and complete."  The New Benefits Provision unequivocally requires Agencies to get the benefits payment/provision *right*.  *See* S.B. 3650 (P.A. 103-1030), § 42.  With respect to an enforcement action against Agencies, there is simply no "good-faith reliance on client benefit representations" defense or "good-faith effort to comply to the best of an Agency's abilities" defense to be found within the New Benefits Provision's language, and there are no rules that could fill that gap.  *See id.*

### C. **90 Days Became 720 Hours.**

The Original Benefits Provision imposed obligations on Agencies after their employees worked 90 days, but the New Benefits Provision changes this day requirement to a 720-hour

requirement. S.B. 3650 (P.A. 103-1030), § 42(b); *e.g.*, Villarreal Decl. ¶¶ 12–13; Pls.' Br. 5. Defendant asserts that it is "borderline frivolous" to assert that this change "increases the compliance burden" because it "does not necessitate any new recordkeeping as to hours worked" and "it was temporary labor service agencies and their clients who lobbied for this change." (Opp'n Br. 8–9.)

Defendant overlooks the fact that because the key metric is now hours, not days, Agencies may now have to reassess and modify benefits in the middle of a shift. (Villarreal Decl. ¶¶ 12–13.) Additionally, Defendant overlooks the New Benefits Provision's imposition of new problems with respect to employee self-reporting. Under the new statutory language, an Agency must track both (1) the hours a temporary employee works for "the same third party client" while employed by *their own* Agency, and (2) the hours a temporary employee worked for that same client while employed by *another* Agency. S.B. 3650 (P.A. 103-1030), § 42(b) (imposing benefits requirements only with respect to "a day or temporary laborer who is assigned to work and performs work at the same third party client for more than 720 hours within a 12-month period"); Villarreal Decl. ¶ 13; *see* ECF No. 23-3 ¶ 37. The problem here is that Agencies must rely on employee self-reporting to track this second category of hours. (*See, e.g.*, Villarreal Decl. ¶ 13; ECF No. 23-2 ¶ 39.) But, as the Staffing Association's declaration explains, "employees are unlikely to be able to provide reliable information about the number of hours they worked for a particular client because they tend not to keep that information and it is not shown on pay stubs." (Villarreal Decl. ¶ 13.)

Consequently, the change from days to hours does increase the compliance burden here. And whoever else may have supported this change at one time, it is notable that the Illinois Legislature specifically excluded the Staffing Associations themselves from the "amendatory

discussions" that resulted in the New Benefits Provision. (*E.g.*, ECF No. 63-2, 36:10–37:16 (statement of Rep. Gregg Johnson) (stating that he talked to bill sponsor Rep. Edgar Gonzales, Jr. and others about why members of the Staffing Associations "haven't been part of the amendatory discussions"); *see also id.* at 37:16–40:43 (noting that members of the Staffing Associations were "excluded from the negotiations" and discussing the potential reasons for that).)

### D. "Equivalent Benefits" Became "Substantially Similar Benefits."

Finally, while the Original Benefits Provision required Agencies to pay or to provide "equivalent benefits" to client's directly hired employees, the New Benefits Provision requires Agencies to pay or to provide "substantially similar benefits." S.B. 3650 (P.A. 103-1030), § 42(b); *e.g.*, Villarreal Decl. ¶¶ 14–15; Pls.' Br. 5–6. Defendant claims that this argument fails "as a matter of law" because "similar" is either the same as or a lesser requirement than "equivalent" and "the presumption is that Illinois courts will construe" the new language "to lessen [the Staffing Associations'] burden, not worsen it." (Opp'n Br. 9–10.)

Defendant is once again mistaken. Defendant's linguistic argument misses the point because the new "substantially similar" requirement is more nebulous and imprecise than "equivalent." Defendant's own definitions demonstrate this point, as "alike" is not the same thing as "equal." (*Compare id.* at 10 (defining "similar" as "*alike* in substance or essentials" (emphasis added)), *with id.* (defining "equivalent" as "*equal* in force, amount, or value" (emphasis added)).) This is even more apparent when the definition of "substantial"—which Defendant omits—is considered: "being largely but not wholly that which is specified." *Substantial*, MERRIAM-WEBSTER.COM, https://shorturl.at/XVaRY. The New Benefits Provision therefore changes what was previously a statute setting a precise value for benefits that must be provided or paid into a statute with a subjective element and a potential range of values for these benefits. Consequently,

as the Staffing Association's unrebutted declaration explains, Agencies must now "predict whether [their] view as to whether a benefits package is 'substantially similar' will be the same as the one taken by the Director of the Department or a state court judge." (Villarreal Decl. ¶ 15.) And any such value assessment is even more fraught with litigation risk given "the employee-specific views on the value of benefits and the inability to know for certain the value of at least some benefits until months or even years after those benefits are provided." (*Id.*)

Notably, the Staffing Associations are not "assum[ing] that state officials will construe state law in the most expansive way imaginable" here. (*See* Opp'n Br. 10 (citation omitted).) The Staffing Associations are merely properly reading the New Benefits Provision in a way that gives effect to every statutory word. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (recognizing that it is a "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute'" (citation omitted)); *People v. Ellis*, 199 Ill. 2d 28, 39 (2002) ("The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. To determine the legislature's intent, a court first looks to the statute's language, according that language its plain and commonly understood meaning. If possible, the court must give effect to every word, clause, and sentence; it must not read a statute so as to render any part inoperative, superfluous, or insignificant; and it must not depart from the statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express." (citations omitted)). Plaintiffs stated "presumption . . . that Illinois courts will construe" the new language "to lessen [the Staffing Associations'] burden, not worsen it," Opp'n Br. 10, is therefore unsupported. *See Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 11 (2009) ("It is a general principle of statutory interpretation that we give statutes the fullest, rather than the narrowest, possible meaning to which they are susceptible." (citations omitted)).

For all these reasons, as well as those provided in the Staffing Associations' opening brief (*e.g.*, Pls.' Br. 1–2, 9–15), the New Benefits Provision's changes merit revision of the Court's preliminary injunction analysis to address how it is now even more clear that an injunction is proper here based on ERISA preemption. Nevertheless, if the Court chooses not to make this revision, as explained above, the Court may still properly grant the Motion and extend the preliminary injunction to specifically cover the New Benefits Provision.

DATED: September 12, 2024	Respectfully Submitted,

/s/ *Matthew T. Furton*

Matthew T. Furton
(mfurton@lockelord.com)
Julie C. Webb
(jwebb@lockelord.com)
Heidi L. Brady
(heidi.brady@lockelord.com)
Joshua A. Skundberg
(josh.skundberg@lockelord.com)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

AND

Carl C. Scherz, *Pro Hac Vice*
(cscherz@lockelord.com)
Locke Lord LLP
2200 Ross Avenue
Dallas TX, 75201
*Attorneys for Plaintiffs*

AND

Bradley S. Levison
(brad@hlhlawyers.com)
Herschman Levison Hobfoll PLLC
401 S. LaSalle St.
Ste. 1302G

Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group*