## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Staffing Services Association of Illinois, | ) | |
| American Staffing Association, ClearStaff Inc., | ) | |
| M.M.D. Inc. d/b/a The AllStaff Group, Inc., | ) | |
| TempsNow Employment and Placement | ) | |
| Services LLC, | ) | |
| | ) | Case No.: 1:23-cv-16208 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Jane R. Flanagan, solely in her capacity as the | ) | |
| Director of the Illinois Department of Labor, | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., and TempsNow Employment and Placement Services LLC, by their attorneys at Locke Lord LLP, complain of Defendant Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, as follows.

## NATURE OF PLAINTIFFS' CLAIMS

1.      Plaintiffs Staffing Services Association of Illinois and American Staffing Association (collectively the "Trade Association Plaintiffs"), along with Plaintiffs ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc. and TempsNow Employment and Placement Services LLC (collectively the "Staffing Agency Plaintiffs"), bring this case to secure necessary preliminary and permanent injunctive relief addressing multiple violations of the United States Constitution. Recently enacted amendments to the Illinois Day and Temporary Labor Services Act (820 ILCS 175/1 *et seq.*) violate the Supremacy Clause of the United States Constitution and are therefore preempted by the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1001 *et seq.*)

("ERISA"), the Patient Protection and Affordable Care Act (42 U.S.C. §§ 18001 *et seq.*) ("ACA"), and the National Labor Relations Act (29 U.S.C. §§ 151 *et seq.*) ("NLRA").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction of Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331 because the claim arises under federal statutes and the United States Constitution.

3.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Illinois.

## PARTIES

4.     Plaintiff Staffing Services Association of Illinois (individually "SSAI") is an Illinois not-for-profit corporation with its principal place of business in Springfield, Illinois. SSAI conducts operations throughout the State of Illinois, including within the Northern District of Illinois. SSAI is a trade association that promotes the interests of its approximately thirty members that are temporary staffing agencies operating throughout the State of Illinois.

5.     Plaintiff American Staffing Association (individually "ASA") is a Virginia non-stock corporation with its principal place of business in Alexandria, Virginia. ASA promotes the interests of temporary staffing agencies operating in the State of Illinois, including within the Northern District of Illinois and throughout the United States.

6.     Plaintiff ClearStaff Inc. (individually "ClearStaff") is an Illinois corporation with its principal place of business in the Northern District of Illinois. ClearStaff is a staffing agency that specializes in meeting the needs of corporations in Illinois, including in the Northern District of Illinois, which need temporary labor services. ClearStaff typically employs over 2,000 individuals in the State of Illinois in a given week and sends them out to work at over 300 third-party clients, some of whom have multiple worksites. ClearStaff is an SSAI member.

7.      Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc. (individually "AllStaff") is an Illinois corporation that is principally located within the Northern District of Illinois. AllStaff is an employment agency that specializes in meeting the needs of corporations in manufacturing and industrial environments. AllStaff operates in multiple states, including serving the needs of clients located in the Northern District of Illinois. AllStaff typically employs over 3,000 field employees in the State of Illinois in a given week and sends them out to work at over 100 third-party clients, many of whom have multiple worksites. AllStaff is an SSAI member.

8.      Plaintiff TempsNow Employment and Placement Services LLC (individually "TempsNow") is a Delaware corporation with its principal place of business in the Northern District of Illinois. TempsNow is a staffing agency that specializes in meeting the needs of Illinois corporations, including those in the Northern District of Illinois, which need temporary labor services. TempsNow typically employs approximately 400 temporary individuals in the State of Illinois in a given week and sends them out to work at approximately thirty third-party clients. TempsNow is an SSAI member.

9.      The Staffing Agency Plaintiffs are registered day and temporary labor service agencies under the Day and Temporary Labor Services Act. A "Day and Temporary Labor Service Agency" is "any person or entity engaged in the business of employing day and temporary laborers to provide services, for a fee, to or for any third party client pursuant to a contract with the day and temporary labor service agency and the third party client, and which is located, operates, or transacts business within the State of Illinois." 820 ILCS 175/5.

