**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., TempsNow Employment and Placement Services LLC,<br><br>    Plaintiffs,<br><br>   vs.<br><br>Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No.:  1:23-cv-16208<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**RENEWED MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

## BACKGROUND

**I.     The Temporary Staffing Industry Plays a Critical Role in the Illinois Economy.**

About 650,000 people work as temporary staffing employees in Illinois. 820 ILCS 175/1 (finding at least 650,000 work as temporary employees). For workers, employment as a "temp" meets a need for short-term, flexible employment. Decl. of Brittany Sakata, attached as **Exhibit A**, ¶3; Decl. of Byron Figueroa, attached as **Exhibit B**, ¶¶15–18; Decl. of Eric Villarreal, attached as **Exhibit C**, ¶¶10–13. Because temporary workers can refuse assignments and take extended— and even last minute—breaks from working, "temping" can provide the flexibility needed to balance work with other commitments, such as family responsibilities, school, and other employment. Ex. B, ¶16; Ex. C, ¶¶11–12. Temping is also useful for people looking to enter or re-enter the workforce. Ex. B, ¶¶17–18; Ex. C, ¶¶11–13. Temping is attractive to many already vulnerable Illinois workers, such as stay-at-home parents, workers with seasonal jobs, students, and immigrants. Ex. B, ¶16; Ex. C, ¶11. Employment with a temporary staffing agency also gives workers opportunities to obtain experience and training, explore the local labor market, and test a variety of job settings before making permanent commitments. *See* Ex. B, ¶13; Ex. C, ¶¶13–15.

Staffing agencies promote the growth of commerce and industry in Illinois. *See* Ex. A, ¶¶4–6; Ex. B, ¶11; Ex. C, ¶5. Temporary staffing agencies hire individuals as employees and then offer company clients staffing, candidate screening, and the opportunity to consider potential hires before committing to direct-hire employment arrangements. Ex. A, ¶¶3, 7; Ex. B, ¶11; Ex. C, ¶5. Temporary staffing agencies also allow employers to ramp up personnel quickly and scale down rapidly, as needed per operational and other needs. *See* Ex. B, ¶11; Ex. C, ¶¶4–5. Reliance on staffing agencies allows light industrial companies, such as manufacturers and distributers, the chance to compete in the marketplace more effectively by focusing on growth and innovation,

while outsourcing the difficult task of finding qualified individuals to perform needed work. *See* Ex. B, ¶11–12; Ex. C, ¶5; *see also* Decl. of Scott Polen, attached as **Exhibit D**, ¶2.

## II.     Staffing Agencies in Illinois Have Been Regulated Since 2006.

The Day and Temporary Labor Services Act ("DTLSA") has regulated Illinois' temporary staffing industry since 2006. *See* 820 ILCS 175/1 *et seq.* It has historically required staffing agencies to register with the Illinois Department of Labor ("IDOL") to operate in Illinois. 820 ILCS 175/45. The DTLSA and the IDOL have also long required staffing agencies to take various steps to protect the interests of their employees, such as by providing each employee with an itemized pay statement and paying a minimum of four hours of pay whenever they are assigned to, but ultimately not engaged by, a client. 820 ILCS 175/30(a), (g).

## III.    Illinois Amends the DTLSA, and This Court Enjoins the Original Benefits Provision.

On August 4, 2023, Governor J.B. Pritzker signed into law H.B. 2862, which, among other new staffing industry regulations, added Section 42 to the DTLSA. H.B. 2862 (P.A. 103-0437), 103rd Gen. Assemb. § 42 (Ill. 2023) (codified at 820 ILCS 175/42).[1] Section 42 provided in relevant part (the "Original Benefits Provision"):

> A day or temporary laborer who is assigned to work at a third party client for more than 90 calendar days shall be paid not less than the . . . equivalent benefits as the lowest paid directly hired employee of the third party client with the same level of seniority at the company and performing the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and that are performed under similar working conditions. If there is not a directly hired comparative employee of the third party client, the day or temporary laborer shall be paid not less than the . . . equivalent benefits of the lowest paid direct hired employee of the company with the closest level of seniority at the company. A day and temporary labor service agency may pay the hourly cash equivalent of the actual cost benefits in lieu of benefits required under this Section.

---

[1] https://www.ilga.gov/legislation/103/HB/PDF/10300HB2862lv.pdf.

*Id.* Section 42 was in effect until the General Assembly passed, and the Governor signed, legislation in mid-November 2023 to delay the effective date of the Original Benefits Provision until April 1, 2024. H.B. 3641 (P.A. 103-0564), 103rd Gen. Assemb. § 65 (Ill. 2023).[2]

On November 22, 2023, Plaintiffs Staffing Services Association of Illinois and American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, and TempsNow Employment and Placement Services LLC (collectively "Plaintiffs") filed this lawsuit seeking, inter alia, a finding that the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*, ("ERISA") preempts the Original Benefits Provision. ECF No. 1, ¶¶68–75, 94(A). Plaintiffs accordingly filed a motion for preliminary injunction on December 21, 2023. ECF Nos. 21, 23. The Court considered the applicable preliminary injunctions factors and entered an Order preliminarily enjoining enforcement of the Original Benefits Provision in March 2024 ("March 2024 Order"). *See, e.g.*, ECF No. 45, pp. 5–11, 17–22. The transcript from the February 7, 2024 evidentiary hearing is attached as **Exhibit E**. The issuance of the March 2024 Order eliminated the threat of harm caused by the Original Benefits Provision. *See, e.g.*, Ex. C, ¶¶43–45.

## IV. Following the Court Enjoining the Original Benefits Provision, the General Assembly and Governor Amended the Original Benefits Provision by Enacting S.B. 3650.

The Director thereafter commenced an interlocutory appeal of the Court's March 2024 Order, and this Court stayed this action. ECF No. 48. During the pendency of the Director's appeal, the Illinois General Assembly passed, and the Governor signed, S.B. 3650 into law, which became effective upon signing. S.B. 3650 (P.A. 103-1030), 103rd Gen. Assemb. § 42 (Ill. 2024) (codified at 820 ILCS 175/42).[3] With a retroactive effective date of April 1, 2024, S.B. 3650 amended and superseded various provisions of the DTLSA, including the Original Benefits Provision, which

---

[2] https://www.ilga.gov/legislation/publicacts/103/PDF/103-0564.pdf.
[3] https://www.ilga.gov/legislation/publicacts/103/PDF/103-1030.pdf.

was replaced with new language (the "New Benefits Provision"). 820 ILCS 175/42. The New

Benefits Provision pertinently states:

> (b) A day and temporary labor agency shall provide a day or temporary laborer who is assigned to work and performs work at the same third party client for more than 720 hours within a 12–month period, beginning on or after April 1, 2024, substantially similar benefits to the job classification of employees performing the same or substantially similar work on jobs and performed under similar working conditions. A day and temporary labor service agency may pay the hourly average cash equivalent of the actual cost of the benefits the third party client provides the applicable directly hired employees in lieu of benefits required under this subsection.

