**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., TempsNow Employment and Placement Services LLC, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| | )   Case No.: 1:23-cv-16208 |
| vs. | )<br>) |
| Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, | )<br>)<br>) |
| Defendant. | )<br>) |

**REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
<u>RENEWED MOTION FOR PRELIMINARY INJUNCTION</u>**

## INTRODUCTION

As the Director's Opposition demonstrates, the New Benefits Provision is sufficiently similar to the Original Benefits Provision so that Plaintiffs' Renewed Motion for a Preliminary Injunction raises a set of issues virtually identical to those this Court has already assessed. The New Benefits Provision therefore merits being enjoined for the same reasons as the Original Benefits Provision. An analysis of nuances between the New and Original Benefits Provisions results in a finding that the New Benefits Provision is an even stronger candidate for preemption.

The New Benefits Provision shares the same general structure as the Original Benefits Provision: staffing agencies must either "modify[] an ERISA plan" (ECF No. 94, p. 25) to be more generous or pay employees an amount of money that is measured by benefits paid to a stranger. As Plaintiffs detailed in their moving brief, the New Benefits Provision, like the Original Benefits Provision, warrants ERISA preemption. ERISA creates a singular nationwide framework for the administration of benefit programs. ERISA's regulatory scheme does not leave room for states to enact laws like this one that connect with and reference ERISA plans, no matter how worthy or well-intended the goals of such legislation may be.

In an effort to stave off another preliminary injunction, the Director rehashes two main arguments, neither of which is availing. First, the Director asserts that the New Benefits Provision is a simple wage statute that merely regulates wages in the same manner as a prevailing wage statute; but this false equation is no more compelling now than it was when the Director unsuccessfully raised it over a year ago. Second, the Director argues that Plaintiffs have not sufficiently established irreparable harm; but this argument lacks merit because all of the elements of irreparable harm present in March 2024 are still present. For example, some Plaintiffs face an existential crisis as a result of the New Benefits Provision. And all Plaintiffs have realized serious client losses, still have no right to recover money damages, still must incur compliance costs, still

face enforcement risk, and still face a substantial but hard-to-quantify-with-precision decline in revenue. There are therefore ample independent grounds on which this Court can properly find that irreparable harm exists.

Consequently, for the reasons provided in their original brief and as further explained below, Plaintiffs respectfully request the Court grant their Renewed Motion and enter a preliminary injunction prohibiting the Director from enforcing the New Benefits Provision.

## ARGUMENT

### I. Plaintiffs Have Established that They Are Likely to Succeed on the Merits.

The Director's Opposition does not disavow her statement that the 2024 amendments to Section 42 of the DTLSA—that is, the New Benefits Provision—do "not materially amend" the law this Court found likely to be preempted in March 2024. App. Br. at 6, n.4, *Staffing Servs. Ass. Ill. v. Flanagan*, No. 24-1450 (7th Cir. June 18, 2024). Indeed, in thirty pages, the Director never challenges Plaintiffs' evidence that the New Benefits Provision, like its predecessor, imposes a multi-step, analytical comparison process between the benefits provided to each staffing agency employee and the benefits provided to someone else. To be sure, the Director disputes the extent of the burden imposed by the New Benefits Provision; but she never says the New Benefits Provision is, on balance, *less* likely to be preempted than the prior version.

If anything, the Director's Opposition here made the preemption analysis easier because she admits that the statutory mandate to provide "substantially similar benefits" requires staffing agencies to engage in "modifying an ERISA plan." (ECF No. 94, p. 25.) The Director does not genuinely argue that such plan modification avoids preemption. Instead, the Director exclusively argues that the cash-payment option is a clever preemption-circumvention mechanism.

This argument fails in every instance for the same reasons it failed before. The multi-step, analytical comparison between benefit packages is a statutory prerequisite before anyone can

invoke the cash-payment option. But there is no schedule of cash payments that staffing agencies can access as a short cut. Under either the New or Original Benefits Provision, the only way to reach the cash-payment option is to do a detailed comparison between benefits offered to different people. (*See* ECF No. 88-2, ¶¶ 79–84 (Decl. B. Figueroa of ClearStaff); ECF No. 88-3, ¶ 36 (Decl. E. Villareal of AllStaff); ECF No. 88-4 ¶¶ 21–26 (Decl. S. Polen of TempsNow).) As this Court recognized, "agencies have to collect and analyze benefit plan information from their client for a comparable employee, compare those plans to their existing plans, and determine whether to modify or supplement their plans, calculate and pay the cost of any benefits they do not presently provide, or both." (ECF No. 45, p. 7.) Staffing agencies therefore still must "make judgment calls about employees' eligibility and level of benefits on an individualized and ongoing basis" to properly administer a cash-payment option. (*Id.*, p. 8.)

