UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STAFFING SERVICES ASSOCIATION OF ILLINOIS, AMERICAN STAFFING ASSOCIATION, CLEARSTAFF INC., M.M.D. INC. D/B/A THE ALLSTAFF GROUP, INC., TEMPSNOW EMPLOYMENT AND PLACEMENT SERVICES LLC, <br><br> Plaintiffs, <br><br> v. <br><br> JANE R. FLANAGAN, SOLELY IN HER CAPACITY AS THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF LABOR, <br><br> Defendant. | No. 23 C 16208 <br><br> Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Temporary staffing agencies and trade associations brought this action against the Director of the Illinois Department of Labor to enjoin the enforcement of several amendments to the Illinois Day and Temporary Labor Services Act. Last year, the Court preliminarily enjoined Section 42 of that law as preempted by the Employee Retirement Income Security Act of 1974. While that order was on appeal, the Illinois General Assembly amended Section 42. Defendant dismissed the appeal, Plaintiffs filed an amended complaint, and now Plaintiffs ask the Court to preliminarily enjoin the enforcement of the new Sections 42(b) and (c). For the following reasons, that motion is denied.

1

**Background**

On August 4, 2023, the Illinois General Assembly enacted and Governor Pritzker signed several amendments to the Illinois Day and Temporary Labor Services Act ("DTLSA") into law. The amendments are aimed at enhancing protections for the labor and employment rights of the more than 650,000 temporary workers in the State. *See* 820 ILCS 175/2. Those temporary workers are employed by temporary staffing agencies ("agencies") and sent to third-party client work sites.

On November 22, 2023, Plaintiffs, which include three agencies and two agency trade associations, filed this suit challenging three of the new provisions: Sections 11, 42, and 67. Plaintiffs moved for a preliminary injunction prohibiting the Illinois Department of Labor ("the Department") from enforcing all three provisions and related regulations. Plaintiffs asked the Court to preliminarily enjoin the enforcement of Section 42 as preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), Section 11 as preempted by the National Labor Relations Act, and Section 67 as violating due process principles.[1] Following a hearing, where the Court heard argument and testimony from representatives of the three agency Plaintiffs, the Court granted the motion as to Section 42 and denied the motion as to Sections 11 and 67. R. 45 ("March 2024 Order"). Thereafter, Defendant filed an interlocutory appeal of the March 2024 Order, and this Court stayed the litigation pending the appeal. During the pendency of the appeal, in June 2024, the Illinois

---

[1] Shortly before Plaintiffs filed this suit, the General Assembly passed, and the Governor signed, legislation delaying the effective date of Section 42 until April 1, 2024.

2

General Assembly passed and Governor Pritzker signed into law new amendments to the DTLSA, including changes to Section 42.

Section 42 guarantees temporary workers "[e]qual pay for equal work" and covers both wages and benefits. Plaintiffs' challenge is focused on the benefits provision, not the wages provision. The benefits provision in the original Section 42 provided in relevant part:

> A day or temporary laborer who is assigned to work at a third party client for more than 90 calendar days shall be paid not less than the . . . equivalent benefits as the lowest paid directly hired employee of the third party client with the same level of seniority at the company and performing the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and that are performed under similar working conditions. If there is not a directly hired comparative employee of the third party client, the day or temporary laborer shall be paid not less than the . . . equivalent benefits of the lowest paid direct hired employee of the company with the closest level of seniority at the company. A day and temporary labor service agency may pay the hourly cash equivalent of the actual cost benefits in lieu of benefits required under this Section.

The benefits provision in the new Section 42(b) provides:

> A day and temporary labor agency shall provide a day or temporary laborer who is assigned to work and performs work at the same third party client for more than 720 hours within a 12–month period, beginning on or after April 1, 2024, substantially similar benefits to the job classification of employees performing the same or substantially similar work on jobs and performed under similar working conditions. A day and temporary labor service agency may pay the hourly average cash equivalent of the actual cost of the benefits the third party client provides the applicable directly hired employees in lieu of benefits required under this subsection.

820 ILCS 175/42(b). Additionally, Section 42(c) provides:

> Upon request, a third party client to which a day or temporary laborer has been assigned to work and performed work for more than 720 hours within a 12-month period or 4,160 hours within a 48-month period shall

3

>be obligated to timely provide the day and temporary labor service agency with all necessary information related to job duties, working conditions, pay, seniority, and benefits it provides to the applicable classification of directly hired employees necessary for the day and temporary labor service agency to comply with this Section. Upon receipt of the accurate and complete information described in this subsection from the third party client, it shall be the responsibility and duty of the day and temporary labor service agency to calculate and determine the straight-time hourly rate of pay and the benefits it shall offer to the day or temporary laborer, including any cash equivalent. The failure by a third party client to provide any of the information required under this Section shall constitute a notice violation by the third party client under Section 95. For purposes of this Section, the day and temporary labor service agency shall be considered a person aggrieved as described in Section 95.