10.     Defendant Jane R. Flanagan is the Director of the Illinois Department of Labor ("IDOL"). As the leader of the IDOL, Director Flanagan is the official responsible for the

administration and enforcement of the provisions of the Illinois Day and Temporary Labor Services Act ("DTLSA").

## BACKGROUND FACTS

**I.      The Temporary Staffing Industry Is an Integral Part of the Illinois Economy.**

11.     According to the findings of the Illinois General Assembly, more than 650,000 people work as day or temporary laborers in the State of Illinois. 820 ILCS 175/2. Day and temporary laborers are those who contract "for employment with a day and temporary labor agency." 820 ILCS 175/5.

12.     Illinois law defines "day or temporary labor" as "work performed by a day or temporary laborer at a third-party client, the duration of which may be specific or undefined, pursuant to a contract or understanding between the day and temporary labor service agency and the third party client" and does not include "labor or employment of a professional or clerical nature." 820 ILCS 175/5.

13.     For workers, employment as a "temp" meets a need for short-term, flexible employment. Because temporary workers can refuse assignments and take extended—and even unplanned—breaks from working, "temping" can provide the flexibility needed to balance work with other commitments, such as family responsibilities, school, and other employment. Temporary work is also useful for people looking to enter or re-enter the workforce. Temping is attractive to stay-at-home parents, workers with seasonal jobs, students, immigrants, and retired workers.

14.     Employment with a temporary staffing agency also gives workers opportunities to obtain experience and training, explore the local labor market, and test a variety of job settings before making a permanent commitment, that is, being directly hired by the company at which the

temporary employee has been placed. Some workers simply prefer the variety of temporary assignments to the routine of a regular job.

15.     Temporary staffing agencies hire individuals as employees and then offer agency clients flexible staffing, candidate screening, and the opportunity to try out potential hires before committing to a direct-hire employment arrangement. Temporary staffing agencies also allow employers to ramp up quickly, and scale down rapidly, depending on the ebb and flow of demand. Companies may turn to staffing agencies for temporary workers until permanent staff are hired. Companies may also source potential direct hires.

16.     Ultimately, reliance on staffing agencies allows light industrial companies, such as manufacturing and distribution companies, the chance to compete more effectively by focusing on growing their businesses, while outsourcing the task of sourcing qualified individuals to perform the work that is needed. Temporary staffing agencies promote the growth of commerce and industry throughout the State of Illinois by helping their clients meet their staffing needs more efficiently.

## II.     Illinois Amends the DTLSA in 2023, and this Court Subsequently Preliminarily Enjoins the Director's Enforcement of the Original Benefits Provision.

17.     The DTLSA has regulated Illinois' temporary staffing industry since its enactment in 2006.

18.     For example, since passage of the DTLSA in 2006, temporary staffing agencies have been required to register to do business in the State of Illinois. The DTLSA has also always provided that staffing agencies must provide their employees with a detailed itemized statement providing information such as the number of hours worked at each third-party client and the rate of payment for each hour worked. The DTLSA has also always provided a minimum four-hours

5

of pay, at the agreed rate of pay, whenever a temporary laborer is assigned to work at a third-party client's worksite but is not utilized by the third-party client.

19.     The Illinois General Assembly passed amendments to the DTLSA in the Spring of 2023. These amendments were signed into law by the Governor on August 4, 2023.

20.     Included in the 2023 DTLSA amendments was an entirely new provision, 820 ILCS 175/42 ("Section 42"), which provided that a temporary employee is to be provided equivalent benefits after working at a particular client site for 90 days in a twelve-month period or, alternatively, the "hourly cash equivalent of the actual cost benefits [*sic*]" ("Original Benefits Provision").