> (c) Upon request, a third party client to which a day or temporary laborer has been assigned to work and performed work for more than 720 hours within a 12–month period or 4,160 hours within a 48–month period shall be obligated to timely provide the day and temporary labor service agency with all necessary information related to job duties, working conditions, pay, seniority, and benefits it provides to the applicable classification of directly hired employees necessary for the day and temporary labor service agency to comply with this Section. Upon receipt of the accurate and complete information described in this subsection from the third party client, it shall be the responsibility and duty of the day and temporary labor service agency to calculate and determine the straight-time hourly rate of pay and the benefits it shall offer to the day or temporary laborer, including any cash equivalent.

*Id.* § 42(b)–(c).

## V. The New Benefits Provision Is Largely the Same as the Original Benefits Provision.

The New Benefits Provision generally mirrors the approach of its enjoined predecessor.

The New Benefits Provision adopts the same general structure that requires staffing agencies to

compare benefits provided to their employees with benefits offered by another employer to that

employer's directly hired employees. *See id.* The New Benefits Provision similarly provides the

option of paying cash in lieu of benefits, where the amount paid in lieu of benefits is measured by

the benefits provided by another employer. *See id.*

The New Benefits Provision requires staffing agencies give their temporary employees

"substantially similar benefits" to the "job classification of" the client's employees "performing

the same or substantially similar work on jobs and performed under similar working conditions."

*Id.* § 42(b). This is similar to the "equivalent benefits" provision under the Original Benefits Provision that focused on a comparable directly hired employee. *See* H.B. 2862 (P.A. 103-0437), 103rd Gen. Assemb. § 42 (Ill. 2023) (codified at 820 ILCS 175/42). Instead of the previous ninety-day threshold for the benefits requirements to apply to a particular employee, the New Benefits Provisions applies to employees who are assigned to, and perform work at, a particular client for 720 hours over a twelve-month period. 820 ILCS 175/42(b).

As was the case with the Original Benefits Provision, the actual cost for staffing agencies providing benefits to particular employees still varies from employee to employee and depends upon individual employee decisions. *See* 820 ILCS 175/42(b); Ex. B, ¶¶33, 35, 71; Ex. C, ¶¶28, 31, 36. Individual employees can (1) accept or reject benefits, (2) have individual circumstances that affect their benefits, such as having a spouse and/or child(ren), and (3) have preferences for more coverage or less coverage depending on their personal circumstances. Ex. B, ¶¶33, 35–36, 71; Ex. C, ¶29; Ex. D, ¶¶28–30, 32. In other words, this remains a granular, individualized, and discretionary analysis.

### A. The Staffing Agency Must First Identify Employees Who Have Hit the New Benefits Provision's Hours' Threshold Before Determining Which Amorphous "Job Classification" the Employee Satisfies.

Attempted compliance with either option under the New Benefits Provision remains burdensome and futile. The staffing agency must first identify whether an employee was assigned to, and performed work at, a particular client for 720 hours within the previous twelve-month period. 820 ILCS 175/42(b); Ex. B, ¶56. While seemingly straightforward, the New Benefits Provision, just as its predecessor did with a 90-day threshold calculation, is agnostic as to *which* staffing agency assigned the employee to the client for any of the 720 hours. *See* 820 ILCS 175/42(b); Ex. C, ¶¶37–38. Temporary employees often work for multiple staffing agencies. *See* Ex. B, ¶56; Ex. C, ¶37. If staffing agency A assigns a particular temporary employee to work for

a client for 120 hours in the first month of the year, and staffing agency B has assigned the same employee to work for the same client for 600 hours by the eighth month of the year, then staffing agency B may be violating the New Benefits Provision unless it assumes its employees have already worked that client. *See* 820 ILCS 175/42(b). This violation exposes staffing agency B to potentially catastrophic civil exposure. 820 ILCS 175/67, 70; *see also* Ex. C, ¶39; Ex. D, ¶35.

After the staffing agency determines which employees are under the New Benefits Provision's purview, they must then identify the comparable client-side group—i.e., the "job classification of employees." 820 ILCS 175/42(b). The New Benefits Provision's use of job classifications for assessing a staffing agency's benefits obligations is a new, and more difficult, challenge that was not present in the Original Benefits Provision. *See* ECF No. 60-1, p. 2 (Decl. E. Villarreal). Previously, staffing agencies were expected to find a comparative employee from among a potentially large group of potential comparators. Ex. B, ¶75. The New Benefits Provision, however, does not explain what "job classification" means. Ex. B, ¶76. Clients are free to categorize their workforce however they want and may consider laborers in a warehouse that move stock around—a common usage for temporary employees—to be one job classification or multiple job classifications based on seniority and/or whether they use power equipment (e.g., forklifts). Ex. B, ¶76.

Alternatively, the New Benefits Provision could refer to job classifications according to the Bureau of Labor Statistics ("BLS"), which publishes "a federal statistical standard used by federal agencies to classify workers into occupational categories for the purpose of collecting, calculating, or disseminating data." Ex. B, ¶76; *see also Standard Occupational Classification*, Bur. Lab. Stats., https://www.bls.gov/soc (last visited Nov. 14, 2024). Under this system, which is twice referenced in the equal pay provision of Section 42 but not referenced in the New Benefits

Provision, workers are presently classified into one of 867 detailed occupations where classification 53-7062 is "Laborers and Freight, Stock, and Material Movers, Hand" that manually move materials or perform other general labor, but only if they are not classified into other groups (e.g., those moving construction materials or using power equipment). *See 2018 Standard Occupational Classification System*, Bur. Lab. Stats., https://www.bls.gov/soc/2018/major_groups.htm (last visited Nov. 14, 2024).

Regardless of whether agencies use their clients' job classifications or the BLS job classifications, a job classification does not actually receive benefits simply because it is not a human being. Ex. B, ¶77. The individuals working in a particular job classification may have a variety of preferences relating to benefits, with some prioritizing retirement investing and others eschewing any benefit that requires out-of-pocket costs such as health insurance. Ex. B, ¶¶76–78. Moreover, the fluid nature of temporary employment necessarily means that many temporary employees perform work that transcends a single "job classification" over the period of several months. *See* Ex. B, ¶76–78.