Moreover, this multi-step, analytical process is accompanied by document gathering and disclosure obligations that differ from those provided by ERISA. *Compare* 820 ILCS 175/42(c) (requiring staffing agencies to obtain records for non-employees "related to job duties, working conditions, pay, seniority, and benefits" prior to "calculate[ing] and determin[ing] . . . benefits" for temporary employees), *with* 29 U.S.C. § 1059(a) (requiring employers to "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees"). And this process creates results that can be challenged by regulators and strangers in state court instead of under ERISA. *Compare* 820 ILCS 175/(67), (70), *with* 29 U.S.C. § 1132(a)(3). Consequently, the New Benefits Provision imposes different statutory burdens and a different enforcement regime than ERISA and is therefore incompatible with Congress' vision of a singular law that governs or "relate[s] to" employee benefit plans. *See* 29 U.S.C. § 1144(a). Plaintiffs have made far more than a "strong showing" that the New Benefits Provision has both

an impermissible "connection with" and "reference to" employee benefit plans. *See Shaw v. Delta Air Lines, Inc.* 463 U.S. 85, 96–97 (1983).

A.      **The New Benefits Provision Is Preempted Since It "Connects With" ERISA Plans.**

The present dispute is as straightforward as its predecessor dispute. (ECF No. 45.) ERISA preempts the New Benefits Provision because it "governs the payment of benefits, a central matter of plan administration." *See Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001). The New Benefits Provision interferes with national uniform plan administration by imposing differential treatment for agency employees that are fortunate enough to be assigned to long-term temping assignments. *See Ingersoll-Rand Co. v. McClendon,* 498 U.S. 133,142 (1990). In a myriad of ways, including by imposing reporting and disclosure obligations, the New Benefits Provision "mandate[d] employee benefit structures or their administration," which triggers preemption. *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995).

ERISA preempts state laws requiring "providers to structure benefit plans in particular ways, *such as by requiring payment of specific benefits*, or by binding plan administrators to *specific rules for determining beneficiary status*." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86–87 (2020) (internal citations omitted) (emphasis added). The New Benefits Provision does both. It requires staffing agencies to pay certain employees specific benefits paid to a different human being. Sure, there is a cash option—but using that option requires, in every instance, that a staffing agency use specific rules established by different employers for determining the beneficiary status of non-employees of the agency. In short, the New Benefits Provision requires "[p]rolonged individualized decision-making concerning benefits," which is precisely the type of statute that is preempted under ERISA's "connection with" jurisprudence. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 595–97 (7th Cir. 1998).

Nothing in the Director's opposition undermines the application of these ERISA principles to the New Benefits Provision. The Director does not dispute that the New Benefits Provision requires employers to obtain, analyze, and store employee benefits information from potentially hundreds of clients for potentially thousands of employees in the relevant "job classification." She does not argue that this task is mechanical and thus requires no judgment. She also does not argue the value and cost of any given person's benefits is something other than a function of individual choices (such as to reject or accept health plans) and individual circumstances (such as whether the employee has a spouse or dependents and chooses to maximize or minimize each benefit). The Director therefore implicitly admits that staffing agencies must use discretion and judgment to compare their clients' benefits with their own benefits.

Instead of addressing these realities, the Director focuses solely on the cash-payment option and frames the New Benefits Provision as a "total compensation statute." (*See* ECF No. 94, pp. 18–23.) The Court, however, has already rejected this argument. (ECF No. 45, p. 10 ("The Department's attempt to analogize Section 42 to prevailing wage and other statutes that have survived preemption fares no better.").) Nothing material has changed.

It is simply not true that the New Benefits Provision evades ERISA preemption because it merely regulates wages, which is an "area of traditional state regulation." (ECF No. 94, pp. 19–20.) The New Benefits Provision exclusively focuses on benefits—not wages. Benefits and wages are radically different concepts for a myriad of reasons, including that wages are mandatory and always taxed as income, whereas ERISA benefits may be declined or accepted in part and are not treated as taxable income. The Director's effort to characterize the New Benefits Provision as a compensation statute is akin to calling a cat a giraffe. Benefits are simply not the same thing as

wages. This Court should therefore not hesitate to reject the Director's argument that the New Benefits Provision merely governs wages.