820 ILCS 175/42(c).

Defendant informed the Seventh Circuit that the amendments did "not materially amend [Section 42's] benefits provision," and issued a bulletin advising agencies that the Department considered Section 42(b) to be enjoined by the March 2024 Order. In September 2024, Plaintiffs moved to modify the March 2024 Order under Federal Rule of Civil Procedure 62(d) or issue an indicative ruling under Federal Rule of Civil Procedure 62.1, which the Court denied. Thereafter, Defendant voluntarily dismissed the appeal, and the Court granted the joint motion to lift the stay on the district court proceedings. Plaintiffs amended their complaint and filed the present motion to preliminarily enjoin the enforcement of the new Sections 42(b) and (c).[2] The Court held oral argument, at which Defendant stated that it was no

---

[2] The ERISA Industry Committee, the American Benefits Council, the National Retail Federation, the Chamber of Commerce of the United States of America, the National Alliance of Healthcare Coalitions, the Society for Human Resource Management, the HR Policy Association, the Business Group on Health, and the

4

longer taking the position that the amendment does not materially amend the original benefits provision.

## Legal Standard

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Parties seeking such relief must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in their favor; and (4) that an injunction is in the public interest. *Id.* at 20. Plaintiffs need not demonstrate likelihood of success by a preponderance of the evidence. *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023). However, they must "make a 'strong' showing that reveals how they propose to prove their case." *Id.* (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). A mere possibility or "better than negligible" chance of success is not enough. *Id.* (citations omitted).

## Discussion

The Court's analysis begins and ends with Plaintiffs' likelihood of success on the merits. Plaintiffs argue that ERISA preempts Section 42(b) and (c). Section 42(b) requires an agency to provide temporary workers who have worked more than 720 hours at a third party client site with benefits that are "substantially similar" to those the client provides certain directly hired employees or pay "the hourly average cash

---

Business Roundtable sought leave to file an *amici curiae* brief in support of Plaintiff's motion, which the Court granted. *See* R. 89, 89-1. The arguments presented in the brief largely mirror Plaintiffs' arguments.

5

equivalent of the cost of the benefits" provided by the client. 820 ILCS 175/42(b). Section 42(c) requires third party clients to timely disclose "all necessary information related to job duties, working conditions, pay, seniority, and benefits it provides to the applicable classification of directly hired employees" so that agencies can meet their obligations under Section 42. 820 ILCS 175/42(c).

As an initial matter, Section 42(c) does not impose any obligations on Plaintiff agencies. It was on that basis that the Court previously held that Plaintiffs did not have standing to challenge the prior version of Section 42(c). *Cf. Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross."). Plaintiffs do not raise any argument to the contrary. As before, the proper parties to raise such a challenge are the third party clients. Therefore, the Court considers only whether Plaintiffs have made an adequate showing that ERISA preempts Section 42(b).

I.   Law on ERISA Preemption

ERISA is intended to provide "a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). To that end, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA.[3] 29 U.S.C. § 1144(a). Congress enacted this "broad" preemption provision "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law, thereby minimizing the

---

[3] An "employee benefit plan" is defined as any "plan, fund, or program" that is "established or maintained by an employer" to provide certain benefits, such as healthcare, disability, unemployment, and retirement benefits. 23 U.S.C. § 1002(1), (2)(A).

administrative and financial burden of complying with conflicting directives and ensuring that plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Halperin v. Richards*, 7 F.4th 534, 541 (7th Cir. 2021) (citing *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020)) (cleaned up).

A state law "relates" to an ERISA plan, and is thus preempted, if it "has a connection with or reference to such a plan." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997). A law has a "connection with" with ERISA plans if it "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (citing *Egelhoff v. Egelhoff,* 532 U.S. 141, 148 (2001)). A law makes "reference to" to ERISA plans if "it acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation." *Id.* at 319–20 (citations omitted). Moreover, there is a presumption against preemption in areas of traditional state regulation. *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 931 (7th Cir. 2018).