21.     On November 9, 2023, the Illinois General Assembly enacted an amendment to delay the effective date of the Original Benefits Provision—and a related "equivalent pay" provision also found in Section 42—until April 1, 2024. The Governor signed this amendment into law on November 17, 2023.

22.     Plaintiffs commenced this action on November 12, 2023, for the purpose of challenging certain portions of the DTLSA amendments enacted during 2023, including the Original Benefits Provision. Plaintiffs moved for a preliminary injunction prohibiting, *inter alia*, enforcement of the Original Benefits Provision in December 2023. On March 11, 2024, this Court issued an opinion relevantly holding the Trade Association and Staffing Agency Plaintiffs were likely to succeed on their claim that ERISA preempted the Original Benefits Provision.

23.     The Department appealed this ruling to the United States Court of Appeals for the Seventh Circuit. During the pendency of that appeal, the Governor signed a "trailer bill" on June 23, 2024 that modified portions of the DTLSA, including the Original Benefits Provision. *See* Pub. Act 103-1030.

24.     The IDOL subsequently dismissed its appeal in accordance with a joint request with the Trade Association and Staffing Agency Plaintiffs to return to this Court, permit the filing of an amended complaint, and create a stipulated schedule for further proceedings on a renewed motion for preliminary injunction in light of the enactment of Public Act 103-1030.

25.     One of the amendments enacted by Public Act 103-1030 in June 2024 affects the language of the Original Benefits Provision. Instead of requiring payment of equivalent benefits or an alternative cash payment in the event a temporary employee works at a particular client site for 90 days in a twelve-month period, the new language of Section 42 states a temporary employee is to be provided "substantially similar benefits" after working at a particular client site for 720 hours in a twelve-month period or, alternatively, "the hourly average cash equivalent of the actual cost of the benefits" ("New Benefits Provision"). *See* 820 ILCS 175/42.

26.     The IDOL originally claimed in August 2023 that an emergency existed that justified emergency rule making related to, *inter alia*, the Original Benefits Provision. But, after being criticized by the Joint Committee on Administrative Rules for failing to identify an emergency, the IDOL allowed its proposed rules to expire, and therefore become meaningless, in January 2024. The IDOL has proposed no new rules related to the 2023 or 2024 DTLSA amendments.

## III.    The New Benefits Provision Continues to Impose Burdensome and Impermissible Restrictions on Staffing Agencies.

27.     Like the 2023 DTLSA amendments, the 2024 DTLSA amendments include several unworkable provisions that have caused—and will continue to cause—harm to the Staffing Agency Plaintiffs, the Trade Association Plaintiffs and their members, the Staffing Agency Plaintiffs' business partners, and Illinois companies that use temporary staffing agencies.

28.     All Plaintiffs are amenable to reasonable regulation of the temporary staffing industry. Reasonable minds can differ as to the parameters for reasonable regulations, but no reasonable debate can be had about the crippling impact of certain amendments to the DTLSA. The 2023 and 2024 amendments impose extraordinary burden, cost, and compliance risk—all while in violation of federal law. Certain amendments essentially guarantee non-compliance because compliance is literally impossible.

29.     This challenge is exacerbated by the fact that non-compliance risks loss of licensure (*id.* 175/50), exposure to statutory penalties (*id.* 175/70), and endless lawsuits from uninjured, "interested" third parties that claim to monitor compliance with statutory requirements (*id.* 175/67).

30.     Under the New Benefits Provision, temporary staffing agencies operating in Illinois must ensure their employees are paid the same or better wages, and receive substantially similar benefits to the job classification performing the same or substantially similar work on jobs and performed under similar working conditions whenever a temporary employee is assigned and performs work at the same third party client for more than 720 hours within a twelve-month period. *Id.* 175/42. Alternatively, an agency "may pay the hourly average cash equivalent of the actual cost of the benefits the third party client provides the applicable directly hired employees in lieu of benefits required under" Section 42. *Id.* In other words, Section 42 continues provide two non-viable options for compliance.