**B. Calculating the Value and Cost of Benefits Remains Impossible Under the New Benefits Provision.**

Assuming the staffing agency can properly determine (1) which employees have hit the 720-hour threshold and (2) which classification they fall within, the staffing agency must next assess the value of the benefits it provides to each of its employees. 820 ILCS 175/42(b); *see also* Ex. B, ¶¶77–80; Ex. C, ¶¶34–37; Ex. D, ¶¶19, 21. Perceptions as to the value of benefits differ from employee to employee. *See* Ex. B, ¶16; Ex. C, ¶36; Ex. D, ¶11. Some employees see value in contributing to a retirement plan with a matching contribution, while others prefer to maximize their immediate cash compensation. Ex. B, ¶¶70, 73, 77; Ex. D, ¶¶15, 28, 30, 32. Some employees value a high-deductible plan, whereas others place more value on lower-deductible plans with

higher premium. Ex. C, ¶¶25–26, 30–31. Similarly, perceptions of value change over time as employees' personal circumstances (e.g., sick family members, having children, approaching retirement age, etc.) evolve. Ex. B, ¶55, 68; Ex. D, ¶15. Nevertheless, staffing agencies will need to decide the value of a bundle of benefits, including health care and retirement benefits to every worker, some of whom place greater value on some benefits while placing less value on other benefits. *See* Ex. B, ¶¶62, 77–78; Ex. C, ¶¶35–36; Ex. D, ¶¶19–21.

The staffing agency must next assess the value of the benefits provided to the "job classification of employees performing the same or substantially similar work on jobs performed under similar working conditions." 820 ILCS 175/42(b); Ex. B, ¶75. In other words, instead of comparing one temporary employee to *one* client-side comparable employee, staffing agencies must now compare one temporary employee to an entire job classification—which is either a hypothetical grouping published by the BLS or an actual grouping that may or may not have uniform options as a result of such things as employees not yet having the seniority to be entitled to certain benefits, or seniority-based distinctions, such as more seasoned employees receiving more leave than newer employees. Ex. B, ¶¶75–80.

To make this comparison, benefit plan administrators must request, obtain, assess, and maintain information and documents not otherwise gathered or kept in the ordinary course of business. *See* 820 ILCS 175/42(b) & (c); Ex. B, ¶¶40, 59, 87; Ex. C, ¶44. Plan administrators must then analyze these records from their clients to determine the type of work and working conditions of the particular job classification. 820 ILCS 175/42(c); Ex. B, ¶53. Benefit plan administrators must then repeat this assessment constantly because the value of benefits changes over time depending on individualized circumstances, such as someone's health and, therefore, their tolerance for risk of being without health insurance. Ex. B, ¶¶55, 68.

In the event the staffing agency determines the client's benefits are superior, the agency needs to identify "the applicable directly hired employees" for the purpose of determining whether to offer cash in lieu of benefits. 820 ILCS 175/42(b); Ex. B, ¶¶79–81. This is not the same as the hypothetical "job classification" published by the BLS, and it may or may not be the same employees as in the client's "job classification" that may span multiple geographic locations or include workers with very different levels of seniority. Ex. B, ¶79.

However "the applicable directly hired employees" are determined, the value used in this computation will depend on the choices of the various individuals in that group. Ex. B, ¶80. Thus, unlike the Original Benefits Provision, which required comparison to one "comparable" employee, the New Benefits Provision requires assessing the value of benefits received by two different groups—the (1) job classification and the (2) applicable directly hired employees—which is more burdensome, expensive, and risky than making the single comparison required by the Original Benefits Provision. Ex. B, ¶80.

The alternative means of complying with the New Benefits Provision remains similar to the alternative contained in the Original Benefits Provision. Ex. B, ¶¶79–80. Staffing agencies "may pay the hourly average cash equivalent of the actual cost of the benefits" "in lieu" of benefits. 820 ILCS 175/42(b). This determination focuses on a different group. Instead of using the job classification that may be a hypothetical group published by the government or an actual grouping used by a light industrial company or even adopted by the light industrial company for purposes of compliance, this comparison focuses on the real people that make up the "applicable directly hired employees." 820 ILCS 175/42(b). This determination requires the staffing agency to determine the actual cost for each employee in the applicable cohort for each benefit, aggregate

them all, and find an average. Ex. B, ¶¶79–81. This step is just as burdensome as the Old Benefits Provision and adds the requirement of finding an average of the various actual costs. Ex. B, ¶81.

As discussed during the first round of briefing on the DTLSA (*see, e,g.*, ECF 23, p. 6), the actual costs of benefits are hardly an easy number to determine for one person, much less a group of people. The actual costs depend on personal preferences to accept or reject any given benefit, and if accepted, the nature of the acceptance, which can drive the actual costs much higher if, for example, someone enrolls in health insurance for themselves plus spouse and dependents. *See* Ex. B, ¶¶68, 70–71. Even the costs of non-ERISA benefits, such as leave, must be part of this actual cost determination. Ex. B, ¶69.

## VI. The Illinois Temporary Staffing Industry Has Remained at the Status Quo Due to the Court's March 2024 Order.

The Court's March 2024 Order enjoining the Original Benefits Provision (which was set to take effect on April 1, 2024) protected the staffing industry from irreparable harm. That Order maintained the status quo. Although the State of Illinois enacted modifications to the DTLSA in June 2024, the Director acknowledged the similarities between the enjoined Original Benefits Provision and the New Benefits Provision. Indeed, after the Governor signed the new version of the DTLSA into law in June 2024, the Director advised the Seventh Circuit that S.B. 3650 "does not materially amend [Section 42's] benefits provision." Dkt. 14, 6 n.4. On or about August 13, 2024, the Director issued a bulletin advising the Illinois temporary staffing industry that the IDOL considered the New Benefits Provision to be enjoined by the Court's March 2024 Order. *See* Bulletin for Day and Temporary Labor Services Agencies, attached as **Exhibit F** ("*The 'equal benefits' part of the law remains enjoined by the courts and is not currently being enforced by the [Illinois] Department [of Labor].*" (emphasis in original)). On September 9, 2024, the Director requested the Court "make conforming edits" to the March 2024 Order "to reflect the minor

language changes" enacted by S.B. 3650. ECF No. 63, p. 1. The Director only opposed Plaintiffs' request to modify the March 2024 Order to include the New Benefit Provision to the extent Plaintiffs argued the New Benefits Provision was more burdensome than the Original Benefits Provision. *Id.* In other words, the Director views the burdens on staffing agencies to be—at a minimum—equal under both the New and Original Benefits Provisions. Plaintiffs agree that the two versions of the statute impose at least equivalent burdens.

**VII.    Plaintiffs Have No Choice but to Pursue This Action.**

As amended by S.B. 3650, the DTLSA still empowers the IDOL to revoke the registration of staffing agencies that violate the New Benefits Provision. 820 ILCS 175/50. The DTLSA continues to permit uninjured, third-party "interested" parties to file civil actions to collect civil penalties for violations of the Temporary Staffing Laws. 820 ILCS 175/67. Plaintiffs asked this Court to modify its March 2024 Order to include the New Benefits Provision on August 30, 2024. ECF Nos. 59, 60. The Court denied this request on September 23, 2024. ECF No. 69. Fearing a mootness ruling that would cause the loss of a year and substantial resources, the Director abandoned its appeal on October 18, 2024. Dkt. 26. This Court thereafter granted the Director's and Plaintiffs' Joint Motion to Lift the Stay in this proceeding. ECF Nos. 72, 73.