Similarly, the Director's continued reliance on inapposite authorities addressing prevailing wage statutes (*see, e.g.*, ECF No. 94, pp. 19–20 (citing *Cal. Div. of Lab. Standards Enf't v. Dillingham Const.*, 519 U.S. 316, 319 (1997); *Frank Bros. v. Wisconsin Dep't of Transp.*, 409 F.3d 880, 886 (7th Cir. 2005)) remains misplaced. Prevailing wage "statutes are afforded particular deference because public works projects are an area of traditional state regulation." (ECF No. 45, p. 10.) But the New Benefits Provision does not govern public works projects. It governs private enterprises. Moreover, unlike a public works project that pegs employee compensation on public projects to a published, pre-determined schedule, the New Benefits Provision pegs employee benefits on private projects to the benefits offered by numerous other employers that are neither published nor precalculated nor uniformly applicable. Unlike a prevailing wage statute, the New Benefits Provision, as posited by the Director, requires comparing the merits of (1) a package consisting of a generous health plan and a stingy retirement plan with (2) a stingy health plan and a generous retirement plan. Worse, some employees accept/participate in benefits and others do not. (*See* ECF No. 88-2 ¶¶ 33, 35–36, 71; ECF No. 88-3, ¶¶ 28–29; ECF No. 88-4, ¶¶ 19, 28–30, 32.) This comparison is far from the type of "mechanical calculation" that could avoid preemption. *See Cvelbar v. CBI Ill. Inc*. 106 F. 3d 1368, 1375–78 (7th Cir. 1997).

The Director also erroneously argues the New Benefits Provision does not "require[] employers to pay employees specific benefits" because it "merely increase[s] costs or alter[s] incentives." (ECF No. 94, p. 20.) The New Benefits Provision and the Original Benefits Provision have the same basic structure. Under either provision, staffing agencies must:

- Track time spent at a certain jobsite;

- Gather information about benefits provided to non-employees; and

- "[M]ake judgment calls about employees' eligibility and level of benefits on an individualized and ongoing basis." (ECF No. 45, p. 8.)

These provisions therefore require staffing agencies to make a multitude of decisions about the value of employment benefits, such as whether an employee that opts out of his employer's plain-vanilla 401(k) retirement program should be provided with a retirement program option that has a discretionary 3% match of a group of strangers' future contributions or the financial equivalent even if vesting information will not be known for years.

Of course, these decisions increase costs. But costs are merely the tip of the iceberg. Under the New Benefits Provision, staffing agencies face endless analytical decisions. Unlike wages, which are inherently objective and relatively stable over time, the value and cost of benefits are subjective, dynamic, and dependent on individual preferences and circumstances. Decisions about the value or cost of these benefits are fraught with the danger of being inaccurate and then, under the New Benefits Provision, being second guessed by the Director, allegedly harmed employees, and so-called "interested parties" in a state court action that has none of the protections of an ERISA proceeding under 11 U.S.C. § 1132(a), which keeps costs low to ensure that employers are motivated to provide employee benefits in the first instance.

In a final effort to evade ERISA preemption, the Director seeks refuge in a pair of cases from the Ninth Circuit. Specifically, the Director points to *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 646–47 (9th Cir. 2008) ("*Golden Gate*"), and *ERISA Industry Committee v. City of Seattle*, 840 F. App'x 248, 249 (9th Cir. 2021) ("*ERIC*"), in support of her argument that the New Benefits Provision is a "total compensation" law that can be satisfied through "ERISA-governed plans or cash-equivalent payments." (ECF No. 94, pp. 21–22.)