Plaintiffs contend that Section 42(b) "relates to" ERISA plans in four main ways. First, it "references" ERISA plans by tethering the statutory obligation to the value of ERISA plans. Second, it "connects with" ERISA plans by impeding the agencies' ability to administer their plans in a uniform way. Third, it imposes an ERISA plan by requiring agencies to engage in prolonged, individualized decision-making regarding benefits. And fourth, it creates an alternative enforcement scheme

7

that competes with ERISA. While this case presents a close question, the Court finds that Plaintiffs have not adequately shown that they are likely to succeed on any of these bases.

II.     Reference to ERISA Plans

Plaintiffs contend that Section 42(b) makes "reference to" ERISA plans by tying the statutory obligations to the nature and value of such plans. The provision bears some similarity to the ordinance at issue in *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 126–27 (1992). In *Greater Washington*, the Supreme Court considered an ordinance that required employers who provided health insurance to their employees to provide "equivalent health insurance coverage for injured employees eligible for workers' compensation benefits." *Id.* The Court held that the ordinance made "reference to" an ERISA plan because the coverage it required was "measured by reference to" the level of benefits provided by the employer's ERISA plan. *Id.* at 130 ("[A]ny state law imposing requirements by reference to such covered programs must yield to ERISA.").

Similarly here, an agency's obligations under Section 42(b)—whether providing "substantially similar" benefits or paying the cash equivalent of the cost of benefits provided by the client—are measured by reference to the benefits the agency provides to its workers and/or the benefits its clients provide to their employees. In many cases, agencies and their clients provide benefits through ERISA plans. *E.g.*, R. 88-2 ¶¶ 43–50 (benefits offered by ClearStaff's clients include 401(k) programs and healthcare plans); R. 88-3 ¶¶ 17–33 (AllStaff offers 401(k) program and three health

8

insurance plans). But Plaintiffs also concede that in many cases, agencies and their clients provide benefits that are not covered by ERISA, "such as leave." R. 88 at 22. Because Section 42(b) is "indifferent" to whether those benefits are offered through an ERISA plan or not, it cannot be said that the statute "refers to" such plans under prevailing case law. *See Dillingham*, 519 U.S. at 327–28 (state law did not refer to ERISA plans because the apprenticeship programs it regulated did not need to be ERISA programs); *see also Rutledge*, 592 U.S. at 481 (state law did not refer to ERISA plans because it regulated pharmacy benefit managers "whether or not the plans they service fall within ERISA"); *Travelers*, 514 U.S. at 656 (state law did not refer to ERISA plans because it imposed surcharges on patients and HMOs regardless of whether coverage or membership was secured by an ERISA plan, private purchase, or otherwise). On that basis, Plaintiffs have not shown they are likely to succeed on their ERISA preemption claim based on an impermissible "reference to" ERISA plans.

  III. Connection with ERISA Plans

Plaintiffs also argue that Section 42(b) is "connected with" ERISA plans. This type of ERISA preemption targets "laws that require providers to structure their benefit plans in particular ways, such as by requiring payment of specific benefits or by binding plan administrators to specific rules for determining beneficiary status." *See Rutledge*, 592 U.S. at 86 (citing *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97 (1983); *Egelhoff*, 532 U.S. at 151). But Section 42(b) does not mandate that agencies structure their ERISA plans any particular way. Certainly, an agency that does not offer "substantially similar benefits" can comply by amending an existing ERISA plan

9

or adopting a new one. But it can also comply by paying workers the cash value of the cost of the benefits provided by the client and leaving the existing ERISA plans as they are.

Though not binding on this Court, the Ninth Circuit's decision in *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639 (9th Cir. 2008) is instructive. At issue in that case was a San Francisco ordinance that required certain employers to make minimum healthcare payments on behalf of their employees, either by contributing to new or existing ERISA plans or by paying the City directly. *Id.* at 645–46. The Court held that the ordinance was not "connected with" ERISA plans because employers could meet the statutory requirement without establishing or changing an existing ERISA plan. *Id.* at 656. The City-payment option gave "employers a meaningful alternative that allows them to preserve the existing structure of their ERISA plans." *Id.* at 660. So too here, by utilizing the cash alternative, an agency can fully satisfy Section 42(b)'s obligations without touching an ERISA plan.