31.     The New Benefits Provision makes it the statutory "responsibility and duty of the day and temporary labor service agency to calculate and determine . . . the benefits it shall offer to the day or temporary laborer, including any cash equivalent" upon "receipt of the accurate and

complete information" from third-party clients. *Id.* 175/42(c). This provision introduces new ambiguity into the timing of staffing agencies' obligations under the New Benefits Provision.

32.     Section 42's requirement that agencies ensure that certain of their employees receive substantially similar benefits may seem like a reasonable rule to those that do not operate staffing agencies or light industrial companies with the need for temporary labor. But it is shockingly far from workable in practice, extraordinarily costly and burdensome, and is inconsistent with federal law. Section 42 purports to require a never-ending, multistep process that first requires identification of the job classification of employees performing the same or substantially similar work on jobs and performed under similar working conditions. *See id.* This task remains burdensome given that third-party clients may have a variety of potential job classifications,  different from client to client, and the actual cost of benefits for employees within a job classification varies because individual employees (1) can accept or reject benefits, (2) have individual circumstances that affect their benefits, such as having a spouse and/or child(ren), and (3) have preferences for more coverage or less insurance coverage. Moreover, the New Benefits Provision does not define "substantially similar benefits," thereby adding additional uncertainty to what was already a burdensome process.

33.     Thus, for example, group life insurance is often offered as a benefit to directly-hired employees of the Plaintiff temporary staffing agencies' third-party clients. But the participation in life insurance as a benefit differs from employee to employee even within the same job classification. Some employees reject the benefit because it comes with an employee contribution that reduces the employee's pay-day compensation. Other employees may accept the offer of life insurance, but they may opt in or out of coverage for their spouse and/or dependent school-aged children because they may or may not see value in life insurance on their spouse or their school-

9

aged children. Some employees may be willing to fund the maximum available coverage while others may prioritize maximizing their compensation and only secure half the maximum available coverage. There is therefore substantial variance between employees within a job classification when it comes to identification of (1) their life insurance benefits and (2) the actual cost of their life insurance benefits.

34.     Likewise, participation in retirement plans varies from employee to employee at third-party clients. Although some hourly-wage employees find participation in a 401(k) or other retirement plan attractive, a substantial portion refuse to contribute to a retirement plan, even when their employer offers a generous matching contribution, in favor of larger paychecks. Among employees that contribute, the amount contributed typically varies, and it is often below the threshold for a matching contribution. In addition, there are often vesting periods for matching contributions. These variables mean actual cost for any matching contribution varies by employee within a job classification and changes over time. There is therefore substantial variance between employees within a job classification when it comes to identification of (1) their retirements benefits and (2) the actual cost of their retirement benefits.

35.     Similarly, participation in health insurance plans varies from employee to employee within a job classification at third-party clients. Some employees opt out of health insurance coverage, preferring—again—to prioritize maximization of their cash compensation. Other employees are interested in opting in, but they typically have a range of health care options, including plans that offer a lower premium and more limited benefits and plans that require payment of a higher premium or larger exposure to out-of-pocket medical expenses. There is therefore substantial variance between potentially comparable employees within a job

classification when it comes to identification of (1) their health care benefits and (2) the actual cost of their health care benefits.

36.     Additionally, participation in leave plans and other fringe benefits varies greatly from employee to employee and company to company. Some employees take advantage of policies that allow uncompensated family leave and others do not. Some employees are in a position to take advantage of leave policies that authorize additional unpaid leave for certain purposes, such as attendance at school events or family bereavement. Others are not. Some employees are in position to take advantage of tuition reimbursement programs and others are not. Some employees need to take advantage of sick leave opportunities and others do not. Some employees take advantage of carry-over programs that allow unused paid leave days to carry-over to the next year up to a cap. Companies may be subject to differing local, state or federal laws concerning sick leave, protected leave or paid leave depending on the situs of the company or number of employees. Some leave programs use a front-loading approach; others use an accrual approach, such that two companies with the same number of paid days off will have very different actual costs depending on when actual costs are assessed. There is therefore substantial variance between potentially comparable employees when it comes to identification of (1) their leave and other fringe benefits and (2) the actual cost of their leave and other fringe benefits.