Although the IDOL's website presently states the New Benefits Provision is not being enforced due to the pendency of this litigation since August 2024, the Director could and is expected to abandon this voluntary position if this Court does not enjoin the New Benefits Provision. *See* ECF No. 63, pp. 1, 5–6; *see also* Decl. of Frank Auriemma, attached as **Exhibit G**, ¶3. The staffing industry in Illinois cannot take the risk that the New Benefits Provision becomes enforceable because the irreparable harm expected in February 2023 remains the essentially the same. Ex. B, ¶¶85–88; Ex. C, ¶¶40–46; Ex. D, ¶40; Ex. G, ¶3.

**ARGUMENT**

Plaintiffs seek a preliminary injunction prohibiting the Director from enforcing the New Benefits Provision. This injunction is necessary pending a trial where Plaintiffs will seek a permanent injunction pursuant to Federal Rule of Civil Procedure 65. (ECF No. 82, pp. 17–21). To obtain preliminary injunctive relief, Plaintiffs "must make a clear showing that" four factors are satisfied: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *See Starbucks Corp. v. McKinney*, 144 S.Ct. 1570, 1576 (2024) (citation omitted). The Court must then "equitably weigh these four factors together to determine if a preliminary injunction is warranted." *See Int'l Ass'n of Fire Fighters v. City of E. Chi.*, 56 F.4th 437, 446 (7th Cir. 2022) (citation omitted). Each factor, once again, counsels in favor preliminarily enjoining onerous employee benefits mandates of Section 42.

All that is needed here is a finding that the New Benefits Provision is at least as likely to be preempted by ERISA as was the Original Benefits Provision. Considering the Director seemingly concedes this conclusion while simultaneously objecting to the propriety of any injunction, (*see* ECF No. 63), such a finding seems non-contested, rendering further discussion unnecessary. In an abundance of caution, a complete discussion of each factor is set forth below.

**I.      Plaintiffs Are Likely to Succeed on The Merits.**

To establish likelihood of success on the merits, Plaintiffs must show more than a "better than negligible" or "mere possibility" of success. *See Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023) (citations omitted). But Plaintiffs "need not demonstrate likelihood of success by a preponderance of the evidence" or that they "definitely will win the case": it is only necessary to "make a 'strong' showing that reveals how [they] propose[] to prove [their] case." *See id.* (citation omitted); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 768 (7th

Cir. 2023) (citation omitted). Plaintiffs "must show that . . . [they] ha[ve] *some* likelihood of success on the merits of [their] claim." *See Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023) (emphasis added) (citation omitted). "What amounts to 'some' depends on the facts of the case at hand." *See Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022) (citation omitted). Once again, Plaintiffs satisfy this modest standard.

### A. Plaintiffs Are Likely to Succeed on Their Claim that ERISA Preempts the New Benefits Provision.

"Because federal law is the supreme law of the land, it preempts state laws that 'interfere with, or are contrary to, federal law.'" *Boomer v. AT & T Corp.,* 309 F.3d 404, 417 (7th Cir. 2002) (quoting *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712 (1985)); U.S. Const. art. VI, cl. 2. A state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Egelhoff v. Egelhoff*, 532 U.S. 141, 156 (2001) (citation omitted). ERISA sets out a comprehensive federal system for the regulation of employee benefit plans. *See D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 127 (1992); 29 U.S.C. § 1001 *et seq.* To ensure exclusive federal regulation and thereby facilitate minimized administrative and financial burdens on plan administrators, ERISA generally preempts "any and all State laws" that "relate to" employee benefit plans. 29 U.S.C. § 1144(a); *see also Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016); *Greater Washington Bd. of Trade*, 506 U.S. at 127. "A law 'relates to' an employee benefit plan," and is preempted, "if it has a [1] connection with *or* [2] reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (italics added). As was the case with the Original Benefits Provision, the New Benefits Provision has both a contention with, and reference to, employee benefit plans.

1.      **The New Benefits Provision Impermissibly Connects with ERISA Plans.**

ERISA's preemption provision minimizes "the administrative and financial burden of complying with conflicting directives" and ensures "plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge v. Pharm. Care Mgt. Ass'n*, 141 S.Ct. 474, 480 (2020) (citation omitted). A state law may be subject to preemption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* (citation omitted). ERISA therefore preempts state laws setting specific rules for administrators when determining beneficiary status or requiring payment of specific benefits, as those laws have a "connection with" ERISA plans. *Id.* To determine whether a state law has an impermissible "connection with" ERISA plans, this Court examines "both the objectives of the ERISA statute . . . as well as the nature of the effect of the state law on ERISA plans." *Egelhoff*, 532 U.S. at 147.

ERISA also preempts state laws that "interfere[] with nationally uniform plan administration." *Gobeille*, 577 U.S. at 320 (citation omitted); *see also Jackson v. E.J. Brach Corp.*, No. 94 C 6350, 1995 WL 319760, at *6 n.6 (N.D. Ill. May 26, 1995) ("ERISA is a comprehensive statute, one of the main purposes of which is to replace the preexisting web of conflicting obligations imposed by fifty states' benefits laws with a uniform national regulatory system."). It provides exclusive regulation as to reporting, recordkeeping, and disclosure of benefits. *See Gobeille*, 577 U.S. at 323 (finding ERISA preempted Vermont law requiring certain disclosures, explaining preemption "is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting [and recordkeeping obligations] on plans."). ERISA also provides the sole source of regulation as to benefit determinations. *See Egelhoff*, 532 U.S. at 150 (finding ERISA preempted Washington law requiring plans to revoke a spouse's designation as a beneficiary upon

-14-

divorce because it was inconsistent with ERISA regulations that allow reliance on a plan's documents and procedures).

Like its predecessor, the New Benefits Provision bucks ERISA's requirement for national uniformity. The conflicts between the New Benefits Provision and ERISA include, for example:

- The New Benefits Provision continues to impermissibly require a staffing agency to change an employee's ERISA plan based on where the employee is sent to work, which means that staffing agency ERISA plan administrators are unable to treat their employees in a uniform, non-discriminatory manner as required by federal law. *Compare* 820 ILCS 175/42, *with* I.R.C. § 401(a)(4), *and Rutledge*, 141 S.Ct. at 480 (holding ERISA preempts state laws when "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage").

- The New Benefits Provision requires staffing agencies to design, administer, and disclose many different plans, with each hourly employee being potentially entitled to benefits under several different plans in any given year, 820 ILCS 175/42, which is inconsistent with ERISA's obligations. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 108 (1983) (noting states "may not require an employer to alter its ERISA plan").