The Director's reliance on *Golden Gate* and *ERIC* is misplaced. There is no equivalence between the New Benefits Provision and the laws in those cases. Those cases concerned local ordinances requiring certain employers to provide employees with direct cash payments to be used for "health care expenditures" or: (1) pay a predetermined fee to the city government (*Golden Gate*, 546 F.3d at 645); or (2) include the employees in a health insurance plan (*ERIC*, 840 F. App'x at 249; *see also ERISA Indus. Comm. v. City of Seattle*, No. C18-1188 TSZ, 2020 WL 2307481, at *1 (W.D. Wash. May 8, 2020), *aff'd*, 840 F. App'x 248 (providing additional background on the ERIC dispute and ordinance framework)). The differences between the discretion-laden New Benefits Provision, on the one hand, and the mechanical, healthcare-oriented ordinances in *Golden Gate* and *ERIC* are substantial. Most importantly, the ordinances in *Golden Gate* and *ERIC* concerned only the healthcare expenditures of a singular employer and a "fixed" statutory formula for calculating the value of benefits that did not "depend on contingences." *Golden Gate*, 546 F.3d at 651; *see also ERISA Indus. Comm*, 2020 WL 2307481, at *3–*4. Moreover, the *Golden Gate* and *ERIC* decisions only required employers to use documents kept in the ordinary course of business and to engage in "mechanical record-keeping" as to "health care expenditures." *Golden Gate*, 546 F.3d at 651; *see also ERISA Indus. Comm*, 2020 WL 2307481, at *4. The legal schemes in those two cases were therefore nowhere near as burdensome, discretionary, or focused on dictating greater benefits to workers as the New Benefits Provision.

In any event, *Golden Gate* and *ERIC* are outliers arising from unique factual situations. For example, courts have reached different outcomes from *Golden Gate* and *ERIC* when the state laws at issue required employers to utilize their discretion to select, calculate, and administer employee benefits. *See, e.g.*, *Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998) ("Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and

preempted by it."); *see also Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir. 1993) (similar); (*see also* ECF No. 88, pp. 20–21 (collecting cases standing contrary to *Golden Gate* and *ERIC*).) Indeed, even the Ninth Circuit recently recognized the extreme nature of *Golden Gate*, indicating the *Golden Gate* ruling would not save statutes imposing more than "non-discretionary administrative obligations" on employers from ERISA preemption. *See Jarvis Taxpayers Ass'n v. Cal. Secure Choice Ret. Sav. Program*, 997 F.3d 848, 861 (9th Cir. 2021).

For all these reasons, the Court should find once again that Plaintiffs have made a sufficiently strong showing that the New Benefits Provision impermissibly "connects with" ERISA plans.

**B. The New Benefits Provision Is Preempted Because It References ERISA Plans.**

Plaintiffs have also made a strong showing that the New Benefits Provision impermissibly references ERISA plans, and nothing in the Director's Opposition demonstrates otherwise. The Director gives short shrift to this argument, merely arguing that the New Benefits Provision escapes ERISA preemption here because it applies to both ERISA-governed benefits and non-ERISA-governed benefits, such as leave. (ECF No. 94, p. 23.) The Director is mistaken. It is irrelevant that the reach of the New Benefits Provision includes non-ERISA benefits. Courts have routinely rejected similar arguments. *See, e.g., D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 131 (1992) (holding law requiring employers to provide "equivalent" health insurance plans to employees eligible for a non-ERISA benefit was preempted under "reference to" ERISA preemption; "It makes no difference that [the law's] requirements are part of the District's regulation of, and therefore also 'relate to,' ERISA-exempt . . . plans."); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524–25 (1981) (holding statute indirectly regulating pensions through workers' compensation statute was preempted under "reference to" preemption).

Moreover, the New Benefits Provision applies to health insurance. This alone is a fatal "reference to" ERISA plans because "employer-sponsored health insurance programs are subject to ERISA regulation, and any state law imposing requirements by reference to such covered programs must yield to ERISA." *Greater Washington Board of Trade*, 506 U.S. at 130–31 (internal citations omitted). The New Benefits Provision is decidedly *not* a generally applicable statue as the Director contends (*see* ECF No. 94, p. 23) because it simply does not "function[] irrespective of[] the existence of an ERISA plan." *See Ingersoll-Rand Co.*, 498 U.S. at 139–40. In every instance, and for every employee at or approaching the statutory threshold hours requirement, the New Benefits Provision requires a staffing agency to conduct a comparison of one package of benefits with another package of benefits to determine if they are substantially similar. This mandatory analysis does not function irrespective of an ERISA plan merely because some non-ERISA benefits, such as leave, are within the components of an employee's benefits. For example, every staffing agency witness that has testified has described ERISA retirement programs and ERISA health insurance programs offered by their agency or their clients. (*See* ECF No. 88-2, ¶¶ 22–39, 43–49; ECF No. 88-3, ¶¶ 17–33; ECF No. 88-4 ¶¶ 5–17, 22.) If "a state law affecting the designation of a beneficiary is sufficiently 'related to' an ERISA plan" to be preempted, *see Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 566 (7th Cir. 2002), then a state law affecting the amount and characteristics of an employee's benefits is "related to" an ERISA plan and therefore preempted.