In addition, several courts outside of this Circuit have held that laws guaranteeing a minimum level of compensation, comprised of both wages and benefits, are not "connected with" ERISA plans because employers can satisfy their obligations without an ERISA plan. *See, e.g.*, *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 89 (2d Cir. 2015) (state law mandating minimum rate of compensation for home care aids, which could include wages or "other direct compensation paid to or provided for" benefits); *Keystone Chapter, Associated*

*Builders & Contractors, Inc. v. Foley,* 37 F.3d 945, 958 (3d Cir. 1994) (state law mandating public works contractors pay employees a minimum "prevailing wage," including a benefits component that could be satisfied through benefits or cash). Like these laws, Section 42, viewed as a whole, guarantees temporary workers a minimum level of compensation, comprised of both a wage component and a benefit component, and the benefits component can be satisfied through means unconnected with ERISA plans.

Plaintiffs point out that in *Golden Gate* and the minimum level of compensation cases, determining the expenditure obligation was mechanical. For example, in *Golden Gate*, employers simply multiplied an employee's total number of hours worked by a rate set forth in the ordinance. *Id.* at 644. That stands in sharp contrast to Section 42(b). At the start, an agency will have to identify the temporary workers who have worked more than 720 hours at a particular client site and therefore fall within Section 42(b)'s scope. R. 88-2 ¶ 56; R. 88-3 ¶¶ 37–38. For each worker, the agency will have to identify directly hired employees at the client site who perform "the same or substantially similar work under similar working conditions," and determine the "job classification" to which they belong, which could be based on classification scheme of the Bureau of Labor Statistics ("BLS"), the client, or otherwise. R. 88-2 ¶¶ 55, 76–77. After ascertaining the benefits provided to employees in that job classification, the agency will have to compare those benefits with the benefits it provides to its temporary workers and determine whether the

11

benefits are "substantially similar," which is not defined in the statute.[4] R. 88-2 ¶¶ 57, 58, 62, 78–79; R. 88-3 ¶ 36; R. 88-4 ¶ 21. If the agency decides the benefits are not "substantially similar," it will have to decide how it will comply. It can change the benefits provided to its workers through new or amended ERISA plans. Or it can calculate and pay the "hourly average cash equivalent of the actual cost of the benefits" provided by the client.[5] R. 88-2 ¶¶ 61–63; R. 88-3 ¶ 35; R. 88-4 ¶¶ 17, 20.

As described by Plaintiff agencies' representatives in affidavits and testimony, engaging in this analytical process is likely to be difficult, burdensome, and costly, and will involve decisions that are individualized and discretionary in nature. But that does not mean that the process interferes with the uniformity of plan administration in a manner that implicates the "connected with" type of ERISA preemption. *See De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816 (1997) ("Any state tax, or other law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute."); *see also Rutledge*, 592 U.S. at 87 ("[C]reating inefficiencies alone is not enough to trigger ERISA pre-emption."). Section 42(b) does not compel any

---

[4] The Department began the rulemaking process with respect to the prior version of the benefits provision to provide guidance on compliance. The Court would expect that the Department will do the same with respect to the new provision.

[5] Plaintiffs suggest there is a difference between the "employees performing the same or substantially similar work on jobs . . . under similar working conditions" and "the applicable directly hired employees." *E.g.*, R. 88 at 10 ("[T]he New Benefits Provision requires assessing the benefits received by two different groups—the (1) job classification and (2) applicable directly hired employees[.]") (citing R. 88-2 ¶ 80). In the Court's view, such a reading strains the plain meaning of the statutory text.

12

change to what is covered, how beneficiaries are designated, or the way benefits are disbursed under an ERISA plan. *Cf. Egelhoff*, 532 U.S. at 151 (state law requiring plan administrators to either follow specific rules for determining beneficiary status or opt out by amending plan had "connection with" ERISA plans); *Shaw*, 463 U.S. at 89, 100 (state law requiring employers to provide the same benefits for pregnancy as for any other disability "related to" ERISA plans). Nor does it impose any additional recordkeeping or disclosure requirements on a plan. *Cf. Gobeille*, 577 U.S. at 323 (state law requiring plans to report detailed information about claims and plan members had "connection with" ERISA plans). Section 42(b) may economically influence agencies to make changes to their ERISA plans to provide different benefits, but it does not force them to do so. *See Rutledge*, 592 U.S. at 87 ("ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage."); *Dillingham*, 519 U.S. at 332–33 (state law that incentivized, but did not require, plans to follow certain standards for apprenticeship programs was not "connected with" ERISA plans). Agencies can continue administering the same ERISA plans with the same terms in the same way—or administering no ERISA plans—if they so choose.

The Court notes that it reached a different conclusion when presented with similar arguments about the original provision. That conclusion was based on two cases: *Egelhoff* and *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180, 183 (4th Cir. 2007). With the benefit of new briefing and renewed review, the Court finds

13

the state laws at issue in these cases distinguishable from Section 42(b) in their connectedness to ERISA plans.