37.     The same variance exists for other benefits, including but not limited to dental, vision, prescription drug coverage, employee stock ownership plans, disability plans, and accidental death and dismemberment benefits.

38.     The result of all these options is that the "benefit bundle" for any given employee within a job classification at the third-party client of a temporary staffing agency is unique. Of

course, the "benefit bundle" is also unique for any given employee among the "applicable directly hired employees" for purposes of computing a cash payment.

39.     Nevertheless, under the 2024 DTLSA amendments, the agency must ensure its employees receive "substantially similar benefits" to a job classification. Alternatively, the agency can pay the "hourly average cash equivalent of the actual cost of the benefits" of the "applicable directly hired employees"—all of whom have a unique "benefit bundle" that changes over time. Agencies must do the same when the job classification or applicable directly hired employee is non-existent, which happens in the relatively common situation where a third-party client has no hourly, direct-hire employees. This calculus is even further complicated when the agency's employee works a five-month assignment at one third-party client and then works a five-month assignment at another third-party client within the same twelve-month period.

40.     Thus, properly identifying the legally compliant benefits that must be received by the temporary employee or even the "hourly average cash equivalent of the actual cost of the benefits" of "applicable directly hired employees" that must be paid is, at least, extraordinarily burdensome, costly, and risky. As a practical matter, it is also impossible.

41.     Provisions of a state statute imposing these obligations are impermissible under the uniform scheme of federal regulation of employee retirement and health insurance plans.

42.     "Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002) (citing *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712 (1985); U.S. Const. art. VI, cl. 2).

43.     ERISA sets out a comprehensive system for the federal regulation of private employee benefit plans. *See D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992); 29 U.S.C. § 1001 *et seq.*

44.     ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a). "ERISA's pre-emption provision assures that federal regulation of covered plans will be exclusive." *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992). ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a).

45.     The Patient Protection and Affordable Care Act ("ACA") also preempts state laws that hinder or impede its implementation of uniform rules governing the provision of health care plans. *See, e.g., UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 91–92 (2d Cir. 2020) ("New York's regulation interferes with, indeed reverses, some of the central 'criteria and methods' that HHS, acting within its statutory authority, established for implementing a risk adjustment program and methodology" under the ACA).

46.     Although ERISA is the exclusive source of rules and remedies for private employee benefit plans, and the ACA governs the provision of heath care plans, the New Benefits Provision requires employers to conduct a detailed comparison and then either modify and/or adopt certain benefit schemes.

47.     Alternatively, the New Benefits Provision requires the disclosure/assessment of information about the "applicable directly hired employees" so that the hourly average cash equivalent of the actual cost of the benefits of the applicable directly hired employees' benefits

can be computed and paid instead of the benefits that the employee would ordinarily be entitled to receive.

48.     Under Section 70 of the DTLSA, the IDOL has authority to conduct investigations, conduct hearings in accordance with the Illinois Administrative Procedure Act, issue civil penalties ranging from $100 to $18,000 per violation ("DTLSA Penalties"), and/or commence a civil action through the Illinois Attorney General to address violations of Section 42 and other provisions in the DTLSA. 820 ILCS 175/70. Non-compliance can result in the IDOL issuing cease and desist orders, suspending or revoking the registration of a staffing agency, and/or imposing DTLSA Penalties.