- As did its predecessor, the New Benefits Provision subjects staffing agencies to judicial remedies such as fines for making improper benefit determinations under 820 ILCS 175/67 & 70 even though ERISA is the exclusive source of civil enforcement remedies for improper benefit determinations. *See, e.g.*, *Doe v. Aetna Inc.*, No. 16 C 8390, 2017 WL 118417, at *3 (N.D. Ill. Jan. 12, 2017); 820 ILCS 175/42 & 70.

Prior to the State of Illinois seeking to upend the employee benefits structure of staffing agencies through Section 42, Plaintiffs AllStaff, ClearStaff, and TempsNow offered all hourly employees in Illinois the same benefits. But, under the New Benefits Provision, these Plaintiffs would need to differentiate between employees in terms of providing benefits. *See* 820 ILCS 175/42. Some of their employees would be offered Plaintiffs' respective benefits plans, whereas other employees would need to be offered different benefits that are "substantially similar" to those offered by a particular client or clients. Accordingly, as was the case under the Original Benefits Provision, staffing agencies may be designing and administering hundreds of different benefits plans. Ex. B, ¶49; Ex. D, ¶17. Perhaps more troublingly, staffing agencies will be moving

employees from one benefit plan to another benefit plan multiple times per year depending on what their—potentially hundreds of—clients are providing to the relevant job classification at any given time. Ex. B, ¶¶4, 49; Ex. C, ¶¶3, 33; Ex. D, ¶17.

It is an impermissible imposition of a specific benefit program to require a staffing agency to cease offering its benefits plan (e.g., its chosen retirement or health insurance offerings) and instead utilize ongoing discretion (1) to determine which employees have worked over 720 hours at a specific client within a twelve-month period (notwithstanding the fact that several employers could have dispatched that employee to the same client in that period), (2) analyze all clients' offered benefits and determine their similarity or differences to the staffing agency's own benefits, and (3) calculate what benefits are needed for the staffing agency to offer "substantially similar benefits," for which the New Benefits Provision provides no guidance. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998) ("Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it."); *see also Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir. 1993) (holding ERISA preempted state statute requiring employers to make "prolonged, individualized decisions" about benefits eligibility).

Moreover, ERISA prohibits states from dictating particular benefit programs. *See, e.g., Rutledge*, 141 S. Ct. at 480. The Supreme Court has stated that ERISA preempts "laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." *Id.* ERISA preempts laws whose "acute, albeit indirect, economic effects . . . force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* (citations omitted); *Shaw*, 463 U.S. at 100 (finding a statute requiring a specific benefit to be preempted). The New Benefits Provision contradicts both of these ERISA preemption principles.

Additionally, the New Benefits Provision still requires staffing agencies' clients to disclose information surrounding their offered benefits so that staffing agencies can determine whether they must swap their benefits for those "substantially similar" to those offered by the clients or, alternatively, calculate the average hourly actual cost of supplying those benefits. 820 ILCS 175/42(c). Specifically, clients must provide staffing agencies with "all necessary information" related to the benefits offered to the relevant job classification of employees so that staffing agencies can make discretionary decisions about whether two health insurance plans are "substantially similar." *Id.* ERISA has multiple reporting and disclosure requirements; but this type of disclosure obligation is not one of them. *See, e.g.,* 29 U.S.C. § 1027.

In *Gobeille v. Liberty Mutual Insurance Co.*, the Supreme Court held that ERISA's "connection with" preemption applies when a state law imposes disclosure and recordkeeping requirements on top of ERISA's disclosure and recordkeeping requirements. 577 U.S. 312 (2016). The Court explained:

> [R]eporting, disclosure, and recordkeeping are central to, and an essential part of, the uniform system of plan administration contemplated by ERISA. . . . . Vermont's reporting regime, which compels plans to report detailed information about claims and plan members, both intrudes upon 'a central matter of plan administration' and 'interferes with nationally uniform plan administration.' The State's law and regulation govern plan reporting, disclosure, and—by necessary implication— recordkeeping. These matters are fundamental components of ERISA's regulation of plan administration. Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability. Pre-emption is necessary to prevent the States from imposing novel, inconsistent, and burdensome reporting requirements on plans.

*Id.* (citation omitted). Government agencies at the state level are simply not allowed to impose "disuniform" state disclosure and recordkeeping employee benefit statutes. *Id.*

The New Benefits Provision remains impossible to comply with, thereby underscoring its preemption. *See, e.g.*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (noting preemption occurs when it is "impossible for a private party to comply with both state and federal

requirements" (citation omitted)). If staffing agencies are required to process information to comply with a statute dictating which of two potential benefit plans must be offered, then staffing agencies would run into another intractable conflict. Ensuring a staffing agency employee is provided substantially similar benefits offered by a client means enrolling employees in different benefit plans at times when enrollment is not permitted under the Affordable Care Act ("ACA"). *See* 26 CFR § 54.4980B-4. Plans cannot treat working at the same assignment for 720 hours within a twelve-month period as a qualifying event to change coverage, (29 U.S.C. § 1163), and state laws that attempt to upend the administration of health care plans in the United States are preempted. *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) ("[S]tate laws that 'hinder or impede' the implementation of the ACA run afoul of the Supremacy Clause.").

Even if this impossibility was ignored, ERISA does not permit the imposition of administrative costs on ERISA plan administrators and sponsors by a state statutory scheme. *Gobeille*, 577 U.S. at 323 ("Differing, or even parallel, regulations from multiple jurisdictions could create wasteful administrative costs and threaten to subject plans to wide-ranging liability."). The New Benefits Provision requires staffing agencies to switch from providing a singular set of benefits for all employees to providing unique, person-specific benefits because staffing agencies, by definition, send their employees to hundreds of different clients—each of whom provides their own unique benefits. Staffing agencies will need to set up dozens or hundreds of benefit plans, each with its own life insurance, health insurance, disability insurance, leave policies, etc. that are "substantially similar" to their hundreds of clients' plans. This is an impossible task. Ex. B, ¶¶4, 49; Ex. C, ¶¶3, 33; Ex. D, ¶17.

Further costs arise from the dynamic nature of the temporary staffing industry. A temporary employee assigned to company A may be needed long enough to trigger the benefits provision,

but they are not, by definition, permanent. Thus, they may be assigned to another client within the same year where the same process and same costs will repeat. States are not permitted to impose this type of burden and cost on plan administrators. *See, e.g.*, *Rutledge*, 141 S. Ct. at 480 (reiterating that ERISA preempts laws whose "acute, albeit indirect, economic effects . . . force an ERISA plan to adopt a certain scheme of substantive coverage").

The enforcement provisions of the DTLSA that permit regulators to rescind licenses and issue fines as well as the private right of action granted to interested parties and others are "alternative enforcement mechanisms" for a non-compliant benefit plan, which is prohibited under ERISA. *See, e.g.*, *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995) ("[S]tate laws providing alternative enforcement mechanisms also relate to ERISA plans, triggering pre-emption."). Section 1132(a) of ERISA sets forth the exclusive causes of action and remedies here and identifies the parties with standing to pursue claims for failure to operate a benefits program in a compliant manner. *See generally Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 54 (1987) (noting the balancing reflected in ERISA between the need for "prompt and fair claims settlement procedures" and the "public interest in encouraging the formation of employee benefit plans.").