In sum, Plaintiffs have made far more than a strong showing that the New Benefits Provision has an impermissible "connection with" and "reference to" employee benefit plans. *See Shaw*, 463 U.S. at 96–97. Plaintiffs have come forward with substantial evidence in the form of documents and testimony from four industry leaders. Although the Director claims Plaintiffs are

arguing "edge cases" (ECF No. 94 p. 18), the Director has not identified a single so-called "edge case," or the core cases, it claims to exist. A state that forces employers to compare their employees' benefits with the benefits offered by other employers— and take action to ensure substantial similarity—must be preempted in every instance because it undermines employers' motivation to create benefit plans, which was the vision behind Congress' adoption of ERISA. *See e.g.*, *Alessi,* 451 U.S. at 515 (acknowledging the "primary [ERISA] goal of benefiting employees and the subsidiary goal of containing pension costs"); *Ingersoll-Rand Co.,* 498 U.S. at 142 (noting Congress' goal in enacting ERISA "was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government"). Accordingly, the Court should find that Plaintiffs have sufficiently shown that they are likely to succeed on the merits.

## II.    Plaintiffs Have Shown Irreparable Harm and an Inadequate Remedy at Law.

In March 2024, the Court enjoined the Original Benefits Provision prior to its effective date. (*See* ECF No. 45, p. 20.) While on appeal, the Original Benefits Provision was amended into the New Benefits Provision, which the Director admits made no "material[] amend[ments]" to the Original Benefits Provision. (ECF No. 88, p. 10.) Recognizing the striking similarities between the New and Original Benefits Provisions, the Director, *sua sponte*, informed the public that she would not enforce the New Benefits Provision until litigation concerning its constitutionality was resolved. (ECF No. 88, pp. 10–11.) Doubling down on her belief that the New Benefits Provision could not be enforced, the Director asked this Court in September 2024 to make "minor language changes" to the previous injunction to hasten an appeal that would assess the constitutionality of Section 42's benefits provision. (ECF No. 88, p. 25.)

The Director disputes none of this. The Director instead switches gears to argue that eight months of compliance with the wage provisions of Section 42(a)—that is, the Minimum Wage

Provision (820 ILCS 175/42(a))—demonstrates that staffing agencies can readily comply with the New Benefits Provision without breaking a sweat. The Director also argues that Plaintiffs lack any new evidence of harm from the New Benefits Provision as distinct from the Original Benefits Provision. Finally, the Director argues that causation of the allegedly irreparable harm is debatable and therefore an insufficient showing has been made. None of these arguments have merit.

### A. Compliance With the DTLSA's Minimum Wage Provision Does Not Demonstrate Lack of Irreparable Harm.

The Court should ignore the Director's simplistic suggestion that eight months of compliance with the Minimum Wage Provision, which has never been challenged, makes compliance with the New Benefits Provision a breeze. The two provisions operate much differently.

To comply with the Minimum Wage Provision, staffing agencies engage in a nondiscretionary analysis of certain employees' wages compared to either the lowest-paid comparable client-side employee's wage or the median wage of a job classification preselected by the federal Bureau of Labor Statistics. 820 ILCS 175/42(a). In the Director's view, once staffing agencies complete this analysis, compliance with the New Benefits Provision is simple, as they must only engage in "additional administrative steps: gathering the dollar amount paid in benefits for employees in the comparable 'job classification' (information to which any responsible employer has ready access) and calculating a simple average by dividing by the number of employees." (ECF No. 94, p. 10). This is a gross oversimplification of what must be done to comply with the New Benefits Provision.

Although the Minimum Wage Provision and New Benefits Provision share an initial step of identifying employees who may have hit the 720-hour threshold, the similarities end there. The New Benefits Provision requires many additional steps, including: (1) determining the proper

12

classification of employees for any comparison; (2) assessing the value of the staffing agency's employee benefits to the employee; (3) securing, assessing, and maintaining employee benefit information from third-party clients; (4) determining whether the staffing agency's own benefits are "substantially similar" to the proper comparative cohort; and (5) if necessary, providing different health insurance, retirement, long-term disability, etc. benefits to the affected employees or stripping all benefits from the affected employees and making a payment "in lieu" of the benefits required by the New Benefits Provision.[1] All of this, of course, is contingent on clients' willingness to share benefits information, such as health insurance enrollment data, for employees that have nothing to gain from their private information being shared with a staffing agency. The unrebutted testimony demonstrates that this is not something clients are willing to do. (*See, e.g.*, ECF No. 88, p. 26.) Notably, this multi-step comparison process is completely absent from the Minimum Wage Provision. Therefore, a history of compliance with the Minimum Wage Provision does not demonstrate the absence of irreparable harm.[2]

---

[1] The Director misconstrues a TempsNow document as a purported example of this analysis. (ECF No. 94, p. 10.) As detailed in the attached Third Declaration of Scott Polen, the document the Director cites as an example of a client "pay[ing] out the cash value of paid leave" (*id.*) is actually an example of TempsNow determining two employees' required minimum wage under the DTLSA. Third Declaration of Scott Polen, attached as **Exhibit 1**.