In *Egelhoff*, the Supreme Court considered a Washington law that forced plan administrators to follow certain rules for determining beneficiary status, rather than allowing administrators to pay benefits to those identified in the plan documents. 532 U.S. at 147. The law bore some resemblance to Section 42(b) in that it offered two ways of complying with it. But in *Egelhoff*, a plan administrator either had to follow the statutory beneficiary scheme or amend its ERISA plan to opt out. *Id.* at 150. In other words, there was no way of complying with the state law without changing the way an ERISA plan was operated or written. Plan administrators would thus have to "maintain familiarity with the laws of all 50 States *so that they can update their plans as necessary* to satisfy the opt-out requirements of other, similar statutes." *Id.* at 151 (emphasis added). In contrast, if an agency chooses to comply with Section 42(b) by paying cash, it need not take any action with respect to any ERISA plan it may have or may not have.[6]

---

[6] Plaintiffs also argue briefly that the provision "governs a central matter of plan administration" because it regulates "the payment of benefits." In support, Plaintiffs rely on *Egelhoff*, wherein Supreme Court held that "unlike generally applicable laws regulating 'areas where ERISA has nothing to say,' which we have upheld notwithstanding their incidental effect on ERISA plans, this statute governs the payment of benefits, a central matter of plan administration." 532 U.S. at 148 (quoting *Dillingham*, 519 U.S. at 330) (cleaned up). But in this Court's view, the Supreme Court did not use the "payment of benefits" as broadly as Plaintiffs suggest. The law in *Egelhoff* dictated to whom benefits would be disbursed under a plan. How benefits are disbursed under a plan is a matter of plan administration. Paying the cash value of the cost of benefits is not.

There is a similar distinction to be made with *Fielder*. In that case, the Fourth Circuit considered a Maryland law that required certain employers to spend at least 8% of their total payrolls on employee healthcare costs. *Fielder*, 475 F.3d at 183. As with Section 42(b) and the law in *Egelhoff*, the Maryland law offered a choice: employers could increase contributions to an ERISA plan or pay the amount their spending fell short to the State. *Id.* However, the Fourth Circuit stated that because an employer "would gain nothing" from paying the State, the "only rational choice" was changing the ERISA plans to meet the minimum spending requirement. *Id.* at 193. By effectively mandating how employers structured their healthcare plans, the law had an "obvious" connection with ERISA plans. *Id.*

Plaintiff agencies' representatives claim that calculating the hourly average cash equivalent of the actual cost of benefits will be "difficult" or even "impossible." *E.g.,* R. 88-3 ¶ 81, 88-4 ¶¶ 20, 26. But that is based on Plaintiffs' claim that the statute requires them "to determine the actual cost for each employee in the applicable cohort for each benefit, aggregate them all, and find an average." R. 88 at 10–11. The statute does not dictate that agencies calculate the hourly average cash equivalent of the actual cost of benefits in this way. Defendant offers a far more straightforward calculation method of dividing the client's total benefits expenditure for the relevant job classification by the number of employees in that classification. *See* R. 94-7 at IDOL00142, IDOL000151 (describing BLS's methods for calculating average cost of benefits). Indeed, Section 42(c) requires third-party clients to provide agencies with "all necessary information" to determine this value. *See* 820 ILCS 175/42(c). In sum,

15

unlike in *Fielder*, neither the statutory language nor the factual record shows that the cash option is not a real option.

On that basis, Plaintiffs have not shown they are likely to succeed on their ERISA preemption claim based on an impermissible "connection with" ERISA plans.

IV. Creation of ERISA Plan

Plaintiffs also argue that by demanding that agencies engage in this analytical process, Section 42(b) imposes an ERISA plan.[7] The starting point for this argument is the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 12 (1987). In that case, the Supreme Court considered whether ERISA preempted a Maine statute that provided for a one-time, lump-sum severance payment to employees in the event of a plant closure. The Court held that the statute did not establish or require employers to maintain an ERISA plan because the "theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits." *Id.* ("To do little more than write a check hardly constitutes the operation of a benefit plan.").

Thereafter, in *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir. 1993), the First Circuit considered a Massachusetts statute that required employers to pay severance benefits to employees who lost their jobs within two years of a corporate takeover. Applying *Fort Halifax*, the Court explained that to comply, a Massachusetts

---

[7] Other courts have considered similar arguments under the "reference to" category of ERISA preemption. *E.g.*, *Golden Gate*, 546 F.3d at 648 (explaining that if the ordinance at issue "creates an ERISA plan," it "almost certainly makes an impermissible 'reference to' an ERISA plan.").