49.     In addition, statutorily defined "interested" parties may commence civil actions under the amendments to the DTLSA against staffing agencies and/or their third-party clients in the event they believe there have been violations of the New Benefits Provision, regardless of whether the IDOL has investigated the alleged violations and decided they have no merit or have been cured. 820 ILCS 175/67. These so-called "interested" parties will not have standing to pursue claims based on alleged harm they did not experience, but they may be able to deceive some into thinking that a statutory grant of authority to commence a lawsuit is sufficient to satisfy constitutional standing requirements despite governing case law to the contrary.

50.     An interested party, which is defined in Section 5 of the DTLSA as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements" may recover statutory penalties for any non-compliance with Section 42. 820 ILCS 175/5. "In an action brought pursuant to this Section, an interested party may recover against the covered entity any statutory penalties set forth in [S]ection 70 and injunctive relief." 820 ILCS 175/67.

51.     Temporary staffing agencies therefore face loss of licensure, substantial and potentially catastrophic statutory penalties, and civil actions by a potentially infinite number of uninjured third parties for perceived violations of Section 42. This liability risk imposes long-term burdensome and costly recordkeeping and compliance obligations, as well as prolonged individualized decision-making concerning benefits.

**IV.     The Labor Dispute Provision Imposes Impermissible State Regulation.**

52.     Under the 2024 version of Section 11 of the DTLSA, temporary staffing agencies must disclose the existence of strikes, lockouts, work stoppage, picket, bannering, or handbilling that exists because of a labor dispute at any place a staffing agency may send an employee. 820 ILCS 175/11. This right exceeds the rights of directly-hired employees.

53.     In addition to this disclosure obligation, the DTLSA requires staffing agencies to inform employees sent to such a place of their right under the DTLSA to refuse the assignment without prejudice to receiving another assignment.

54.     The Illinois Supreme Court held in *People v. Federal Tool & Plastics*, 62 Ill. 2d 549 (Ill. 1975) that the NLRA preempted an Illinois statute requiring employers to disclose the existence of labor disputes in any advertisement for replacement workers during strikes. Statutes requiring disclosure of the existence of a strike or other labor dispute "encumber[] the employer's right to hire" replacement labor, which is governed exclusively by the NLRA. *Id.* at 554; *see also United Auto Workers v. C.M. Smillie Co.*, 139 Mich. App. 731, 735 (1984) (finding the NLRA preempted a Michigan statute requiring the advertising of labor disputes because such regulation "directly affects the employer's success in hiring replacements," which is a right protected and governed exclusively by the NLRA).

55.     In addition to the impermissible disclosure obligations, the NLRA likewise preempts the DTLSA's protection of workers from adverse employment actions. If an agency's

employee refuses to break a picket line, replace a locked-out employee, or otherwise work at a worksite that they have been advised is experiencing a "labor dispute," then the staffing agency loses its right to treat the employee as an at-will employee.

56.     This new statutory right to information and employment protection impermissibly encroaches on an area of labor law exclusively regulated by the federal government. *Garmon* preemption prevents states from regulating conduct that is protected or prohibited, or even arguably affected by, Section 7 of the NLRA. *See San Diego Bldg. Trades Council, Millmen's Union v. Garmon*, 359 U.S. 236, 246–47 (1959).

57.     "Labor law preemption applies . . . when a State acts 'as regulator of private conduct' with an 'interest in setting policy' that is different from the policy of the federal government." *Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018) (citing *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 229 (1993)).

## V.     The 2024 DTLSA Amendments Continue to Threaten Irreparable Harm to the Plaintiffs.

58.     Plaintiffs are led by SSAI and ASA. SSAI and ASA are, respectively, Illinois and national trade associations consisting in whole or in part of members that are temporary staffing agencies operating throughout Illinois, including within this District.