The punishments for violating the New Benefits Provisions are the same as the Original Benefits Provision. *Compare* H.B. 2862 (P.A. 103-0437), 103rd Gen. Assemb. § 67, 70 (Ill. 2023) (codified at 820 ILCS 175/42), *with* 820 820 ILCS 175/67, 70. The IDOL may revoke the registration of a staffing agency and/or impose "civil penalt[ies]" for a violation, which would include an inaccurate decision about whether the benefits of an employee are substantially similar to benefits provided to another person. *See* 820 ILCS 175/70; *see also id.* 175/50. Additionally, "interested part[ies]," which may be any organization that claims to monitor statutory compliance,

are authorized to commence civil actions against staffing agencies and their clients, and they may recover the civil penalties provided in the statute. 820 ILCS 175/67. Interested parties will never be able to show they have standing; but even the burden of litigating their lack of standing imposes burden. Ex. B, ¶66; Ex. C, ¶39; Ex. D, ¶¶25, 35.

The alternative "average actual cost" option does not save the New Benefits Provision from federal preemption. This false alternative has an impermissible "connection with" ERISA plans. As the Supreme Court noted in *Egelhoff*:

> We do not believe that the statute is saved from pre-emption simply because it is, at least in a broad sense, a default rule. . . . Plan administrators must either follow [the State of] Washington's beneficiary designation scheme or alter the terms of their plan so as to indicate that they will not follow it. The statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it.

*Egelhoff v. Egelhoff*, 532 U.S. 141, 150–51 (2001). Burdensome, impractical, and disuniform opt-out provisions do not save otherwise preempted state laws. *See* ECF No. 45 ("Even with the choice between providing benefits or cash, Section 42 denies agencies the ability to administer its ERISA plans uniformly."). For example, in *Retail Industry Leaders Association v. Fielder*, the Fourth Circuit held a Maryland law requiring large employers to spend 8% of their total payrolls on employee health insurance costs—or pay the balance directly to the State of Maryland—had an impermissible connection to ERISA plans. 475 F.3d 180, 192–93 (4th Cir. 2007). "Even if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Id.* at 193.

The First Circuit similarly rejected an argument that employers could avoid an ordinance's apprentice training requirements by establishing and coordinating "a separate [non-ERISA] plan into which such apprentices would be funneled." *Merit Const. All. v. City of Quincy*, 759 F.3d 122, 130 (1st Cir. 2014). "Even though a non-ERISA option might be available for compliance with

the Ordinance, the availability of such an option does not save the Ordinance: its mandate still has the effect of destroying the benefit of uniform administration that is among ERISA's principal goals." *Id.* at 131; *see also Retail Industry Leaders Ass'n v. Suffolk County,* 497 F. Supp. 2d 403, 416 (E.D.N.Y. 2007) (holding ERISA preempted a state law allowing employers to opt out of providing specific benefits by paying specific amounts of money).

### 2. The Benefits Provision Has a "Reference to" ERISA Plans.

ERISA likewise preempts the New Benefits Provision because it requires reference to ERISA plans. A law refers to ERISA plans if it "acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Rutledge*, 141 S.Ct. at 481. In *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 (1992), the Supreme Court held ERISA preempted a Washington D.C. law requiring "employers who provide health insurance for their employees to provide equivalent health insurance coverage for injured employees eligible for workers' compensation benefits." 506 U.S. at 126–27. Since the D.C. law imposed "requirements by reference to" employers' ERISA plans by requiring employers with ERISA plans to involuntarily provide *more* insurance coverage, the Court held the law "must yield to ERISA." *Id.* at 130–31.

The New Benefits Provision is no different. It requires staffing agencies to either create a new ERISA plan superior to their existing plan in order to (1) ensure they are providing "substantially similar" benefits or (2) pay a certain amount that would be computed by *reference to* the benefits and actual cost of another employer's ERISA plan benefits (plus other non-ERISA benefits, such as leave policies). Specifically, staffing agencies must use their ERISA plans (*i.e.*, health, vision, life, and dental insurance, as well as retirement programs) as reference points when comparing their value and/or actual cost to third-party employers' benefits, including their ERISA-governed health, vision, life, and dental insurance, as well as retirement programs. This specific

"reference to" ERISA plans on both sides of an engagement renders the New Benefits Provision preempted regardless of which of the two compliance options the staffing agency pursues. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829 (1988).

ERISA's comprehensive regulatory scheme preempts statutes that create an "ongoing administrative scheme" that require managerial discretion. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987); *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997) (noting an ongoing administrative scheme exists when a company must "make administrative determinations about coverage and eligibility" that are "not simple mechanical calculations").

The obligation to exercise discretion over multiple competing ERISA plans demonstrates the problem with the New Benefits Provision and ERISA preemption. Staffing agencies must constantly assess their ERISA plans' value to each employee and assess each of their clients' ERISA plans to determine which offers more value and/or to compute the hourly average of the actual cost of the clients' plans. 820 ILCS 175/42(b); Ex. B, ¶¶53, 58, 68, 84; *see also* Ex. C, ¶37. "Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it." *Collins*, 147 F.3d at 597; Ex. B, ¶¶53, 66–67, 82; Ex. D, ¶¶25–26, 34, 38–39. Such ongoing discretion is present here.

## II.    Plaintiffs Are Likely to Suffer Irreparable Harm Without Preliminary Injunctive Relief.

To establish irreparable harm, Plaintiffs must "demonstrate that irreparable injury" to them "is *likely* in the absence of an injunction." *See A.C. by M.C.*, 75 F.4th at 74 (emphasis added) (citation omitted). "Irreparable harm occurs when the 'legal remedies available to the movant are inadequate'" (*id.*), meaning they are "seriously deficient as compared to the harm suffered," but they need not be "wholly ineffectual." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (citations omitted).

Plaintiffs do not, and cannot, seek compensatory damages from the Director. *See generally Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 750–51 (N.D. Ill. 2007) (granting permanent injunction based on Illinois law violating federal Supremacy Clause; "[P]laintiffs have no adequate remedy at law. Defendants are state officials who have sovereign immunity from suits for damages."). The Director is an Illinois official acting in her official capacity. State officials have sovereign immunity from suits for damages. *See, e.g.*, *Gov't Suppliers Consolidating Servs., Inc. v. Bayh*, 734 F. Supp. 853, 863 (S.D. Ind. 1990) (finding no adequate legal remedy because plaintiffs sought preliminary injunction against governor and state, but "[Plaintiffs] are barred from recovering damages from the state due to the doctrine of sovereign immunity and the eleventh amendment"). Plaintiffs' remedy can therefore only come through preliminary and permanent injunctive relief. *See, e.g.*, *Giannoulias*, 523 F. Supp. 2d at 750–51.