[2] An additional problem is that "the dollar amount paid in benefits" for any given employee is not knowable in advance. For example, the dollar amount associated with an employer's discretionary match obligation for 401(k) contributions can only be known after contributions have been made and after vesting periods have passed. Other times, the "dollar amount" associated with a benefit, such as health insurance, is a function of the employee's preferences, which may change as an employee shifts his or her coverage preferences over time and has major life events, such as change in marital status of birth of a child. Unlike wages, which are always known in advance with precision, employers simply do not know the dollar amount of benefits for every employee in advance.

**B.     The Irreparable Harm the Court Previously Found Remains Sufficient to Support a Preliminary Injunction.**

Without an amended injunction to preserve the status quo that has been in place since March 2024, Plaintiffs and their members are likely to suffer severe financial losses, disruption to client relations, and in some instances, a threat to the viability of their businesses. *See, e.g.*, Third Declaration of Scott Polen, attached as **Exhibit 1**, ¶¶ 2–8 (attesting that the lost business that will follow if the New Benefits Provision is enforced would result in TempsNow "not remain[ing] a viable business"); (ECF No. 88-2 ¶¶ 85–87 (attesting ClearStaff saw revenue decrease in 2023 by about 8% because of the DTLSA and faced lost business from four clients due to the New Benefits Provision); ECF No. 88-3, ¶ 45 ("I expect that 50% or more of [AllStaff's] current clients will reduce or eliminate their staffing workforce if the Benefits Rule takes effect."); ECF No. 88-4, ¶¶ 39–40 ("[TempsNow does] not have the funds to hire support staff, such as HR personnel, to calculate, design and administer the plans and other requirements of the amended Act. . . . Four of TempsNow's twenty clients have made it clear that they will stop using some of our services or they have stopped using our services due to the amendments to the Act."). Of course there is no evidence of irreparable harm arising for the first time after June 2024. The operative benefits provision of Section 42 has never threatened anyone because it has been enjoined—formally and informally—since March 2024. And there is no reason to believe anyone fears the New Benefits Provision less or more than the Original Benefits Provision, as both provisions share the same general structure.

**C.     Plaintiffs' Showing Here Satisfies the Irreparable Harm Requirement.**

Ultimately, the decision about the existence of irreparable harm is precisely what it was in March 2024. Major losses from enforcement of the New Benefits Provision remain expected. Material numbers of clients have ceased—or indicated they will cease—using Plaintiffs' services.

Compliance costs and enforcement risks remain. The record in this case is replete with evidence of irreparable harm in many different forms, including lack of a monetary claim against a state actor, compliance costs associated with an unconstitutional statute, substantial loss of revenue, substantial loss of clients, and existential questions for at least some of Plaintiffs. Each of these is an independent basis to find irreparable harm to support issuance of a preliminary injunction. (*See* ECF No. 88, pp. 22–27.) And nothing material has changed since this Court stated that because of "the costs of complying, potential penalties for not complying, business losses incurred thus far, and the inability to recoup losses, Plaintiffs have established more than a mere possibility of irreparable harm." (ECF No. 45, p. 20.)

The Director does not directly challenge Plaintiffs' evidence of irreparable harm with her own evidence. Instead, she suggests some of Plaintiffs' evidence of harm is not as supported by the documentary evidence as she believes it should be. (ECF No. 94, p. 6.) The Director's opinion about what documents she thinks exist is merely her supposition and conflicts with evidence demonstrating that many of the relevant communications were oral. (*See, e.g.*, ECF No. 94-6, p. 2) (ClearStaff Interrogatory Responses).) Oral communications should not be ignored as evidence merely because of their form.