16

employer "need[ed] some ongoing administrative mechanism for determining" each employee's eligibility for the severance payment, which included a "for cause determination" that "call[ed] for judgments based on information well beyond the employee's date of hiring and termination." *Id.* Because the Massachusetts statute imposed a regime that amounted to an ERISA plan, it was preempted by ERISA. *Id.* at 856; *see also Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998) (applying *Fort Halifax* and *Simas* to hold that an employer's retention agreements were preempted by ERISA because they required "[p]rolonged individualized decision-making concerning benefits"); *cf. Howard Jarvis Taxpayers Ass'n v. California Secure Choice Ret. Sav. Program*, 997 F.3d 848, 853, 862–63 (9th Cir. 2021) (distinguishing *Simas* and holding that California law requiring certain employers to participate in state-run IRA savings program did not impose ERISA plan because employers' eligibility determinations were "essentially mechanical" and "non-discretionary").

Similar to *Simas*, to comply with Section 42(b), agencies will need to maintain an ongoing administrative scheme with particularized and judgment-laden determinations about workers' eligibility for new or different benefits or the cash equivalent of the cost of the benefits provided by their clients. But *Simas* involved severance payments. Certain payments of benefits do not constitute ERISA plans if paid out of an employer's general assets. *See Massachusetts v. Morash*, 490 U.S. 107, 109, 116 (1989) (ERISA did not preempt state law requiring employers to pay employees vacation benefits on the date of discharge because those benefits were

17

"payable on a regular basis from the general assets of the employer and are accumulated over time only at the election of the employee"); 29 C.F.R. § 2510.3-1(b)(2)–(3) (payment of compensation to employees for medical leave, vacation, sabbatical leave, or absences related to military duty, jury duty, or training are not ERISA plans if paid out of the employer's general assets). Plaintiffs do not address this argument in reply. On that basis, Plaintiffs have not shown they are likely to succeed on their ERISA preemption claim based on the argument that the administrative obligations imposed by Section 42(b) constitute an ERISA plan.

V.  Alternative Enforcement Mechanism

Plaintiffs' final argument is that ERISA preempts Section 42(b) because of the ways it can be enforced against agencies. ERISA preempts "state-law causes of action seeking 'alternative enforcement mechanisms' as an end run around ERISA's more limited remedial scheme." *Halperin*, 7 F.4th at 541 (quoting *Travelers*, 514 U.S. at 645). Plaintiffs argue that the DTLSA's provisions permitting the Department to rescind licenses and issue fines and granting a private right of action to interested parties, including temporary workers, *see* 820 ILCS 175/55, 67, 70, 95, circumvent the remedial scheme at 29 U.S.C. § 1132(a). Under Section 1132(a), "a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 53 (1987). "Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits." *Id.*

But this suit does not present any cause-of-action arising under the DTLSA. *Cf. Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 148 (1990) (ERISA preempted state-law wrongful discharge claim based on employee's allegation that employer fired him to avoid contributing to or paying benefits under a pension fund); *Pilot Life*, 481 U.S. at 54 (ERISA preempted state-law breach of contract and tort claims for alleged improper processing of claims for plan benefits). Instead, it is a facial preemption challenge. Whether a cause of action arising under the DTLSA is an "end run around" ERISA's enforcement scheme will depend on the nature of that cause of action, including who is asserting it and whether it involves an ERISA plan. *See Halperin*, 7 F.4th at 545 (claims brought by bankruptcy creditors against company's directors and officers were not preempted as an "alternative enforcement mechanism" because plaintiffs had no rights under ERISA as participants, beneficiaries, or fiduciaries); *cf. Sherfel v. Newson*, 768 F.3d 561, 567–68 (6th Cir. 2014) (ERISA preempted Wisconsin law as applied to Nationwide's plan because it authorized employees to obtain benefits provided by that ERISA plan). For that reason, Plaintiffs have not shown they are likely to succeed on their ERISA preemption claim based on the DTLSA's enforcement provisions.

Because the Court finds that Plaintiffs have not shown they are likely to succeed on the merits, the Court does not address the other elements of the preliminary injunction analysis. Plaintiffs' motion for a preliminary injunction is denied.

## Conclusion

For the foregoing reasons, the Court denies Plaintiffs' motion for a preliminary injunction.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: May 22, 2025