59.     SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs are currently suffering and will continue to suffer irreparable harm because of the 2024 DTLSA amendments. Specifically, the 2023 and 2024 DTLSA amendments have caused clients and potential clients of temporary staffing agencies, such as the Staffing Agency Plaintiffs, to refrain from using Staffing Agency Plaintiffs', and members of the Trade Association Plaintiffs', services for longer-term needs out of fear that compliance with the DTLSA's Original Benefits

Provision, and now the New Benefits Provision, is expensive, impossible, and the legal consequences of non-compliance are potentially catastrophic.

60.    SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs are currently suffering and will continue to suffer irreparable harm by being subjected to the unconstitutional provisions of the DTLSA. The unconstitutional provisions of the DTLSA have also substantially increased operating costs and impaired the equity value of staffing agencies operating in the State of Illinois, including SSAI's members, ASA's Illinois-based members, and the Staffing Agency Plaintiffs.

61.    These ongoing injuries are redressable by enjoining the Director and all persons acting in concert therewith, including but not limited to anyone meeting the definition of an "interested party" under the DTLSA, from enforcing the unconstitutional provisions of the amendments to the DTLSA.

62.    The Director enforces the provisions of the DTLSA, including the New Benefits Provision, in her official capacity.

63.    Plaintiffs have no adequate remedy at law.

64.    None of the issues raised in this action relate to worker safety or worksite hazards. The issues raised herein concern purely economic matters.

## COUNT ONE
**Violation of the Supremacy Clause of the United States Constitution—
Preemption by the Employee Retirement Income Security Act of 1974**

65.    Plaintiffs repeat and reallege paragraphs 1-64.

66.    ERISA is a federal statute governing the regulation and administration, as well as compliance enforcement, of employee benefits plans established or maintained by private employers in the United States.

17

67.    ERISA does not obligate employers to establish benefits plans or provide substantially similar benefits to those offered by other employers.

68.    Section 42 requires temporary staffing agencies to ensure their employees receive either the (1) substantially similar benefits received by the certain job classification of the temporary staffing agency's client or (2) the hourly average cash equivalent of the actual cost of the benefits the temporary staffing agency's client provides the applicable directly hired employees. 820 ILCS 175/42.

69.    The benefits provision of the DTLSA, regardless of whether it is the Original Benefits Provision or the New Benefits Provision, relates to ERISA plans. 820 ILCS 175/42.

70.    As discussed above, agencies face two nonviable options. Option one forces temporary staffing agencies to design and administer additional or modified ERISA plans, which ERISA prohibits.

71.    Option two forces temporary staffing agencies to incur the burden, expense, and risk of gathering and assessing information about their own ERISA plan and their clients' ERISA plans. This option also imposes a duty to make discretionary calculations about the design and administration of ERISA and non-ERISA benefits to identify the value and the cost of various benefit regimes.

72.    ERISA therefore preempts the benefits provision of Section 42. Plaintiffs respectfully request this Court preliminarily and permanently enjoin the Director and all persons acting in concert therewith from enforcing the benefits provisions of Section 42.

### COUNT TWO
**Violation of the Supremacy Clause of the United States Constitution—
Preemption by the Patient Protection and Affordable Care Act**

73.    Plaintiffs repeat and reallege paragraphs 1-72.

74.     State laws that hinder or impede the implementation of the ACA are preempted under the Supremacy Clause of the United States Constitution.

75.     The ACA contains an employer mandate that urges companies to offer health insurance by imposing penalties if they fail to do so. *See generally* 26 U.S.C. § 4980H.

76.     Compliance with the employer mandate is typically achieved by embracing a statutory "safe harbor" that requires uniform and consistent treatment of all similarly situated employees.

77.     The New Benefits Provision prevents large employers such as the agency Plaintiffs from taking advantage of the ACA's safe harbor by mandating different health plans for different employees depending on their assignments.

78.     Likewise, the New Benefits Provision mandates that agencies open a new enrollment window anytime a person works as a temporary employee in the same worksite for more than ninety days in a twelve-month period hinders and impedes the ACA's uniform implementation. In a given twelve-month period a person could work as a temporary employee at numerous worksites thereby entitling that employee to multiple new enrollment windows in contravention of the ACA's uniform implementation. This is also yet another example of where a temporary laborer will have more rights than a directly-hired employee.