To comply with the New Benefits Provision, Plaintiffs and their members "will be forced to incur the expense and burden of determining the relevant values of benefits and creating, selecting, modifying, or supplementing existing ERISA plans or paying the difference." ECF No. 45, p. 18; *see also* Ex. B ¶¶53–84; Ex. C, ¶¶ 34–40; Ex. D, ¶¶18–35. As was the case with the Original Benefits Provision (ECF No. 23, pp. 24–27), Plaintiffs advance three layers of irreparable harm they will likely suffer without further injunctive relief.

### A. The Compliance Burden Imposed by A Preempted Law Is Irreparable Harm.

Being forced to incur compliance costs imposed by a preempted federal law is sufficient to establish irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 and 390-91 (1992) (affirming preliminary injunction where plaintiff was forced to incur (1) financial losses for violating a preempted state law or (2) the costs of complying with the law throughout proceedings challenging it); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 and n.19 (11th Cir. 2014) (affirming irreparable harm finding in ERISA preemption case that "[a]bsent an

injunction, [plaintiff's] members will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties." (citation omitted)); *see also Maine Forest Prod. Council v. Cormier*, 586 F. Supp. 3d 22, 62–63 (D. Me.), *aff'd,* 51 F.4th 1 (1st Cir. 2022) ("[Movant] is likely to experience irreparable harm by having to choose between following federal law, which opens him up to liability under state law, or complying with an unconstitutional state law." It is irreparable harm for a company to be potentially "subject to fines; forced to spend time, money, and resources to comply with the new requirements and regulations under [the new law] that may later be struck down . . . ." *Air Evac EMS., Inc. v. Dodrill*, 548 F. Supp. 3d 580, 595 (S.D.W. Va. 2021).

### B. Staffing Agencies Will Likely Be Forced Out of Business Absent Injunctive Relief.

Preliminary injunctive relief is particularly appropriate when, without it, the Director's actions are likely to cause Plaintiffs to shut down or lose a significant portion of their business. *See generally Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))); *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994) ("[Movant's] irreparable harm is that it will lose sales and the opportunity to maintain and develop relationships with existing and potential customers of [its] products."); *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1063 (E.D. Wis. 2020) (finding "irreparable harm based on the likelihood that [movant] will go out of business").

As this Court previously found, Plaintiffs AllStaff, ClearStaff, and TempsNow suffered severe financial losses prior to the Original Benefits Provision taking effect. ECF No. 45 ("ClearStaff, AllStaff, and TempsNow have each lost clients and revenue due to Section 42." Indeed,

ClearStaff's revenue plummeted 8% and at least four of its clients—a "baking company," a "paper and plastic tube manufacturer, a "metal fabricator," and a "plastic bottle" manufacturer—curtailed working with ClearStaff due to the 2023 DTLSA amendments. Ex. E, pp. 78:18–79:23; Ex. B, ¶¶85, 87. AllStaff saw a 15% drop in revenue due to the Original Benefits Provision (ECF No. 45, p. 19; Ex. E, p. 54:18–22) and expects at least half of its clients to reduce their usage of temporary employees if the New Benefits Provision takes effect (Ex. C, ¶45). TempsNow lost four—King Wire, SSI, Brilliant Gifts, and Bernhard Woodworking—of its twenty clients. Ex. E, pp. 102:10–106:8; Ex. D, ¶40. Finally, the Plaintiff ASA's members "have reported that the new requirements of record-keeping and record-producing as well as the payment/benefit requirements have caused and will continue to cause an extraordinary compliance burden. They also report that the Legislation will expose them to compliance risks that did not previously exist." Ex. A, ¶14.

Shortly after the New Benefits Provision was enacted, the Director told the Seventh Circuit in June 2024 that the 2024 revisions to the DTLSA made no "material[]" changes to the Original Benefits Provision. Dkt. 14, 6 n.4. In August 2024, the Director issued a bulletin to the temporary staffing industry advising that the IDOL considered the March 2024 Order as enjoining enforcement of the New Benefits Provision. Ex. F ("*The 'equal benefits' part of the law remains enjoined by the courts and is not currently being enforced by the [Illinois] Department [of Labor]*." (emphasis in original)). In September 2024, the Director urged this Court to "make conforming edits" reflecting the "minor language changes" between the Old and New Benefits Provisions. ECF No. 63, p. 1.

Given the above, the industry has known that the New Benefits Provision is not being enforced, limiting additional evidence of harm since the Court last considered this question. *See* Ex. A, ¶12; Ex. G, ¶3; Ex. C, ¶¶43–46. Nevertheless, there is no reason to believe that the "materially" same New Benefits Provision would pose a different risk of irreparable harm to Plaintiffs. TempsNow still

cannot afford a human resources and legal staff to manage the potentially hundreds of constant, discretionary, and individualized calculations needed to ensure its relevant employees are receiving (1) substantially similar benefits as those offered by its clients to a job classification or (2) calculate the "the hourly average cash equivalent of the actual cost of the benefits" in lieu of providing substantially similar benefits. Ex. D, ¶¶26, 34–35, 38–39. AllStaff and ClearStaff will not be able to assuage its clients' fears of having to open "all necessary information" for those agencies to determine what benefits need to be compared to their own. Ex. E, pp. 22:10–23:3 ("[S]ome of [AllStaff's] host clients are willng to share that information and some are not willing to share that information."), 31:10–17, 34:20–35:5 ("Can [AllStaff] push? Sure, but then I have a chance of losing my business."), 78:18–79:6 ("Just because  of the burden of the law, they do not want to share sensitive information with us. Therefore, they are ending the assignments of [ClearStaff's] employees."); *see also* Ex. C, ¶44. No Plaintiff will be able to avoid the loss of clients and revenue they expected prior to the Court's March 2024 Order. *See* Ex. B, ¶87; Ex. C, ¶¶41–46; Ex. D, ¶40; Ex. G, ¶3.

### C.    It Is Impossible to Calculate Plaintiffs' Current and Future Harm.

Harm is irreparable when injury to the business cannot be reliably estimated. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003). "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)). "[Plaintiff's] irreparable harm is that it will lose sales and the opportunity to maintain and develop relationships with existing and potential clients of [its] products." *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509–10 (7th Cir. 1994).