In many ways, the Director's focus on whether there is irreparable harm is surprising because no one can seriously contend the DTLSA amendments—including the New Benefits Provision—are neutral to the staffing industry. They are not. The effect of these amendments is to burden long-term assignments of temporary workers through making those types of engagements less economically attractive to consumers of temporary services. So-called "interested parties" are actively suing staffing agencies for alleged violations of the DTLSA amendments. *See., e.g.* **Exhibit 2.** The only way to avoid the additional business expenses imposed by the New Benefits

Provision is to either not consume services affected by that provision or to pay more for services affected by that provision. Common sense indicates that such a statute would impair the financial interests of the providers of such services (and their employees).

Nevertheless, the Director argues that the downturn in Plaintiffs' businesses since the Original and New Benefits Provisions were enacted is attributable to a "general downturn in the staffing industry" in 2023. (ECF No. 94, p. 12.) Even if this were correct, "such evidence does not negate the fact that agencies will have to incur the costs of compliance or face the penalties of noncompliance." (ECF No. 45, p. 19.)

Moreover, the Director places undue reliance on *Buntrock v. S.E.C.*, 347 F.3d 995, 997 (7th Cir. 2003), to argue that this case is premature. As an initial matter, this Court already found *Buntrock* inapplicable here. (*See* ECF No. 45, p. 20.) Additionally, the mere "'existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper[.]" *Korte v. Sebelius*, 735 F.3d 654, 667 (7th Cir. 2013) (citation omitted); *see also Illinois Bankers Ass'n v. Raoul*, No. 24 C 7307, 2024 WL 5186840, at *6 (N.D. Ill. Dec. 20, 2024) ("[T]he threat of enforcement of this provision is causing pecuniary injury now."). "[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphasis in original).

Finally, despite the Director's protestations to the contrary, the New Jersey staffing industry litigation does not undermine any aspect of Plaintiffs' position here. (*See* ECF No. 94, pp. 12–14.) In fact, in that out-of-Circuit case, the court found that the staffing industry plaintiffs *actually suffered irreparable harm that would support entry of a preliminary injunction. New Jersey Staffing All. v. Fais*, No. 1:23-CV-02494, 2023 WL 4760464, at *6–8 (D.N.J. July 26, 2023). Specifically,

16

in 2023, the court held that the staffing industry plaintiffs' inability to recover damages from state officials, likely loss of millions of dollars, and the prospect of at least some of the industry members being forced out of business was sufficient irreparable harm to support entry of a preliminary injunction. *Id.* At that time, however, the plaintiffs were not pursuing any claims based on ERISA preemption. *See id.* at *9.

One year later, the plaintiffs amended their complaint to assert an ERISA preemption claim and moved for a preliminary injunction. *New Jersey Staffing All. v. Fais*, No. 1:23-CV-2494, 2024 WL 4024090, at *2–5 (D.N.J. Aug. 30, 2024). In ruling on that motion, the court did not dispute the plaintiffs' evidence as to irreparable harm, but instead found that this "second bite at the apple" was too late and that the asserted harm did not outweigh the danger of disruption of the "status quo" because, unlike here, the one-year delay took place while the New Jersey benefits provision at issue was being enforced. *Id.* at *1, *4–*5. Notably, the New Jersey litigation remains ongoing, with the staffing plaintiffs pursuing a permanent injunction.

For all these reasons, the Court should find that Plaintiffs have sufficiently shown irreparable harm here.

## III. Plaintiffs Have Shown the Balance of Hardships and the Public Interest Weigh in Favor of an Injunction.

Considering Plaintiffs' strong showing that they are both likely to succeed on the merits and suffer irreparable harm should the Court not enjoin the Director's enforcement of the New Benefits Provision, "the balance of harms need not weigh as heavily in [their] favor." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). Notwithstanding this lower standard, Plaintiffs have shown that not enjoining the Director's enforcement of the New Benefits Provision—which has never been enforced—would disrupt the status quo, thereby threatening the viability of an industry that employs more than 650,000 Illinoisans. *See, e.g.*, Declaration of Scott

Polen, attached as **Exhibit 1**, ¶ 7 (stating enforcement of the New Benefits Provision will result in the closure of TempsNow); (ECF No. 88-1 ¶ 14; ECF No. 88-3, ¶ 41 (stating staffing clients are considering moving out of Illinois or investing in automation should the New Benefits Provision become effective)); 820 ILCS 175/2. In addition to this strong public interest in preserving employers and employment opportunities, "[t]here is also a strong public interest in ensuring the Supremacy Clause is properly effectuated." *Illinois Bankers Ass'n v. Raoul*, No. 24 C 7307, 2024 WL 5186840, at *17 (N.D. Ill. Dec. 20, 2024). Thus, all the elements of a traditional preliminary injunction analysis point decidedly toward issuance of an injunction in this case.