79.     The substantially similar benefits and actual cost provisions of Section 42 are therefore preempted by the ACA. 820 ILCS 175/42. Plaintiffs respectfully request this Court permanently enjoin the Director and all persons acting in concert therewith from enforcing the substantially similar benefits provisions of Section 42.

## COUNT THREE
### Violation of the Supremacy Clause of the United States Constitution—
### Preemption by the National Labor Relations Act

80.     Plaintiffs repeat and reallege paragraphs 1–79.

19

81. The NLRA governs labor relations among private employers and employees in the United States.

82. Section 11 of the DTLSA amendments requires temporary staffing agencies to give temporary employees advance written notice of labor disputes characterized by strikes, lockouts, picketing, bannering, or hand billing. 820 ILCS 171/11.

83. Section 11 also grants employment protection to temporary staffing agency employees if they exercise a new statutory right to refuse assignments after disclosure of the existence of a labor dispute. 820 ILCS 171/11.

84. The labor-dispute warning provision regulates economic and bargaining positioning despite Congress' decision to leave such matters to the discretion of private employers and employees. *See Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140 (1976)). States may not regulate "areas that Congress left to the free play of economic forces. By protecting against state interference with policies implicated by the structure of the NLRA, *Machinists* preemption preserves Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons." *Cannon v. Edgar,* 33 F.3d 880, 885 (7th Cir. 1994) (citation omitted).

85. The DTLSA amendments also impermissibly increase employees' protected Section 7 rights under the NLRA. *See Keehr v. Consol. Freightways of Delaware, Inc.,* 825 F.2d 133, 136 (7th Cir. 1987) (stating *Garmon* preemption "prohibits states from regulating conduct protected, prohibited or arguably affected by sections 7 and 8" of the NLRA).

86. The NLRA preempts Section 11. 820 ILCS 171/11. Plaintiffs respectfully request this Court permanently enjoin the Director and all persons acting in concert therewith from enforcing Section 11.

## <u>PRAYER FOR RELIEF</u>

87.     Plaintiffs respectfully request this Court enter an Order and Judgment granting the following relief:

A.      Preliminarily and permanently enjoining the Director and all persons acting in concert therewith from enforcing the benefits provisions of the DTLSA (820 ILCS 175/42) due to it being preempted by ERISA (29 U.S.C. §§ 1001 *et seq.*);

B.      Permanently enjoining the Director and all persons acting in concert therewith from enforcing the "labor dispute" warning and employment rights  provisions of the DTLSA (820 ILCS 171/11) due to it being preempted by the NLRA (29 U.S.C. §§ 151 *et seq.*);

C.      Award Plaintiffs their reasonable expenses, including attorneys' fees, pursuant to 5 ILCS 100/10-55(c); and

D.      For any other relief this Court deems appropriate.


DATED: November 13, 2024              Respectfully Submitted,

                                      /s/Matthew T. Furton
                                      Matthew T. Furton
                                      (mfurton@lockelord.com)
                                      Julie C. Webb
                                      (jwebb@lockelord.com)
                                      Heidi L. Brady
                                      (heidi.brady@lockelord.com)
                                      Joshua A. Skundberg
                                      (josh.skundberg@lockelord.com)
                                      Locke Lord LLP

111 South Wacker Drive
Chicago, IL 60606

AND

Carl C. Scherz – Appearing *Pro Hac Vice*
(cscherz@lockelord.com)
Locke Lord LLP
2200 Ross Avenue
Dallas TX, 75201
*Attorneys for Plaintiffs*

AND

Bradley S. Levison
(brad@legalhl.com)
Herschman Levison PLLC
401 S. LaSalle St.
Ste. 1302G
Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff
Group, Inc.*