Here, it is impossible to calculate the harm the New Benefits Provision, if enforced, would cause the Plaintiffs and their members. Plaintiffs and their members—and the Illinois temporary

staffing industry generally—were protected from losing further business following this Court's March 2024 Order enjoining the Original Benefits Provision. Ex. A, ¶12; Ex. C, ¶¶43–46; Ex. G, ¶3. Yet, prior to the March 2024 Order, businesses that typically relied on Plaintiffs' services refrained from doing business with them due to the onerous requirements of the Original Benefits Provision. *See, e.g.*, ECF No. 45, pp. 18–19 (noting ClearStaff's "clients explained that they were ending temporary assignments because they did not want to share sensitive information with the agencies, as required by the law"); *see also* Ex. A, ¶11; Ex. B, ¶87; Ex. D, ¶40. The evidence at the prior evidentiary hearing demonstrated Plaintiffs expected to lose clients, revenue, and opportunities. Ex. E, pp. 53:11–54:22 (AllStaff), 78:18–81:16 (ClearStaff), 101:2–106:8 (TempsNow). This demonstrates irreparable harm. *See Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden*, 834 F. Supp. 2d 1091, 1102 (D. Idaho 2011) (finding plaintiffs were irreparably harmed because they forwent "activity that is at least arguably protected by federal law").

In addition to these business losses, Staffing Agencies face potentially catastrophic civil exposure, considering the DTLSA permits fines of up to $18,000, and staffing agencies often book hundreds of employees per day. 820 ILCS 175/70. For these high-volume, low-margin businesses, even a single inaccurate assessment of value or the average actual costs of someone's benefits could cause financial ruin. *See, e.g.*, Ex. D, ¶35. Just as was the case previously, the inability to even calculate losses combined with the threat of civil liability establishes irreparable harm.

**III.    The Balance of the Hardships and the Public Interest Weighs in Favor of Plaintiffs.**

Because the Staffing Associations have established the "threshold requirements" of success on the merits and irreparable harm, the Court "must balance the equities, weighing the harm to the [Plaintiffs] if the requested injunction is denied against the harm to the [Director] and the public—including third parties—if it is granted." *See Finch*, 82 F.4th at 578 (citation omitted). "This

balancing test is done on a sliding scale: 'If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor.'" *See Life Spine, Inc.*, 8 F.4th at 539 (citation omitted). "In balancing the harms, the court also considers the public interest." *See id.* (citation omitted). Considering whether an injunction is in the public interest means weighing "the consequences of granting or denying the injunction to non-parties." *See Int'l Ass'n of Fire Fighters, Loc. 365*, 56 F.4th at 446 (citations omitted); *see also The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 575 (7th Cir. 2023).

On the one hand, Plaintiffs have established significant and irreparable harm. *Supra*, Section II. On the other hand, the Director has little (if any) interest in enforcement of unconstitutional laws. *See, e.g.*, *Volkswagen AG v. iman365-usa*, No. 18-CV-06611, 2020 WL 977969, at *8 (N.D. Ill. Feb. 28, 2020) ("[E]njoining the Defendant from violating the law cannot, by its very nature, cause the Defendant any harm."). Courts routinely grant injunctive relief against state officials where refusing to grant the injunction would have catastrophic effects on a plaintiff's ability to conduct business. *See, e.g., Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, No. 23 CV 50279, 2023 WL 5367336, at *10 (N.D. Ill. Aug. 4, 2023) (granting preliminary injunction; "The harm to [the Illinois Attorney General] and the public is minimal . . . and the conduct is already covered by the existing Consumer Fraud Act.").

Preliminary injunctive relief serves the public interest when used to correct ongoing violations of constitutional rights. *O'Brien v. Town of Caledonia,* 748 F.2d 403, 408 (7th Cir. 1984) ("[T]he public has a strong interest in the vindication of an individual's constitutional rights."). Northern District of Illinois courts routinely follow this directive. *See, e.g., Foster v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013) (finding preliminary injunction in the public interest since "Illinois taxpayers have a vested interest in ensuring that the constitutional rights of its citizens are

protected"); *Illusions Too Reality, LLC v. City of Harvey*, No. 02 C 7272, 2003 WL 260335, at *8 (N.D. Ill. Feb. 4, 2003) (finding "the public interest is served by preventing the violation of a party's constitutional rights"); *Sharif v. City of Chicago*, 530 F. Supp. 667, 671 (N.D. Ill. 1982) ("This preliminary injunction will serve the public interest by vindicating constitutional rights."). The public interest is also served by enjoining ongoing violations of the Supremacy Clause. *Nat'l Foreign Trade Council, Inc. v. Giannoulias*, 523 F. Supp. 2d 731, 751 (N.D. Ill. 2007) (granting permanent injunction in preemption case; "[T]he public interest is served by any abatement of unconstitutional activity.").

ERISA aims to maintain uniform benefits nationwide. *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (noting Congress did not intend ERISA to be "so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place"). The Director has no interest in disregarding Congress's intention. The national uniformity mandated by ERISA would be eviscerated if the Director could to require employers to (1) analyze other employers' benefits, (2) determine and weigh the value of both their own benefits and other employers' benefits, and (3) adopt and provide new "substantially similar benefits" as provided other employers or determine and pay the "hourly average cash equivalent of the actual cost of the benefits the" other employer pays its employees. 820 ILCS 175/42(b).

This case affects the livelihoods of nearly a million Illinois workers in an industry with an annual payroll of about $7.8 billion. Ex. A, ¶13. Absent an injunction prohibiting enforcement of the challenged provisions of the DTLSA, temporary staffing will become less desirable and light industrial work—such as manufacturing and distribution—will be incentivized to migrate across the border into neighboring states. The public interest is served by avoiding this kind of dislocation in the employment markets, and the outflux of potentially hundreds of thousands of jobs from

Illinois to other states. *See, e.g., Lineback v. Chauffeurs, Teamsters, & Helpers Loc. Union No. 414*, 513 F. Supp. 2d 988, 999 (N.D. Ind. 2007) ("The harm to the public interest would be that those towns in which Aggregate facilities are located could potentially lose a business and the jobs and taxes that come with having the business located there."); *Gould v. Lambert Excavating, Inc.*, 870 F.2d 1214, 1221 (7th Cir. 1989) (affirming preliminary injunction and stating, "one of the expressed purposes of ERISA is to ensure the protection of millions of employees covered by pension plans.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court enter an Order preliminarily enjoining the Director and all persons acting in concert therewith from enforcing the New Benefits Provision and grant such other relief this Court deems appropriate.

DATED:  November 15, 2024        Respectfully Submitted,

/s/Matthew T. Furton
Matthew T. Furton
(mfurton@lockelord.com)
Julie C. Webb
(jwebb@lockelord.com)
Heidi L. Brady
(heidi.brady@lockelord.com)
Joshua A. Skundberg
(josh.skundberg@lockelord.com)
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

AND

Carl C. Scherz, *Pro Hac Vice*
(cscherz@lockelord.com)
Locke Lord LLP
2200 Ross Avenue
Dallas TX, 75201
*Attorneys for Plaintiffs*

AND

Bradley S. Levison
(brad@legalhl.com)
Herschman Levison PLLC
401 S. LaSalle St.
Ste. 1302G
Chicago, IL 60605
*Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc.*