## IV. Injunctive Relief Should Extend to All Illinois Staffing Agencies.

In their Renewed Motion, Plaintiffs ask the Court to preliminarily enjoin the Director from enforcing the New Benefits Provision. (ECF No. 88, p. 30.) This is the same relief Plaintiffs requested in relation to the Original Benefits Provision, thereby resulting in neither the Original nor the New Benefits Provision having ever been enforced. (*See* ECF No. 23, p. 30; ECF No. 46.) Nevertheless, the Director now argues that any injunctive relief should be limited to only the three individual staffing agency plaintiffs—AllStaff, ClearStaff, and TempsNow—because such a limited injunction would afford them "complete relief." (ECF No. 94, pp. 28–30.)

The Director admits, however, that this Court possesses the authority to enjoin enforcement of the statute *by the defendant*. (*See* ECF No. 94, p. 30.) An enjoined statute "cannot be applied *to anyone*." *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (emphasis in original); *see also Free Speech Coal., Inc. v. Rokita*, No. 1:24-CV-00980-RLY-MG, 2024 WL 3228197, at *18 (S.D. Ind. June 28, 2024) (noting that it "is quite ordinary" "to enjoin the entire statute statewide" because "the claimed constitutional violation inheres in the terms of the statute, not its application" (citing *Ezell*, 651 F.3d at 698)). The Court should once again exercise that authority here and

preliminarily enjoin the Director's enforcement of the New Benefits Provision. The Director can be enjoined because she is a party to this action. Fed. R. Civ. Pro. 65(d)(2). There is no reason to require each staffing agency in Illinois to bring its own duplicative lawsuit against the Director. And requiring such duplicative litigation would undermine the status quo, which was the purpose of first preliminary injunction in this matter. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024); *see also Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir.2001) ("A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved.").

In any event, Plaintiffs Staffing Services Association of Illinois and American Staffing Association are trade associations that have associational standing to pursue relief on behalf of their members. An association has associational standing to sue on behalf of its members when: "(1) at least one of its members would 'have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members.'" *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (citation omitted). Members may "remain unnamed by the organization" (*Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008)), so long as there are "specific allegations establishing that at least one identified member had suffered or would suffer" concrete, particularized injury in fact from the defendant's actions. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, this requirement is satisfied because Plaintiffs AllStaff, TempsNow, and ClearStaff are members of SSAI. (ECF No. 82, pp. 2–3.) Finally, there is no need for the members of ASA and SSAI to participate in this proceeding that only seeks equitable relief. *See, e.g.*, *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1061–62 (N.D. Ill.), *aff'd*, 85 F.4th 1175 (7th Cir.

2023) ("Member participation is typically required only when the party seeks damages . . . ."). Accordingly, all the elements of associational standing are present, and therefore every member of the two trade association plaintiffs should benefit from any preliminary injunction.

DATED: January 28, 2025                    Respectfully Submitted,


                                           /s/ Matthew T. Furton
                                           Matthew T. Furton
                                           (matthew.furton@troutman.com)
                                           Julie C. Webb
                                           (julie.webb@troutman.com)
                                           Heidi L. Brady
                                           (heidi.brady@ troutman.com)
                                           Joshua A. Skundberg
                                           (josh.skundberg@ troutman.com)
                                           Troutman Pepper Locke LLP
                                           111 South Wacker Drive
                                           Chicago, IL 60606

                                           AND

                                           Carl C. Scherz, *Pro Hac Vice*
                                           (carl.scherz@troutman.com)
                                           Troutman Pepper Locke LLP
                                           2200 Ross Avenue
                                           Dallas TX, 75201
                                           *Attorneys for Plaintiffs*

                                           AND

                                           Bradley S. Levison
                                           (brad@legalhl.com)
                                           Herschman Levison PLLC
                                           401 S. LaSalle St.
                                           Ste. 1302G
                                           Chicago, IL 60605
                                           *Attorney for Plaintiff M.M.D. Inc. d/b/a The AllStaff Group, Inc.*

<u>**Certificate of Service**</u>

I, Matthew T. Furton, an attorney, state that on January 28, 2025, I caused a true and correct copy of the foregoing to be served via e-filing upon all parties of record.

_____/s/ Matthew T. Furton_____